RECEIVED

JUL 2 4 2015

DEBORAH S. HUNT, Clerk

Barbara Ellis
8293 South Huron River Drive
South Rockwood, MI 48179
July 20, 2015

Office of the Clerk
United States Court of Appeals for the Sixth Circuit
540 Potter Stewart Courthouse
100 E. Fifth Street
Cincinnati, Ohio 45202-3988
RE:  Case #15-1059

To the Court:`

This Pro Se Appellant submits the following issues to the Court for correction.  As the local rules require that Pro Se filings be on paper and this case requires a substantial amount of documentation, error has occurred in the public record on pacer.gov.

 While this could be handled verbally,  these issues are submitted in writing as the most efficient method of notifying all parties of this request.  The intent is simply accuracy for the benefit of all.

It should be noted that this list is not exhaustive and that any method of correction suggested is for the convenience of the court to be implemented at their discretion.  The Appellant is Pro Se and has no expectations as to what the court should or will do.

The Appellant submits that the listed text corrections to the Appellant Reply Brief became necessary because her word processing program is open source and has no legal dictionary.  At some point, given the length of the document and struggles with formatting and printing, the crash of spell and grammar check may have been inevitable.  The Appellant asks this court's forgiveness for these issues and asks that it consider and correct the attached errors.

### Issues with the record of Case# 15-1059 on pacer.gov

The Appellant submits that the following processing errors with the Appellant's Brief Exhibits as they obscure pertinent facts and cause Optical Character Recognition (OCR) blindness for electronic search programs:

| # | Doc | Pg | Issue | Suggestion | Replacement |
|---|-----|-----|-------|------------|-------------|
| 1 | 20-2 | 19 | Page is upside down, | Correct orientation | Attached |
| 2 | 20-2 | 157 | Post it obscuring pertinent text. | Replace page.  Matter of public record. | Attached |

The Appellant submits that the listed text corrections to the Appellant Reply Brief are requested necessary because her word processing program is open source and has no legal dictionary. At some point, given the length of the document and struggles with formatting and printing, perhaps the crash of spell and grammar check were inevitable. The Appellant asks this court's forgiveness for these issues and asks that, should the Appellee does not resubmit a revised Appellee Brief, that this correct the attached errors. Regardless of the Appellee's actions, the exhibits that are missing because the Exhibits for the Motion to Sanction were initially attached to the Appellant Reply Brief. There is no prejudice to the Appellee as they were served the complete Appellant Reply Brief with exhibits on 07/14/2015:

| # | Doc | Pg | Issue | Suggestion | Replacement |
|---|-----|-----|-------|------------|-------------|
| 3 | 24 | | ALL EXHIBITS MISSING Doc 25 exhibits were originally filed as Doc 24 exhibits | Add exhibits. | Attached |
| 3a | 24 | 10 para 1 | Exhibit reference omitted | ...this situation. (Ex. - B, "Obama's Foreclosure Relief Program Was Designed to Help Bankers, Not Homeowners") | Corrected page 10 attached |
| 4 | 24 | 16 para 1 | "promissory stopper" | "promissory estoppel" | Corrected page 16 attached. |
| 5 | 24 | 19 para 2 | Whereas a consumer mortgage would... | Whereas a consumer mortgage[r] would.. | Corrected page 19 attached. |
| 6 | 24 | 19 para 3 | Since both case ran somewhat concurrently, breach of the NMS on grounds relating to are not decided. | Since both case[s] ran somewhat concurrently, breach of the NMS on grounds relating to [Kim] are not decided. | Corrected page 19 attached. |
| 7 | 24 | 19 para 4 | "That this court read this decision and precedents carefully and see that this Appellee is conveniently missing precedent support for voiding this mortgage. | "That this court read this decision and precedents carefully and see that this Appellee is conveniently missing precedent support for [NOT] voiding this mortgage [foreclosure]. | Corrected page 19 attached. |
| 8 | 24 | 20 | The Appellee is again, doesn't | The Appellee again, doesn't... | Corrected page 20 attached. |

The Appellant submits that the following exhibit is improperly located in the Motion to Correct the Record - Master List.  Furthermore, there is no prejudice in any manner of correction to the Appellee because the document is present in the Exhibits, just not where referenced.  And, the Appellee has presented modification attempts to the court multiple times in the record without complaint of any deficiencies in or with the required hardship letter(s) necessary to process a modification or a foreclosure alternative.  Hence, even assuming they fail to locate this document under "B1", it is part of the Appellee's own records, so no prejudice can be claimed for correcting this in a manner that prevents relocating 71 following pages of exhibits from their initial position:

| # | Doc | Pg | Issue | Suggestion | Replacement |
|---|-----|----|-------|-----------|-------------|
| 9 | 26 | 21 | Item number 136 lists Exhibit location as D1 when the document is actually located at B1, page 42. | Replace with attached page with corrected location because as moving the document to "DI" will require RENUMBERING every page from 71 to 141 and may create confusion.  No Prejudice as the Appellee has this document as part of loan modification application and it is in Document 26 on page 43. | Corrected page 21 attached |

Thank you for your assistance in this matter.

Regards,

Barbara Ellis
Pro Se Appellant
Case# 15-1059

# CHASE ⬡

March 2, 2010

BARBARA A ELLIS
8293 HURON RIVER DR
SOUTH ROCKWOOD MI 48179

Dear  BARBARA A ELLIS

This letter is to confirm that **you have chosen to proceed with the Chase Pre-qualified Modification offer** and do not wish to be considered for a modification under the government's *Making Home Affordable* (MHA) program.

We are glad to be able to offer you a choice of products to provide you with assistance, and we hope that the information we provided to you on both programs was helpful to you in making your decision.

We do want to remind you one last time that while the MHA Program does require that you provide more documentation and enter into a three month trial period plan, it also has some unique financial benefits, including the possibility of earning up to $1,000 per year for five years if you keep your payments current.  Please remember that by electing the Chase offer, you are not disqualified from MHA program eligibility, although you would have to meet program guidelines if at any point you choose to apply.

We will begin the modification process and you will receive your application materials shortly.  If you have any questions, please don't hesitate to call us at 866-566-6459
Sincerely,

Henry S Langenfelder
Mod Counselor II

*#1*

*DOC 20-2*
*PAGE 19*
*UPSIDE DOWN*

about the availability of payment reduction options. The foregoing notwithstanding, Servicer shall have no obligation to solicit borrowers who are in bankruptcy.

2.  Servicer shall disclose and provide accurate information to borrowers relating to the qualification process and eligibility factors for loss mitigation programs.

3.  Servicer shall communicate, at the written request of the borrower, with the borrower's authorized representatives, including housing counselors. Servicer shall communicate with representatives from state attorneys general and financial regulatory agencies acting upon a written complaint filed by the borrower and forwarded by the state attorney general or financial regulatory agency to Servicer. When responding to the borrower regarding such complaint, Servicer shall include the applicable state attorney general on all correspondence with the borrower regarding such complaint.

4.  Servicer shall cease all collection efforts while the borrower (i) is making timely payments under a trial loan modification or (ii) has submitted a complete loan modification application, and a modification decision is pending. Notwithstanding the above, Servicer reserves the right to contact a borrower to gather required loss mitigation documentation or to assist a borrower with performance under a trial loan modification plan.

5.  Servicer shall consider partnering with third parties, including national chain retailers, and shall consider the use of select bank branches affiliated with Servicer, to set up programs to allow borrowers to copy, fax, scan, transmit by overnight delivery, or mail or email documents to Servicer free of charge.

6.  Within five business days after referral to foreclosure, the Servicer (including any attorney (or trustee) conducting foreclosure proceedings at the direction of the Servicer) shall send a written communication ("Post Referral to Foreclosure Solicitation Letter") to the borrower that includes clear language that:

    a.  The Servicer may have sent to the borrower one or more borrower solicitation communications;

    b.  The borrower can still be evaluated for alternatives to foreclosure even if he or she had previously shown no interest;

    c.  The borrower should contact the Servicer to obtain a loss mitigation application package;

    d.  The borrower must submit a loan modification application

A-24

in contract law that the party who introduces and attempts to profit from ambiguity bears the cost of the contract. When both parties are wrong, as in the a fore-mentioned case, then the costs are assigned to the party who can most afford it. In, JP Morgan Chase v. FDIC, it obviously was the U.S. Government. Here, it is J.P.Morgan Chase. Given that 9 out 10 ten modifications were denied and most likely resulted in full foreclosure, this super banks financial advantage, not logic is dictating this situation. (**Ex. - B**, "Obama's Foreclosure Relief Program Was Designed to Help Bankers, Not Homeowners")

## C. Plaintiff Filed This Lawsuit, Despite Her Stated Willingness to Let the Property Be Sold At A Sheriff's Sale.

Much of Plaintiff's Brief consists of fanciful allegations that Chase and Trustee conspired to harm her, because unspecified "actions were dictated by governing authorities."

This is a blatantly false statement as the Defendant references back to the original complaint and NOT the appellant brief and generalizes about "fanciful claims."

Again, the Defendant does not contest that Chase was running out the statute of limitation on the RESPA violations. It should be noted that Chase's intent for running out that statute did not become clear to the Plaintiff until after the foreclosure when the class action notice for Saccocci v. JP Morgan Chase Bank, N.A., Case No. 3-cv-21107-FAM. It should be noted that this is very first and only time Chase complied with the mortgage note's notice clause that states:

> Neither the Borrower nor the Lender my commence, join in, or be joint to any
> ~~dicial~~ action (as either and individual litigant or the member of a class) that arises
> ~~c~~party's actions pursuant to this Security Instrument or that allege that the
> breached any provision of, or any duty owed by reason of this Security
> such Borrower or Lender has notified the other party (with such notice
> ~~a~~nce with Section 15) of such alleged breach and afforded the other

#3
DOCUMENT 29
IS MISSING
ALL EXHIBITS
#3a — EXHIBIT
REFERENCE

10

# EXHIBIT "A"

# JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE

Tuesday, March 3, 2015

## U.S. Trustee Program Reaches $50 Million Settlement with JPMorgan Chase to Protect Homeowners in Bankruptcy

*Settlement Addresses Robo-Signing and Other Improper Practices in Bankruptcy Cases*

The Department of Justice's U.S. Trustee Program (USTP) has entered into a national settlement agreement with JPMorgan Chase Bank N.A. (Chase) requiring Chase to pay more than $50 million, including cash payments, mortgage loan credits and loan forgiveness, to over 25,000 homeowners who are or were in bankruptcy. Chase will also change internal operations and submit to oversight by an independent compliance reviewer. The proposed settlement has been filed in the U.S. Bankruptcy Court for the Eastern District of Michigan, where it is subject to court approval.

In the proposed settlement, Chase acknowledges that it filed in bankruptcy courts around the country more than 50,000 payment change notices that were improperly signed, under penalty of perjury, by persons who had not reviewed the accuracy of the notices. More than 25,000 notices were signed in the names of former employees or of employees who had nothing to do with reviewing the accuracy of the filings. The rest of the notices were signed by individuals employed by a third party vendor on matters unrelated to checking the accuracy of the filings.

Chase also acknowledges that it failed to file timely, accurate notices of mortgage payment changes and failed to provide timely, accurate escrow statements.

"It is shocking that the conduct admitted to by Chase in this settlement, including the filing of tens of thousands of documents in court that never had been reviewed by the people who attested to their accuracy, continued as long as it did," said Acting Associate Attorney General Stuart F. Delery. "Such unlawful and abusive banking practices can deprive American homeowners of a fair chance in the bankruptcy system, and we will not tolerate them."

"This settlement should signal once again to banks and mortgage servicers that they cannot continue to flout legal requirements, compromise the integrity of the bankruptcy system and abuse their customers in financial distress," said Director Cliff White of the U.S. Trustee Program. "It should be acknowledged that Chase responded to the U.S. Trustee's court actions by conducting an internal investigation and taking steps to mitigate harm to homeowners. But years after uncovering improper mortgage servicing practices and entering into court-ordered settlements to fix flawed systems, it is deeply disturbing that a major bank would still make improper court filings and fail to provide adequate and timely notices to homeowners about payments due. Other servicers should take note that the U.S. Trustee Program will continue to police their practices and will work to ensure that those who do not comply with bankruptcy law protections for homeowners will pay a price, just as Chase has done in this matter."

<u>Payments, Credits and Contributions of More Than $50 Million:</u>

In the proposed settlement, Chase agrees to provide payments, credits and contributions totaling more than $50 million:

- Chase will provide $22.4 million in credits and second lien forgiveness to about 400 homeowners who

received inaccurate payment increase notices during their bankruptcy cases.

- Chase will pay $10.8 million to more than 12,000 homeowners in bankruptcy through credits or refunds for payment increases or decreases that were not timely filed in bankruptcy court and noticed to the homeowners.

- Chase will pay $4.8 million to more than 18,000 homeowners who did not receive accurate and timely escrow statements.  This includes credits for taxes and insurance owed by the homeowners and paid by Chase during periods covered by escrow statements that were not timely filed and transmitted to homeowners.

- Chase will pay $4.9 million, through payment of approximately $600 per loan, to more than 8,000 homeowners whose escrow payments Chase may have applied in a manner inconsistent with escrow statements it provided to the homeowners.

- Chase will contribute $7.5 million to the American Bankruptcy Institute's endowment for financial education and support for the Credit Abuse Resistance Education Program.

Changes to Internal Operations: In the proposed settlement Chase also agrees to make necessary changes to its technology, policies, procedures, internal controls and other oversight systems to ensure that the problems identified in the settlement do not recur.

Oversight by Independent Reviewer: Amy Walsh, a partner with the law firm Morvillo LLP, has been selected to serve as independent reviewer to verify that Chase complies with the settlement order.  The independent reviewer will file public reports with the bankruptcy court.

No Effect on Additional Relief by Homeowners: This settlement does not affect the rights of any homeowners to seek any relief against Chase that they may deem appropriate.

Chase Contact Information: Homeowners with questions about the settlement may contact Chase at 866-451-2327.

The settlement is the culmination of actions taken by the U.S. Trustee Program in districts around the country concerning Chase's improper practices in bankruptcy cases, including robo-signing.  Director White commended the U.S. Trustee Program team in the field and headquarters who expertly identified, investigated, litigated and settled this matter, including Deputy Director and General Counsel Ramona Elliott, National Creditor Enforcement Coordinator Gail Geiger and Trial Attorneys Diarmuid Gorham and Kelley Callard.

The U.S. Trustee Program is the component of the Justice Department that protects the integrity of the bankruptcy system by overseeing case administration and litigating to enforce the bankruptcy laws.  The U.S. Trustee Program has 21 regions and 93 field office locations.

15-256

# EXHIBIT "B"





& company

Topics
Activism

Arts & Culture
Civil Liberties
Democracy & Government
Economy & Work
Environment
Faith & Reason
Health & Science
History
Inequality
Justice
Media
Money & Politics
Society
War & Peace
Video
Take Action
Guests
Shows

Search BillMoyers.com  🔍

SPOTLIGHT
The Fight to Vote
Trans-Pacific Partnership
Money & Politics
Climate Change
Economic Inequality
Bill's Essays
Morning Reads

ECONOMY & WORK

# Obama's Foreclosure Relief Program Was Designed to Help Bankers, Not Homeowners

February 14, 2015
by David Dayen

*This article appears in the Winter 2015 issue of* The American Prospect *magazine.*





(Photo: Fibonacci Blue/flickr CC 2.0)

*After her stroke, Alice Emile of Freeport, New York, wanted to die at home. On April 24, 2009, she passed away quietly at the age of 74. Her son Darrell Emile, executor of the estate, had to close the reverse mortgage she took out in 2006, which had passed into the hands of Bank of America.*

*A Bank of America representative told Emile he would receive a payoff document within six months, and have six additional months to determine the best way to settle the account. This is considered standard for reverse mortgage closings. But in October 2009, a bank representative claimed that they had never received word that Emile's mother had died (even though, by this time, the bank was addressing letters about the house to "the Estate of Alice Emile"). After Emile faxed Bank of America the death certificate, for what he says was the third time, the bank informed him that the account was in default.*

*Emile had the money to settle the mortgage, and would have had he simply received a payoff document. But Bank of America never delivered one, and they refused his offers to pay afterward, instead filing for foreclosure in May 2010. Since Emile cannot get a payoff document, he cannot sell the home, which is stuck in limbo awaiting completion of foreclosure. The estate did, however, benefit in April 2013 from the Independent Foreclosure Review, a Federal Reserve–led settlement designed to compensate homeowners for foreclosure errors. The check was for $300.*

Politicians, economists and commentators are debating the causes of the rise in inequality of income and wealth. But one primary cause is beyond debate: the housing collapse, and the government's failure to remedy the aftermath. According to economists Emmanuel Saez and Gabriel Zucman, the bottom 90 percent of Americans saw one-third of their wealth wiped out between 2007 and 2009, and there has been no recovery since. This makes sense, as a great deal of the wealth held by the middle and working classes, particularly among African-Americans and Hispanics, is in home equity, much of which evaporated after the bubble popped. The effects have been most severe in poor and working-class neighborhoods, where waves of foreclosure drove down property values, even on sound, well-financed homes. Absent a change in policy, Saez and Zucman warn, "all the gains in wealth democratization achieved during the New Deal and the postwar decades could be lost."

President Obama will carry several legacies into his final two years in office: a long-sought health

care reform, a fiscal stimulus that limited the impact of the Great Recession, a rapid civil rights advance for gay and lesbian Americans. But if Obama owns those triumphs, he must also own this tragedy: the dispossession of at least 5.2 million US homeowner families, the explosion of inequality, and the largest ruination of middle-class wealth in nearly a century. Though some policy failures can be blamed on Republican obstruction, it was within Obama's power to remedy this one — to ensure that a foreclosure crisis now in its eighth year would actually end, with relief for homeowners to rebuild wealth, and to preserve Americans' faith that their government will aid them in times of economic struggle.

Faced with numerous options to limit the foreclosure damage, the administration settled on a policy called HAMP, the Home Affordable Modification Program, which was entirely voluntary. Under HAMP, mortgage companies were given financial inducements to modify loans for at-risk borrowers, but the companies alone, not the government, made the decisions on whom to aid and whom to cast off.

In the end, HAMP helped only about one million homeowners in five years, when 10 million were at risk. The program arguably created more foreclosures than it stopped, as it put homeowners through a maze of deception designed mainly to maximize mortgage industry profits. More about how HAMP worked, or didn't, in a moment.

HAMP cannot be justified by the usual Obama-era logic, that it represented the best possible outcome in a captured Washington with Republican obstruction and supermajority hurdles. Before Obama's election, Congress specifically authorized the executive branch, through the $700 billion bank bailout known as TARP, to "prevent avoidable foreclosures." And Congress pointedly left the details up to the next president. Swing senators like Olympia Snowe (Maine), Ben Nelson (Nebraska) and Susan Collins (Maine) played no role in HAMP's design. It was entirely a product of the administration's economic team, working with the financial industry, so it represents the purest indication of how they prioritized the health of financial institutions over the lives of homeowners.

> "It's a terrible irony. This man who represents so much to people of color has presided over more wealth destruction of people of color than anyone in American history."

Obama and his administration must live with the consequences of that original sin, which contrasts with so many of the goals they claim to hold dear. "It's a terrible irony," said Damon Silvers, policy director and special counsel for the AFL-CIO, who served as deputy chair of the Congressional Oversight Panel for TARP. "This man who represents so much to people of color has presided over more wealth destruction of people of color than anyone in American history."

*Andrew Delany, a licensed carpenter from Ashburnham, Massachusetts, was diagnosed with a*

*spinal disorder a couple weeks before the financial crisis of September 2008. He immediately sought mortgage help, but his lender, Countrywide, told him to call back after the presidential election. By then, Delany had no savings left. "You do all the paperwork to get a HAMP or a HARP or a hope and some help," Delany says, referring to the government-sponsored programs for mortgage modifications. His letters to Countrywide, and then Bank of America after they purchased Countrywide, were often returned unopened.*

*Delany fought for three years, acting as his own lawyer because he could not afford one, before the bank was allowed to foreclose at the end of 2011. Bank of America then suddenly withdrew the foreclosure. The loan servicing got sold to a debt collector, who has refused to take Delany's calls. They could restart foreclosure on Delany at any time, but he's not leaving. "I have nothing to lose but my house," Delany says.*

The Obama administration legacy on housing policy began before he entered office. By the time of Lehman Brothers' failure in September 2008, defaults on subprime loans had spiked significantly. A critical mass of Democrats in Congress refused to agree to TARP unless some portion got devoted to keeping people in their homes. (The Obama Treasury Department would eventually devote $50 billion of TARP funds to this purpose, of which only $12.8 billion has been spent, more than five years later).

The most direct and effective policy solution to stop foreclosures is to allow bankruptcy judges to modify the terms of primary-residence mortgages, just as they can modify other debt contracts. This is known in the trade as "cramdown," because the judge has the ability to force down the value of the debt. The logic of bankruptcy law reduces debts that cannot be repaid in order to serve a broader economic interest, in this case enabling an underwater homeowner to keep the house. Liberal lawmakers believed the threat of cramdown would force lenders to the table, giving homeowners real opportunities for debt relief. Wall Street banks were so certain they would have to accept cramdown as a condition for the bailouts that they held meetings and conference calls to prepare for it.

But although then-Senator Obama endorsed cramdown on the campaign trail, he supported a bailout package that deferred the provision until after the elections. Donna Edwards, then a freshman congresswoman, received a personal commitment from candidate Obama that he would pursue cramdown at a later date, and it swung her vote for the bailout. On January 15, 2009, Obama's chief economic policy adviser, Larry Summers, wrote to convince Congress to release the second tranche of TARP funds, promising that the incoming administration would "commit $50-$100 billion to a sweeping effort to address the foreclosure crisis ... while also reforming our bankruptcy

Elder sent in paperwork six times, and on two occasions got firm agreements for a modification, but both agreements fell through. He has almost never talked to a human being at his mortgage servicer during the last five years.

laws." But the February 2009 stimulus package, another opportunity to legislate mortgage relief, did not include the bankruptcy remedy either; at the time, the new administration wanted a strong bipartisan vote for a fiscal rescue, and decided to neglect potentially divisive issues. Having squandered the must-pass bills to which it could have been attached, a cramdown amendment to a housing bill failed in April 2009, receiving only 45 Senate votes.

Senate Majority Whip Dick Durbin, who had offered the amendment, condemned Congress, declaring that the banks "frankly own the place." In fact, the administration had actively lobbied Congress against the best chances for cramdown's passage, and was not particularly supportive when it came up for a vote, worrying about the impacts on bank balance sheets. Former Treasury Secretary Timothy Geithner admitted in his recent book, "I didn't think cramdown was a particularly wise or effective strategy." In other words, to get the bailout money, the economic team effectively lied to Congress when it promised to support cramdown.

The administration's eventual program, HAMP, grew out of the banking industry's preferred alternative to cramdown, one where the industry, rather than bankruptcy judges, would control loan restructuring. Unfortunately, the program has been a success for bankers and a failure for most hard-pressed homeowners.

*In 2005, Hurricane Wilma blew down the auto repair shop that James Elder and his brother had owned for 25 years. He had just refinanced into a new mortgage on his home in West Palm Beach, Florida, weeks earlier, through National City Bank. A subsequent business failed in the wake of the Great Recession, and by January 2009, Elder had to default on his mortgage loan payments.*

*He tried to get a loan modification through HAMP when the program came out in March 2009, but National City (which would eventually be purchased by PNC Bank) "dual tracked" him. One division of the bank began foreclosure proceedings while another appeared to be negotiating the loan modification in good faith. Elder sent in paperwork six times, and on two occasions got firm agreements for a modification, but both agreements fell through. He has almost never talked to a human being at his mortgage servicer during the last five years.*

PNC voluntarily withdrew the case, and then re-filed it years later. Another hearing was pending as we went to press. "I don't know what the outcome will be; we're ready either way," Elder says. "I don't deny that I owed the money. All I wanted was a fair shake. Help never came for the homeowners."

In appreciating how HAMP failed homeowners, it's important to understand the role of "servicers." We're no





longer in the age of *It's a Wonderful Life*; your lender does not hold onto your mortgage anymore. During the housing bubble, most loans were sold to intermediaries, packaged into securities, and passed off to bond investors, such as pension funds. Servicers were hired to process monthly payments, handle day-to-day contact with homeowners, and distribute the proceeds along to the investors. Servicers also

Absentee Owned: In the crisis, there are too many repossessions, not enough refinancings. (AP Photo/David Zalubowski)

decide when to foreclose and when to modify loans, making them the key to HAMP's success.

Servicers, basically glorified accounts-receivable departments staffed by line-level workers making relatively low wages, can eke out a profit as long as they never need to perform any customer service. They had neither the expertise nor the resources to handle millions of individual requests, no matter how much money the Treasury offered them to modify loans. "There was no way HAMP could have worked on the scale that it would have needed to work," says Max Gardner, a bankruptcy lawyer and an expert on foreclosures. "You're trying to turn servicers into underwriters." From the first waves of the foreclosure crisis, it was clear that servicers had no capacity to fulfill this role.

The Treasury Department, which engineered HAMP, compounded the problem by making the program exceedingly complex, tweaking it on the fly with new rules and guidelines. This sprung from their consuming obsession with ensuring that only "worthy" borrowers received modifications, perhaps spurred on by Rick Santelli's proto–tea party rant against undeserving homebuyers. The preoccupation with moral hazard was targeted at homeowners instead of banks, creating overlapping income and asset double-checks to weed out the unworthy and placing more burdens on overstretched servicers.

Worse yet, servicers have their own financial incentives that run counter to the modest incentive payments in HAMP. Servicers make their money based on a percentage of unpaid principal balance on a loan. Forgiving principal — the most successful type of loan modification — eats into servicer profits, so servicers shy away from principal reduction, preferring less effective interest rate cuts. Plus, servicers collect structured fees — such as late fees — which make it profitable to keep a borrower delinquent. Even foreclosures don't hurt a servicer, because they make back their portion of fees in a foreclosure sale before the investors for whom they service the loan. The old manner of mortgage lending gave everyone a stake in keeping homeowners in their homes; now, the incentives are all mismatched.



If HAMP's goal was truly to prevent foreclosures, there is no good explanation for why the program operates the way it does. Servicers couldn't handle a minimal caseload, let alone a byzantine program. The incentive problems between loan owners and loan servicers were well known. But if HAMP

could give homeowners enough hope that they could save their home by making a few more payments, the Treasury could prevent outright defaults or deeper principal reductions from crashing the value of mortgage-backed bonds and derivatives, many of which were held by banks. So bank balance sheets, not homeowner fortunes, took priority.

Defending Lenders: HUD Secretary Shaun Donovan and Treasury Secretary Tim Geithner, with dissenter Sheila Bair of the FDIC. (AP Photo/Gerald Herbert)

HAMP defenders often cite the enormous complexity in the structure of mortgage ownership as a reason for the program's failure to deliver more relief to homeowners. But bank bailouts were just as difficult to negotiate, says Amir Sufi, professor of finance at the University of Chicago's Booth School of Business. "Those programs got done," Sufi says. "Programs to help homeowners never did."

Other officials found ways to manage mortgage relief. Former FDIC Chair Sheila Bair engineered a kind of dry run of HAMP in 2008, when her agency took over the failed subprime lender IndyMac. Needing to salvage a cascade of bad loans and prevent a foreclosure epidemic, Bair initiated a very different process. "Basically, we sent you a letter saying based on our records, we're giving you a new mortgage payment at 31 percent of your income," Bair says. "What you need to do is sign this form, give the first month's check, a W2, and the name of your employer. It's like a couple pages. Then you got your loan mod [modification]."

Servicers quickly discovered that they could game HAMP in their own interest, using it as a kind of predatory lending program. One tactic was to chronically lose borrowers' income documents to extend the default period.

The Treasury's HAMP design was infinitely more cumbersome, effectively sabotaging the program before it got started. "We would have helped unworthy borrowers, but did that matter at that point?" Bair asks. "We helped unworthy banks too."

Servicers quickly discovered that they could game HAMP in their own interest, using it as a kind of predatory lending program. One tactic was to chronically lose borrowers' income documents to extend the default period. "I'm doing a book now," Bair says, "and [in] almost every family I interviewed, servicers had lost their paperwork at least once." Prolonged "trial modifications" allowed servicers to rack up payments and late fees while advancing the foreclosure process behind the borrower's back. They could then trap the borrower after denying the modification, demanding back payments, missed interest, and late fees, using the threat of foreclosure as a hammer. "They created a situation where the borrower would start making the payments, end up not getting the modification, and still go into foreclosure," Bair says.

This pattern happened with disturbing regularity. According to a recent Government Accountability Office report, 64 percent of all applications for loan modifications were denied. Employees at Bank of America's mortgage servicing unit offered perhaps the most damning revelations into servicer conduct. In a class-action lawsuit, these employees testified that they were told to lie to homeowners, deliberately misplace their documents, and deny loan modifications without explaining why. For

their efforts, managers rewarded them with bonuses — in the form of Target gift cards — for pushing borrowers into foreclosure.

Because of all this, HAMP never came close to the three–four million modifications President Obama promised at its inception. As of August 2014, 1.4 million borrowers have obtained permanent loan modifications, but about 400,000 of them have already re-defaulted, a rate of about 30 percent. The oldest HAMP modifications have re-default rates as high as 46 percent. And HAMP modifications are temporary, with the interest rate reductions gradually rising after five years. The first rate resets began this year.

*Kim Thorpe, whom everyone knows as KT, answered her door one day to find the sheriff of Harrison, Maine, handing her foreclosure papers. "This has to be wrong, I just made the payment," Thorpe told him.*

*That was in March 2010. Citi Mortgage, which services the loan, has taken Thorpe to court on multiple occasions, but the servicer keeps voluntarily dismissing the cases before trial. Citi Mortgage continues to call Thorpe to collect a debt, which they claim has ballooned to $157,000. But Citi has never found the documents to prove standing to foreclose, which Thorpe never tires of telling them. "When they know that you don't fear them, you've taken away their power," she says.*

*Citi can still try to locate the proper documents and pursue foreclosure again. In the meantime, Thorpe is fighting stage three breast cancer. She and her husband have separated and their kids have moved out. "It's a house now, not a home," she says. But she continues to wait for the bank's next move.*

The cynical view is that HAMP worked exactly to the Treasury's liking. Both Senator Elizabeth Warren and former Special Inspector General for TARP Neil Barofsky revealed that then-Secretary Geithner told them HAMP's purpose was to "foam the runway" for the banks. In other words, it allowed banks to spread out eventual foreclosures and absorb them more slowly. Homeowners are the foam being steamrolled by a jumbo jet in that analogy, squeezed for as many payments as they can manage before losing their homes.

HAMP facilitated such a scheme perfectly. Giving discretion on modifications to mortgage servicers meant that they would make decisions in their own financial interest. No losses would be forced on the owners of the loans, and no principal forgiveness would be made mandatory. The system, by design, worked for financial institutions over homeowners.

The Obama administration "viewed foreclosures as an instrument of housing markets clearing,"

Damon Silvers says. "And they thought foreclosures were unavoidable, in order to maintain the fiction that these loans were worth what banks said on the balance sheet."

Silvers explains that only minimal taxpayer funds, far less than the total needed, were devoted to preventing foreclosures; banks never had to kick in their own share. "In order for the economy to be revived, we needed to write down the principal on these loans," he says. "The decision that was made amounted to debt peonage on U.S. families to the benefit of the banks."

Indeed, the administration missed or delayed several opportunities to provide relief and prevent foreclosures while also boosting the economy. During the 2008 presidential debates, John McCain proposed a $300 billion plan to buy up mortgages and renegotiate their terms, similar to the Depression-era Home Owner's Loan Corporation. There were also bipartisan calls for a mass refinancing program for underwater homeowners, which would save them billions in monthly payments. Ultimately, the administration never tried to buy mortgages (though plenty of hedge funds did), and their refinancing program didn't produce even its meager results until 2012, years after the crisis erupted.

Two critical moments perfectly illustrate the Treasury's priorities on HAMP and housing. First, the department laid out precise program guidelines — in a thick handbook — that banned many of the practices in which servicers engaged. But the Treasury never sanctioned a servicer for contractual non-compliance, and never clawed back a HAMP incentive payment, despite documented abuse. In the summer of 2011, the Treasury temporarily withheld incentive payments, but they would eventually hand over all the money. If the program had actually put borrowers first, they could have used sanctions to force better outcomes.

> Wells Fargo told him to stop paying so as to qualify for HAMP, but then used that default to file for foreclosure, sell the property to the bank itself, and set an eviction date.

Then, in October 2010, it was revealed that, in order to verify standing to foreclose, servicers forged and backdated assignments, and "robo-signed" affidavits attesting to their validity without any knowledge of the underlying loans. Almost immediately, the top five servicers paused their foreclosure operations. Nobody knew how much legal liability servicers had, but with state and federal law enforcement investigating and potentially trillions of dollars in mortgages affected, the numbers were expected to be high.

At the FDIC, Sheila Bair immediately saw this as an opportunity. "When robo-signing raised its ugly head, I sent a proposal to Tim [Geithner]," Bair says. "I called it a super-mod. Any loan that's more than 60 days delinquent, take it down to face value — just take it down. Write off that principal. And if they held onto the house and kept making their mortgage payment, any subsequent appreciation they would have had to share with the lenders. But just take it down."

But the Treasury didn't use this newfound leverage to force losses onto the banks. Instead, they were more concerned with a "global settlement" with bankers to defuse the issue, limit bank losses, and make the situation manageable for the perpetrators.

After a perfunctory investigation, state and federal officials reached an agreement with the top five servicers, called the National Mortgage Settlement. Despite claims that a million homeowners would get principal reductions as a result, in the end only 83,000 received such help. Other settlements for fraudulent conduct delivered no jail time, the payment of penalties with other people's money, empty promises to never misbehave again, and cash awards to victims that were so low some didn't even bother to cash the checks. The administration refused to use the leverage from bank mistakes to the benefit of borrowers, because they didn't want to hurt banks. "We were just seeing the world through two different prisms," Bair says.

*Mike Malleo of Manasquan, New Jersey, refinanced into an infamous "Pick-a-Pay" loan from World Savings Bank in 2005, which offered a low teaser rate. Years later, his late wife contracted stage four pancreatic cancer, and the subsequent medical bills, loss of wages and eventual reset of the interest rate made it impossible to afford the mortgage.*

*A settlement with the New Jersey attorney general over Pick-a-Pay mortgages entitled Malleo to a loan modification. But Malleo never received relief, despite applying on four separate occasions. Instead, Wells Fargo told him to stop paying so as to qualify for HAMP, but then used that default to file for foreclosure, sell the property to the bank itself, and set an eviction date of August 21, 2014.*

*Weeks before eviction, Malleo received a letter from Home Start Housing Center promising they could get him out of foreclosure. After submitting his information, Home Start sent him an offer—on Wells Fargo stationery — approving him for a HAMP modification with a lower monthly payment.*

*Malleo sent in his payment, but that day, two sheriffs and a moving truck came to evict him from the house. Wells Fargo claims to have never heard of Home Start. After initially insisting that Wells Fargo must accept the terms of the approved modification, days later Home Start returned his check and rescinded the offer. Malleo moved out of the house October 1. "The web of deceit is overwhelming," Malleo says. "The embarrassment, the disgrace that has occurred is amazing."*

We're still in a foreclosure crisis, five years after the technical end of the Great Recession. While leading indicators like delinquencies and foreclosure starts have fallen from their peak, they remain "at nearly three times the normal level," says Sam Khater, deputy chief economist at housing

specialist CoreLogic. More than 8.7 million homeowners remain underwater, with the borrower owing more than the home is worth, and more than half a million families will lose their homes this year under current trends. More troubling, delinquencies and foreclosure starts have inched back up in recent months. In August, analyst RealtyTrac found that foreclosure auctions increased for the first time in 44 months, and foreclosure filings in the third quarter of 2014 also jumped, breaking a three-year string of declines.

This new foreclosure activity is not concentrated in new loans, which have very low default rates. The problem is practically all legacy loans from bubble-era mortgages sold on houses that had unsustainably high prices and appraisals to people struggling with stagnant wages and financial insecurity. In other words, the crisis was never solved; it was deferred. In the coming years, two million loan modifications, including HAMP loans, will face higher interest rate resets, and 800,000 of those loans are underwater. Another foreclosure spike is a distinct possibility.

Banks have also decided to finally cut through their foreclosure backlog, after modest increases in the value of real estate made it more attractive to them to seize the homes. In Florida, money from the National Mortgage Settlement that is supposed to help borrowers instead funds foreclosure courts, which have a stated directive to dispose of cases and get to evictions, regardless of the history of lender abuses. "The courts have been corrupted and co-opted like we'd never imagine," says Matt Weidner, a foreclosure defense attorney in Tampa.

Mortgage servicers remain beset with the same scarce resources, wrongheaded financial incentives, and unprepared staffs. The Consumer Financial Protection Bureau recently released evidence of servicers violating new rules that the CFPB put in place in January 2014, including failure to execute loan modification agreements, incorrect reports to credit agencies, and misrepresentation of borrower options. In October, New York banking regulator Ben Lawsky found that mortgage servicer Ocwen backdated thousands of loan modification denial letters to avoid a 30-day appeal process (an old Bank of America trick).

Foreclosures before courts now often feature robo-witnesses, entry-level employees with no knowledge of the underlying loans, who come to court reading a script attesting to the veracity of the servicer's claims. "The biggest result of the robo-signing controversy has been to move it into the courtroom," says Thomas Ice, a Florida defense lawyer who exposed robo-signing in several depositions in 2010. "They don't give their signature, they just perjure themselves in court."

The persistent crisis, and the lack of sanctions for anyone responsible for misconduct, continues to weigh down the economy. As Amir Sufi and Atif Mian's groundbreaking research shows, consumer spending fell hardest in the areas where home prices dropped the most, particularly poor areas where people of color were preyed on by the subprime lending industry. More foreclosures fueled heavier price declines, creating a vicious cycle. The consequent destruction of wealth led to reduced demand from over-indebted borrowers, contributing to a pervasively weaker economic recovery.

And lower net worth means less consumption going forward, particularly in housing. "This permanent scar has been left on the middle class," Sufi says.

The Obama administration's most recent attempt at a solution is to loosen lending restrictions to jump-start the housing market. That trades financial instability for a short-term housing stimulus, and could put homeowners in significant peril. "Everyone's on board with allowing debt to build up during a boom," Sufi says, "but we now know afterwards, policymakers will leave people out to dry. You're going to suffer losses and not get any forgiveness."

Americans implicitly understand this. Household formation has been "disturbingly slow" since the Great Recession, says former Fannie Mae housing economist Tom Lawler. Homeownership rates have descended to 1995 levels, according to the Census Bureau, with the losses concentrated most in Generation X, which bore the full impact of the foreclosure crisis. Housing ordinarily leads an economic recovery — but not this one. Part of this weakness is caused by low income growth and depressed housing prices that feed on themselves. But there are psychological as well as economic scars from millions of foreclosures. Amid the carnage, people have naturally shied away from placing their wealth in a volatile asset like a home.

> Foreclosures before courts now often feature robo-witnesses, entry-level employees with no knowledge of the underlying loans, who come to court reading a script attesting to the veracity of the servicer's claims. "They don't give their signature, they just perjure themselves in court."

Perhaps the worst legacy of the failure to stop the crisis is the impact on trust in government itself. HAMP's predatory lending schemes reinforced the old Ronald Reagan dictum that the most dangerous words in the English language are "I'm from the government and I'm here to help." How do you tell families who signed up for an aid program that ended up actively harming them to ever believe in government again?

Particularly for a president like Obama, who entered office on a promise of activist government, with ardent backing from communities of color victimized by the crisis, the decision to protect banks over homeowners was debilitating. A tide of cynicism swept out Democrats in the last midterm elections, with voters more skeptical than ever that government can solve problems, or take the people's side over the financiers. Two-thirds of voters in exit polls found the economy to be rigged for the wealthy.

"The consequence of these decisions was the disillusionment of his base in believing that political action is going to work," says Damon Silvers. "They weakened the Obama presidency in ways he could never recover from."



**David Dayen** is a contributing writer to *Salon.com* and a weekly columnist for *The Fiscal Times*. His forthcoming book about foreclosures will be published by the The New Press. He tweets @ddayen.

**TOPICS:** Democracy & Government, Economy & Work, Inequality
**TAGS:** 2008 recession, bank of america, eviction, foreclosure, lending, widget

© 2015 Public Affairs Television, Inc. All rights
reserved.

II

# EXHIBIT "C"

# COMMENTS

## JUDGMENTS: FRAUD AS A BASIS FOR RELIEF IN FEDERAL COURTS FROM FINAL STATE COURT JUDGMENTS

FINAL JUDGMENTS frequently are not accorded the finality the term suggests, and their binding effect may be eviscerated in a number of ways.[1] In appropriate circumstances these judgments may be nullified either directly or collaterally, and occasionally may be attacked via a hybrid proceeding.[2] The following discussion assumes that a final state court judgment, valid on its face, is attacked in a federal court on the ground of fraud.[3] The purpose of this comment is to identify the fraudulent conduct for which a federal court will grant relief from a final state court judgment and to ascertain the scope of the relief which may be granted.

### THE EXTRINSIC-INTRINSIC DISTINCTION

It has generally been recognized that relief from a prior judgment will not be granted as a matter of course upon a mere showing

---

[1] The binding effect of judgments may be avoided by: a new trial; altering, amending or vacating the judgment; moving for judgment notwithstanding the verdict; appeal; setting aside for mistake, inadvertance, surprise, excusable neglect, newly discovered evidence, or fraud; or enjoining enforcement. See FED. R. CIV. P. 60(b); 3 FREEMAN, JUDGMENTS § 1178 (5th ed. 1925).

[2] "A direct attack on a judgment is an attempt to avoid or correct it in some manner provided by law, in a proceeding instituted for that very purpose . . . . [I]f the action or proceeding has an independent purpose and contemplates some other relief or result, although the overturning of the judgment may be important or even necessary to its success, then the attack on the judgment is collateral." 49 C.J.S. *Judgments* § 408 (1947).

One commentator has asserted that an independent action in equity to enjoin the enforcement of a valid judgment is not exactly a collateral or a direct attack, but might be termed an indirect attack because "the action recognizes that the judgment is valid, but seeks to establish certain conduct or matter that renders the enforcement of the valid judgment inequitable." 7 MOORE, FEDERAL PRACTICE ¶ 60.25[2] & n.16 (2d ed. 1955) [hereinafter cited as MOORE].

[3] Such assumptions ignore the difficult problems which are encountered in proceedings attacking prior judgments which arise from the determination of whether the prior judgment is or is not final; the record is complete and/or correct on its face; the tribunal was competent to hear the issue presented; the court had jurisdiction over the parties and the subject matter; the court was competent to render the judgment given; and the citizenship of the parties and the amount in controversy is appropriate to establish federal jurisdiction.

For an analysis of some of the current problems and well-reasoned suggestions for improvements in the law regarding attacks on final judgments see Comment, 66 YALE L.J. 526, 541-42 (1957).

of the existence of fraud.[4] This reluctance apparently is an outgrowth of the doctrine of res judicata,[5] which precludes repeated litigation on the same issue by the same parties. In *United States v. Throckmorton*[6] the Supreme Court laid down the general rule for granting relief from prior final judgments on the ground of fraud. The Court there was concerned with an attempt to avoid the effect of a final judgment on the ground that the judgment had been based in part on a forged document which had been admitted as evidence. In denying relief, the Court acknowledged that extrinsic or collateral fraud which prevented a losing party from fully presenting his case so that no real contest occurred would be sufficient to set aside a prior judgment, but held that fraud as to any matter which was actually presented and considered in the judgment assailed would be insufficient to support the attacking action.[7]

The fundamental basis for the Court's distinction appears to be in accord with the principle that a final judgment concludes all matters presented or necessarily considered in reaching the decision.[8] Thus the *Throckmorton* case established an extrinsic-intrinsic dichotomy which allowed relief from a fraudulently obtained judgment only in situations where the doctrine of res judicata

[4] *E.g.,* 7 MOORE ¶ 60.37[1] nn.38 & 39.

[5] For a comprehensive discussion of the doctrine of res judicata, see 2 FREEMAN, JUDGMENTS ch. XI (5th ed. 1925), wherein the author states: "When a matter is once adjudicated, it is conclusively determined as between the same parties and their privies; and this determination is binding as an estoppel, in all other actions, whether commenced before or after the action in which the adjudication was made." *Id.* § 670 at 1413-14.

[6] 98 U.S. 61 (1878).

[7] "But there is an admitted exception to this general rule [that an issue once litigated to a final judgment will bar subsequent litigation on the same issue] in cases where, by reason of something done by the successful party to a suit, there was in fact no adversary trial or decision of the issue in the case. Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practised on him by his opponent . . . which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and fair hearing. . . . On the other hand, the doctrine is equally well settled that the court will not set aside a judgment because it was founded on a fraudulent instrument, or perjured evidence, *or for any matter which was actually presented and considered in the judgment assailed.* . . . [T]he acts for which a court of equity will on account of fraud set aside or annul a judgment or decree, between the same parties, rendered by a court of competent jurisdiction, have relation to frauds, *extrinsic or collateral,* to the matter tried by the first court, and *not* to a fraud in the matter on which the decree was rendered." *Id.* at 65-66, 68.   (Emphasis added.)

[8] See note 5 *supra.*

would not be violated. This concept has been expressly adopted in twenty-nine jurisdictions.[9]

In the subsequent case of *Toledo Scale Co. v. Computing Scale Co.*,[10] the Supreme Court failed to follow the extrinsic-intrinsic dichotomy established in *Throckmorton* and added a duplicitous category. In denying an injunction against enforcement of a prior judgment on asserted fraudulent grounds, the Court stated that an application of the extrinsic-intrinsic distinction was superfluous unless it was first found that the fraud charged prevented the complaining party from making a full and fair defense.[11] Professor Moore, relying on a phalanx of authority, states that fraudulent conduct which prevents a party from fairly and fully presenting his claims or defenses is extrinsic fraud.[12] It therefore appears that the Court in *Toledo Scale Co.*, despite its refusal to apply the extrinsic or intrinsic labels, was actually following the *Throckmorton* distinction by predicating relief on a finding that the fraud charged prevented the presentation of a valid defense.

It has also been asserted that a position contrary to that of the Court in the *Throckmorton* case was taken when a similar question arose in *Marshall v. Holmes.*[13] Referring to these two cases, one writer has stated:

> The Supreme Court of the United States, to show its utter impartiality, has ruled both ways, and left the spectacle of two cases, one of which holds that false evidence is a ground for reversal, the other that it is not, both of which have been followed, and neither of which has ever been overruled.[14]

---

[9] Ariz., Ark., Cal., Ga., Idaho, Iowa, Ind., Kan., Ky., La., Md., Mich., Minn., Miss., Mo., Nev., N.J., N.M., N.Y., N.C., N.D., Ohio, Okla., Pa., S.D., Tenn., Tex., Utah, and Wash. See authorities cited note 4 *supra*; 49 C.J.S. *Judgments* § 269 n.3 (1947); 7 Moore ¶ 60.37[1] nn.38 & 39.

[10] 261 U.S. 399 (1923).

[11] "We do not find ourselves obliged to enter upon a consideration of the sometimes nice distinctions made between intrinsic and extrinsic frauds in the application of the rule, because in any case to justify setting aside a decree for fraud whether extrinsic or intrinsic, it must appear that the fraud charged really prevented the party complaining from making a full and fair defense. If it does not so appear, then proof of the ultimate fact, to wit, that the decree was obtained by fraud, fails." *Id.* at 421.

[12] "Fraud is extrinsic where a party is prevented by trick, artifice or other fraudulent conduct from fairly presenting his claim or defenses or introducing relevant and material evidence." 7 Moore ¶ 60.37[1] & n.17.

[13] 141 U.S. 589 (1891).

[14] Note, *Fraud as a Basis for Setting Aside a Judgment*, 21 Colum. L. Rev. 268, 269 (1921).

The distinction made in the above quotation occasionally has been accepted to mean that the Supreme Court has taken opposing positions on the validity of the extrinsic-intrinsic dichotomy.[15] Such an interpretation appears patently erroneous for two reasons. First, assuming that these two decisions are incompatible, the conflict is not in regard to the validity of the extrinsic-intrinsic distinction, but to the application of the distinction to a particular set of facts: whether forged evidence admitted in the prior action is extrinsic or intrinsic fraud on the party against whom it was used.[16] Secondly, it is by no means clear that the Court in *Marshall v. Holmes* held forged evidence to be extrinsic fraud. What the Court did hold was that a state court could not properly deny removal of a proceeding from a state court to a federal court if the general nature of the proceeding for which removal was sought was one of which the federal courts could rightfully take cognizance. The Court regarded an action to set aside a judgment in which the losing party had been fraudulently prevented from asserting a valid defense as being in the general nature of a proceeding of which a federal court could rightfully take cognizance under its equity power. Without passing on the merits of whether a forged instrument was or was not the type of fraud for which relief would be granted, the Court held, that once the general nature of the action was found to be within the cognizance of the federal court, it was for the federal court, not the state court, to determine whether the plaintiff was entitled to relief.[17]

As a result of these and other statements attributing opposing positions to the Court in the *Throckmorton* and *Marshall* decisions the validity of the extrinsic-intrinsic dichotomy is uncertain.[18] The

[15] See Note, *Relief in Federal Courts Against State Judgments Obtained by Fraud,* 54 YALE L.J. 687, 693 n.20 (1945), and authorities cited therein.

[16] In the *Throckmorton* case the plaintiff sought to have a prior judgment set aside on the ground that it had been obtained through the admission into evidence of a forged deed; in *Marshall v. Holmes* the plaintiff sought to set aside the prior judgment on the ground that a letter authorizing her agent to contract for her, on which denial of recovery in the prior action was based, was a forgery.

[17] "The suit being, in its general nature, one of which the Circuit Court of the United States could rightfully take cognizance, it was for that court, after the cause was docketed there, and upon final hearing, to determine whether, under the allegations and proof, a case was made which, according to the established principles of equity, entitled [plaintiff] to protection against the judgments alleged to have been fraudulently obtained." 141 U.S. at 601.

[18] *E.g.,* Chicago, R. I. & P. Ry. v. Callicotte, 267 Fed. 799 (8th Cir. 1920); Laun v. Kipp, 155 Wis. 347, 145 N.W. 183 (1914); Boring v. Ott, 138 Wis. 260, 119 N.W. 865 (1909). See 3 BARRON & HOLTZOFF, FEDERAL PRACTICE AND PROCEDURE § 1331 (rev ed. 1960) [hereinafter cited as BARRON & HOLTZOFF]; 3 FREEMAN, JUDGMENTS § 1233 (5th ed. 1925); Annot., 88 A.L.R. 1201 (1934).

thrust of the decisions, however, appears to be aimed at creating a distinction which does not prostitute the res judicata doctrine. It may therefore be concluded, regardless of the application of the intrinsic label, that where the asserted fraud was considered or presented in the prior action, it will be an insufficient basis upon which to grant relief from the prior judgment.

The converse, however, does not necessarily follow. The mere fact that the issue of fraud presented in the attacking action was not, and could not have been, litigated in the prior action does not conclusively establish a right to relief.[19]  As an independent action to obtain relief from a prior judgment is limited to an equitable proceeding,[20] relief will be granted only in accordance with general equitable principles.  Consequently, even in situations where the doctrine of res judicata would not bar the subsequent judicial determination of the issue of fraud, courts nevertheless have refused relief under general equitable principles in cases where the disclosure of fraudulently concealed documents would not have changed the result,[21] where the fraud did not prevent the presentation of a good defense,[22] where the fraud would have been discovered but for the negligence of the complaining party,[23] where the fraud caused no injury,[24] or where the complaining party delayed an unreasonable length of time after discovering, or after he should have discovered, the fraud.[25]

## THE SCOPE OF RELIEF

### Requirement for Independent Proceeding

It is well settled that in appropriate cases the federal courts may grant relief from prior judgments obtained by fraud.[26]  When the judgment being attacked was rendered by a state court rather than another federal court, relief may be had only in an independent action which attacks the prior decree.  This doctrine was clearly enunciated by the Supreme Court in *Barrow v. Hunton*.[27]  In pass-

[19] See note 72 *infra*.
[20] See notes 33 & 34 *infra*.
[21] Kithcart v. Metropolitan Life Ins. Co., 119 F.2d 497 (8th Cir. 1941).
[22] Crim v. Handley, 94 U.S. 652 (1876).
[23] Sorenson v. Sutherland, 109 F.2d 714 (2d Cir. 1940).
[24] Annot., 113 A.L.R. 1235 (1938), and authorities cited therein.
[25] Grubb v. Public Util. Comm'n, 281 U.S. 470 (1930).
[26] Marine Ins. Co. v. Hodgson, 11 U.S. (7 Cranch) 332 (1813). See note 33 *infra* and accompanying text.
[27] 99 U.S. 80 (1878).

ing on the legality of removing to a federal court an action which attacked a prior state court judgment for fraud, Mr. Justice Bradley stated that a United States court could not properly entertain jurisdiction of a proceeding so connected with the original suit as to form an incident to it or a substantial continuation of it, but that an original or independent proceeding to set aside a decree for fraud might be within the cognizance of the federal court.[28]

Following this doctrine, the Supreme Court and the lower federal courts have repeatedly and consistently held that the federal courts cannot sit in review of state court judgments, but may prevent a party from benefiting from his fraudulently obtained judgment only in an independent equitable proceeding.[29]  This limitation of seeking relief via an independent action rather than an ancillary or supplementary proceeding presumably would require the re-enactment of all steps necessary to institute an original action.  Process must be served and jurisdiction over the parties and the subject matter must be re-established.[30]

The requirement for an independent proceeding may create additional complications when the attacking action is first brought in the same tribunal, or a court of review of the same tribunal, which rendered the judgment being attacked, and thereafter is attempted to be removed to a federal court.  A determination that the attacking action which is sought to be removed was brought as an original or independent action will be necessary to properly sustain the removal. This frequently may be difficult because of the fact that the tribunal from which removal is sought may be appropriate to hear either a supplementary or an independent attack on the decree which is to be vitiated.[31]

---

[28] "If the proceeding is merely tantamount to the common-law practice of moving to set aside a judgment for irregularity, or to a writ of error, or to a bill of review or an appeal it would belong to [the category of a supplementary proceeding so connected with the original suit as to form an incident to it, and substantially a continuation of it], and the United States court could not properly entertain jurisdiction of the case. . . .  On the other hand, if the proceedings are tantamount to a bill in equity to set aside a decree for fraud in the obtaining thereof, then they constitute an original and independent proceeding, and . . . the case might be within the cognizance of the Federal courts." *Id.* at 82-83.

[29] *E.g.,* Simon v. Southern Ry., 236 U.S. 115 (1915); Howard v. DeCordova, 177 U.S. 609 (1900); Gaines v. Fuentes, 92 U.S. 10 (1875); Dulien Steel Prods., Inc. v. Connell, 252 F.2d 556 (5th Cir. 1958); and United States v. Mashunkshey, 72 F.2d 847 (10th Cir. 1934).

[30] See generally 1 BARRON & HOLTZOFF, §§ 21-70.

[31] See generally 7 MOORE ¶ 60.39[1].

### Restriction to Equitable Relief

In 1813, the Supreme Court adopted the principle, derived from an early anonymous English case,[32] that an independent action to obtain relief from a prior judgment is an equitable proceeding.[33] The consistent pronouncements of the federal courts since that time have indicated that the principle of restricting the relief which a federal court may grant from a final state court judgment to equitable remedies and denying any action on the prior judgment directly has been accepted without opposition.[34]

The requirements which should exist before a federal court will exercise its equity power to prevent a successful party from utilizing a prior final judgment were succinctly stated in *National Surety Co. v. State Bank*:[35]

The indispensable elements of such a cause of action are (1) a judgment which ought not, in good conscience, to be enforced; (2) a good defense to the alleged cause of action on which the judgment is founded; (3) fraud, accident or mistake which prevented the defendant in the judgment from obtaining the benefit of his defense; (4) the absence of fault or negligence on the part of the defendant; and (5) the absence of any adequate remedy at law.[36]

This power of the federal courts appears to be expressly recognized in rule 60(b) of the Federal Rules of Civil Procedure, which states in part:

---

[32] Anonymous, Litt. 37, 124 Eng. Rep. 124 (Ex. 1626). "If a judgment be given in an action at common law, the Chancellor may not alter or meddle with the judgment, but he may proceed against the person for corrupt conscience, because he takes advantage of the law against conscience." *Ibid.* Translated and quoted in English in 7 MOORE ¶ 60.36, at 601.

[33] Marine Ins. Co. v. Hodgson, 11 U.S. (7 Cranch) 332 (1813). "Without attempting to draw any precise line to which courts of equity will advance, and which they cannot pass, in restraining parties from availing themselves of judgments obtained at law, it may safely be said, that any fact which clearly proves it to be against conscience to execute a judgment, and of which the injured party could not have availed himself in a court of law; or of which he might have availed himself at law, but was prevented by fraud or accident, unmixed with any fault or negligence in himself or his agents, will justify an application to a court of chancery.

"On the other hand, it may with equal safety be laid down as a general rule, that a defence cannot be set up in equity, which has been fully and fairly tried at law, although it may be the opinion of that court, that the defence ought to have been sustained at law." *Id.* at 336.

[34] See, *e.g.*, West Virginia Oil & Gas Co. v. George E. Breece Lumber Co., 213 F.2d 702 (5th Cir. 1954); McSherry Mfg. Co. v. Dowagiac Mfg. Co., 160 Fed. 948 (6th Cir.), *cert. denied*, 214 U.S. 512 (1908); Sayers v. Burkhardt, 85 Fed. 246 (4th Cir. 1898), *cert. denied*, 172 U.S. 649 (1899).

[35] 120 Fed. 593 (8th Cir. 1903).

[36] *Id.* at 599.

This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding . . . .[37]

## THE APPLICABLE LAW

The third significant consideration as to relief available in the federal courts from a prior final state court judgment evolves from the doctrine of *Erie R.R. v. Tompkins*,[38] which directs that matters of substance, which are distinguished from matters of procedure, be determined by state law rather than federal law in diversity cases. In many proceedings attacking final state court judgments, the selection of the applicable law will be a moot problem because of the substantially similar results that would be reached under both sets of rules. However, the determination of the applicable law will not always be merely a theoretical problem,[39] and in such situations the resolution of this question may well determine the right to relief. It therefore is essential to determine whether federal law or state law is applicable to such attacks.

It has frequently been indicated that the right to attack a prior state court judgment for fraud in an independent action is a substantive question,[40] and therefore is controlled by state law. On the other hand, it has been asserted[41] that the *Erie* doctrine is not applicable in independent actions attacking prior final judgments, on the ground that such attacks are matters of procedure. For example, in *Griffith v. Bank of New York*,[42] in reversing the dismissal of an independent attack on a prior New York state court judgment,[43] Judge Clark of the Court of Appeals for the Second Circuit, without citing any substantiating authority, stated:

But since the matters here involved are procedural, the doctrine of Erie R. Co. v. Tompkins [citations omitted] is not involved.[44]

---

[37] FED. R. CIV. P. 60(b). See 3 BARRON & HOLTZOFF § 1331.
[38] 304 U.S. 64 (1938). See 7 MOORE ¶ 60.37[3].
[39] See, e.g., Griffith v. Bank of New York, 147 F.2d 899 (2d Cir. 1945); Laun v. Kipp, 155 Wis. 347, 145 N.W. 183 (1914).
[40] For example, in O'Boyle v. Bevil, 259 F.2d 506 (5th Cir. 1958), Judge Tuttle, speaking for the Court of Appeals, stated: "Questions as to the setting aside of judgments are difficult at best. This difficulty is increased when attack is made in a federal court on a state court judgment. There is one principle, however, that stands out clearly in this area of controversy. That is that in diversity cases, a federal court may set aside a state court judgment for equitable grounds that are recognized by the state as a basis for such action." *Id.* at 511-12.
[41] See Note, 54 YALE L.J. 687 nn.20 & 25 (1945), and authorities cited therein.
[42] 147 F.2d 899 (2d Cir. 1945).
[43] Bank of New York v. Kaufman, 26 N.Y.S.2d 474 (Sup. Ct. 1940), *aff'd,* 261 App. Div. 818, 25 N.Y.S.2d 408 (1941).
[44] 147 F.2d at 904.

The weight of authority and the better reasoning seem to support the view that *Erie* requires the federal courts to grant or withhold relief in accordance with state law to avoid the spectacle of different results in the same state depending on whether the independent action is brought in a state or federal court.[45]  This reasoning coincides with the concept that the essential purpose of diversity jurisdiction in the federal courts is to provide another forum to determine the rights of the parties—not to create another body of law.[46]

The real character of the action to establish fraud is more clearly revealed by tracing the chain of consequences to its ultimate conclusion.  The immediate purpose of the attacking action is to show fraud; the essential purpose of showing fraud is not to avoid the prior judgment, but rather to establish why an offense or defense which would have changed the allocation of rights in the previous action, was not then presented.  Thus the showing of fraud does nothing more than provide the justification for admitting additional evidence after the conclusion of the prior proceeding.[47]  It may properly be said that the admission of evidence is a matter of procedure; however, the rules of admission and exclusion which operate to completely bar recovery in a suit brought in a state court bear vitally and not formally or negligibly on the state's policy regarding finality of local judgments.[48]  The determination which must be

---

[45] See Guaranty Trust Co. v. York, 326 U.S. 99 (1945); 7 Moore ¶ 60.37[3] at 633-34.

[46] "Diversity jurisdiction is founded on assurance to non-resident litigants of courts free from susceptibility to potential local bias. The Framers of the Constitution, according to Marshall, entertained 'apprehensions' lest distant suitors be subjected to local bias in State courts, or, at least, viewed with 'indulgence the possible fears and apprehensions' of such suitors. . . . And so Congress afforded out-of-State litigants another tribunal, not another body of law." Guaranty Trust Co. v. York, 326 U.S. 99, 111-12 (1945). *Cf.* Byrd v. Blue Ridge Rural Elec. Co-op., Inc., 356 U.S. 525, 536-39 (1958).

[47] The mere showing of fraud does not entitle the complaining party to relief; it only entitles him to show that the previously adjudicated rights would have been allocated differently but for the fraud. Without first showing fraud (or other similar grounds for relief not considered herein) in the prior action, the complaining party will not be permitted to demonstrate that the prior allocation of rights should be changed by introducing additional evidence of injury, a valid defense. See note 72 *infra.*

[48] "The nub of the policy that underlies *Erie R. Co. v. Tompkins* is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away should not lead to a substantially different result. . . . Plainly enough, a statute that would completely bar recovery in a suit if brought in a State court bears on a State-created right vitally and not merely formally or negligibly. As to consequences that so intimately affect recovery or non-recovery a federal court in a diversity case should follow State law." Guaranty Trust Co. v. York, 326 U.S. 99, 109-10 (1945).

made in the context here considered is whether state or federal law shall prescribe the factors sufficient to disturb the finality of a state court's judgment.

It is submitted that *Erie requires* the federal courts to apply state law in a proceeding attacking a final state court judgment. When a state establishes limits within which a person may avoid the effect of a final decree of a state tribunal, absent contrary expression, relief beyond the specified limits is precluded by negative implication. A refusal by the federal courts to abide by these specified limits effectively creates additional rights and remedies to those granted by the state.[49] Recognizing that such a result would be contrary to the purpose of diversity jurisdiction,[50] the Supreme Court has held that the federal courts cannot grant relief to litigants when relief is barred in the state courts by statutes of limitations,[51] contributory negligence,[52] failure to meet a burden of proof,[53] and local applications of conflict of laws rules.[54] Therefore, when a state creates a right to recover and then limits that right, either directly by refusing to allow an action to be brought after the lapse of a certain period of time, or impliedly by requiring the existence of certain conditions[55] —for example the presence of extrinsic fraud—it seems clear that federal courts in diversity cases should follow state law.

Moreover, the arguments advanced in favor of applying federal law to independent actions seeking to set aside prior judgments for fraud are cursory and appear to be superficial. One commentator, for example, reasoned that the extrinsic-intrinsic dichotomy was procedural because it was used as a device for effecting the distribution of the power of review of judgments among various courts.[56]

---

[49] Where state law allows relief from final judgments only where extrinsic fraud is present, clearly the federal courts will be creating a new basis for relief if they permit the prior judgment to be set aside on a showing of intrinsic fraud only. On the other hand, a refusal to abrogate the binding effect of a final judgment upon a showing of intrinsic fraud when state law specifies that any fraud is sufficient to avoid a prior judgment is similarly creating an additional right to the victorious party in the prior action. This seems contrary to the Supreme Court's statement of the purpose of diversity jurisdiction of the federal courts. See note 46 *supra.*

[50] *Ibid.*

[51] Guaranty Trust Co. v. York, 326 U.S. 99 (1945).

[52] Palmer v. Hoffman, 318 U.S. 109 (1943).

[53] Cities Service Oil Co. v. Dunlap, 308 U.S. 208 (1939).

[54] Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941).

[55] See note 49 *supra.*

[56] Note, *Relief in Federal Courts Against State Judgments Obtained by Fraud,* 54 YALE L.J. 687, 693-94 (1945). This reasoning developed as a result of the writer's attempt to justify the remark of Judge Clark in *Griffith v. Bank of New York* that

His conclusion appears to be based on the assumptions that intrinsic fraud excludes review by a *different* tribunal by limiting such an attack within the framework of the original action and its ancillary proceedings, and that extrinsic fraud excludes review by the *same* tribunal because such an attack is an independent, rather than an ancillary or supplementary, proceeding.[57]  To the contrary, some states require that *all* direct attacks on prior judgments be brought in the same court which rendered the judgment.[58]  The acknowledgment that intrinsic fraud limits review to an ancillary or supplementary proceeding is itself a recognition that intrinsic fraud will not support an independent action for relief from a prior judgment. The corollary to this acknowledgment obviously is that extrinsic fraud *will* support the independent action.  The writer's reasoning appears to ignore this fundamental basis for the distinction—that extrinsic fraud will support an independent action while intrinsic fraud will not—and seems to assume that relief from a final judgment for intrinsic fraud is denied because the distinction limits him to courts which may properly hear ancillary or supplementary proceedings.  It is submitted that it is the determination of the right to relief which requires the application of state law and that the ascertainment of a proper court to hear the action is merely a collateral matter following the initial determination.

The same commentator asserted that as a result of *Marshall v.*

such attacks were not covered by the *Erie* doctrine because they were matters of procedure. 147 F.2d 899 at 904 (2d Cir. 1945).

[57] "This view [that the necessary fraud for setting aside prior judgments is a matter of procedure] gains support from the fact that the right to seek review of a judgment generally depends on whether the injured party had the opportunity of bringing before the court in the original action the facts and issues that constitute fraud. If he had, the policy of avoiding relitigation would generally cause the review to be limited by the framework of the original action and its ancillary proceedings, excluding any action before a different tribunal; the latter would be appropriate only when the fraud itself prevented the litigant from fairly presenting the facts in his favor to the original court. Consequently, the classification of fraud resolves itself into a determination of which court is the proper one for the case to be brought in, and the dichotomy between 'intrinsic' and 'extrinsic' fraud becomes a device for effecting a distribution of the power of review over judgments." Note, 54 YALE L.J. 687, 693 (1945).

[58] See, *e.g.*, Duncan Coffee Co. v. Wilson, 139 S.W.2d 327 (Tex. Civ. App. 1940), where the court held that a direct attack on a final judgment rendered in a Texas court could be brought only in the same court which rendered the judgment being attacked; and an action otherwise qualifying as a direct attack, but brought in a different court will be considered collateral rather than direct. For a general discussion of the Texas rule see Hodges, *Collateral Attacks on Judgments* (pts. 1-2), 41 TEXAS L. REV. 163, 499 (1962-1963).

*DUKE LAW JOURNAL* [Vol. 1964: 109

*Holmes*[59] the Supreme Court was committed to a rejection of the extrinsic-intrinsic dichotomy.[60] Consequently, an incongruous situation is presented from which the author provides no escape: The extrinsic-intrinsic distinction is a matter of procedure under state law because the distinction is used to allocate the power of review. Since it is a procedural matter, federal law rather than state law is applicable. Under federal law, however, the distinction is not used to allocate the power of review, which is the only basis for defining it as procedural, because federal law does not recognize the distinction. Therefore, under federal law the assertion of fraud must be substantive, which requires the application of state law in diversity cases.

## CONCLUSION

A federal court may, in appropriate cases[61] where it has jurisdiction as a result of diversity of citizenship, grant relief from a prior final judgment of a state court. The better view, under the *Erie* doctrine, is that in diversity cases where there is no federal question involved,[62] a federal court may grant relief if the proceeding had been brought in the proper state court. This view is based on the theory that the diversity jurisdiction of the federal courts is merely to provide another tribunal for the settlement of contested rights and is not to create another body of law within a state.[63] Therefore, to grant relief in a federal court when no similar relief is available

---

[59] 141 U.S. 589 (1891). See notes 16 & 17 *supra* and accompanying text.

[60] Note, 54 YALE L.J. 687 n.20 (1945).

[61] See discussion accompanying note 3 *supra*.

[62] Closely related to the problem here under consideration is a question of federal constitutional law which must be distinguished. The problem arises from the "due process of law" requirement of the fourteenth amendment and is found in situations where the judgment being attacked is void rather than voidable. Where, for example, the prior court had no jurisdiction of the parties or the subject matter, the action attacking that judgment may properly be brought in the federal courts without regard to state law. In such situations, however, the proceeding has substantially changed from a diversity case to a federal question case.

For a discussion of, and suggested solutions to, some of the problems raised by applying the void-voidable distinction to direct and collateral attacks see Comment, 66 YALE L.J. 526 (1957). See Daniels v. Thomas, 225 F.2d 795 (10th Cir. 1955), where the court of appeals stated: "It is a principle as old as our dual state and federal judicial systems that a federal court is without jurisdiction to interfere with a judgment in a state court action in which the state court had jurisdiction of the subject matter and the parties thereto. It is only when the judgment of a state court is void either because that court lacked jurisdiction of the subject matter or of the parties to the action, or because it entered a judgment which it had no power to enter under the law, that such judgment may be reviewed in a federal court." *Id.* at 797.

[63] See note 46 *supra*.

Case: 15-1059     Document: 30     Filed: 07/24/2015     Page: 37

in the state courts would abrogate this rule and effectively create an additional remedy rather than merely an additional tribunal.[64]

Diversity cases in federal courts attacking prior state court judgments are limited, however, by virtue of the fact that the federal courts have not been given a power of review over state court judgments.[65] Consequently, any proceeding attacking a state court judgment cannot be supplementary or ancillary but must be an independent action.[66] The independent action attacking the validity of a prior judgment is an equitable proceeding;[67] therefore, a federal court cannot act directly on the judgment by amending, annulling or vacating it, but rather is limited to acting on the parties in accordance with general equitable principles.[68]

The application of these general equitable principles has led the courts to distinguish between extrinsic and intrinsic fraud.[69] This dichotomy recognizes the principles embodied in the doctrine of res judicata[70] by defining intrinsic fraud as fraud which was actually presented or necessarily considered in the prior action, and extrinsic fraud as a collateral matter which was not previously in issue.[71] After finding the existence of the proper kind of fraud, a federal court will otherwise grant relief only in accordance with other general principles of equity.[72]

Despite the prevailing view that state law will govern in granting relief from a prior state court judgment,[73] the development of the extrinsic-intrinsic dichotomy in the federal courts is significant be-

---

[64] *Cf.* text accompanying note 49 *supra.*

[65] For an excellent discussion of this matter pointing out that diversity jurisdiction rests in the discretion of Congress to determine at what time and upon what conditions the power may be invoked see Gaines v. Fuentes, 92 U.S. 10, 17-18 (1875).

[66] See note 28 *supra.*

[67] See notes 32 & 33 *supra.*

[68] *Ibid.*

[69] See note 7 *supra.*

[70] "The principle of res judicata 'that suits may not be immortal, while men are mortal' is given primacy by *Throckmorton* over the principle of individual justice, which, in theory at least, might be better achieved through the process of relitigation." 7 MOORE ¶ 60.37[1] at 609.

[71] See note 7 *supra* and accompanying text.

[72] Thus, in addition to extrinsic fraud, the complaining party must show: that the judgment rendered is inequitable, Kithcart v. Metropolitan Life Ins. Co., 119 F.2d 497 (8th Cir. 1941), and Annot., 113 A.L.R. 1235 (1938), and authorities cited therein; that a valid defense was available, Crim v. Handley, 94 U.S. 652 (1876); that he was not at fault or negligent in failing to present his defense, Grubb v. Public Util. Comm'n, 281 U.S. 470 (1930); and that the defense was not presented because of the fraud of the other party, Sorenson v. Sutherland, 109 F.2d 714 (2d Cir. 1940).

[73] See note 9 *supra.*

cause it has been followed closely by the state courts.[74]   Regardless of the state's acknowledged acceptance or rejection of the federal extrinsic-intrinsic dichotomy, the results are likely to be similar because of the application of general equitable principles, only a part of which are embodied in the res judicata doctrine upon which the extrinsic-intrinsic distinction is based.

---

[74] 7 Moore ¶ 60.37[1] & n.39.

**B. Plaintiff has Waived Many Claim In the Complaint By Failing To Raise Them On Appeal.**

Plaintiff would have the court note that she is proceeding Pro Se out of necessity and not choice and generally trusts this court to render justice and not technicalities. Given the time and learning curve, Plaintiff would rather rely on the issues she understands rather than subject the court to lengthy dissertations on matters such a promissory estoppel.

Additionally, Plaintiff does not believe that huge monetary judgments are interchangeable with justice.

#4
DOC 24
PAGE 16
TYPO

**C. Plaintiff Did Not Allege Any Grounds To Challenge The Sheriff's Sale**

Defendant claims that this fails because the redemption period had expired. And Defendant's opinion is that the standard for fraud by misrepresentation has not been met.

In actuality, there are 4 points that need to be addressed regarding the Sheriff's Sale. As a matter of public record at the Monroe County Registrar of Deeds as well as Doc # 1-1 Pages 222 – 226 available to the District Court from the onset, Rule 103(d) Plain error establishes grounds because it greatly affects my rights to redemption, much needed potential income and the ability to void the sale.

I maintain that fraud by misrepresentation was indeed proven, further insight has been gathered on the process of producing these documents. The value used evidence of sale that correctly states a 12 month redemption is generated by Chase and sent to Orlans

16

The much referenced Kim V. JP Morgan Chase Bank is not the final authority on this matter for two reasons:

As a non-consumer mortgage, the Plaintiff needed business profit off of the property as long as possible, even if a redemption sale would be the ultimate result. Hence the business owner suffers much greater hardship than "just moving" as their business model is negatively and permanently altered. Whereas a consumer mortgage[r] would simply keep the property while earning their income elsewhere.

The National Mortgage Settlement disposition regarding Kim v. JP Morgan Chase is less clear given any false information is a breach of the settlement. Since both case[s] ran somewhat concurrently, breach of the NMS on grounds relating to [Kim] are not decided.

The Appellant would also point out that this Appellee's counsel has specific knowledge of Kim v. JP Morgan Chase having argued it before the Michigan Supreme Court. That this court read the decision and precedents carefully and see that this Appellee is conveniently missing precedent support for [not] voiding this mortgage [foreclosure]. In that, the Michigan Supreme Court counted any Federal Statutes, such as the National Mortgage Settlement be considered and that a redemption that allows a small business owner to profit on a depreciated business asset is retaining partial interest in their property. The Appellant submits this intentional misread of the statute argued personally as yet another example of extrinsic fraud.

# 5, 6, 7
Doc 24
PAGE 19

TYPOS

19

**D.  Plaintiff Fails to State a Claim for Fraud.**

This has mostly addressed above except for the following.  Appellee lies to this court in that Appellant did and does intimate that recklessness occurred.  However, the Appellee agreed that prejudice for breaches of the NMS lay with them, hence intention and recklessness have been over ridden.

Appellee appears intentionally obtuse regarding the redemption quote.  As stated above, redemption rights belong to the Appellant not the Appellee and are 6 months, OR 12 months, not 6 months and 3 weeks.  In fact, the Appellee show their prejudice and/or knowledge in that 6 months 3 weeks can be given because Defendant is aware that the correct period is the longer `12 months.

The Appellant did not abandon her claim to fraud, she accented it with the extrinsic components of the fraud.  The Appellee again, doesn't contest that extrinsic fraud occurred here, rather they feign ignorance of what the Appellant is trying to say.

**E. Plaintiff's Claims Relating to Loan Modification are Irrelevant To The Disposition Of This Appeal.**

Plaintiff suggests that the Court read this section and then re-read the Appellant brief.  Aside from ignoring all matters pertaining to bankruptcy, Defendant appears to have gotten lost and then parrots that the Plaintiff agreed to a short sale AGAIN.

In fact under MRE 103 (d) Plain Error.  It becomes clear that the earliest and over riding statute as it applies to the disposition is bankruptcy fraud.

#8

Document 24

PAG 20

TYPO

19 DOCUMENT 26 PAGE 21 MISLOCATED EXHIBIT

| | Event Date Issue Document Reference | Event | Document Reference |
|---|---|---|---|
| 132 | February 20, 2013 | Weber & Olcese, Chase representatives finally record Discharge of Judgment Lien | EXHIBIT A1 |
| 133 | February 20, 2013 | SHADAWN STEPHENS – Extends foreclosure date to 03-07-2013 | EXHIBIT A1 |
| 134 | February 22, 2013 | Chase starts investigation | Doc 1-1 p 212 |
| 135 | February 26, 2013 | SHADAWN STEPHENS – Extends foreclosure date to 03-14-2013 | EXHIBIT A1 |
| 136 | February 28, 2013 | The Hardship Letter to Chase about Loan Modification clearly states that I am a REGISTERED REPRESENTATIVE, ILLNESS, attempts to meet their requirement of "not working for myself" and other recap of issues – Note the fax transmission receipt says that Chase received it. | EXHIBIT B1 Loan Modification Application 1-3/34 |
| 137 | March 11, 2013 | Chase investigation letter and apology for how long it's taking | EXHIBIT C1 |
| 138 | March 13, 2013 | SHADAWN STEPHENS – Extends foreclosure date to 04-18-2013 | EXHIBIT C1 |
| 139 | March 14, 2013 | Phone discussion notes PAM RAY – SHORT SALES about second short-sale. Note: 5 business days TO BE contacted by short-sale team after Chase recieves an offer NICOLE ART – MODIFICATION – Online modification | EXHIBIT C1 |
| 140 | April 10, 2013 | Letter to Chase about mail tampering and nothing from Chase. Filed a police report with the Monroe County Sheriff over the phone | EXHIBIT C1 |
| 141 | April 12 2013 | New real estate broker contract with CRAIG BOLLERUD – EXPIRES 12-31-2013 | EXHIBIT C1 |

19

This envelope is made from post-consumer waste. Please recycle - again. 

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

PRIORITY
★ MAIL ★

DATE OF DELIVERY SPECIFIED*

USPS TRACKING™ INCLUDED*

INSURANCE INCLUDED*

PICKUP AVAILABLE
* Domestic only

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.

PS00001000014

EP14F July 2013
OD: 12.5 x 9.5



VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

UNITED STATES
POSTAL SERVICE®

PRIORITY MAIL
POSTAGE REQUIRED

---



**UNITED STATES POSTAL SERVICE**   **Click-N-Ship®**

P

usps.com
$5.05
US POSTAGE
Flat Rate Env

9405 8036 9930 0033 8332 55 0050 5000 0034 5202

Commercial Base Pricing

07/21/15          Mailed from 48179   062S0000000313

**PRIORITY MAIL 2-DAY™**

BARBARA A ELLIS                    Expected Delivery Date: 07/23/15
8293 S HURON RIVER DR
S ROCKWOOD MI 48179-9513                        **0006**

C023

SHIP
TO: OFFICE OF THE CLERK
    SIXTH CIRCUIT US APPEALS COURT
    100 E 5TH ST RM 540
    CINCINNATI OH 45202-3988

**USPS TRACKING #**

9405 8036 9930 0033 8332 55

Electronic Rate Approved #038555749

FROM:

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; July 2013; All rights reserved.