# RECEIVED

AUG − 4 2015

**DEBORAH S. HUNT, Clerk**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

BARBARA ELLIS,

      PRO SE Appellant,

v

CHASE HOME FINANCE, LLC,
JPMORGAN CHASE BANK, N.A.,
DEUTCH BANK NATIONAL
TRUST COMPANY, as Trustee, and
UNKNOWN TRUST, the currently
unknown asset-backed security at issue,
Appellees.

Appeal No. 15-1059

Trial Court No. 2:14-cv-11186
Honorable Laurie J. Michelson
Mag. Judge Michael J. Hluchaniuk

---

BARBARA ELLIS
Pro Se
8293 South Huron River Drive
South Rockwood, MI 48179
Telephone: (734)672-0574
4barbls@gmail.com

DYKEMA GOSSETT PLLC
Kyle R. Dufrane (P58809)
Thomas H. Trapnell (P74345)
Attorneys for Appellees
400 Renaissance Center
Detroit, MI 48243
(313)568-6529
kdufrane@dykema.com
ttrapnell@dykema.com

---

## APPELLANT REPLY TO APPELLEE RESPONSE TO MOTION TO SANCTION

FRAP 27(a)(4) clearly states *"A reply must not present matters that do not relate to the response."*

      This Plaintiff's intent is to respect the law and this Court, however, the Defendant's statement (RE# 29, page 4, para 2) *"Every instance of supposedly*

*sanctionable conduct Plaintiff cites is either trivial (e.g., noting in passing that she filed*
*her appellate brief on the date the filing was processed by the Court), or premised on*
*basic misunderstanding of the law and/or the judicial process. "*

This response not only requires rebuttal but opens reply up to literally the application of the
law on everything that has transpired in and outside of this case.

So, logic and how it applies to matters of law will be discussed from the onset, then
detailed legal argument of elements necessary to appeal and this motion to sanction will
follow. For clarity, the Plaintiff will use common language instead legal nouns and terms.

This is a Court of Federal Appellate Procedure, and the Defendant continues to
argue that no procedural basis for an appeal has been presented by the Plaintiff while
choosing not to rebut key allegations made by the Plaintiff. Defendant also states the
Plaintiff was unable to locate, fund or personally produce claims that meet what the
Defendant deems appropriate pleading standards given two citations regarding pro se
litigants. Hence the forfeiture of her reputation, career and home should not only be legal
but appropriate because she has a *"basic misunderstanding of the law and/or the judicial*
*process.* Matters of law and how they apply will be brought up as the Plaintiff works
through the response brief. Additionally, this Court should note that the Defendant has
refused to reply to the most egregious of the Plaintiff's allegations.

Justice is not an assumed result of any litigation, but it is the necessary target of the
law and judicial process. The operation of "the law" may be envisioned as a pendulum
swinging. When the law, a judgment or verdict is conclusive, the pendulum stops, the law

or the matter at hand is deemed "well settled" and one dearly hopes the final disposition is "just" and it's arrival there was "speedy." Unfortunately, the world outside of court rooms moves independently and much faster than the court system. The pendulum swings can be great and away from target of justice. It can takes years, even decades, for measures at least approximating justice to be determined in our court system when external factors influence it.

Lower courts judge disputes and apply laws. Appellate courts verify that lower courts follow proper procedure, judge consistently to legislation and clarify points of law. But, to be clear, the *ONUS OF EVERY COURT IS THAT JUSTICE BE ACHIEVED*. Hence, in every court system, there is at least one rule, that in the interest of justice, allows a court to suspend procedures and take notice of errors that would prevent justice from being served. It is no mistake that in this appellate procedure court that FRAP 2 – Suspension of Rules is the SECOND rule of this Court. Appeals generally means there is at least one major unaddressed issue with a lower court decision or process. In this case, the Plaintiff counts FOUR that affect substantial rights. Frivolousness of the appeal is not an assumption that should be made, even if the appeal fails, as dictated in MRPC 3.1 – Meritorious Claims and Contentions:

> *The filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery. What is required of lawyers is that they inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good-faith arguments in support of their clients' positions. Such action is not frivolous even though the lawyer believes that the client's position ultimately will not prevail.* **The action is frivolous, however, if the lawyer is unable either to make a good-faith argument on the merits of**

*the action taken or to support the action taken by a good-faith argument for an extension, modification, or reversal of existing law.*

Sanctions, rarely used and unpopular to everyone, are, nevertheless, necessary to the preservation of any court system. Sanctions are warranted when the law, the court or the judicial system has been abused and the ability to render justice has been thwarted. MRPC 3.1 – Meritorious Claims and Contentions is explicit about this also:

> *Comment: The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also has a duty not to abuse legal procedure. The law, both procedural and substantive, establishes the limits within which an advocate may proceed. However, the law is not always clear and never is static. Accordingly, in determining the proper scope of advocacy, account must be taken of the law's ambiguities and potential for change.*

Sanctionable behavior hinders the process and increases time necessary to reach a final disposition while attempting to render the goal of justice impossible. Failure to apply sanctions when justice has obviously been subverted is explicit approval of those actions by the court system.

Generally, overtly sanctionable behavior does not "just happen". Most often, it is financed by a litigant who has the financial means necessary to make such unbecoming conduct a worthwhile risk to the attorney or the firm. This Plaintiff will not cover the plethora of laws Congress has enacted to attempt at least a modicum of "fairness" for less wealthy litigants (such as anti-trust laws).

## I. REPLY TO INTRODUCTION

4

## I.  INTRODUCTION

>  The "Motion to Sanction" filed by Plaintiff/Appellant Barbara
> Ellis ("Plaintiff"), proceeding pro se, lacks any legal or factual basis and
> should be denied.

The "Motion to Sanction" filed by this Plaintiff/Appellant, proceeding *pro se*

should granted because, as this Plaintiff will show, the Defendant's tactics, are often

sanctionable.  Some of the Defendant's primary maneuvers are either to not answer a claim

for which they have no defense, they offer a specious arguments that fail upon simple

review of the facts or they feign confusion to the point of obstructiveness.  The Defendants

multiply these maneuvers into combination of actions that clearly demonstrate a *mens rea*

of bad faith and disrespect of the law and the judiciary.  Most egregiously,  this Defendant

has demonstrably participated in a fraud on a federal court in *Saccocio v. JPMorgan Chase*

*Bank, N.A.,* this became motive for the Defendant behavior and sets the pattern of extrinsic

and fraud on the District Court that carried into this appellate court.

>  It goes without saying that this Court's standards for applying sanctions
> must follow applicable law, and not the "customer complaint" standards
> proposed by Plaintiff in her Motion (see Motion, p. 7).

Sanctions are warranted when litigants and/or their attorneys intentionally abuse the

legal process and/or the court.  Merely stating that a *pro se* litigant lacks any legal or

factual basis is not a defense for a Defendant that consistently and blatantly lies to this

Court.  The statement *"must follow applicable law, and not the 'customer complaint'*

*standards proposed by Plaintiff"*  isn't an argument it's a specious attempt at reframing one

out of context sentence into an inference that the Plaintiff would never make.

Since there is no incentive for registered representatives to litigate, the Plaintiff

5

explained that her extensive documentation of personal matters was pure self interest in protecting her job. Why? Because for financial associates, any customer complaint may result in an investigation but a familial complaint of her role as a personal fiduciary to her mother most certainly would. Hence, across the board, this Plaintiff maintained the documentation level every financial associate should do to protect her reputation and her career. (See Motion, p 7). So after citing the three personal reasons for high documentation and why it was necessary, the Plaintiff explicitly stated that she has no [working] knowledge of how courts choose and apply sanctions. And finally the Plaintiff SUBMITTED the following [issues] to this Court [for their discretionary judgment].

> *Plaintiff fails to allege any conduct by Defendants/Appellees and/or*
> *Defendant's counsel that could warrant sanctions.*

This is a frivolous and incorrect statement. In actuality, Defendants have chosen not to rebut several of the most obvious claims, such as the motive listed above, lying to this Court about the contents of Kim. V JP Morgan Chase about the content of Michigan Supreme Court citations – particularly egregious since Mr. Hickey was part of the team that argued that case for JP Morgan Chase, etc.

> *Other than invective directed against both the U.S. financial sector and the*
> *U.S. government, Plaintiff offers only the following in support of her*
> *request;*

Another blatant lie to this court. The Defendant's have not contested that this Plaintiff is not a lay person in Economics, financial services and mathematics. Merriam Webster defines invective as [noun:] *"harsh or insulting words: rude and angry language."*

6

Being a professional, the Plaintiff finds it's use ludicrous.  The Plaintiff broke her argument

for sanctions into why sanctions are necessary.  The first being that JP Morgan Chase has a

track record of bad behavior that both ignores and negatively impacts the small business

owners in the USA.  In particular, non employer businesses such as the Plaintiffs.  While

the Plaintiff did submit a partial interview of Jeffrey Sachs,  one of the top 100 leading

economists in the world who shamed JP Morgan Chase's CEO and characterized the

atmosphere in Washington right now as pay for play – that is expert opinion offered under

the section entitled  The Appellee. The Plaintiff chose not to include three articles from a

popular middle class magazine because she deemed them too inflammatory.  Aside from

this, only JP Morgan Chase has  control over JP Morgan Chase's public reputation.  Aside

from urging the need to act, Plaintiff only reference to "government" is that Congress is

reviewing the CFPB and if it's chartered to protect small business owners such as her.

> *Plaintiff offers only the following in support of her request; (1) the
> "Standard of Review" section of Defendant's Brief cites two cases which
> Plaintiff deems inapposite;*

Again, the Defendant fails to rebut claims or [intentionally] leaves arguments out of

their rebuttals.  The citations are thin,  and under affirmative defense, Plaintiff is

required to rebut.  She also maintains that, since pleadings require facts be

established, relevant citations require similar facts to be anything but frivolous

argument.  Then the Defendant ignores the significance of Chambers v. NASCO,

Inc. and it's primacy for a court's inherent powers to sanction.

> *(2) Defendant's Brief notes in passing that the filing of Plaintiff's Brief was*

*processed on May 13, 2015, but Plaintiff submitted her brief for filing on
May 12, 2015.*

This is another specious and misleading argument that falls apart on review. The
above statement makes it appear that the Defendants stated in their Brief "but Plaintiff
submitted her brief for filing on May 12, 2015." They did not.

This Court needs to review the actual document RE# Doc 21, Page 19, paragraph 3.
It has one sentence, set apart in it's own paragraph exactly as follows:

*Plaintiff did not retain another attorney and filed her Brief on Appeal on
May 13, 2015.*

Hence, the Defendants lie to this Court about **creating** content where  a
statement that left uncontested by this Plaintiff is grounds for dismissal of the entire lawsuit
on procedural grounds i.e. Plaintiff missed the initial filing deadline.

*(3) Defendants' counsel's website advertises the firm's expertise in
expediting the commercial (as opposed to residential) foreclosure context.*

In contrast, is this apt placement or an accident? As Plaintiff points out to this
Court, that Dykema's website states: "We pride ourselves in advising clients how to
accelerate what can be exasperatingly slow foreclosure process. We have developed
creative techniques to maximize disposition proceeds." (RE# Doc 25-2 page 131). Again,
this bears review in context. This statement is under the general heading of "Financial
Services Litigation and the next paragraph starts with "Dykema's financial services
litigators... Merriam-Webster's dictionary states the definition of creative, in this context,

8

is: "*done in an unusual and often dishonest way*" in short while the full definition is

"*managed so as to get around legal or conventional limits <creative financing> also:*

*deceptively arranged so as to conceal or defraud <creative accounting>*" This Plaintiff

maintains that, out of a firm of 334 lawyers, the stance of the financial services litigation

team is, indeed, creative to the point of bad faith.

> *Plaintiff can point to no way in which any of the foregoing is misleading,*
> *frivolous, or otherwise improper.*

In short, the Plaintiff, just has. And the Plaintiff would remind this Court that, as detailed

below, sanctions are generally warranted when multiple acts of sanctionable behavior

demonstrate the bad faith necessary to invoke inherent power sanctions.

## I. REPLY TO BACKGROUND

> *II. BACKGROUND*
>
> *This is a routine residential foreclosure lawsuit, in which Plaintiff was*
> *originally represented by counsel.*

The Defendant has, to date, not contested any allegations made by the

Plaintiff that the Defendant and their counsel knew of the Plaintiff's status as a

registered representative from June 10, 2010, Plaintiff's claim that the Defendant

defaulted in bankruptcy regulations where they applied to the PRO SE Plaintiff, that

the District Court failed to apply the terms of the National Mortgage Settlement and

that the Defendant intentionally protracted the loan modification and foreclosure

process so as to profit from their illegal activities regarding forced placed hazard

insurance and to conceal their fraud upon the court in Saccocci v. JP Morgan Chase.

ALL ALLEGATIONS ABOVE HAVE NOT BEEN REBUTTED BY

DEFENDANTS IN ANY PLEADING including but not limited to their extrinsic

fraud and fraud upon the court.  Although, in their reply brief,  Defendant's did

directly correct Plaintiff that Judge Michelson made no reference to the NMS in her

granting their motion to dismiss.  Hence, this is not and was never a "routine" or

"garden variety" residential foreclosure lawsuit as presented to the District and this

court from the onset.

The Court should note that bankruptcy, in of itself, does not preclude this Plaintiff

from being hired as a financial associate  (because people do get sick and declare

bankruptcy).  The reasoning is that broker-dealer compliance oversight is sufficient to

prevent issues.  However, foreclosure promotes the false notion that the Plaintiff was

irresponsible with her finances and failed to work with her bank.

> *The District Court ordered Plaintiff's Complaint dismissed with prejudice*
> *on December 16, 2014.  (RE# 23, Order, Page ID# 775-791) Plaintiff filed a*
> *notice of appeal to this Court on January 14, 2015.  Following a Court-*
> *ordered mediation session, Plaintiff's counsel filed a Motion to Withdraw,*
> *bases on "the failure and/or refusal of the Appellant to pay any of her*
> *attorney fees or costs of this appeal;*

The Plaintiff is financially challenged from January 2015  because the complex wound

bed began started shedding again. She notified Mr. Gantz email February 12, 2015(RE#

Doc 26, Motion, Page 148-139).  This Court should review the retainer agreement and

note that, regardless of income, Mr. Gantz is accruing interest on the unpaid balance.

(RE#,Doc 26 Motion, pp 131-132 6.)

> *the insistence of Appellant to appeal new issues and/or issues that were not*
> *previously litigated in the underlying lawsuit; and the insistence of*
> *Appellant to take unilateral action against the Appellees, outside of this*
> *appeal." (Doc. 15, Motion to Withdraw, Page ID#2). The Court granted*
> *that Motion on February 25, 2015. (Doc 16-2).*

What this court should note is the first phone call on June 10, 2010 where JP Morgan Chase customer service initially scoffed at Plaintiff's demand for reimbursement for force placed hazard insurance. That this Plaintiff would and did point out that it was a repeat violation of their fiduciary responsibility and paraphrased the FINRA regulations requiring she report such behavior.

This brings Plaintiff's Counsel and his motion to withdraw into a clearer light. It is sure that, due to bankruptcy, Plaintiff had little to no financial reason to litigate this issue. However, the bankruptcy affected Plaintiff's ability to obtain housing or purchase another home. Issues that were obscured to the Plaintiff came into the light, Mr. Gantz took exception, and made his statement to the court:*" the insistence of Appellant to appeal new issues and/or issues that were not previously litigated in the underlying lawsuit;"*

In light of new information, Plaintiff had good reason to appeal as well as obligation to bring the fraud upon the court forward, but is that *"the insistence of Appellant to take unilateral action against the Appellee, outside this appeal"*? If Mr. Gantz had proof Plaintiff had taken such action after he chose to appeal, he certainly would have done so.

> *Plaintiff did not retain another attorney, and filed her Brief on Appeal pro*
> *se May 12, 2015. (Doc 20-1). Defendants filed their Brief on June 15,*
> *2015. On July 14, 2015, Plaintiff filed her reply brief, and then made two*
> *additional filings: (1) A document entitled "Correction of the Record,"*
> *attaching a purported chronology of alleged events involving Plaintiff*

*and/or her mother over the past several years (Doc 16); and (2) Motion to Sanction.*

FRAP 10(b)(2) clearly states that the Appellant must submit a correction of the record if they intend to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence.

The Plaintiff clearly quoted the Rule in the Motion, it appears on the docket as a motion and the Defendant had 10 days to adjust the content of the "purported chronology" but instead the Defendant breaks FRAP procedure and calls the contents into question here instead of the motion. This Plaintiff submits to this Court that the Defendant's real issue is that, in effort not to bury this Court in paper, most of the records the Plaintiff included were the documents that the Defendants already had, such as hardship letters or proof to events referenced in the original document. The "purported chronology" is quite provable upon request. The Plaintiff sought to clarify a complicated, non-routine matter for everyone's convenience, yet the Defendant failed to raise any objection other than feigning confusion as to the purpose of this "document."

> *Plaintiff's Motion to Sanction, like much of her prior briefing in this matter consists primarily of a diatribe against both the U.S. government and financial industry. See Motion, pp. 9-13.*

The Defendant does not contest the Plaintiff's expertise in the financial industry, economics or mathematics. A "diatribe" is "an angry and usually long speech or piece of writing that strongly criticizes someone or something." Another false and misleading statement.

12

Rather, the Plaintiff observed that the nature of the economy has shifted to non employer businesses using a Federal Reserve Bank paper issued May 25, 2015. This is NEW analysis this Court has not seen as yet.

The Plaintiff further observes that there are competing trends between the few super banks and the 43 million non employer businesses in the U.S.A. and that justice is stacked against a non employer business as they have neither the time (no employees) or the money (average $48,000 a year in income) to fight super banks for their rights.

The Plaintiff points out to this Court that she is both a rare and superlative representative of the 43 million small business owners in the USA.

That the Defendant, not the "financial industry," has and will continue to damage the U.S. Economy for profit – as demonstrated by their public track record. The expert opinions of Jeffrey Sachs, one of the worlds top 100 economists are entered for the record. The Plaintiff presents an article that the latest (and, as yet, unproven) methods of regulating the financial industry are under review by Congress (not the Plaintiff). The Plaintiff then concludes that the task of holding the Defendant to following regulation for the sake of the battered U.S. Economy falls solely to the U.S. Government's Judicial Branch (this court). At least in the short run.

> *All of the Defendants' and their counsel's supposedly sanctionable conduct relates to the content of Defendant's Brief.*

This is a blatantly false statement to this Court and the proof exists in the analysis that starts on page 14.

*First, Plaintiff claims that Defendants improperly cited unspecified cases dating back to 1975, because "these precedents pre-date the affirmative defense instituted by the U.S. Supreme Court in 2002." (Motion, p. 15).*

Firstly, the Defendant simply ignores that the authority for Pro Se Litigants lies in the Pro Se Handbook not four case citations that are seriously flawed by facts that are vastly different. This topic is covered in detail below under Standard of Review.

*Next, Plaintiff asserts that Defendants made a "materially false statement to this court" by noting that Plaintiff filed her Brief on May 13 (the date the filing was processed), rather than on May 12 (the date Plaintiff actually filed her Brief). (Id., p. 16).*

This was covered in sufficient detail in the introduction above.

*Plaintiff goes on to claim that the standard of review cited by Defendants is sanctionable, because the facts (as opposed to the procedural posture) of an unspecified case from 2009 are inapposite. (Id., p. 16).*

The Defendant flatly fails to concede that every instruction for the court and it's officers is to rely on facts over procedure, as covered below. And, Defendant flatly ignores that Michigan Rules of Professional Conduct govern the sanctions in being reported to the Michigan State Bar for disciplinary action. And the Defendant reinforces the Plaintiff's statement that the Defendant is trying to simply win on procedure issues, obscure facts, having not amended or submitted anything in their defense of this highly complicated matter on Motion to Sanction, page 16, para 1.

The Plaintiff points out that her attorney quit after filing appeal, so certain matters, like jurisdiction were settled – except for bankruptcy default, but then restated it in great detail for the Defendant in her response brief.

The Plaintiff then clearly alleges that the Defendant is operating in bad faith for

improper purposes i.e. intimidation or more legally oppression of this pro se litigant.

The Plaintiff states the intentionally wrongful dating of the Appellant Brief filing May 13, 2015 as covered in detail above.

> *Finally, Plaintiff states that Defendants' counsel "is in violation of the Michigan Rules of Professional Conduct as detailed in this brief and that they advertise these tactics on their website." (Id., p. 18). Plaintiff apparently bases this claim on the fact that defense counsel's firm website advertises the firm's experience in expediting the commercial foreclosure process. See Ex. G to Motion; see also Motion, p. 17.*

Again, Plaintiff covered this above. But, the Plaintiff does point out that the Defendant is trying procedural issues, obscuring the facts, having not amended or submitted anything to their defense.

The Plaintiff contests the Defendants attempts to direct this Courts behavior towards the Pro Se Plaintiff with a handful of a cases that have distinctly different requirements in judging the facts in each case. The Defendant then ignores her allegation that they are producing these citations out of bad faith and for the improper purpose of harassing this Plaintiff as the Court's direction is quite clear using the Pro Se Handbook. The Plaintiff will elaborate further as to the invalidity of the Defendant's argument below.

> *III. Standard of Review:*
>
> *Fed R. App. P. 38 permits the Court to sanction a party to an appeal when the appeal is prosecuted regarding issues that are already clearly resolved, or with the apparent motivation of delay, harassment or other improper purposes. Wilton Corp. v. Ashland Castings Corp., 188 F.3d 670, 676 (6th Cir. 1999). Fed. R. App.P. 38, in conjunction with Fed. R. Civ. P. 11, permits this Court to sanction a party for making misrepresentations or frivolous arguments in its appellate brief, and/or for failing to cite controlling*

*authority. See, e.g., Borowski v. De Puy, Inc., 850 F.2d 297, 305-306 (7th Cir. 1988).*

This is a false and misleading statement as this Court has the inherent power to impose sanctions and assess attorneys' fees and costs. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44-45(1991). They flow from the nature of the judicial institution itself – powers that "are necessary to the exercise of all others." *United States v. Hudson,* 7 Cranch 32, 24 L. Ed 259 (1812). Inherent powers include the power to issue contempt sanctions; the power to impose obedience, respect and decorum, and submission to lawful court mandates; and – most significantly here – the "well-acknowledged" inherent power of a court to levy sanctions in response to abusive litigation practices." Roadway Express, Inc. V. Piper, 447 U.S. 752, 765 (1980).

That is, an attorney is "unreasonable and vexatious" when the attorney exceeds the bounds of the law or unduly burdens the court system, courts may sanction the offending attorney. That is, had the District Court been duly notified of the bankruptcy, the National Mortgage Settlement, the prejudice of the Appellant losing her home and all future means of supporting herself, the District Court would have properly evaluated the case without need for appeal (multiplying litigation and costs to an already financially challenged small business owner.) and correction of the record.

### IV. PLAINTIFF DOES NOT SET FORTH ANY GROUNDS FOR AN AWARD OF SANCTIONS AGAINST DEFENDANTS AND/OR THEIR COUNSEL.

*Plaintiff's Motion should be denied, because she does not claim – and cannot claim – that Defendants' Brief contained either material misrepresentations, misstatements of applicable law, or frivolous arguments.*

16

See violations above and analysis below.

*(And of course, Defendants are not the appellant and are not prosecuting this appeal).*

Bad faith and frivolous argument ignoring this Court's inherent power to sanction.

See analysis below.

*Every instance of supposedly sanctionable conduct Plaintiff cites is either trivial (e.g., noting in passing that she filed her appellate brief on the date the filing was processed by the Court), or premised on a basic misunderstanding of the law and/or the judicial process.*

The filing issue is covered above as intentionally misleading.  See analysis below.

*For instance, Plaintiff apparently disputes Defendants' citation to Clark v. Nat'l Travelers Life Ins. Co., 518 F.2d 1167, 1169 (6th Cir. 1975) because of the year that decision was issued, but fails to point to any way in which the proposition for which that case was cited – namely, that this Court is not required to identify a pro se litigant's arguments for her – is inaccurate.*

The Plaintiff's Pro Se Status is determined by STATE statutes, hence the matter of

how a Pro Se is handled is well settled except for May 2013 changes that further eliminate

a Pro Se Litigants access to counsel through court appointment..

*(Motion, p. 15). Nor is there any rule or case law prohibiting the citation to pre-2002 cases, as Plaintiff seems to argue. Similarly, Plaintiff appears to dispute Defendants' citation to Ashcroft v. Iqbal, 556 U.S. 662 (2009) because the facts of that case are different than our case, notwithstanding the fact that Iqbal sets forth the well recognized pleading standards applicable in all federal cases. (Id., p. 16).*

Bad faith and frivolous argument ignoring this Court's inherent power to sanction.  See

analysis below.

*As for the statements on Defendants' counsel's website, she has not shown them to be relevant, let alone false or sanctionable.*

17

See violations above and analysis below..

> *The only legal authority Plaintiff cites in support of her motion,*
> *Chambers v. Nasco, Inc., 501 U.S. 32 (1991), is a sharp contrast to*
> *the instant litigation.*

The Defendant states (RE #29, page 5 para 2) that "The only legal authority Plaintiff cites

in support of her motion, *Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991), is a sharp contrast

to the instant litigation. This newly introduced term "instant litigation" raises a specious

defense that the Plaintiff's former attorney was a lawsuit mill and therefore the Plaintiff's

claims automatically have no merit or extreme prejudice. Logically, these are two

completely independent conclusions as a lawsuit of merit can and will appear in a practice

that operates as a "lawsuit mill" and meritless lawsuit can and are brought by non-mill

practices. By this reasoning, that 9 out of 10 loan modification "attempts" failed and most

likely ended in foreclosure would justify any litigation against these "foreclosure mills"

that call themselves banks. It is unjustifiable bias for this Court to even consider that her

former counsel justifies the Defendant's behavior. There are simply too many unknown

factors and odd "coincidences" regarding the departure of both bankruptcy specialists in

Mr. Gantz's practice (at a critical junction and within 3 months of each other) to consider

this argument anything but frivolous. And, except for implying this Plaintiff is a crazy, the

Defendant's offer no further defense of the allegations. Two actions, a legal pattern,

introduction of bias with Thill v. Ocwen and threats to sanction Gantz and Associates as

presented to the District Court Judge Laurie Michelson originated from Dykema.

> *Chambers addressed a years-long course of misleading conduct by a*

18

*litigant, involving not only frivolous, dilatory filings, but conduct intended
to commit fraud on the court. Here, by contrast, Plaintiff only quibbles with
minor details of Defendants' briefing.*

Bad faith and frivolous argument ignoring this Court's inherent power to sanction and their

fraud upon the court and misuse of legal processes to conceal it.. See analysis below.

### V. CONCLUSION AND RELIEF REQUESTED

*For all these reasons, the Court should deny Plaintiff's Motion*

Bad faith and failure to withdraw a response that has been misproven. The court should

grant the Plaintiff's motion and sanction as it deems appropriate.

## STANDARD OF REVIEW SPECIOUS RE:  INHERENT POWERS

In response to the Defendant's position that Chambers v. NASCO is merely an

incidental citation and denies any sanction but FRAP Rule 11 and FRAP 38, the Plaintiff

has detailed a federal courts inherent power to sanction below. As the citations clearly state,

every federal court has inherent powers and discretion in applying them sua sponte or on

motion. Hence, the Defendants begin their response to a motion to sanction them with

another specious, out of context claim that must be rebutted in spite of the fact that it is a

waste of this Court's precious time to read through such a dissertation. Mostly so the

Plaintiff can prove to the Defendant that she did her research before making the  motion

and cited Chambers v. NASCO because of it's primacy.   This court should note that the

Defendant, who demands from this Court and this Plaintiff, a  higher level of pleading from

this Pro Se Plaintiff than any COURT instruction on the Eastern District Court's website.

Rather than go on at length on a well settled matter, this Plaintiff points out to this Court

that the Defendant fails to acknowledge the significant changes in the Federal District

Court's Pro Se Handbook in its May 2013 update.  The substantial change the Defendant ignores in demanding attorney level pleadings from pro se litigants is that, effective May 2013 the prejudicial change from the 2008 handbook (EX – H) where Plaintiff's can no longer request a court appointed attorney and Judges have no options in appointing them. Additionally, the substantial list of pro se resources listed in the 2008 handbook is now defunct and boils down to almost nothing.  Hence, a pro se litigant's ability to produce the pleadings the Defendants demand is almost non-existent simply using the internet and in finding legal aid.  The Federal Court's recognized it,  the Defendant is using obscured procedural changes (this pro se appellant finally resorted to the internet archive to see the OLD handbook) and old and invalid arguments as grounds to foment a frivolous appeal. Rather, this Plaintiff submits the most recent 2011, Illiberal Construction of Pro Se Pleadings (EX-I) which dovetails with the Federal Court's position and is more extensive than the Defendant's irrelevant and out-dated citations that ignore the 2013 changes in court procedure.

## V.  DEFENDANTS CHOOSE NOT TO REBUT MAJOR CLAIMS

Defendant's pattern of not responding to Plaintiff allegations occur here as well. Dykema submitted as their only exhibit for their motion to dismiss to Judge Laurie J. Michelson, their unpublished case, Thill v. Ocwen Loan Servicing, LLC.  Dykema's intent being to unduly influence Judge Laurie J. Michelson that this matter lacked any merit whatsoever after submitting a statement of case to her in a manner that was equivalent to affirmative misrepresentation:

MRPC Rule 3.3 Candor Toward the Tribunal

(e)

...

REPRESENTATIONS BY A LAWYER
An advocate is responsible for pleadings and other documents prepared for litigation, but is usually not required to have personal knowledge of matters asserted therein, because litigation documents ordinarily present assertions by the client or by someone on the client's behalf and not assertions by the lawyer. Compare Rule 3.1. However, an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, **may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry. There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation.** The obligation prescribed in Rule 1.2(c) not to counsel a client to commit or assist the client in committing a fraud applies in litigation. Regarding compliance with Rule 1.2(c), see the comment to that rule. See also the comment to Rule 8.4(b).

This Court may not be able to use MRPC beyond recommendations to the Michigan Bar, however, as detailed below, this Court's inherent power to sanction is sufficient to address this issue and the Defendant's creation and misuse of Thill introduced an unjustifiable bias that all Gantz and Associates cases are meritless and hence this case was also as Judge Rosen details his concern with counsel RE# 2:14-cv-11186-LJM-MJH pg #339. IV. Conclusion.

This lead to a denial of a jury trial for the Plaintiff as well as the threat of sanctions t Gantz and Associates by Judge Michelson, all of which led to the breakup of Gantz and Associates and the somewhat suspicious loss of both attorney's who specialized in bankruptcy.

The Defendant states (RE #29, page 5 para 2) that "The only legal authority Plaintiff cites in support of her motion, *Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991), is a sharp contrast to the instant litigation. The term "instant litigation" raises a specious defense that the

Plaintiff's former attorney was a lawsuit mill and therefore the Plaintiff's claims automatically have no merit or extreme prejudice.  Logically, these are two completely independent conclusions as a lawsuit of merit can appear in a practice that operates as "lawsuit mill" and meritless lawsuit are brought about by non-mill practices.  By Defendants logic, the fact that 9 out of 10 loan modification "attempts" failed and likely ended in foreclosure would therefore justify all litigation against these "foreclosure mills" that call themselves banks.  It is unjustifiable bias for this Court to even consider that anything her former counsel did justifies the Defendant's behavior.  There are simply too many unknown factors and odd "coincidences" regarding the departure of both bankruptcy specialists in Mr. Gantz's practice (at a critical junction and within 3 months of each other) to consider this argument anything but frivolous.  And, except for speciously calling this Plaintiff's motives into question, the Defendants offer no real defense that these are not coincidence.

Even more disturbing is that there were bankruptcy claims in Thill – yet Judge Rosen  chose not to consider because he contended counsel made it a waste of time.  All after Dykema made an affirmative misrepresentation about this case as "garden variety" when it was not – on the level of prejudice as a registered representative, not to mention a pro se non consumer bankruptcy, the National Mortgage Settlement, negatively altered rights of redemption on what is, despite flat out lies by counsel, a voidable foreclosure.  Any combination of which clearly demonstrate the mens rea and pattern for fraud on the court.

Much of which transpired because Defendant's are determined to prevent this Plaintiff from making public the factual information of their much publicized issues with defaults on bankruptcy regulations as well as their fraud upon the court in Saccoccio v. JP Morgan Chase, N.A., where stated (RE# Case 1:13-cv-21107-FAM, Doc 59-1, page 4, Section 1.11):

> **"Defendants have denied and continue to deny each and every allegation of liability, wrongdoing and damages, as they have substantial factual and legal defenses to all claims** and class allegations in the Saccoccio Litigation. Defendants maintain and continue to maintain that they have acted in accordance with applicable agreements and governing law. Nonetheless, Defendants have concluded that because the continuation the Saccocio Litigation be fully and finally settled on a class-wide basis in the manner and upon the terms set forth in this Agreement."

As it stands, JP Morgan Chase refunded homeowners 12.5 cents upon a dollar, bringing their net profit in delaying this Plaintiff to ~ 1.5 billion dollars while only reimbursing claimants a maximum of $300 million for insurance they didn't place. Plaintiff submits as a supplement to the record, so as to be explicit January 27, 2009 correspondence (Ex. - H) from Thrivent Investment Management stating that my FINRA registration was terminated on January 19, 2009. It clearly states that it would not be necessary to retake the Series 7 licensing exam if employed by another broker dealer within 2 years. Given that her 88 year old mother had a cardiac incident in July 2009, the Plaintiff was well aware that there was potential for her mother to pass at any time. Hence, the Plaintiff had good cause to maintain her standing as a registered representative but it also required is reporting knowledge of illegal activity.

Given that JP Morgan Chase wished to continue his illegal activity, they had vested interest in preventing the Plaintiff from returning to her chosen profession. The Plaintiff

finds her illness regrettable given the fact that the fraud continued for 3 more years and many suffered financial hardships similar to hers.   Hence, this is not and cannot be the "routine residential foreclosure lawsuit" (Response, page 2, para 1) that the Defendant's have previously characterized as "garden variety."

All of which is under this Court's inherent power to sanction as they see fit.  The Plaintiff is not required to split hairs on exactly how this Court employs inherent sanction and where.   This pro se Plaintiff states that since there is clear and obvious coordination in the Defendant's actions,  bad faith is demonstrated and both of these violations apply:

**2. Duty to Correct or Withdraw**

The failure to correct or withdraw a litigation position, once a litigant or lawyer learns that it is baseless, may be sanctioned.

**3. Discovery Abuse**

The court may invoke its inherent power to sanction discovery abuse that is not punishable under the applicable Federal Rules of Civil Procedure.

Furthermore, the Plaintiff's clearly pointed out (RE# 25-1, page 17, para 3) that District Judge Laurie J. Michelson did order a statement of the case from BOTH attorneys (RE#2:14-CV-1186-LJM-MJH Doc #12).  The Defendant offers no rebuttal and NO INFORMATION to this Court as to the process and content of these statements.  Did the counsel's confer and issue a joint statement (evidence of collusion in affirmative misrepresentation)?  Or were the statements separate (affirmative misrepresentation by Dykema, possible obstruction of justice by JP Morgan Chase).  Explicitly, not only did the Defendant, in bad faith, repeatedly make an affirmative misrepresentation that this is a

"garden variety" residential foreclosure lawsuit to the District Court – the Defendant maintains the affirmative misrepresentation to THIS court to the point of annoying repetition. At least in the response to sanctions, they changed it to "This is a routine residential foreclosure lawsuit…" (RE# 29, page 2, para 1) most likely to prevent this statement from being struck for repetitiveness. All charges being applicable as both JP Morgan Chase was definitely aware of the above and in Dykema's actions in it's pleadings regarding their default in bankruptcy regulation which up until now (see Response, page 1, number (3)) the Defendants ignored in repeated citings of Mr. Gantz's motion to withdrawal and unrebutted except and then as a defense of their website advertising (and also Response, page 3, para 1, final sentence.)

Defendant's default in regulations regarding her pro se Chapter 7 bankruptcy and the Dykema website as referenced above can most easily be proven by the Defendant's behavior from the onset of the bankruptcy right up until this filing. As is well evidenced, this Plaintiff's modification was going to be under high scrutiny with JP Morgan Chase simply because she pointed out the illegal activity. After Plaintiff filed bankruptcy on June 10, 2010, she immediately called JP Morgan Chase to notify them when she returned home from the clerks office. Over the course of much phone negotiation in regarding the reimbursement of the forced placed insurance, Chase did indeed reimburse her to a positive $135 in September, as they paid the full policy amount instead of the amount due on the new insurance policy. However, as a PRO SE Chapter 7 bankruptcy creditor, in the August phone negotiation on or about August 1, 2010, Chase requested that they REMODIFY once outside the bankruptcy. Now to fully evaluate Chase's actions, this Court needs to consider the following:

1. Plaintiff was forced into declaring Chapter 7 bankruptcy PRO SE – as her mother's

personal fiduciary no funds

2. Plaintiff is still struggling with a well documented illness (by day if necessary).
3. Plaintiff is providing 24 hour supervision and care for her 88 year old mother.
4. 80 percent of the residence is utilized for her mother's care or storage of her mother's property from selling the family farm in 2008.
5. The actual property usage is documented in bankruptcy exhibits, the bankruptcy hearing record and bank appraisal pictures.
6. As instructed by Elder Care attorney, Kevin Gilhool, 100 percent of the Plaintiff's income comes from the home care rental business created to provide for her mother.

Hence, on or about August 1, 2010, the Plaintiff is fully reliant on J.P. Morgan Chase for information as to the status of her JP Morgan Chase modification.

**These are pertinent excerpts. The text, it's entirety, is in Sanctions: The Federal Law of Litigation Abuse By Gregory P. Joseph (2012).**

**1. Power to Sanction**

**The federal courts are vested with the inherent power to issue sanctions for abusive litigation practices undertaken in bad faith.**

The rules of civil and appellate procedure do not completely describe and limit the power of federal judges to sanction litigation misconduct. Chambers v. NASCO, Inc., 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2D 27 (1991). The federal courts must be, and are, empowered to "protect the administration of justice by levying sanctions in response to abusive litigation practices.'" Brockton Sav. Bank v. Peat, Marwick, Mitchel & Co., 771 F.2d 5, 11 (1st Cir. 1985), quoting Penthouse Int'l Ltd. v. Playboy Enters., 663 F.2d 371, 3896 (2d Cir. 1981). The imposition of inherent powers sanctions is appropriate only where the offender has willfully abused judicial process or otherwise conducted litigation in bad faith In re Itel Sec. Litig., 791 F.2d 672, 675 (9th Cir. 1986): Kreagerv. Solomon & Flanagan P.A., 775 F.2d 1541, 1542-1543 (11th Cir. 1985); Lipsig v National Student Mktg. Corp. 663 f.2d 178, 180-181 (D.C. Cir 1980). See also Link v. Wabash R.R. 370 U.S. 626, 632, 82 S. Ct. 1386, 8 L. Ed 2d 734 (1932) (recognizing the "well-acknowledged" inherent power of a court to levy sanctions in response to abusive litigation practices).

....

**2. Restraint and Discretion**

**Inherent powers must be exercised with restraint and discretion.**

Somewhat obvious, hence the Plaintiff allows this Court may reference the full text as it wishes. This Plaintiff, however, point out to this Court, again, that she has lost even if she attains reversal and awards. Whereas, the Defendants separately and conjoined from June 10, 2010 have performed fraud on the court(s) while profiting close to 1.49 billion dollars from other mortgage holders – people who may or may not have been pushed into foreclosure and/or bankruptcy by these actions. This meets the acid test of extraordinary circumstances and great harm to many beyond this Plaintiff. Plaintiff also points out that she hasn't specifically asked for large sums of money, rather that the court make the determination of appropriate sanction of both JP Morgan Chase and their counsel.

## 3. Burden of Proof

The District of Columbia Circuit has ruled that a default (and presumably a dismissal) sanction may not be entered under the inherent power unless, among other things, the district court has found by clear and convincing evidence—not a preponderance— that the abusive behavior occurred. Sheperd v. American Broadcasting Cos., Inc. 62 F.3d 1469, 1472-1473 (D.C. Cir. 1995). Somewhat analogously, the First Circuit has required clear and convincing evidence in the context of a dismissal predicated on a fraud upon the court, although that may be attributable to the general burden of proof in fraud cases. Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989) (bogus agreement appended to complaint). Similarly, the Eighth Circuit reversed a district court grant of summary judgment as a sanction for withholding a document in discovery because the fraud upon the court had not been but "must be supported by clear, unequivocal and convincing evidence." Pfizer, Inc. v. International Rectifier corp., 538 F.2d 180, 195 (8th Cir. 1976).

## B. COURTS
### Inherent power sanction s may be issued by federal district or appellate court judges.

Like § 1927 sanctions and unlike those issued under Rule 11, inherent power sanctions may be awarded by appellate as well as district court judges. In re Kelly, 841 F.2d 908, 917 (9th Cir. 1988). Bankruptcy judges are also empowered to award inherent power sanctions. In re Miller, 14 B.R. 443, 446-448 (Bankr. E.D.N.Y. 1981); In re Emergency Beacon Corp., 52 B.R. 979 (Bankr. S.D.N.Y. 1985) aff'd, 790f.2d 285 (2d Cir. 1986). In re Dyer, 322 F. 3d 1178, 1197 (9th Cir. 2003) (but also holding that "[t]he bankruptcy court's inherent sanction authority ... like its civil

contempt authority, does not authorize significant punitive damages").

…

Because, as discussed below, inherent power sanctions may issue against counsel, on appeal they serve the allocation function discussed in connection with § 1927 (§ 21(A)(2), supra)—i.e., they are used when appropriate to sanction appellate counsel while other powers are often used to sanction litigants. Additionally, since inherent power sanctions are indifferent to the underlying merits of a dispute, they also serve the gap-filling function discussed in connection with § 1927 (§ 21(A)(2), supra) in permitting appellate court to award sanctions to an appellant—whether prevailing or nonprevailing—or to a nonprevailing appellee. Kelly, 841 F.2d at 917; State Indus. v. Mor-Flor Indus., 948 F.2d 1573 (Fed. Cir. 1991)(citing Treatise). See also § 28(B)(3), infr.

## C. PERSONS LIABLE

**Inherent power sanctions may issue against attorneys, clients or pro se litigants.**

The federal courts' ability to impose inherent power sanctions on parties has long been recognized. Alyeska Pipeline Serv. v. Wilderness Soc'y, 421 U.S. 240, 258-259, 95 S. Ct. 1612, 44 I. Ed 2d 141 (1975); F.D. Rich Co. v. United States ex rel Indus. Lumber Co., 417 U.S. 116, 129, 94 S. Ct. 2157, 40 L. Ed 2d 703 (1974).

Pro Se litigant are treated no differently …

The scope of inherent power sanctions was extended to counsel in Roadway Express, Inc., v. Piper, 447 U.S. 752, 766, 100 S. Ct. 2455, 65 L. Ed. 2D 488 (1980) ("[t]he power of a court over members of its bar is at least as great as its authority over litigants").

Vicarious liability also extends to the lawyer's firm or employer. Lockary v. Kayfetz, 974 F.2d 1166, 1170 (9th Cir. 1992) (non-profit legal foundation, counsel's employer, sanctioned under inherent power as "responsible entity"). Mroz v. Mroz, 65 F.3d 1567, 1576 (11th Cir. 1995).

Apart from vicarious liability for employers and firms, liability for inherent power sanctions is personal to the offender. It is error to attribute misconduct to all co-parties indiscriminately without adequate supporting findings. Bonilla v. Volvo Car Corp., 150 F.3d 88 (1st Cir. 1988) (reversing award of inherent power and § 1927 sanctions imposed on the theory that, "because the defendants conducted a joint defense—itself a very elastic notion that could embrace a number of quite different relationships—each defendant was therefore automatically responsible for any misconduct in discovery or other proceedings committed by another defendant;"

held, "[t]here may be instances in which one codefendant is liable for sanctions for the litigation-related misconduct of another defendant, but it would take findings as to the knowledge and participation or acquiescence far more specific and detailed than a simple reference to a joint defense").

Similarly a part is not necessarily vicariously liable for the bad faith litigation abuse committed by its counsel. Depending on the facts, it may be appropriate for the court to draw an inference of bad faith on a litigant's part from it's counsel's conduct (e.g., the assertion by counsel of false factual allegations received from the client). However, the litigant's personal bad faith should be found before inherent power sanctions are imposed on it. Byrne v Nezhat, 261 F.3d 1075, 1123 (11th Cir. 2001)("To support its findings of bad faith and otherwise sanctionable conduct [on the part of the client], the court impermissibly relied solely on the actions of counsel … Sanctionable conduct by a party's counsel does not necessarily parlay into sanctionable conduct by a party").


…

## D. TYPES OF PROCEEDINGS

**Inherent power sanctions may be imposed for abusive litigation practices in any proceeding, civil or criminal, in federal district or appellate court. Chambers v. NASCO, inc., 501 U.S. 32, 111 s. Ct. 2123, 115 L. Ed. 2d 27(1991).**

The inherent power from which sanctions issue is said to be "governed not by rule or statute but by the control necessarily vest in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Link v. Wabash R.R., 370 U.S. 626, 630-631, 82 S. Ct. 1586, 8 L. Ed 2d 734(1962). See also Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 11 (1st Cir. 1985). That authority extends to all matters that come before the court. There is no limitation to the type of proceedings—criminal or civil, trial or appeal—in which such sanctions may issue. See e.g., United States v. Kouri-Perez, 1999 U.S. App. LEXIS 8811 (1st Cir. May 7, 1999) …

…

## E. STAGE OF PROCEEDINGS

### 1. Generally

**Sanctionable bad faith may be found in any stage of the proceedings in the commencement or prosecution of a claim, defense or position.**

Inherent power sanctions may be imposed for bad faith abuses that occur at any time during a litigation. They are not restricted to cases where the action is

filed in bad faith.  Oliveri v. Thompson, 803 F.2d 1265 1272 (2d Cir. 1986) ("An inherent power award may be imposed for either commencing or for continuing an action in bad faith, vexatiously, wantonly, or for oppressive reasons"); Smith v. Detroit Fed'n of Teacher Local no. 231, 829 F.2d 1370, 1375 (6th Cir. 1987) ("Under this bad faith exception, it must be established that the attorney was guilty of conduct, by instituting or maintaining an action, motivated by subjective bad faith"); NASCO, Inc. v. CalCasieu T.V. & Radio, Inc., 124 F.R.D. 120, 144 (W.D. La. 1989), aff'd 894 F.2d 696 (5th Cir. 1990), aff'd, 501 U.S. 32(1991)("The shoe fits a frivolous defense as well as it does a frivolous cause of action"-- imposing $1 million in sanctions.  See generally Hall v. Cole, 412 U.S. 1, 15, 93 S. Ct. 1943, 36 L. Ed. 2d 702(1973);
Roadway Express, Inc. V. Piper, 447 U.S. 752, 766, 100 S. Ct. 2455, 65 L. ed 2d 488 (1980).

   The misconduct need not occur before the court.  Collateral behavior that is directly related to the proceedings is punishable under the inherent power.  See e.g., Harlan v. Lewis,  982 F.2d 1255, 1260 (8th Cir. 1993) (defense counsel's attempt to persuade treating physicians not to testify on plaintiff's behalf in medical malpractice action held sanctionable under the inherent power of the court; "[w]e entertain no doubt that the district judge was authorized to preserve the integrity of the proceedings before him by imposing sanctions. **The questioned behavior tainted the trial of the cause and threatened the integrity of further proceedings")** Greviskes v. Universities Research Ass'n, 417 F.3d 752, 759 (7th Cir. 2005) (plaintiff's action dismissed to sanction her fraudulent conduct, including sending fraudulent faxes and forgeries to the corporate defendant to obtain the personnel file of a witness and her **repeatedly lying about this extrajudicial misconduct to the court**; held:  "[Plaintiff's] fraudulent conduct in the course of discovery and attempts to hide such behavior behind a cloak of further fraud and deceit is an affront to the legal process.  No court should be asked to tolerate such behavior in any circumstance").  Sanctioned misconduct may even precede commencement of the litigation, as where a prospective litigant destroys evidence at a time when it does, or reasonably should, anticipate litigation.  See § 26(E)(3), infra; Steen v. Union Pacific R.R., 354 F.3d 739, 747-748 (8th Cir. 2004).  The sanction, however, is limited to bad faith related to the litigation process, and it does not extend to unrelated misconduct, such as prelitigation bad faith misbehavior that is encompassed within the cause of action.

…

   Some of the same procedural limitations that exist under other sanctioning powers may apply to inherent power sanctions as well.  For example, a district court is not authorized to sanction a party for taking a frivolous appeal under the inherent power doctrine any more than it may do so under Rule 11 or § 1927 (§ § 5(A)(1)(a) and 23(A)(4), supra).  That is a matter reserved exclusively to the appellate court.

...

**2. Duty to Correct or Withdraw**

**The failure to correct or withdraw a litigation position, once a litigant or lawyer learns that it is baseless, may be sanctioned.**

Pursuing a claim, defense or position once it becomes clear that no grounds exist to support it may be sanctioned by the court under its inherent power, as under § 1927. Litigants and lawyers are subject to a continuing duty to correct or withdraw litigation positions based on matters that subsequently come to their attention. ... In re Akros Installations, Inc., 834 F.2d 1526, 1532 (9ᵗʰ Cir. 1987) (inherent sanction powers are appropriate "where an unfounded action or defense is brought or maintained in bad faith, vexatiously, wantonly, or for oppressive reasons"); see also Morris v. Adams-Millis Corp. 758 F.2d 1352, 1355, 1357-1358 n. 6 (10ᵗʰ Cir. 1985); Nemeeroff v. Abelson, 704 F.2d 652, 660 &n. 7 (2d Cir. 1983).

The duty to correct or withdraw extends to a bad faith refusal to concede or stipulate a settle point of law, but the refusal must amount to obstructionism, and no sanction may issue where the refusal emanates from an arguably correct position or mere confusion as to the nature of the stipulation. Ametex Fabrics v. Just In Materials, 140 F.3d 101, 110–111 (2d Cir. 1998) ("sanctioning [counsel] for the consequences of a statement that may have been correct, or at least may have represented mere confusion as to the nature of the stipulation [that the adversary] was seeking and not bad faith obstructionism, constitutes an abuse of discretion").

Mr. Hickey

**3. Discovery Abuse**

**The court may invoke its inherent power to sanction discovery abuse that is not punishable under the applicable Federal Rules of Civil Procedure.**

...

The magistrate judge considered Rule 37 inapplicable because no court order had been violated and the document requests and interrogatories had been answered partially (although inadequately). He also found no intentional misconduct justifying § 1927 sanctions. He therefore imposed inherent power sanctions in the form of attorney's feeds and a preclusion order. [Note that this misconduct was probably sanctionable under Rule 26(g) because a negligent response to a document request would almost certainly violate that Rule's "reasonable inquiry" requirement. See § 43(B) infra.) Accord Schmidt v. Ford Motor Co., 112 F.R.D 216 (D. Colo. 1986) (inherent power sanctions issued against counsel who (1) concealed evidence by filing improperly evasive interrogatory answers, where the court believed that Rule 37(d) sanctions could not issue since the answers were

not signed by counsel (who concededly drafted them) and (2) facilitated an expert witness's intentionally misleading deposition testimony);  Lipsig v. National Student Mktg. Corp., 663 F.2d 178, 181-182 (D.C. Cir. 1980) (defense counsel sanctioned for, among other things, dilatory discovery tactics notwithstanding the nonfrivolous quality of the defendant's counterclaim and their good faith in asserting it).

Since 1983, the amendments to Rules 11, 16 and 26 have given new impetus and cachet to the imposition of sanctions.  Courts now seem more disposed to draw on their inherent powers to punish discovery abuse that might well be sanctionable under Rule 26(g) or 37.

…

Where the Rules apply, however, they are generally entitled to deference.  Inherent powers should be invoked sparingly, and certainly not when they are redundant of express powers.  Chambers v. NASCO, Inc., 501 U.S. 32, 50, 111 S. Ct 2123, 115 L. ed 2d 27 (1991)("when there is bad faith conduct in the course of litigation that could be adequately sanctioned under the ruled, the court should ordinarily rely o the Rules rather than the inherent power"). Cf. Strandell v. Jackson Cty., 838 F.2d 884 (7th Cir. 1988).

## § 27 Bad Faith Requirement

### A. GENERALLY

A finding of bad faith on the part of the offender is a prerequisite to the imposition of an inherent power to sanction.

The underlying rationale of inherent power to sanction is punitive.  The essential element in triggering an award of sanctions is the existence of bad faith on the part of the offender.  A finding of bad faith is sin quo non to the imposition of inherent power sanctions.  Roadway Express v. Piper, 447 U.S. 752, 765-766, 100 S. Ct. 2455, 65 L. Ed. 2D 488 (1980). Alyeska Pipeline Serv. v. Wilderness Soc'y , 421 U.S. 240, 258-259, 95 S. Ct. 1612, 44 L. Ed 2d 141 (1975); Pantry Queen Foods, Inc. v. Lifschultz Fast Freight, Inc., 809 F.2d 451, 455 (7th Cir. 1987); Ford v. Temple Hosp., 790 F.2d 342, 346 (3d Cir. 1986); Toombs V. Leonem 777 F.2d 465, 471 (9th Cir. 1985); Lipsiq v. National Student Mktg. Corp., 663 F.2d 178, 180-181 (D.C. Cir. 1980); Obifuele v. 1300 Llc, 2006 U.S. Dist. LEXIS 60043 at *29 (D. Md. Aug. 23, 2006) (quoting Treatise).  See also Chambers v. NASCO, Inc., 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2D 27 (1991) ("the narrow exceptions to the American Rule effectively limit a court's inherent power to impose attorneys' fees as a sanction to cases in which a litigant has engaged in bad-faith conduct or willful disobedience of a court's orders"); but see id. At 59 (Scalia, J., dissenting) (observing that while fee-shifting  requires a finding of bad faith, "that in no way means that all sanctions imposed under the courts' inherent authority require a finding of bad faith.  They do not"--citing cases affirming dismissal for failure to prosecute).

Bad faith is personal to the offender.  Browning Debentures Holders' Comm. V.

DASA Corp., 560 F.2d 1078, 1089 (2nd Cir. 1977). One person's bad faith may not be attributed to another by operation of legal fictions or doctrines such as respondeat superior or vicarious liability. Of course, reasonable inferences from the evidence are permissible.

Accordingly, a party cannot be taxed with the misconduct of his or her counsel absent evidence reflecting that the party participated in the misconduct.

…

McCandless v. Great A&P Tea Co., 697 F.2d 198, 201 (7th Cir. 1983).

Putting aside the generalization about the relative likelihood of animosity existing between lawyers as opposed to litigants, there would seem little need to expand the inherent power to encompass a lower standard  than subjective bad faith in light of other sanctions powers  available to the court.  To state the obvious, because Rule 11  now requires the attorney "to do the necessary research" on which McCandless focused, there is no need to expand Roadway Express to reach the same result.  Since McCandless antedated the effective date of 1983 Rule 11 by some seven months, it may be the court's failure to pick up McCandless' invitation reflects a tacit recognition that there is no longer any need to do so.  The "empty-head, pure-heart" defense to a motion for inherent powers sanctions is viable.  Byrne v. Nezhat, 261 F.3d 1075m 1124 (11th Cir. 2001) ("The district court's statement that [plaintiff] Manov was not even aware that racketeering allegations had been included in the complaint precludes the conclusion that she knowingly or recklessly filed a frivolous claim').

The First Circuit has stated that "a finding of subjective bad faith is not a prerequisite to an award of [inherent power] sanctions, " Dubois v. United States Dep't of Agric., 270 F.3d 77, 81 (1st Cir. 2001), on the theory that vexatiousness suffices, and "[t]he terms 'vexatious' means that the losing party's actions were 'frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'" Local 285, Service Employees Int'l Union v. Nonotuck Resource Assoccs. 64 F.3d 735, 737 (1st Cir. 1995).  On this analysis, mere negligence would suffice, and that is clearly at odds with Supreme Court precedent, under which inherent power sanctions do require a finding of bad faith. The First Circuit would be well advised to consider whether its view is not, in fact, consistent with adherence to the bad faith standard, coupled with a recognition that **subjective bad faith may be inferred from objective acts or omissions.'**

## B. WHAT CONSTITUTES "BAD FAITH"

### 1. Generally

**Inherent power sanctions may be imposed only when there is clear evidence that the challenged actions were entirely without color and made for reasons of harassment, delay or other improper purpose.**

The standard against which bad faith is judged for purposes of inherent power sanctions, is quite high. Adams v. Carlson, 521 F.2d 168, 170 (7th Cir. 1975) ("The standards for bad faith are necessarily stringent"). R. Ventures, Ltd v. Shane, 2000 U.S. Dist. LEXIS 10170, at *7 (S.D.N.Y. July 19, 2000)(citing Treatise).  There must be "'clear evidence' that the challenged actions 'are without color and [are taken] for reasons of harassment or delay or for other improper purposes.'" Weinberger v. Kendrick, 698 F.2d 61, 80 (2d Cir.1982); Accord Eastway Constr. Corp. v. City of New York, 762 F.2d 1284, 1287-1288 (10th Cir. 1986); Campana v. Muir, 615 F. Supp. 871 (M.D. Pa. 1985); Weir v. Lehman Newspapers, Inc., 105 F.R.D. 574 (N.D. Ill. Feb. 25, 1982).  Fidelity Nat'l Title Ins. Co. v. Intercounty Nat'l Title ins. Co., 2002 U.S. Dist. LEXIS 11915, at *29-*30 (N.D. Ill. July 1, 2002) ("Bad faith conduct generally involves oppressive or vexatious conduct, or attempts to perpetrate a fraud on the court') (citing Treatise).

Whether a claim is colorable, for these purposes, " is a matter of 'whether a reasonable attorney could have concluded that the facts supporting the claim might be established.'" Nemeroff v. Ableson, 620 F.2d 339, 348 (2d Cir. 1980) (court's emphasis), quoted with approval in Dow Chem. Pacific, Ltd. v. Rascator Maritime S.A., 782 F.2d 329, 344 (2d Cir. 1986). A claim, defense or position that withstands Rule 11 scrutiny—i.e., that satisfies Rule 11 certification—cannot be punished under the inherent power because, by definition, it is warranted in fact and law and has not been presented for an improper purpose.  Gillette Foods, Inc. v. Bayernwald-Fruchteverwertung, 977 F.2d 809, 814 & n. 9 (3d Cir. 1992) ("if [plaintiff's] tortious interference claim 'narrowly escape[d]' Rule 11 because it did not violate the certification requirement, the district courts bad-faith finding [for inherent power purposes] would squarely contradict  the holding that Rule 11 was not violated").

The bad faith criterion requires more than a showing that a party did not prevail on the merits of a claim, defense or position.  It is not satisfied by evidence of a weak or legally inadequate case.  No will mere negligence or improvidence trigger an inherent power sanction.  ViON Corp. v. United States, 906 F.2d 1564, 1566-1567 (Fed. Cir. !990) (citing Treatise); Autorama, 802 F.2d at 1287-1288;  Pantry Queen Foods, Inc. v. Lifschultz Fast Freight, Inc., 809 F.2d 451, 455 (7th Cir. 1987).

Yet, a finding of bad faith does not require that the legal and factual basis for an action prove totally frivolous.  If "'a litigant is substantially motivated by vindictiveness, obduracy, or mala fides, the assertion of a colorable claim will not bar the assessment of attorneys' fees'" or other appropriate sanction.  In re Itel Sec. Litig., 791 F.2d 672, 675 (9th Cir. 1986) (citations omitted); accord Campana v. Muir, 615 F. Supp. 871 (M.D. Pa. 1985).

The Ninth Circuit holds that inherent power sanctions may be available for reckless misconduct if recklessness is combined with evidence of improper purpose (recklessness-plus).  Gomez v. Vernon, 255 F.3d 1118 (9th Cir. 2001) ("although

recklessness, of itself, does not justify the imposition of sanctions, sanctions are available when recklessness is 'combined with an additional factor such as frivolousness, harassment or an improper purpose.' Sanctions, then, are justified 'when a party acts *for an improper purpose*—even if the act consists of making a truthful statement of a nonfrivolous argument'"), quoting Fink v. Gomez, 239 F.3d 989 (9th Cir. 2001).  Note:  The court's reference to "frivolousness" should not be understood to mean that merely losing on the merits, combined with recklessness, suffices to warrant inherent power sanctions.  Rather, in context, frivolousness should be understood as referring to a claim so weak as to constitute objective evidence on improper purpose.  As Fink makes clear, inherent power "sanctions are available [only] if the court specifically finds bad faith or conduct tantamount to bad faith: (230 F.3d a 994)--and recklessness-plus falls in this category.  Accord B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1108 (9th Cir. 2002)("regardless of whether defense counsel's bad behavior constituted bad faith per se, we readily find that counsel's reckless and knowing conduct in this case was tantamount to bad faith and therefore sanctionable under the court's inherent power").

Indicia of bad faith include "that the claims [or defenses or positions] advanced were meritless, that the counsel knew or should have known this, and that the motive for filing ... was for an improper purpose, such as harassment.' Smith v. Detroit Fed'n of Teacher Local no. 231, 829 F.2d 1370, 1375 (6th Cir. 1987).  Bad faith may be inferred from and set of facts that reasonably suggest it.  Braley v. Campbell, 832 F.2d 1504 1512 (10th Cir. 1987) (en banc) (observing that the subjective bad faith "standard is virtually impossible to apply, " the Tenth Circuit observed that "under the courts' inherent powers, the supreme  court has only required conduct that 'constituted or was tantamount t bad faith'"I]).

Illustratively, bad faith has been inferred from:
…
Engaging in dilatory tactics during discovery and courtroom proceedings, failing to meet scheduled deadlines and misleading the court.  Lipsig v. National Student Mktg. Corp., 663 F.2d 178, 181-182 (D.C. Cir. 1980).

Misrepresenting the record, including the district court's determinations, on appeal. Cambridge Prods., Ltd. v. Penn Nutrients, Inc., 962 F.2d 1048, 1052 (Fed. Cir. 1992).
…
2.  Bad Faith Litigation Abuse vs. Bad Faith Conduct Being Litigated

Not all bad faith is sanctionable under the inherent power—only bad faith litigation abuse.  Bad faith in the underlying conduct that is the subject of litigation may entitle the victim to assert a claim for punitive damages or certain torts (or other causes of action), but it is not sanctionable under inherent power.

''''

**§ 28 Types of Sanctions**

**A. GENERALLY**

**The court is vested with broad discretion to fashion an appropriate inherent power sanction to redress abusive litigation practices.**

Inherent power sanctions are essentially punitive, designed to penalize bad faith abuses of the litigation process. While they may be used to compensate the opposing party for fees that should never have been incurred, their compensatory aspect is only incidental. It is within the discretion of the court to determine the appropriate sanction. ...

Among the types of inherent power sanctions that the court, in its discretion, may choose to impose are:

**1. A fine.** ...

2. An award of reasonable attorneys' fees and expenses.

3. Disqualification of counsel.

4. Preclusion of claims or defenses or evidence.

5. Dismissal of the action.

6. Entry of a default judgment.

7. Suspension of counsel from practice before the court or disbarment.

8. Vacatur of a judgment for fraud. Brockton, 771 F.2d at 11. Cardiac Pacemakers, Inc. St. Jude Med., Inc., 2002 U.S. Dist. LEXIS 4000 at **193 (S.D. Ind. Feb. 13, 2002) ("a federal court has inherent power to vacate it's own judgment upon proof that a fraud has been perpetrated upon the court")** (citation and quotation omitted).

9. Injunctive relief limiting a person's future access to the courts.

10. A contempt citation.

11. Permitting adverse inference from document destruction.

12. Ordering Document Production.

13. Tolling Interest Accruing to Party Filing Frivolous Appeal.

14. Ordering Defendant to Secure Bond Covering Damages Claim.

15. Reducing Plaintiff's Counsel's Contingency Fee & Precluding Counsel From Representing Other Similarly Situated Persona.

16. Limiting Voir Dire, Peremptory Challenges and Argument Time.

## B. SPECIFIC SANCTIONS CONSIDERED

**1. Fines ...**

**2. Fees and Expenses**

...

**Ability to Pay. ...**

**Government Lawyers. ...**

**Pro Se Litigants.** Even though, under Rules 11 and 37, a pro se litigant who is also a lawyer may not be awarded attorneys' fees calculated as though the litigant were represented by counsel, such an award may be available to a pro se attorney under the inherent power of the court. Pickholtz v. Rainbow Techs., Inc., 284 F.3d 1365, 1377-1378 (Fed. Cir. 2002) ("It is true that there is no federal statutory or appellate precedent for imposing attorney fees sanctions in favor of a pro se attorney under a court's inherent power. However, ... [w]e see no reason why in proper circumstances they may not be applied in favor of a pro se attorney under inherent power. Failure to do so ... would place a pro se litigant at the mercy of an opponent who might engage in otherwise sanctionable conduct, but not be liable for attorney fees to a pro se party. There are other ways of sanctioning a party than assessing attorney fees, such as preclusion of the introduction or evidence or testimony, or even a default judgment. However, attorney fees are such a valuable and frequently used tool in the armamentarium of trial judges that we see no reason for categorically ruling them out of consideration. The district court therefore abused its discretion in determining that it lacked authority to award attorney fees to a pro se attorney".)

## 3. Preclusion, Dismissal and Default Orders

The courts' authority to dismiss an action, pleading, claim or defense under their inherent power or, alternatively to enter a default judgment is well-settled. In Link v. Wabash R.R., 370 U.S. 626, 633, 82 S. Ct. 1386m 8 L. Ed. 2D 734 (1962), the Supreme Court upheld the dismissal with prejudice with plaintiff's action for failure to prosecute. Entry of a default judgment is equally well-recognized, although it is sometimes secured through the circuitous route of calling cases "ready for trial" when it is apparent that this will lead ineluctably to

a default. Eash v. Riggins Trucking Inc., 757 F.2d 557, 561 (3d Cir, 1985). See generally Donaldson v. Clark, 819 F.2d 1551, 1557, n. 6 (11th Cir. 1987)(en banc)("The court has the power either to dismiss a case with prejudice or to enter a default judgment for a failure to prosecute with reasonable diligence or for failure to comply with court orders or rules of procedure").

The courts recognize that dismissal with prejudice or entry of a defaults judgment is a harsh sanction. This harshness is aggravated when the sanction is levied in response to misconduct of counsel and is not attributable to the party directly. Jaquette v. Black Hwk Cty., 710 F.2d 455, 462 (8th Cir. 1983). Consequently, courts frequently turn to more narrowly tailored powers to deter abuses. Among these are preclusion orders that bar the assertion of specific claims or defenses or the introduction of specific items of evidence. Titus v. Mercedes-Benz of North Am., 695 F.2d 746, 749 n. 6 (3d Cir. 1982) (noting "that district courts may … consider as sanctions the preclusion of claims or defenses"); Petroleum Ins. Agency, Inc. v. Hartford Acc. & Indem. Co., No. 80-2732-T (D-Mass, May 14, 1985)(magistrate judge's decision) (entering, inter alia, preclusion order).

5. Enjoining Future Access to the Courts

A court confronted with a litigant who has engaged in a pattern of abusive litigation is authorized to enter an injunction that restricts that litigant's future access to the courts.

4. Disqualification, Suspension or Disbarment

5. Enjoining Future Access to the Courts

6. Ordering Documents Produced

7. Enjoining the Filing of Motions

8. Forfeiture of Attorneys' Fees

9. Instructing Jury of Evidence Tampering or Perjury

10. Conditioning Amendment of Pleading on Fee Payment

11. Referral to Attorney Disciplinary Authorities.

12. Compensatory Damages

The Ninth Circuit upheld an award of $5,000 compensatory damages (in addition to $5,000 attorney's feed) for pain and suffering caused by the defendants' wrongful introduction of humiliating evidence concerning plaintiff's

sexual history, in violation of Federal Rule of Evidence 412, in an employment discrimination trial. B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1108-1109 (9th Cir. 2002) ("in Chambers, the Court delineated a broad range of situations for which a variety of sanctions were deemed appropriate, and noted that even outright dismissal of a lawsuit lies within the court's inherent power. The Court therefore reasoned that the 'less severe sanction' of an assessment of attorneys' fees was well within the court's authority as well. 501 U.S. at 43-45. Similar logic applies here ... for imposing sanction for the embarrassment and pain suffered by Plaintiff as a result of the improper testimony, the district court was not invading the province of the jury or providing a substantive remedy to an aggrieved party. Instead, the amount the court imposed reflected its assessment of the actual harm incurred by the Plaintiff, both in terms of additional attorneys' fees and emotional and reputational damage. This was well within the bounds of the court's discretionary power").

...

## §29 Procedural Matters

### A. DUE PROCESS

**Due process protections must be afforded before inherent power sanctions may be imposed.** Mickle v. Morin, 297 F.3d 114, 126 (2d Cir. 2002) ("Before imposing sanctions, the court must afford the person it proposes to sanction due process, i.e., 'notice and opportunity to be heard.' ... The award of sanctions.. cannot be sustained [because, inter alia] ... there is no indication that the district court provided [counsel] with any sort of notice that the court was considering imposing sanction or with an opportunity to be heard before sanctions were imposed").

Inherent power sanctions may not be imposed unless the procedure leading to the assessment comports with due process. Roadway Express v. Piper, 447 U.S. 752, 767 and n. 14, 100 S. Ct. 2455, 65 L. Ed. 2D 488 (1980). Due process requires in the absence of extraordinary circumstances, notice and an opportunity to be heard before sanctions are imposed. Eash v. Riggins Trucking, Inc., 757 F.2d 557, 570 (3d Cir. 1985). In re Akros Installations, Inc., 834 F.2d 1526m 1532 (9th Cir. 1987). If due process rights are violated, any sanctions award will be reversed. See, e.g., Glass v. Pfeffer, 657 F.2d 252, 257-258 (10th Cir. 1981); In re Richardson, 793 F.2d 37, 40 (1st Cir. 1986).

Due process is a flexible concept, and the particular procedural protections vary depending upon all of the circumstances. See generally, Morrissey v. Brewer, 408 U.S. 471, 481, 92 S. Ct. 25923, 33 L. Ed 2d 484 (1972); Roadway Express, 447 U.S. at 7676 and n. 14; Chambers v. NASCO, Inc., 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2D 27 (1991) ("A court must, of course, exercise

caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees");  Braley v. Campbell, 832 F.2d 1504, 1514 (10th Cir. 1987)(en banc).  The key is that the alleged offender be afforded adequate notice and an opportunity to be heard before the final sanctions order is entered.

Notice for due process purposes entails awareness of (1) the fact that sanctions are under consideration, (2) the reasons why they are under consideration, and (3) the type of sanctions being considered.  In re Tutu Wells Contamination Litig., 120 F.3d 368 (3d Cir. 1997) (citing Treatise).  The notice issue is particularly pointed in connection with inherent power sanctions since, unlike Rule 11 and § 1927, they derive from a common law tradition and are not based upon a statute or rule setting forth the standard of conduct expected of counsel or litigants.  Three Circuits have, however, upheld the issuance of inherent power sanctions, even though the offender was on notice only of possible Rule 11 sanctions, where (1) the offender was on notice of precisely what conduct was alleged to be sanctionable, (2) that conduct involved bad faith (a sine qua non of inherent power sanctions but not of Rule 11 sanctions), and (3) the scope of Rule 11 does not encompass that conduct.  Miller v. Cardinale (In re DeVille), 361 F.3d 539m 549 (9th Cir. 2004) (Bankruptcy Rule 9011); Methode Elecs., Inc. v. Adam Techs., Inc., 371 F.3d 923 (7th Cir. 2004); Fellheimer, Eichen & Braverman v. Charter Techs., 57 F.3d 1215, 1225 (3d Cir. 1995).  In these circumstances, there is little point in a remand to determine whether inherent power sanctions are appropriate because the District Court has already made a factual determination that they are, and has done so in a proceeding in which the offender was on notice of the precise factual basis rendering inherent power sanctions apt.
     The due process calculus may always be affected by the knowledge which the circumstances reflect the offender to have had concerning the consequences of his or her conduct.  Link v. Wabash R.R., 370 U.S. 626, 632, 82 S. Ct. 1386, 8L. Ed. 2D 734 (1962); Eash 757 F.2d at 571.  "The absence … of a statute, Federal Rule, ethical canon, local rule or custom, court order or … court admonition proscribing the act for which a sanction is imposed in a given case may raise questions as to the sanction's validity in a particular case."  Eash, 757 F.2d at 571.

     The 1993 Advisory Committee Note to Rule 11 urges that "the procedures specified in Rule 11—notice, opportunity to respond, and findings – should ordinarily be employed when imposing a sanction under the court's inherent powers.  The 21-day safe harbor contained in Rule 11 does not apple to inherent power sanctions.  If the sanctioned behavior is subject to sanction under Rule 11, that fact not only militates strongly against the imposition of inherent power sanctions, but also the failure to seek Rule 11 sanctions in a timely fashion—in accordance with the safe harbor provisions of what is now Rule 11(c)(2)---may incline the court against imposing an inherent power sanction as well.  …

the Supreme Court considered, but did not expressly adopt (or reject) five criteria for determining whether due process had been accorded, finding that each of the five criteria had been satisfied in the case before ti.  Drawn from Rule 11 jurisprudence, these criteria were:

1.  That sanctions be timely in order to have the desired deterrent effect—a criterion the Chambers Court found satisfied in light of repeated timely warnings from both the court and opposing counsel;

2.  That the sanction be tailored to the particular wrong – a requirement not breached (even though full attorney's fees for the duration of the litigation were awarded) due the frequency and severity of the offender's abuses of the judicial system;

3.  That the injured party mitigate the prejudice it suffers—although failure to seek summary disposition of the case was excused in Chambers because the offender made a swift conclusion to the litigation impossible by continuing to assert that material factual disputes existed;
4.  That sanctions be imposed only after the offender receives an appropriate hearing for abuses of process occurring beyond the courtroom (such as conduct before other tribunals or disobedience to court orders;

5.  That the court conduct an inquiry into whether the offender is personally responsible for the challenged conduct.

The due process procedure that the court employs should be structured in light of all of the surrounding circumstances.  These include:

1.  The severity of the sanction under consideration;
2.  The interests of the alleged offender in having a sanction imposed only when justified;
3.  The risk of erroneous imposition of sanctions relative to the probable value of additional notice and hearings;
4.  The interest of the court in the efficient use of the judicial system, including the fiscal and administrative burdens that additional procedural requirements would entail;
5.  Whether the sanctions at issue were sought by a party or are being considered sua sponte by the court;'
6.  If the sanctions were sought by a party, the type of sanctions sought;
7.  The type of sanction under consideration by the court;
8.  Whether the sanction under consideration rests on a factual finding, such as a finding of bad faith on the part of the alleged offender;
9.  Whether the judge imposing or considering the sanction presided over the proceedings and is the same judge before whom the offense was committed;
10.  Whether the alleged offender has been provided and opportunity to be

heard before sanctions issued or will be provide with an opportunity to be heard after they issue; and

11. Whether counsel, client or both are the target of the proposed sanction, and the impact of the sanction proceedings on the attorney-client relationship.

See generally § 17 (D)(2), supra.

Whatever procedure may be fashioned, the failure to provide the offender with an opportunity to be heard will require reversal.

…

Even the introduction of a new penalty – assessing jury costs on litigants who settle on the first day of trial – violates due process when imposed upon litigants for the first time without prior notice. Boettcher v. Hartford Ins. Group, 927 F.2d 23, 26 (1st Cir. 1991).

The court has discretion to determine whether a formal hearing is required before sanctions are imposed. It should be observed that, to the extent that bad faith is a prerequisite to the imposition of inherent power sanctions, the Rule 11 cases recite that hearing is generally required before a finding of bad faith may properly be made. Rodgers v. Lincoln Towing Serv., 771 F.2d 194, 205-206 (7th Cir. 1985) see generally § 17(D)(2)(d), supra.

…

More frequently, the opportunity to be heard is satisfied by permitting documentary submissions (brief, affidavits and the like), especially where a violation is established on the record and there is no contested issue of the fact, arguably rendering a hearing unnecessary.

**However, this Pro Se Plaintiff leave this Court to determine the finite procedural mechanisms necessary to properly apply sanctions in this case.**

B. FINDINGS AND CONCLUSIONS

**The district court must specify the reasons underlying the imposition for inherent power sanctions.**

While formal findings of fact and conclusions of law are not required every time inherent power sanctions are ordered, district judges are expected to state the reason for their action with adequate specificity to permit meaningful appellate review.

I hereby certify that the word count of this brief using OfficeLibre's tool is: 13,948

Respectfully submitted:

*Barbara Ellis*

Date: August 4, 2015

By: Barbara A. Ellis
PRO SE Appellant
8293 South Huron River Drive
South Rockwood, MI 48179

<u>CERTIFICATE OF SERVICE</u>

I certify that on August 4, 2015, pursuant to 6 Cir. R. 25, I mailed a copy of the foregoing to Defendant-Appellee via first class mail at the following address:

DYKEMA GOSSETT PLLC

Thomas H. Trapnell (P74345)
Attorney for Defendants-Appellees
400 Renaissance Center
Detroit, MI  48243

# EXHIBIT "H"

**Thrivent Investment Management**

4321 N. Ballard Road, Appleton, WI 54919-0007
Phone: 800-THRIVENT (800-847-4836)
E-mail: mail@thrivent.com • www.thrivent.com
Member NASD. Member SIPC.

A subsidiary of Thrivent Financial for Lutherans

January 27, 2009

Barbara Ellis
8293 S Huron River Rd
South Rockwood MI 48179-9513

Dear Barbara:

This letter serves as formal notification to you that your FINRA registration with Thrivent Investment Management Inc. has been terminated.

In addition, your Thrivent company appointment(s) associated with your contract with Thrivent Financial for Lutherans has been terminated effective upon your termination date. This means you are no longer authorized to solicit, sell or service on behalf of Thrivent as of that date.

Enclosed is a copy of your Form U-5 that has been filed with FINRA terminating your registration as a Registered Representative of Thrivent Investment Management Inc. It is important for you to retain a copy of the Form U-5 for your permanent records. This termination means that you may no longer sell any securities or variable products offered through Thrivent Investment Management Inc.

If you choose to register with another broker-dealer you should provide them with a copy of the enclosed Form U-5. If you register with another broker-dealer within two years of the date in section 4 of Form U-5, in most cases you will not be required to repeat the examination(s) you have successfully completed.

If you are no longer affiliated with a FINRA member firm, you are required to notify FINRA of any mailing address changes for a minimum of two years. Letters advising FINRA of such changes should be sent to: CRD Address Changes, PO Box 9495, Gaithersburg, MD 20898-9495. You can find additional information at www.finra.org.

Good luck with your future endeavors.

Sincerely,

Angela Snyder
Supervisor, Securities Registration
1-800-Thrivent, extension 84545

enclosure

# FILING YOUR LAWSUIT

# IN FEDERAL COURT



This document is provided by the Clerk's Office to assist parties in properly filing a lawsuit in this Court. Litigants are encouraged to review it thoroughly. This document is NOT to be considered legal advice, nor should it be cited as legal authority.   It is subject to exception and modification.   This document should be used in conjunction with the federal rules and Local Rules of this Court.

Revised July 2008

# The Different Kinds of Courts

You may be aware that there are both federal courts and state courts.

In Michigan, state courts are divided by county, and enforce state and municipal laws. Each Michigan county has a County Circuit Court, which decides issues brought under the laws of this State. That includes family disputes, probate, broken contracts, and matters brought under the State Constitution. Also, every city has a District Court, which decides municipal matters (traffic tickets, landlord-tenant, zoning, etc.)

Although Michigan state courts must enforce the federal Constitution and laws, most of the cases they decide involve the Constitution and laws of the state.

Federal courts are established by the U.S. government to decide disputes concerning the federal Constitution and laws passed by Congress. Our state has two federal courts, the Eastern District of Michigan and the Western District of Michigan. The Eastern District covers the eastern half of the lower peninsula. The Western District covers the rest of the state.

# What kinds of cases are filed in U.S. District Court?

There are three types of cases filed in U.S. District Courts:

**1. Cases where the United States government is a party.**

Lawsuits for social security or veterans benefits are among those that would be filed in a federal court. Also, cases against any federal agency, like the Postal Service or Internal Revenue Service.

**2. Cases brought under federal statutes.**

The U.S. District Court is limited to hearing the specific types of cases described in the Constitution or specifically provided for by Congress. Federal laws can cover issues not addressed by state laws, such as interstate commerce, damages at sea, labor laws, environmental matters, agriculture, certain tax matters and many other laws. Also, federal laws can duplicate state laws, such as in civil rights protections.

**3. Cases where the parties reside in different states.**

These types of matters are called "diversity cases." In a diversity case, if you live in Michigan and you are suing someone in another state, the judge will decide which U.S. District Court is most appropriate to hear your case. This is called the "venue." In deciding the proper venue, the judge will consider where the case was filed, where the majority of the parties are located, where the witnesses reside, where the actual damage was done and other issues. A rule of thumb is that the case will be heard at the Court closest to the defendant. But the judge has a lot of latitude.

Diversity cases must claim a minimum of $75,000 in damages. If your case doesn't claim that much, you'll need to file it in state court.

1

# Before you file, please consider:

Rule 11 of the Federal Rules of Civil Procedure prohibits the filing of lawsuits that are clearly frivolous or filed just to harass someone.

If the court determines that you have filed a lawsuit for an improper or unnecessary reason, it may impose sanctions against you, including ordering that you pay any legal fees of the party that you sued.

# Should I file in State Court or Federal Court?

If you are suing someone based on a violation of a federal statute, for example the Americans with Disabilities Act, you would file your case in U.S. District Court.

However, state laws and federal laws sometimes overlap each other. For example, Michigan's Elliott-Larsen Civil Rights Act offers protections to citizens similar to federal civil rights statutes. In other words, you can file a civil rights case in either federal court or Michigan state court. To choose which court would be best, you need to look at other things:

- Where will the jury come from?

- How long will it take for your case to get to trial?

- What are the fees involved in each court?

In State court, your jury will be picked from citizens residing in the county where the case was filed. In federal court, the jury will be selected from a pool of people who reside throughout the eastern half of the lower peninsula. Also, the typical U.S. District Court case takes about a year to litigate. Michigan's state courts have different timelines. It may be worth your time to do some research.

2

# ATTORNEYS

You have the right to represent yourself. You do not have to have an attorney.

If you are representing yourself, the Court may show you some extra consideration. The judge will still expect you to state your case clearly, to make all your deadlines, and follow our filing procedures.

If you can afford to hire your own attorney, but don't know of any, you might consider contacting the **Detroit Bar Association's Referral Service**. That program will tell you which Bar Association members practice the type of law that you need help with. The number to the Detroit Bar Association is **313-961-3545**.

## Where can I do legal research?

Wayne State University, the University of Michigan, and the University of Detroit-Mercy Law School libraries are open to the public, although they will not let you check out material unless you are a student.

Some college libraries have law-related collections, including Henry Ford, Oakland and Macomb Community Colleges; Oakland and Madonna Universities and Walsh College. These collections are not as extensive as you would find at a law school library.

The public libraries in Dearborn, Detroit, Farmington, Flint, Southfield, and Port Huron maintain law-related collections, too.

# Will the Court appoint a lawyer to represent me?

If you would like an attorney, and cannot afford to hire one, the Court may appoint an attorney to represent you. To ask the Court to appoint a lawyer, please fill out an **Application for Appointment of Counsel** form, available in the Clerk's Office.

The Judge bases the decision to appoint an attorney on two items: your financial situation and the merits of your case.

**Where can I get free legal advice?**
If you cannot afford an attorney, but need legal advice, there are a number of agencies that may be able to help you:

| | |
|---|---|
| Free Legal Aid Clinic, Inc. (Serves only Wayne County) | 313-967-5555 |
| Immigration Legal Services/Archdiocese of Detroit English & Spanish Arabic or Chaldean | 313-237-4694 |
| Lakeshore Legal Aid Port Huron Office Caro Office | 810-985-5107 989-673-5651 |
| Legal Hotline for Michigan Seniors | 517-485-9164 |
| Legal Services of Eastern Michigan Genesse County Office Midland County Office Saginaw County Office | 800-339-9513 800-322-9142 800-322-4512 |
| Legal Services of South Central Michigan Ann Arbor Office Jackson Office Monroe/Lenawee Office Livingston /Shiawassee Office | 734-665-6181 517-787-6111 888-251-1598 800-968-0044 |
| Salvation Army Legal Aid Clinic (Serves Wayne, Oakland and Macomb Counties) | 313-361-6340 |
| State Bar of Michigan Lawyer Referral Service (For counties with no local referral service program) | 800-968-0738 |
| University of Detroit-Mercy Urban Law Clinic | 313-596-0262 |
| University of Michigan Law School Clinic | 734-763-4319 |
| Wayne County Neighborhood Legal Services Detroit Office | 313-874-5497 |
| Wayne State University Law School (Serves Wayne County) | 313-577-3970 |

3

## How do I file a lawsuit?

If you have decided to file your lawsuit in U.S. District Court, you will need to file a **complaint** in the Clerk's Office.

## What is the filing fee? Can it be waived?

The fee to file a complaint is $350.00. There are no other fees involved.

If you do not have the $350.00, you may apply to have the fee waived. Ask the Clerk for an **Application to Proceed In Forma Pauperis**.

# What is a complaint?

The complaint is a document telling the judge who you are suing, what your case is about and what you want the court to do about it. You may write your own complaint, or use a form available in the Clerk's Office.

Make your complaint clear and understandable. This is the time to go into as much detail as you can. Don't be overly brief, and expect to tell the Judge the details of your case later. Do it now. *Your case can be dismissed if you do not go into sufficient detail. The Judge **has to** understand what your issues are.*

Along with the **complaint**, you will need to fill out some other forms:

1)    A **Civil Cover Sheet**, a form that asks some statistical information about your case. Directions for filling out a Civil Cover Sheet are on page 6.

2)    A **summons**, a form that lets people know that you are suing them. Directions for filling out a summons are on page 8.

The above forms _**must**_ be filed with any lawsuit. Some additional, voluntary forms are:

3)    An **Application to Proceed In Forma Pauperis**, if you are unable to pay the $350.00 filing fee, and

4)    An **Application for Appointment of Counsel**, if you wish the court to appoint a lawyer to represent you.

All of these forms are available in the Clerk's Office, or online at http://www.mied.uscourts.gov.

When your paperwork is completely filled out, file it with the Clerk's Office.

4

# When you're ready to file your complaint

**W**hen you have your paperwork ready, please come to the Clerk's Office on the 5th Floor of the Theodore Levin U.S. Courthouse in Detroit. (Or, if more convenient, you may file at our offices in Ann Arbor, Flint, or Bay City.)

U.S. District Court offices:

231 W. Lafayette
5th Floor
Detroit, MI 48226
(313) 234-5005

200 E. Liberty
Room 120
Ann Arbor, MI 48107
(734) 741-2380

1000 Washington Avenue
Room 304, P.O. Box 913
Bay City, MI 48707
(989) 894-8800

600 Church Street
Room 140
Flint, MI 48502
(810) 341-7840

# What happens when I come to the Clerk's Office?

When you come to the Clerk's Office, you will need to bring the following:

- 2 **civil cover sheets**,
- 2 **summonses** for each defendant,
- 2 **complaints** *PLUS* 1 copy for each defendant (So, if you are suing two people, you would need four copies, total)
- The $350.00 filing fee unless you are asking the court to waive the filing fee. If so, you will need 2 **Applications to Proceed In Forma Pauperis.**)

Additionally, if you are asking the court to appoint a lawyer to represent you, you will need 2 **Applications for Appointment of Counsel**.

The clerk assisting you will review your paperwork to make sure we have everything we need. He or she will make sure that all of the questions have been answered on the forms and that you have enough copies. If everything is in order, and you are paying the filing fee, the clerk will:

- file-stamp your documents,
- assign a case number and judge,
- sign your summons forms, and
- write you a receipt for the $350 filing fee

**If you are asking that the filing fee be waived**, the clerk will:
- stamp "received" on your complaint (it cannot be marked "filed" until the judge agrees to waive the fee), and
- assign a case number and judge

The clerk will then send the paperwork to the judge, who will rule on whether or not to waive the fee. If the judge waives the fee, the clerk will then file-stamp your documents, sign the summonses and, if the judge orders, arrange for the complaint to be served on the defendants.

**If the judge declines to waive the fee**, the clerk will mail all of your paperwork back to you, with a letter saying that, if you would like the case filed, you will need to pay the filing fee.

# How Do I Fill Out the Civil Cover Sheet?

The **Civil Cover Sheet** asks some statistical information about your case. It looks much more complicated than it is, because of all the options you can check off. It is broken down into eight sections:

**Section I** - *Plaintiffs/Defendants*
a.    asks the name of the plaintiff and the defendant.
b.    asks for the counties where the parties are located. We need to know this in order to help us assign the case to the right office.
c.    asks for the name, address and telephone number of the attorney handling your case. Since you are acting as your own attorney, please indicate that information about you.

**Section II** - *Basis of Jurisdiction,* asks why you are filing this case in U.S. District Court. There are only four reasons, as outlined on page one of this booklet. Please indicate the one item that best says why your case is being filed in federal court.

**Section III** - *Citizenship of Principal Parties*, is used *only if you indicated "Diversity" in Section II*. Pick one box that says where the plaintiff is located and one box to show where the defendant is located.

**Section IV** - *Origin*, gives 7 options. You will most likely choose option one, "original proceeding." That means that you are filing a new lawsuit. The other options are easy to understand.

**Section V** - *Nature of Suit*, says very generally what your case is about. Please check one box only.

**Section VI** - *Cause of Action*, asks for a brief statement telling us what your case is about. Something like, "I am suing my employer for violating my civil rights for not promoting me." You can ignore the part that asks you to cite a civil statute.

**Section VII** is pretty easy to understand. Put down the dollar amount you requested in the complaint, and check if you demanded a jury.

**Section VIII** asks if there are any related cases. If you sued the same defendants in this or any other court, write down the name of the Judge and the case number. Please date and sign the form where it says, "Signature of Attorney of Record."

The back of the form asks two questions about your case. If you have never sued these defendants before, the answer to both questions would be "no."

6

# About Summonses

The summons form is pretty easy to fill out. Just remember that, in the box that asks for the name and address of the defendant being served, you can only put down one name - the party you are suing - and their address. If you are suing more than one person, each individual defendant gets his/her own summons. The Clerk's Office cannot issue summonses without this information.

Remember, each defendant gets his or her own summons. Do not indicate more than one party and address on a summons form. We should be able to look at your completed summons form and see exactly which party is going to receive it.

In the space that gives the defendants the number of days they have to answer, please write in, "20." If you are suing the United States government, enter "60."

# What Happens After My Case is Filed?

You need to let the people you are suing know that you are suing them. You do this by having the deputy clerk sign and seal a summons form. You then serve that form, along with a copy of your complaint, on the defendants. The rules say that you can mail the summons, or it can be served personally by anyone who is not a party and is at least 18 years old.

If the filing fee was waived, the Court may arrange for your defendants to be served.

Please remember that when you file documents in your case, you must send or bring **an original and a copy** of the document to the court. You will also need to serve your defendants.

# If you are suing the United States Government:

The Federal Rules say that when you sue the U.S. Government, you will need to serve summonses on three separate parties. They are:

1. The head of the agency you are suing
2. The United States Attorney in Detroit
3. The United States Attorney General in Washington, D.C.

Even if you are suing a local government agency, you need to serve that office's headquarters, usually in Washington, D.C. For example, if you were injured at a local Post Office, you would actually serve the Postmaster General in Washington, D.C. *not* the local Post Office. In social security cases, the Regional Chief Counsel in Chicago is served instead of the Commissioner.

**Your summonses should be directed to:**

Office of the Attorney General
Department of Justice
10th & Pennsylvania Ave., N.W.
Washington, D.C. 20530

United States Attorney
211 W. Fort Street
Suite 2300
Detroit, MI 48226

**The head of the federal agency that you are suing.**
Some frequently named defendants include:

Social Security Administration
Office of the Regional Chief Counsel, Region V
200 W. Adams Street, 30th Floor
Chicago, IL 60606-5208

U.S. Postmaster General
475 L'Enfant Plaza, S. W.
Washington, D.C. 20260-0010

Secretary, Department of Treasury
1500 Pennsylvania Ave., N.W.
Washington, D.C. 20260-0010

If you need an address not shown here, assistance is available online at http://www.usa.gov or by calling the Federal Information Center at 1-800-FED-INFO (1-800-333-4636).

# EXHIBIT "I"

# COMMENT

## ILLIBERAL CONSTRUCTION OF PRO SE PLEADINGS

RORY K. SCHNEIDER[†]

INTRODUCTION ...................................................................................586
I.   PRO SE LITIGATION AND LIBERAL CONSTRUCTION .......................589
     A.  *The Right to Proceed Pro Se* ...............................................590
     B.  *The Federal Pro Se Docket* ..................................................591
         1.  Evidence of a Burgeoning Caseload ......................591
         2.  Reasons Litigants Represent Themselves...............593
         3.  Challenges Facing Pro Se Litigants ........................597
     C.  *Liberal Construction* .........................................................600
         1.  The Method by Which Courts Liberally
             Construe Pro Se Complaints ...................................601
         2.  The Theory Behind Liberal Construction ............604
II.  PLAUSIBILITY AND PRO SE PLEADINGS .........................................607
     A.  Ashcroft v. Iqbal ...............................................................608
         1.  Background and Prior History ...............................608
         2.  The Supreme Court's Two-Pronged Approach.....609
     B.  Iqbal's *Impact on Pro Se Pleadings* ...................................612
         1.  The Minimal Assurance Provided Pro Se
             Litigants by *Erickson v. Pardus* ...............................613
         2.  *Iqbal's* Exceptional Hostility Toward Pro Se
             Complaints ...............................................................617
         3.  Explanations for the Disproportionate
             Increase in Pro Se Dismissals..................................619

[†] Comments Editor, *University of Pennsylvania Law Review*, Volume 159. J.D. Candidate, 2011, University of Pennsylvania Law School; B.A., 2008, The George Washington University. In loving memory of Barbara Ledet, for whose unconditional support I will forever be grateful.

     a. *Necessarily Conclusory Allegations* .................. 619
     b. *Biased Plausibility* ....................................... 622
III.  REFASHIONING LIBERAL CONSTRUCTION IN A
   POST-PLAUSIBILITY ERA ................................................................. 625
   A. *Restraining Judicial Authority to Carve Complaints* ............. 625
   B. *Making Inferences Transparent to Assist with*
    *Complaint Amendments* .................................................... 628
   C. *Addressing Concerns Related to Neutrality,*
    *Caseload, and Abuse* ....................................................... 630
CONCLUSION .................................................................................... 632

## INTRODUCTION

 Both the right to proceed pro se and liberal pleading standards reflect the modern civil legal system's emphasis on protecting access to courts.[1] Self-representation has firm roots in the notion that all individuals, no matter their status or wealth, are entitled to air grievances for which they may be entitled to relief.[2] Access, then, must not be contingent upon retaining counsel, lest the entitlement become a mere privilege denied to certain segments of society. Similarly, because pleading is the gateway by which litigants access federal courts, the drafters of the Federal Rules of Civil Procedure purposefully eschewed strict sufficiency standards.[3] In their place, the drafters instituted a regime in which a complaint quite easily entitled its author to discovery in order to prevent dismissal of cases before litigants have had an adequate opportunity to demonstrate their merit.[4]

 Far from just articulating a common systemic value, though, the right to prosecute one's own case without assistance of counsel in fact

---

 [1] *See, e.g.*, Phillips v. Cnty. of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008) ("Few issues . . . are more significant than pleading standards, which are the key that opens access to courts."); Drew A. Swank, *In Defense of Rules and Roles: The Need to Curb Extreme Forms of Pro Se Assistance and Accommodation in Litigation*, 54 AM. U. L. REV. 1537, 1546 (2005) (noting that "[o]pen access to the courts for all citizens" is one of the principles upon which the right to prosecute one's own case is founded).

 [2] *See* Swank, *supra* note 1, at 1546 (discussing the importance of self-representation to the fundamental precept of equality before the law).

 [3] *See Proceedings of the Institute on Federal Rules* (1938) (statement of Edgar Tolman), *reprinted in* RULES OF CIVIL PROCEDURE FOR THE DISTRICT COURTS OF THE UNITED STATES 301-13 (William W. Dawson ed., 1938).

 [4] *See* Mark Herrmann, James M. Beck & Stephen B. Burbank, Debate, *Plausible Denial: Should Congress Overrule* Twombly *and* Iqbal *?* 158 U. PA. L. REV. PENNUMBRA 141, 148 (2009), http://pennumbra.com/debates/pdfs/PlausibleDenial.pdf (Burbank, Rebuttal) (asserting that the drafters of the Federal Rules objected to a technical pleading regime because it would "too often cut[] off adjudication on the merits").

depends significantly upon liberal pleading standards.[5] The ability to file a "short and plain statement of the claim"[6] mitigates the impact that the choice to proceed pro se has on litigants' access to discovery by reducing the number of technicalities and requirements the satisfaction of which demands legal expertise. However, recognizing that transsubstantive pleading standards do not sufficiently account for the capability differential between represented and unrepresented litigants, the Supreme Court fashioned a rule of special solicitude for pro se pleadings.[7] Accordingly, "*pro se* complaint[s], 'however inartfully pleaded,' [are] held to 'less stringent standards than formal pleadings drafted by lawyers.'"[8]

Notably, however, the Court granted such leniency, or "liberal construction," to pro se pleadings against the backdrop of *Conley v. Gibson*'s undemanding "no set of facts" standard.[9] The Court's failure to explain how pro se pleadings are to be liberally construed[10] indicates its belief that the standard was already lenient enough to render a detailed

---

[5] *Cf.* Charles E. Clark, *The New Federal Rules of Civil Procedure: The Last Phase— Underlying Philosophy Embodied in Some of the Basic Provisions of the New Procedure*, 23 A.B.A. J. 976, 976-77 (1937) (commenting that liberal pleading rules were necessary to mitigate information asymmetries between plaintiffs and defendants that often led to premature dismissal of suits). Notably, in no suits are such information asymmetries more apparent than those in which pro se litigants sue represented adversaries. These types of suits comprise the vast majority in which pro se litigants appear. *Cf.* Jonathan D. Rosenbloom, *Exploring Methods to Improve Management and Fairness in Pro Se Cases: A Study of the Pro Se Docket in the Southern District of New York*, 30 FORDHAM URB. L.J. 305, 323 (showing that the majority of pro se cases involve unrepresented plaintiffs who sue governmental defendants).

[6] FED. R. CIV. P. 8(a).

[7] *See* Robert Bacharach & Lyn Entzeroth, *Judicial Advocacy in Pro Se Litigation: A Return to Neutrality*, 42 IND. L. REV. 19, 22-26 (2009) (noting that courts created ways to ensure that meritorious pro se suits would not be dismissed simply because the litigants lacked legal knowledge and experience, one of which was liberal construction).

[8] Estelle v. Gamble, 429 U.S. 97, 106 (1976) (quoting Haines v. Kerner, 404 U.S. 519, 520-21 (1972) (per curiam)).

[9] *See* Conley v. Gibson, 355 U.S. 41, 45-46 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."), *abrogated by* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 561-63 (2007). This standard epitomized the notice-pleading regime envisioned by the drafters of the Federal Rules, who emphasized discovery as the stage at which a claim's true merit would come to light, rather than pleading. *See* Christopher M. Fairman, *The Myth of Notice Pleading*, 45 ARIZ. L. REV. 987, 990 (2003) ("With merits determination as the goal, the Federal Rules create a new procedural system that massively deemphasizes the role of pleadings.").

[10] *See* Bacharach & Entzeroth, *supra* note 7, at 29-30 (asserting that because the Supreme Court never defined the "degree of relaxation" afforded pro se pleadings in comparison to the liberal notice pleading standard applicable to all litigants, lower courts adopted different iterations of the rule).

articulation of the practice unnecessary to prevent premature dismissal of meritorious cases. However, with *Bell Atlantic Corp. v. Twombly*[11] and *Ashcroft v. Iqbal*[12] retiring the "no set of facts" standard and ratifying the means by which lower courts dismissed more disfavored cases under *Conley*,[13] liberal construction as presently practiced is not—if it ever was—sufficient to protect pro se litigants' access to courts.

The new plausibility standard[14] with which courts now determine the adequacy of complaints disproportionately harms pro se litigants.[15] First, the Supreme Court's instruction that "conclusory" facts not be presumed true when determining a claim's plausibility[16] will affect those who (1) lack the resources to develop facts before discovery, (2) bring claims requiring them to plead information exclusively within the opposition's possession, or (3) rely on forms in drafting complaints. Pro se litigants typify the parties who demonstrate all three behaviors. Second, determining whether the remaining allegations permit a plausible inference of wrongdoing, as per the Supreme Court's instruction,[17] is a wildly subjective endeavor. Courts are likely—no doubt unintentionally—to draw inferences that disfavor pro se litigants because their "judicial common sense" judgments of what is plausible result from a

---

[11]   550 U.S. 544 (2007).

[12]   129 S. Ct. 1937 (2009).

[13]   *See generally* Richard L. Marcus, *The Revival of Fact Pleading Under the Federal Rules of Civil Procedure*, 86 COLUM. L. REV. 433, 435-37 (1986) (explaining how the reemergence of fact pleading resulted from lower courts' refusals to accept conclusory allegations as sufficient under the Federal Rules in particular categories of suits).

[14]   *See Twombly*, 550 U.S. at 570 (requiring a complaint to allege "enough facts to state a claim to relief that is plausible on its face").

[15]   *See* Patricia W. Hatamyar, *The Tao of Pleading: Do* Twombly *and* Iqbal *Matter Empirically?*, 59 AM. U. L. REV. 553, 615 (2010) (observing a substantially greater increase in the rate of dismissal of pro se suits than represented suits post-*Iqbal*).

[16]   *See Iqbal*, 129 S. Ct. at 1951 ("[T]he allegations are conclusory and not entitled to be assumed true."); Hatamyar, *supra* note 15, at 579 ("*Iqbal* invites judges to . . . eliminate from consideration all the complaint's conclusory allegations . . . ."). The parsing of a complaint into conclusory and nonconclusory factual allegations disregards the Federal Rules' express disavowal of fact pleading, along with their requirement that all facts be presumed true when determining the adequacy of a complaint. *See, e.g.*, Stephen B. Burbank, *Pleading and the Dilemmas of Modern American Procedure*, 93 JUDICATURE 109, 115 (2009) (noting that the drafters of the Federal Rules rejected fact pleading because of the impossibility of distinguishing between conclusions and facts); Hatamyar, *supra* note 15, at 563 (discussing courts' obligations to credit as true all factual allegations in a complaint).

[17]   *See Iqbal*, 129 S. Ct. at 1950 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

drastically different set of background experiences and values.[18]  The admixture of these two steps portends serious trouble for pro se litigants, who, even before the plausibility standard, did not fare well despite the leeway afforded their complaints.[19]

Accordingly, this Comment reevaluates the effectiveness of liberal construction as a bulwark against premature dismissal of pro se complaints.  Part I discusses pro se litigation generally.  It documents the rise of the federal pro se docket, the reasons individuals choose to proceed pro se, and the unique challenges they face as a result of that choice.  Because courts established liberal construction in response to those challenges, Part I ends by considering how this leniency operates in practice.  Part II examines in detail the new plausibility standard articulated by the Supreme Court in *Iqbal.*  Particularly, it dissects the Court's two-pronged approach to demonstrate how each step is uniquely hostile to pro se litigants.  This hostility explains the disproportionate impact that the decision has had and will continue to have on their complaints.  Part III suggests a way to reinvigorate the leeway afforded pro se litigants and bring self-representation closer to epitomizing our system's goal of providing equal court access.  Specifically, Part III advocates for (1) limiting disregard of "conclusory" factual allegations in pro se pleadings and (2) increasing transparency with respect to the inferences drawn against pro se litigants.

## I. Pro Se Litigation and Liberal Construction

To evaluate liberal construction effectively, it is vital to understand the origins and characteristics of pro se litigation generally.  Recounting the roots from which the right to proceed pro se developed and the current prevalence of pro se cases in federal court demonstrates the importance of maintaining formidable protections against early dismissal.  Moreover, dispelling common assumptions about why individuals proceed pro se shows that their rate of dismissal may be disproportionately greater than the rate at which they file unmeritorious claims.  Thus, liberal construction has earned a reevaluation to ensure that it properly accomplishes the goals for which it was originally established.

---

[18]  *Cf.* Burbank, *supra* note 16, at 118 (suggesting that reliance on "judicial experience and common sense," *Iqbal,* 129 S. Ct. at 1950, invites "cognitive illiberalism," a phenomenon that negatively affects classes of disfavored litigants).

[19]  *See* Hatamyar, *supra* note 15, at 615 (noting that, under *Conley,* courts dismissed sixty-seven percent of pro se cases).

## A. *The Right to Proceed Pro Se*

Like many elements of the American legal system, the ability to civilly prosecute one's own case has its origins in British common law.[20] Historically, these ties were so strong, in fact, that "[t]he Founders believed that self-representation was a basic right of a free people."[21] As such, our early legal regimes heavily guarded the ability to proceed pro se; their commitment demonstrates both egalitarian and democratic ideals.

First, a fundamental precept of American law is that financial status should neither determine access to courts nor substantially alter the outcomes of cases.[22] Individuals who are unable to afford attorneys should not be denied a forum in which to air their grievances.[23] To ensure that they are not, any party to a case has long been able to proceed without a lawyer. Importantly, however, considerable "anti-lawyer sentiment" also firmly ingrained the right to self-representation into the American system.[24] This sentiment emphasizes that self-representation safeguards were not solely intended to protect the poor's access to courts; they also empowered citizens of all types to have their own voices heard, rather than speaking exclusively through their lawyers.

The Sixth Amendment protects the constitutional right to represent oneself as a criminal defendant.[25] By contrast, however, the

---

[20] *See* Nina Ingwer VanWormer, *Help at Your Fingertips: A Twenty-First Century Response to the Pro Se Phenomenon*, 60 VAND. L. REV. 983, 987 (2007) (tracing the right to represent oneself in federal court to medieval England, and to the Magna Carta in particular).

[21] Faretta v. California, 422 U.S. 806, 830 n.39 (1975).

[22] *See* Drew A. Swank, *The Pro Se Phenomenon*, 19 BYU J. PUB. L. 373, 374-75 (2005) (noting that the "American legal ideal is that both the wealthy and the pauper could have access to the courts and could be treated equally with the resulting decisions being as fair as possible").

[23] *See id.* at 375 ("The development of pro se rights in the United States has been tied to the rights of indigents to have access to the courts.").

[24] *See, e.g., Faretta*, 422 U.S. at 826-27 (discussing American colonists' fervent distrust of lawyers as responsible for their insistence on maintaining the right to proceed pro se); Jona Goldschmidt, *Cases and Materials on Pro Se Litigation and Related Issues*, THE PRO SE LAW CENTER (May 1–4, 1997), http://www.pro-selaw.org/cases.asp (providing references to research pertaining to the anti-lawyer sentiment from which the right to self-representation emerged).

[25] *See Faretta*, 422 U.S. at 819 ("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. . . . [T]he right to self-representation . . . is thus necessarily implied by the structure of the Amendment."). So firm are the historical roots from which the right to defend oneself from criminal prosecution arose that in sixteenth- and seventeenth-century England, felony defendants were actually required, not just

Supreme Court has not deemed the right to proceed pro se as a civil litigant to be constitutionally guaranteed, despite its longstanding recognition in the Anglo-American legal tradition.[26]    Nevertheless, Congress codified the right to proceed pro se in federal civil suits by statute, even prior to the ratification of the Sixth Amendment.    The Judiciary Act of 1789, the right's earliest statutory expression, pronounced "[t]hat in all the courts of the United States, the parties may plead and manage their own causes *personally* or by the assistance of such counsel or attorneys at law as by the rules of the said courts respectively."[27]    And Congress has, up to the present, continually codified the statutory right to proceed pro se in the United States Code using substantially similar language.[28]

## B.  *The Federal Pro Se Docket*

### 1.  Evidence of a Burgeoning Caseload

Although pro se litigation has been welcomed since the country's founding, federal courts have recently experienced a staggering in-

---

entitled, to proceed without a lawyer, despite the earlier recognition of a right to counsel in misdemeanor prosecutions and civil cases. *See id.* at 823 ("By common law of that time, it was not representation by counsel but self-representation that was the practice . . . ."). The tradition carried over into colonial America as well: "[E]ven where counsel was permitted, the general practice continued to be self-representation [in criminal cases]." *Id.* at 828.

[26]    *See* Swank, *supra* note 1, at 1547 ("Whatever right there is to proceed pro se in criminal cases . . . has not been extended by the Supreme Court to civil cases."); Van-Wormer, *supra* note 20, at 986-87 (noting that, although criminal defendants' right to refuse counsel is protected by the Sixth Amendment of the Constitution, the guarantee "does not extend to civil litigants").    Nonetheless, considerable debate has focused upon whether there is a constitutional right to self-representation in civil cases, despite its nonrecognition thus far by the Supreme Court. *See, e.g.,* Lois Bloom & Helen Hershkoff, *Federal Courts, Magistrate Judges, and the Pro Se Plaintiff,* 16 NOTRE DAME J.L. ETHICS & PUB. POL'Y 475, 484-85 (2002) (suggesting that the right to self-representation is constitutionally guaranteed); Candice K. Lee, Note, *Access Denied: Limitations on Pro Se Litigants' Access to Courts in the Eighth Circuit,* 36 U.C. DAVIS L. REV. 1261, 1265 (2003) (commenting that courts have split on whether civil litigants have a constitutional right to proceed self-represented).    Some states, though, have definitively afforded constitutional protection to civil litigants' right to self-representation. *See, e.g.,* GA. CONST. art. I, § 1, para. XII ("No person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state."); MICH. CONST. art. I, § 13 ("A suitor in any court of this state has the right to prosecute or defend his suit, either in his own proper person or by an attorney.").

[27]    Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 92 (emphasis added).

[28]    *See* 28 U.S.C. § 1654 (2006) ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel . . . .").

crease in the proportion of pro se cases on their dockets.[29]  The trend is restricted neither to particular courts nor to certain types of suits. Rather, it has taken hold in both district and appellate courts, in cases involving prisoners and nonprisoners, and in claims ranging from civil rights to social security.[30]

Presently, pro se litigants appear in approximately thirty-seven percent of all federal court cases.[31]  Specifically, in 2008, there were over 70,000 pro se cases in federal district court, as compared to approximately 200,000 represented cases.[32]  Unsurprisingly, prisoners account for a significant part of the federal pro se docket.  However, nonprisoners still appeared pro se in a significant number of district court cases in 2008—over 20,000, in fact.[33]  Thus, statistics belie the notion that the increase in pro se litigation can solely be attributed to prisoners' incessant filing of habeas corpus petitions and claims under 42 U.S.C. § 1983.[34]

---

[29]  *See* Stephan Landsman, *The Growing Challenge of Pro Se Litigation*, 13 LEWIS & CLARK L. REV. 439, 440-41 (2009) (describing the "inexorably rising tide of pro se litigation" in American courts); *see also* VanWormer, *supra* note 20, at 988-91 (presenting data on the recent rise of pro se litigation in both state and federal courts).

[30]  *See* Landsman, *supra* note 29, at 442 (asserting that, aside from civil rights claims, common claims pursued pro se also involved contract, labor, social security, and tort law).

[31]  Swank, *supra* note 22, at 377 (citing Tiffany Buxton, *Foreign Solutions to the U.S. Pro Se Phenomenon*, 34 CASE W. RES. J. INT'L L. 103, 112 (2002)).

[32]  *See* JAMES C. DUFF, ADMIN. OFFICE OF THE U.S. COURTS, JUDICIAL BUSINESS OF THE UNITED STATES COURTS: 2008 ANNUAL REPORT OF THE DIRECTOR 78 tbl.S-23 (2008) (reporting that 70,948 pro se cases were heard in district courts in the twelve months preceding September 30, 2008, compared to 196,309 non–pro se cases).

[33]  *Id.*

[34]  In fact, two relatively recent statutory developments, the Prison Litigation Reform Act of 1995 (PLRA), Pub. L. No. 104-134, 110 Stat. 1321 (codified as amended in scattered sections of 11, 18, 28, and 42 U.S.C.), and the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered sections of 8, 18, 22, 28 and 42 U.S.C.), have severely limited prisoners' ability to institute abusive litigation.  The PLRA, for example, requires prisoners to exhaust administrative remedies before filing civil actions and pay court filing fees in full, thereby reducing the portion of the pro se docket consisting of prisoner complaints.  *See* 28 U.S.C. § 1915(b)(1) (2006) (imposing full filing fees on prisoner litigants); 42 U.S.C. § 1997e(a) (2006) (codifying an administrative exhaustion requirement); Rosenbloom, *supra* note 5, at 322 (concluding that the sharp decrease in "[t]he number of inmate-filed cases . . . following the enactment of the PLRA" demonstrates the enactment's profound effect on pro se litigation).  Even more strictly, AEDPA forbids prisoners from reinstituting previously adjudicated habeas claims.  28 U.S.C. § 2244(b)(1).  It also prohibits successive habeas petitions containing claims not previously adjudicated absent approval from the relevant court of appeals and either (1) a basis in a new constitutional rule made retroactive on collateral review by the Supreme Court or (2) a showing that the factual predicate for the claim both could not

Moreover, the number of pro se appeals in federal court has similarly increased in recent years to comprise a significant portion of the federal appellate docket. For example, "nonprisoner pro se litigants consistently accounted for approximately thirteen to fourteen percent of all civil federal appeals filed annually between 1997 and 2004."[35] From 2007 to 2008, though, federal courts of appeals experienced an eight percent increase in the number of civil pro se appeals, resulting in almost 20,000 in total.[36] As a result, approximately sixty-two percent of all civil appeals are presently pursued pro se, with approximately 14.5 percent involving nonprisoner pro se parties.[37]

Clearly, then, pro se litigation shows no sign of subsiding. It will only continue to grow as part of the federal docket, warranting an evaluation of the reasons individuals choose to proceed pro se. Without understanding the underlying causes of the rising tide of pro se litigation, meaningful accommodations for self-represented litigants will continue to evade courts.

### 2. Reasons Litigants Represent Themselves

Demonstrating that the leniency granted to pro se pleadings is insufficient to protect meritorious claims from premature dismissal requires first dispelling the notion that pro se claims virtually always lack merit. If they did, courts would appropriately dismiss them at rates substantially higher than complaints submitted by counseled parties. But the well-documented reasons individuals choose to proceed pro se, which largely do not relate to the merits of their claims, undercut the veracity of that belief.[38] In fact, "scholars and pro se litigants

---

have been developed previously and provides clear and convincing evidence that a reasonable factfinder would not have found the defendant guilty. 28 U.S.C. § 2244(b)(2)–(3). Despite these influential developments in prisoner litigation, the pro se docket continues to grow.

[35] VanWormer, *supra* note 20, at 989.

[36] *See* DUFF, *supra* note 32, at 45 tbl.S-4 (indicating an 8.2 percent increase from 2007 to 2008 in civil pro se appeals).

[37] *See id.* (showing that of the 31,454 total civil appeals in 2008, 4595 involved nonprisoners acting pro se).

[38] This is not to deny that a lack of legal expertise often leads litigants to believe they have claims when they, in fact, do not. It does, however, suggest that perhaps the number of unmeritorious pro se filings is not as high as many assert, and perhaps not high enough to explain the grossly disproportionate rate at which they are dismissed. Indeed, the high rate of dismissal of pro se cases cuts against the certainty that pro se claims lack merit because, without any discovery, it is difficult to discern the likelihood that a claim would have been successful—precisely the reason that drafters of the Federal Rules instituted a weak pleading regime in the first place.

themselves have identified several rational, well-considered reasons for deciding to do so."[39]

The assumption that a vast majority of pro se suits lack merit is primarily based upon a conception of the legal market as an accurate filter for unmeritorious cases; good claims attract representation, while bad ones do not.[40] Under this theory, "the fact that no lawyer is willing to take on an action for damages suggests that someone knowledgeable about the law has looked at the matter and concluded that the plaintiff is unlikely to prevail."[41] However, this argument does not accurately capture the reasons that individuals forego representation, as it assumes that lawyers always accept "good" cases presented to them and that any litigant would accept representation if made available.[42] Neither of these assumptions holds water.

First, the most prevalent reason individuals choose to prosecute their own cases is inability to afford counsel.[43] Certainly, the use of contingent fees mitigates to some extent the impact that lack of re-

---

[39] VanWormer, *supra* note 20, at 991.

[40] *See, e.g.*, Merritt v. Faulkner, 823 F.2d 1150, 1155 (7th Cir. 1987) (per curiam) (Posner, J., concurring) (arguing against the appointment of counsel in a pro se suit for damages because the self-represented litigant could have hired an attorney on a contingent-fee basis, and concluding from his failure to do so that the claim lacked merit). For a fuller critique of this argument, see generally Robin Paul Malloy, *Framing the Market: Representations of Meaning and Value in Law, Markets, and Culture*, 51 BUFF. L. REV. 1 (2003).

[41] Colleen McMahon, *The Law of Unintended Consequences: Shockwaves in the Lower Courts After* Bell Atlantic Corp. v. Twombly, 41 SUFFOLK U. L. REV. 851, 867 (2008).

[42] *See, e.g.*, Swank, *supra* note 22, at 378 ("[C]ommon belief is that all pro se civil litigants want counsel to represent them and that no person would choose to be pro se." (internal quotation marks omitted) (footnotes omitted)). The assumption that anyone intending to prosecute a claim desires counsel reflects, in a more refined manner, the saying that "one who is his own lawyer has a fool for a client." Faretta v. California, 422 U.S. 806, 852 (1975) (Blackmun, J., dissenting). Yet the myriad reasons why individuals choose to proceed pro se in civil suits show that they may not be foolish for doing so and certainly cannot be blamed for the decision, as it often results from their insolvency. *See* VanWormer, *supra* note 20, at 991-92 (rejecting the joke as inaccurate in light of why individuals represent themselves). Indeed, even in the criminal context—where the stakes are higher—the saying's accuracy has been called into question by a study that demonstrates that, in fact, "pro se felony defendants in state courts are convicted at rates equivalent to or lower than the conviction rates of represented felony defendants." Erica J. Hashimoto, *Defending the Right of Self-Representation: An Empirical Look at the Pro Se Felony Defendant*, 85 N.C. L. REV. 423, 423 (2007).

[43] *See* Paul D. Healey, *In Search of the Delicate Balance: Legal and Ethical Questions in Assisting the Pro Se Patron*, 90 LAW LIBR. J. 129, 133 (1998) ("Ultimately, the predominant reason for self-representation may be simple economics."); Swank, *supra* note 22, at 378 (asserting that a majority of the public attributes the increase in pro se appearances to the high cost of attorneys).

sources should have on acquiring counsel. However, contingent fees do not effectively assist many claims that pro se litigants pursue, such as those for injunctive relief against civil rights abuses.[44] Additionally, the contingent-fee structure still requires attorneys to front large sums of money to prosecute claims, which they will not do if the projected reward is too little (or nothing at all), despite a significant likelihood of success.[45] Furthermore, there may not exist an accessible legal market in which a litigant can shop her claims, either because of geographical remoteness[46] or incarceration.[47] Thus, proponents of the efficient-legal-market hypothesis ignore influential factors in lawyers' decisions regarding whether to represent prospective clients, which relate less to their claims' merit or likelihood of success and more to external factors.

Furthermore, a significant number of pro se litigants in fact have funds to retain counsel, demonstrating that there are other, noneco-

---

[44] *See* Rosenbloom, *supra* note 5, at 321, 326-27 (asserting that civil rights cases are most frequently pursued pro se and that approximately thirty percent of examined pro se cases sought a form of equitable relief). Although attorneys' fees would presumably be available if these types of suits are "successful," the Supreme Court has limited the ability of civil rights attorneys to receive attorneys' fees under 42 U.S.C. § 1988. *See, e.g.*, Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 598 (2001) (holding that attorneys cannot collect fees under the "catalyst theory," in which defendants voluntarily change their conduct in the way requested by plaintiffs); *see also generally* 42 U.S.C. § 1988 (2006). As a result, attorneys are nevertheless discouraged from pursuing such suits. *See* Catherine R. Albiston & Laura Beth Nielsen, *The Procedural Attack on Civil Rights: The Empirical Reality of* Buckhannon *for the Private Attorney General*, 54 UCLA L. REV. 1087, 1089-92 (2007) (arguing that the Court's holding in *Buckhannon* discourages civil rights claims).

[45] *See* Lee, *supra* note 26, at 1280-81 (doubting the market's capacity to provide representation when the expected profit is too insignificant to attract counsel); Swank, *supra* note 22, at 380 (noting that where little or no profit motive exists, as where a potential client is a defendant or has an unprofitable case, the market will not provide representation). In addition to not fully accounting for lawyers' calculus in accepting cases, the contingent-fee structure may cause parties to forego representation because the substantial portion of an award that goes to the attorney may prevent even successful plaintiffs from being made whole. If a party feels confident in the strength of her suit, then, she may choose to proceed without counsel in order to be more fully compensated for the injuries suffered.

[46] *See* PATRICIA A. GARCIA, LITIGANTS WITHOUT LAWYERS: COURTS AND LAWYERS MEETING THE CHALLENGES OF SELF-REPRESENTATION 8 (2002) (asserting that some litigants "point to problems finding a lawyer" as a reason why they did not obtain counsel); Frances H. Thompson, *Access to Justice in Idaho*, 29 FORDHAM URB. L.J. 1313, 1315 (2002) (asserting that in certain rural locations, even if an individual wishes to hire an attorney, she may not be able to find one).

[47] *See, e.g.*, McMahon, *supra* note 41, at 867 (excluding prisoners from the assertion that the legal market adequately determines meritorious cases because they have "virtually no opportunity to search for counsel").

nomic reasons for their decisions to proceed pro se.[48] For example, pro se litigants have asserted that their distrust of lawyers or the legal system in general drove them to forego representation.[49] Unlike these skeptical individuals, others who choose to prosecute claims without counsel seem to possess a more idealistic vision of our legal system. They believe that courts will come to the "right" or "just" result regardless of their status as unrepresented litigants, a concept from which self-representation itself originated.[50] There are numerous other factors, unrelated to merit, resulting in more litigants opting to not hire counsel, including increased literacy rates, a heightened sense of individualism, and the belief that litigation is simple enough to navigate on one's own.[51] However, one remaining factor is particularly strong in demonstrating that many pro se suits do indeed have merit: consulted counsel often advise litigants to proceed unrepresented because they believe certain cases are easy enough for the litigants to pursue without assistance.[52]

Thus, we should not assume that most pro se suits have been reviewed by lawyers who deemed them unworthy. Rather, many of the reasons individuals choose to act without assistance of counsel may

---

[48] *See, e.g.,* Bauer v. Comm'r, 97 F.3d 45, 49-50 (4th Cir. 1996) (acknowledging that a pro se litigant had the funds and ability to obtain counsel and was therefore not entitled to "preferential treatment"); Landsman, *supra* note 29, at 444-45 (emphasizing the presence among pro se litigants of "individuals who can afford counsel but choose not to hire a lawyer"); Swank, *supra* note 22, at 378 (citing a survey in which almost half of the pro se litigants "implied that they had the necessary funds to hire an attorney, but chose not to"); Spencer G. Park, Note, *Providing Equal Access to Equal Justice: A Statistical Study of Non-Prisoner Pro Se Litigation in the United States District Court for the Northern District of California in San Francisco,* 48 HASTINGS L.J. 821, 831 (1997) ("[T]he overwhelming majority of pro se litigants, 72%, were not legally 'indigent' . . . .").

[49] *See* Jona Goldschmidt, *The Pro Se Litigant's Struggle for Access to Justice: Meeting the Challenge of Bench and Bar Resistance,* 40 FAM. CT. REV. 36, 36 (2002) (discussing "antilawyer sentiment" as a reason for increased pro se litigation); Eric J.R. Nichols, Note, *Preserving* Pro Se *Representation in an Age of Rule 11 Sanctions,* 67 TEX. L. REV. 351, 380 (1988) (placing distrust of the legal system among the reasons why litigants choose to proceed pro se). It seems, then, that the antilawyer sentiment partially responsible for solidifying self-representation as an element of the Anglo-American legal tradition has not dissipated, but rather continues to nurture its growth.

[50] *See* Swank, *supra* note 22, at 379 (presenting noneconomic reasons for which some litigants choose to represent themselves); *see also supra* Section I.A (discussing the foundations upon which the right to self-representation rests, including the notion that the retention of counsel should not substantially alter outcomes).

[51] *See* Swank, *supra* note 22, at 378-79 (listing factors that in recent years have contributed to the growing inclination toward pro se litigation).

[52] *See, e.g.,* Thompson, *supra* note 46, at 1316 (asserting that thirty-one percent of pro se litigants in Idaho consulted counsel, and many were advised not to obtain representation because "their case [wa]s simple enough for them to handle themselves").

be largely unrelated to the validity of their claims, calling into question the presumption of reduced merit that informally attaches to pro se complaints.

### 3. Challenges Facing Pro Se Litigants

If more pro se litigants have potentially valid grievances than commonly believed, there must be other factors, aside from frivolity, that explain the grossly disproportionate rate at which their claims are dismissed. These factors, consisting of the unique challenges faced by litigants proceeding pro se, manifest at the pleading stage of litigation to render their complaints more vulnerable to dismissal for failure to state a claim.[53]

First, there exists significant bias against pro se litigants in the court system: "Pro se litigants are regularly perceived in a negative manner; they are 'most often attacked for the judicial inefficiencies many judges, attorneys, and observers believe they create.'"[54] As a result, they are thought to be pests responsible for "clogging" up the court system.[55] However, the evidence largely disproves these assessments. Indeed, studies have shown that cases with only represented parties consumed more time than[56] and settled at essentially the same rate as their pro se counterparts.[57] Aside from a sense that their claims

---

[53] *See* Rosenbloom, *supra* note 5, at 308-09 (discussing the methods by which over-burdened courts summarily dispose of pro se cases).

[54] Swank, *supra* note 22, at 384 (quoting Buxton, *supra* note 31, at 114).

[55] *See* JONA GOLDSCHMIDT ET AL., MEETING THE CHALLENGE OF PRO SE LITIGATION: A REPORT AND GUIDEBOOK FOR JUDGES AND COURT MANAGERS 121 (1998) (quoting judges who expressed distaste for pro se litigants).

[56] Rosenbloom, *supra* note 5, at 358-59.

[57] *See, e.g.,* Buxton, *supra* note 31, at 145-46 (citing a study which found that civil pro se claims settled at a rate "virtually identical" to that of cases with represented parties); Rosenbloom, *supra* note 5, at 358-59 (noting that cases longest on the docket involved represented parties). The lighter burden that pro se suits impose upon courts in comparison to counseled suits reflects not only pro se litigants' unfamiliarity with available litigation tactics but also the less complex nature of the claims that pro se litigants pursue. Accordingly, pro se suits are particularly good candidates for the sort of limited, court-supervised discovery that many commentators and the *Iqbal* minority have suggested as more appropriate than stringent pleading requirements. *See* Ashcroft v. Iqbal, 129 S. Ct. 1937, 1961-62 (2009) (Breyer, J., dissenting) ("[A] trial court, responsible for managing a case, . . . can structure discovery . . . . Neither the briefs nor the Court's opinion provides convincing grounds for finding these alternative case-management tools inadequate . . . ." (citation omitted)); A. Benjamin Spencer, *Understanding Pleading Doctrine*, 108 MICH. L. REV. 1, 30 (2009) ("[A] better approach might be to permit judges to identify those cases where additional facts are needed to support the needed inference and reserve judgment on the motion to dismiss until after limited, focused discovery on that issue can occur."). The discovery costs would not be

lack merit, the perception that pro se suits are more burdensome emanates in part from the fact that the time required to evaluate a submission drafted by counsel is less than the time required to evaluate a document of comparable length and substance drafted by a pro se litigant. However, submissions drafted by counsel are typically longer and greater in number than those drafted by pro se litigants,[58] thereby negating much of the perceived inefficiency on a case-by-case basis. Thus, pro se litigants do not overwhelmingly inhibit efficient court practice more than others, but the belief that they do certainly heightens the likelihood that their suits are improperly dismissed.

In addition, pro se litigants often lack a sufficient understanding of procedural and substantive law to initiate a lawsuit properly.[59] Procedural deficiencies, such as failure to file on time, are less problematic when evaluating the effectiveness of the leeway given pro se litigants because special treatment on procedural requirements has been, for the most part, emphatically denied.[60] As to substantive matters, however, the knowledge differential is precisely the reason for affording pro se litigants special deference at the pleading stage of litigation. First,

---

crushing and would most likely be less than the costs in time and effort to courts evaluating pro se complaints, which are significant in light of the accommodations to which they are entitled. *See* Buxton, *supra* note 31, at 117 (acknowledging the "extensive time and effort already expended by court clerks and . . . judges in assisting pro se litigants").

[58] *See, e.g.*, Rosenbloom, *supra* note 5, at 359 (noting that "counseled cases generally consisted of 50% more docket entries than non-counseled cases").

[59] *See* VanWormer, *supra* note 20, at 993 ("[T]he self-represented 'are more likely to . . . have problems understanding and applying the procedural and substantive law pertaining to their claim' in the initial stages of litigation." (footnote omitted) (quoting Buxton, *supra* note 31, at 114)).

[60] *See, e.g.*, Pomales v. Celulares Telefónica, Inc., 342 F.3d 44, 49 n.4 (1st Cir. 2003) ("[P]ro se status did not absolve [plaintiff] of the need to comply with . . . the district court's procedural rules."); Creative Gifts, Inc. v. UFO, 235 F.3d 540, 549 (10th Cir. 2000) ("Although pro se litigants get the benefit of more generous treatment in some respects, they must nonetheless follow the same rules of procedure that govern other litigants." (citation omitted)); Edwards v. INS, 59 F.3d 5, 8 (2d Cir. 1995) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them."). The distinction between treatment of procedural and substantive deficiencies is not hard and fast. A small subset of federal courts have

> rel[ied] upon the Supreme Court's rationale in *Haines v. Kerner* to fashion a relaxed set of *pro se* standards for procedural conformity, particularly when dealing with summary judgment proceedings, compliance with discovery rules, the imposition of sanctions, and the introduction of evidence. A greater number of courts, however, take a more traditional approach and extend . . . pleading leniency only to the substantive issues raised, while continuing to strictly enforce compliance with procedural requirements by pro se litigants.

Buxton, *supra* note 31, at 118 (footnotes omitted).

many pro se litigants have difficulty clearly conveying allegations in a complaint due to their lack of legal-writing training.[61]  Thus, even if the conduct from which a grievance arose satisfies each element of a claim, illogical or unclear submissions could still result in dismissal.[62]  Similarly, a mistaken or incomplete understanding of the law can result in a pro se litigant pleading the wrong cause of action or, alternatively, not pleading an available one.[63]

Furthermore, individuals choosing to proceed pro se because they cannot afford legal counsel will often lack the resources to uncover facts prior to filing their complaints.[64]  Consequently, these complaints will frequently be thin on details and therefore require that courts draw more inferences in evaluating motions to dismiss.  In fact, even those who have resources are likely to rely upon standardized forms in drafting complaints and treat them as exemplary pleadings, which is precisely why they are appended to the Federal Rules of Civil Procedure.[65]  Those who do will inevitably conclude that a complaint should be light on facts and will forego prefiling discovery to support their allegations.[66]  These conclusions could very well have proven fatal to complaints under not only the plausibility standard but even under the earlier *Conley* standard as implemented by certain district courts.[67]

Accordingly, nonrobust liberal construction may prevent recognition of meritorious claims by not accounting for the unique challenges

---

[61]  *See* Nichols, *supra* note 49, at 351 (acknowledging that some pro se litigants draft illogical and rambling pleadings that are difficult to decipher).

[62]  *See* Wayne T. Westling & Patricia Rasmussen, *Prisoners' Access to the Courts:  Legal Requirements and Practical Realities*, 16 LOY. U. CHI. L.J. 273, 309 (1985) (emphasizing that poor presentation can lose a case with merit).

[63]  *See* Julie M. Bradlow, *Procedural Due Process Rights of Pro Se Civil Litigants*, 55 U. CHI. L. REV. 659, 678 (1988) (noting that flexible construction of pro se pleadings is meant to combat dismissal where a cause of action exists but the complaint fails to say the "magic words").

[64]  *See* Donald H. Zeigler & Michele G. Hermann, *The Invisible Litigant:  An Inside View of Pro Se Actions in the Federal Courts*, 47 N.Y.U. L. REV. 157, 203-04 (1972) (noting that pro se plaintiffs are "almost totally unaware of the . . . value and techniques of pretrial discovery and investigation").

[65]  *See* VanWormer, *supra* note 20, at 992 (listing the availability of legal forms as one of the factors responsible for pro se litigants' belief that they can successfully prosecute their cases without representation).

[66]  *See, e.g.*, FED. R. CIV. P. Form 11 (demonstrating the brief and general elements that must be included in a complaint alleging negligence); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 576 (2007) (Stevens, J., dissenting) (discussing the "bare allegation[s]" included in Form 9 of the Federal Rules).

[67]  *See infra* notes 89-91 and accompanying text (discussing district courts' tendency to stray from the liberal pleading regime established under *Conley*).

that pro se litigants face. Therefore, liberal construction must be evaluated as actually practiced by courts to determine whether it effectively overcomes the barriers between pro se litigants and court access.

## C. *Liberal Construction*

In recognition of the abnormally high potential for meritorious pro se complaints to be dismissed, the Supreme Court relaxed pleading standards for pro se litigants to ensure that they receive their "day in court."[68] In *Haines v. Kerner*, the Court held that judges should liberally construe pro se pleadings.[69] It further stated that

> allegations such as those asserted by [the pro se] petitioner, however inartfully pleaded, are sufficient to call for the opportunity to offer supporting evidence. We cannot say with assurance that under the allegations of the *pro se* complaint, which we hold to less stringent standards than formal pleadings drafted by lawyers, it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[70]

Despite consistently affirming its holding, though, the Court has failed to flesh out precisely how relaxed a standard lower courts should apply.[71] Consequently, district courts apply different degrees of relaxation, thereby rendering pleading leniency less reliable at preventing dismissal of pro se complaints.[72] Nevertheless, one can discern some unifying principles, both specific and general, from the jurisprudence concerning pro se pleadings.

---

[68] *See* Edward M. Holt, *How to Treat "Fools": Exploring the Duties Owed to Pro Se Litigants in Civil Cases*, 25 J. LEGAL PROF. 167, 168-69 (2001) (asserting that the Supreme Court responded to the potential for unfair dismissal of pro se cases by requiring judges to liberally construe pro se litigants' complaints).

[69] 404 U.S. 519, 520-21 (1972) (per curiam). The Court has reaffirmed the lenient standard in cases following its initial pronouncement in *Haines. See, e.g.*, Fed. Express Corp. v. Holowecki, 128 S. Ct. 1147, 1158 (2008) ("Even in the formal litigation context, *pro se* litigants are held to a lesser pleading standard than other parties."); Estelle v. Gamble, 429 U.S. 97, 106 (1976) ("The handwritten *pro se* document is to be liberally construed.").

[70] *Haines*, 404 U.S. at 520-21 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

[71] *See* Bacharach & Entzeroth, *supra* note 7, at 29 (asserting that the Court "did not define the degree of relaxation" applicable to pro se complaints).

[72] *See id.* at 29-30 ("Not surprisingly, federal courts take varying approaches regarding 'how liberal' the construction of pro se pleadings should be."); Douglas A. Blaze, *Presumed Frivolous: Application of Stringent Pleading Requirements in Civil Rights Litigation*, 31 WM. & MARY L. REV. 935, 971-72 (1990) (concluding that lower courts have frequently ignored or given only "superficial acknowledgment" to the requirement that pro se pleadings be liberally construed).

### 1. The Method by Which Courts Liberally Construe
### Pro Se Complaints

It is difficult to survey all of the ways by which lower courts operationalize liberal construction because of the vague terms in which the Supreme Court articulated its directive.[73]  Nevertheless, two general lower court techniques are clear:  (1) disregard as much as possible pro se litigants' use of incomprehensible language and incorrect grammar in setting forth allegations and (2) intuit from their allegations the appropriate legal claims or procedural devices that pro se litigants would have expressly invoked had they been counseled.[74]  However, there are obvious limits upon the extent to which courts will

---

[73]  Indeed, lower court opinions often give only cursory mention of the method by which they implement liberal construction in a "standard of review" section without specific explanation of how it is given effect when particular allegations are evaluated. *See, e.g.*, Proctor v. Applegate, 661 F. Supp. 2d 743, 759-60 (E.D. Mich. 2009) (acknowledging the liberal construction afforded a pro se complaint in its "standard of review" section, but failing to make further mention of the doctrine in discussion, despite concluding that many of the asserted claims should be dismissed).

[74]  *See, e.g.*, Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) (describing liberal construction as requiring the court to read the pleadings to state a valid claim if reasonable, despite, among other things, a pro se litigant's "confusion of various legal theories" and "poor syntax and sentence construction").  That both of these concessions would be misguided and unfair to the opposition if a pro se complaint were drafted with the aid of counsel—albeit undisclosed—explains courts' strong disapproval of the practice that has come to be known as "ghostwriting." *See, e.g.*, Delso v. Trs. for the Ret. Plan for the Hourly Emps. of Merck & Co., No. 04-3009, 2007 WL 766349, at *16-17 (D.N.J. Mar. 6, 2007) (concluding that a lawyer's informal assistance to a pro se litigant in drafting a court document violated the lawyer's ethical obligations because it provided the litigant undue advantage in light of the leeway afforded pro se litigants).  Permitting limited-scope representations, or "unbundled" legal services, is one oft-suggested way to deal with the undue advantage gained when lawyers assist in drafting documents submitted pro se without disclosing their participation to the court. *See, e.g.*, Michael W. Loudenslager, *Giving Up the Ghost: A Proposal for Dealing with Attorney "Ghostwriting" of Pro Se Litigants' Court Documents Through Explicit Rules Requiring Disclosure and Allowing Limited Appearance for Such Attorneys*, 92 MARQ. L. REV. 103, 105 (2008).  Allowing limited assistance in this fashion could curtail the extra effort demanded of courts when considering pro se complaints drafted with the assistance of counsel because the complaints would be less difficult to decipher.  It would also thereby allay concerns over less meritorious complaints surviving motions to dismiss merely because of the leeway afforded to them. *See* Jeffrey P. Justman, Note, *Capturing the Ghost: Expanding Federal Rule of Civil Procedure 11 to Solve Procedural Concerns with Ghostwriting*, 92 MINN. L. REV. 1246, 1287 (2008) (recommending an amendment to Federal Rule of Civil Procedure 11 that would allow for limited-scope representation and suggesting that such an amendment would make representation more accessible to pro se litigants).

liberally construe pro se complaints—one of which is the dilution of factual allegations needed to state a claim.[75]

Disparity in the writing capabilities of pro se litigants and represented parties can lead to different rulings on motions to dismiss even when the plaintiffs' grievances arise from identical factual circumstances.[76] This is because the style in which allegations are presented affects their clarity, which, in turn, influences whether judges can discern cognizable legal claims from them. A complaint drafted by a lawyer will likely set forth in neutral language the necessary allegations to state a claim effectively—time, place, specific sequence of events—and end with a prayer for relief. By contrast, if the complaint is drafted without assistance of counsel, it will likely be tainted by emotional language, legal jargon, tangents, and less direct or incomprehensible assertions of fact.[77] Accordingly, courts attempt to mitigate the impact that pro se litigants' "inartful" drafting may have on the adequacy of their complaints with the first form of liberal construction: to the extent possible, pro se allegations should be read only for substance, disregarding poor style, vocabulary, syntax, superfluities, and the like.[78] Courts, then, must discern from the allegations the factual scenario that the plaintiff intended to allege.[79]

A complaint that references laws under which the allegations provide no relief may also be subject to dismissal. Presumably, such dismis-

---

[75] *See, e.g., Hall*, 935 F.2d at 1110 (noting that liberal construction does not prevent pro se litigants from having to allege sufficient facts to state a claim).

[76] *See* Westling & Rasmussen, *supra* note 62, at 309 ("There is no doubt that a good case can be lost by poor presentation. . . . Even an otherwise meritorious claim can become lost in a tangle of facts, extraneous material, unsupported assertions, and fallacious arguments."); Zeigler & Hermann, *supra* note 64, at 181-82 (acknowledging the negative effect that pro se litigants' "inability to communicate effectively in writing" can have on their complaints, often leading to dismissal for being "rambling and conclusory").

[77] *See* Zeigler & Hermann, *supra* note 64, at 182 n.91 (discussing the "emotional distortions" in many pro se pleadings, as well as their tendency to "slip into an imitation of legal jargon copied from other sources").

> For example, a civil rights complaint . . . may begin in flamboyant, legal-sounding rhetoric with a series of broad generalizations about civil and human rights. At some point the complainant may state conclusorily that he was "brutally beaten by the guard" and then, with renewed vigor, launch into frenzied attacks on prison conditions in general.

*Id.* at 182.

[78] *See, e.g., Hall*, 935 F.2d at 1110 (listing "poor syntax and sentence construction" as two flaws that should be overlooked in evaluating the sufficiency of pro se complaints).

[79] *See, e.g.,* Ayres v. Ellis, No. 09-4247, 2009 WL 3681892, at *1 (D.N.J. Nov. 4, 2009) (quoting a pro se complaint's unclear factual averments and extracting from them the facts that the pro se litigant "meant to allege").

sal is proper when a reasonably competent lawyer drafts the complaint because the lawyer would have invoked a different law had one been more advantageous to the client's case. However, that same presumption is less tenable with respect to complaints drafted by pro se litigants because of the challenges faced by laypersons in comprehending legal doctrines and recognizing available legal theories upon which to base claims. Acknowledging that pro se litigants frequently have a flawed or incomplete understanding of the law, courts have supplemented their disregard for stylistic deficiencies with a more "activist" form of liberal construction: to the extent possible, courts should restructure a complaint to invoke the most appropriate legal bases suggested by the allegations.[80] For example, one plaintiff who asserted that the parole commission's disregard of its own process regulations was unfair had his complaint interpreted as a procedural due process claim.[81] Thus, courts may construe a complaint to invoke the substantive law under which the allegations have the best chance of stating a claim, even if the plaintiff has asserted violations under an inapplicable law or failed to expressly assert any particular legal claim whatsoever.[82]

Beyond simply targeting challenges pro se litigants face, the two techniques by which courts liberally construe pro se complaints seek to extract what the litigants would have presented had they retained

---

[80] *See, e.g.,* Weixel v. Bd. of Educ., 287 F.3d 138, 145-46 (2d Cir. 2002) (construing a pro se complaint to make the best arguments that the allegations suggest); Franklin v. Rose, 765 F.2d 82, 85 (6th Cir. 1985) (providing a pro se petition for habeas corpus an "active interpretation" to "encompass any allegation stating federal relief" (quoting White v. Wyrick, 530 F.2d 818, 819 (8th Cir. 1976) (per curiam))).

[81] *See* Lee v. Rios, No. 08-5330, 2010 WL 22328, at *4 (6th Cir. Jan. 6, 2010) ("Thus, this Court should construe his argument that he was 'deprived . . . of the fundamental fairness in the parole voting process' as an assertion that the Commission violated his right to procedural due process." (omission in original) (citation omitted)).

[82] *See, e.g.,* Martin v. Overton, 391 F.3d 710, 713 (6th Cir. 2004) (construing a civil rights claim to be instead a habeas petition because that was the only viable claim based upon the allegations set forth in the complaint). Judge Bacharach and Professor Entzeroth take issue with the judicial practice of reading into pro se complaints claims "fairly [but perhaps not explicitly] raised." Bacharach & Entzeroth, *supra* note 7, at 32-41. To illustrate the flaws in such an approach, they point to how it conflicts with the statutory schemes created by the PLRA and AEDPA. *Id.* at 35-41. For example, if a judge reads into a pro se complaint a claim as to which the plaintiff did not exhaust administrative remedies, the practice may lead to dismissal of the entire action under the PLRA. *Id.* at 34. In addition, if a judge construes a civil rights complaint as a habeas petition that ultimately fails, the pro se litigant then faces nearly insurmountable hurdles under AEDPA to filing a successive petition for habeas relief. *Id.* at 37. To the authors, these pitfalls suggest that activist approaches toward pro se litigants should be constrained because they often punish intended beneficiaries. *See id.* at 41 ("With this intangible loss of a judge's neutrality, the courts may be creating unintended penalties for the litigants who the courts are paradoxically trying to help.").

counsel.[83]  However, the Supreme Court has never stated that these techniques are correct.  Indeed, the language with which it articulated the leniency afforded to pro se pleadings hints at an alternative—albeit significantly broader—theory behind liberal construction.  Just what that theory is, and whether it is viable, is the topic of the following subsection.

### 2. The Theory Behind Liberal Construction

Despite its failure to expressly set forth a coherent theory pursuant to which lower courts should liberally construe pro se complaints, the Supreme Court has provided them a modicum of guidance on the general meaning of liberal construction.  The best description one can discern is that liberal construction is simply an exaggerated version of the *Conley* "no set of facts" standard.[84]  In fact, each pronouncement of the relaxed pleading standard is accompanied by the *Conley* Court's instruction not to dismiss a claim unless it is "beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief."[85]  Justice Scalia confirmed this understanding when he asserted that "[l]iberal construction of pro se pleadings is merely an embellishment of the notice-pleading standard set forth in the Federal Rules of Civil Procedure."[86]

As an exaggerated form of transsubstantive notice pleading,[87] then, liberal construction's efficacy as a less stringent standard largely depends upon lower courts' adherence to a simplified pleading regime.  At least in theory, because plaintiffs could easily surpass the

[83]  *See id.* at 43-44 (suggesting that a pro se litigant's intent should be the hallmark of the leeway granted her complaint).

[84]  *See* Bradlow, *supra* note 63, at 681-82 (discussing development of the *Haines* approach in relation to *Conley* and concluding that the "ultimate result is a less stringent interpretation of what is itself a very lax standard"); *see also* Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (articulating the "no set of facts" standard).

[85]  *See, e.g.,* Hughes v. Rowe, 449 U.S. 5, 9-10 (1980) (per curiam) (observing that "it is settled law that the allegations of [a pro se] complaint . . . are held to 'less stringent standards'" and noting that such complaints "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" (citations omitted) (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam))).

[86]  Castro v. United States, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment).

[87]  *See* Fairman, *supra* note 9, at 988 (describing notice pleading as a touchstone of the Federal Rules, merely requiring that a "plaintiff provide a short and plain statement of a claim sufficient to put the defendant on notice" in order to survive a motion to dismiss).

threshold to discovery, the Court appears to have believed liberal construction did not need to take such a robust form. Lower courts followed the Supreme Court's lead by focusing less on liberalizing the actual standard of sufficiency and more on mitigating the effect of pro se litigants' reduced capacity to draft understandable and legally accurate complaints.[88] However, pre-*Twombly*, those lower courts demonstrated a propensity to stray from the liberal standard the drafters of the Federal Rules envisioned.[89] Most significantly, district courts deciding Rule 12(b)(6) motions appropriated the ability to parse a complaint's factual allegations into "conclusory" averments that should be disregarded and other statements entitled to consideration as true.[90] Additionally, courts often insisted that plaintiffs plead facts in support of their claims in order to survive a motion to dismiss.[91] That these devices ran contrary to notice pleading is demonstrated by the Supreme Court's consistent reversal of lower court decisions displaying their use.[92]

---

[88] *See supra* subsection I.C.1 (discussing the ways by which lower courts implement liberal construction in practice).

[89] *See* Hatamyar, *supra* note 15, at 567-68 (noting that lower courts often disregarded the Supreme Court's explicit instructions to apply lenient notice pleading standards, instead insisting on heightened pleading requirements, particularly in civil rights cases).

[90] *See* Marcus, *supra* note 13, at 466-71 (discussing courts' tendency to label some factual allegations conclusory and thereby require more supporting evidence for them to be sufficient).

[91] *See* Fairman, *supra* note 9, at 1011-59 (documenting lower courts' insistence that complaints contain greater factual specificity in various fields of law, including antitrust, environmental, and civil rights).

[92] *See, e.g.*, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 (2002) (reversing a lower court ruling that employment discrimination complaints must allege "specific facts establishing a prima facie case of discrimination" and holding that they must only present "a short and plain statement of the claim showing that the pleader is entitled to relief" (citation omitted)). Notably, however, the Court's recent rulings in *Twombly* and *Iqbal* have called the continuing vitality of *Swierkiewicz* into question. *See, e.g.*, Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009) ("We have to conclude . . . that because *Conley* has been specifically repudiated by both *Twombly* and *Iqbal*, so too has *Swierkiewicz*, at least insofar as it concerns pleading requirements and relies on *Conley*."); Suja A. Thomas, *The New Summary Judgment Motion: The Motion to Dismiss Under* Iqbal *and* Twombly, 14 LEWIS & CLARK L. REV. 15, 18 (2010) (declaring that, as a result of the similarities between the new motion to dismiss and the motion for summary judgment, *Swierkiewicz* "effectively may be dead"). Nevertheless, in neither case did the Supreme Court specifically overturn its decision in *Swierkiewicz*. *See* Thomas, *supra*, at 36 (acknowledging that "*Iqbal* and *Twombly* did not expressly overrule *Swierkiewicz*"). In fact, the Court cited it approvingly in *Twombly*, which together with other commonalities between the two cases—among them, endorsement of a fair-notice principle in Rule 8(a)—suggest that *Swierkiewicz* is still good law. *Compare* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (asserting that Rule 8(a)(2) only re-

Thus, lacking a cohesive articulation of a more liberal standard by which to judge the sufficiency of pro se allegations—and ostensibly relying upon generally liberal pleading to ensure its efficacy—liberal construction did not compensate for the historical end run around notice pleading.[93] And certainly, the challenges confronting pro se litigants could only have exacerbated their vulnerability to the devices lower courts used to dismiss more complaints, despite judicial efforts to overlook them.[94] Approximately sixty-seven percent of pro se complaints were dismissed under *Conley*,[95] clear evidence of this reality. These statistics show that the mantra "dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the *most unsustainable* of cases"[96] may be mere lip service.

This reality, though, has been significantly altered by the sea change in pleading practice inspired by *Twombly* and *Iqbal.* Since the decisions retired *Conley*'s "no set of facts" standard,[97] upon which liberal construction relied, the practice too may have earned its retirement. As the following discussion shows, *Conley* provided a superior—albeit flawed—background standard for liberal construction to protect pro se litigants as compared to the new plausibility standard.

---

quires "a short and plain statement" to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" (citation omitted)), *with Swierkiewicz*, 534 U.S. at 514 (noting that the complaint satisfies the requirements of Rule 8(a) because it gives fair notice to the defendant).

[93] *See* Howard B. Eisenberg, *Rethinking Prisoner Civil Rights Cases and the Provision of Counsel*, 17 S. ILL. U. L.J. 417, 443 (1993) (concluding from a review of reported district court and court of appeals decisions that many courts have applied stringent pleading standards to pro se complaints).

[94] See Section II.B for a more in-depth explanation of how the conflagration of challenges facing pro se litigants post-*Iqbal* renders liberal construction an ineffective bulwark against improper dismissals for failure to state a claim.

[95] Hatamyar, *supra* note 15, at 615.

[96] Boykin v. KeyCorp, 521 F.3d 202, 216 (2d Cir. 2008) (emphasis added). Interestingly, the complaint in *Boykin* was quite similar to the one dismissed in *Iqbal.* In *Boykin*, an African American woman alleged that a lender denied her home-equity loan application on account of her race, sex, and neighborhood. *Id.* at 206. In her complaint, she did not state specific factual allegations to support the claim of discriminatory motive, instead alleging it generally based upon "information and belief." *Id.* at 214 (citation omitted). The Second Circuit reversed the dismissal of the complaint for failure to state a claim, noting that the general averment was sufficient for Rule 8(a) purposes. *Id.* at 215. Whether the same decision would have resulted after *Iqbal* is unclear; however, the court's strong emphasis on the leeway granted pro se complaints, even under *Twombly*, lends hope for more robust liberal construction of the sort proposed herein.

[97] *See, e.g., Twombly*, 550 U.S. at 562-63 (holding that the "no set of facts" standard has earned its retirement and "is best forgotten").

## II. PLAUSIBILITY AND PRO SE PLEADINGS

In *Twombly*, the Supreme Court announced the new plausibility standard by which pleadings are to be judged: a complaint must allege "enough facts to state a claim to relief that is plausible on its face."[98] A facially plausible complaint is one that "raise[s] a reasonable expectation that discovery will reveal evidence" of the alleged wrongdoing.[99] However, despite affirming the *Twombly* decision, *Iqbal* substantially bolstered plausibility as a device by which lower courts can dismiss weak, not just meritless, cases.[100] *Iqbal* is the focus of the

---

[98] *Id.* at 570. For an interesting account of the origins of plausibility, see Edward Brunet, *The Substantive Origins of "Plausible Pleadings": An Introduction to the Symposium on Ashcroft v. Iqbal*, 14 LEWIS & CLARK L. REV. 1, 3-9 (2010). Professor Brunet traces the origins of the word "plausible" to antitrust litigation, in which the Court used the term substantively to evaluate whether a conspiracy claim made "economic sense." *Id.* at 4. According to him, "[b]ecause of the prior substantive use of plausibility it seems highly questionable to re-use this term as a new procedural standard for assessing Rule 12(b)(6) motions to dismiss. . . . Plausibility as a standard to test pleadings seems confused and should be scrapped." *Id.* at 14.

[99] *Twombly*, 550 U.S. at 556.

[100] *See* Robert G. Bone, *Plausibility Pleading Revisited and Revised: A Comment on Ashcroft v. Iqbal*, 85 NOTRE DAME L. REV. 849, 852 (2010) ("*Iqbal* applies a thick screening model that aims to screen weak as well as meritless suits, whereas *Twombly* applies a thin screening model that aims to screen only truly meritless suits."). This is certainly not the only significant change brought about by the Court's decision in *Iqbal*. In addition to its ruling with respect to pleading standards, the *Iqbal* Court eliminated the possibility of supervisory liability in *Bivens* claims, which are made against federal officials for constitutional violations. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (refuting the petitioner's contention that officials can be made liable under *Bivens* pursuant to a theory of supervisory liability and holding that "each Government official . . . is only liable for his or her own misconduct"); *see also generally Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (providing a private remedy for violations of the Fourth Amendment by federal agents). This will no doubt cause shockwaves in lower courts, which, prior to *Iqbal*, acknowledged forms of supervisory liability in *Bivens* actions, despite the well-established precedent that such claims cannot be based upon respondeat superior. *See, e.g.*, Dalrymple v. Reno, 334 F.3d 991, 995 (11th Cir. 2003) (discussing the standard for supervisory liability in a *Bivens* action); Ruiz Rivera v. Riley, 209 F.3d 24, 28-29 (1st Cir. 2000) (acknowledging that in *Bivens* actions, supervisory liability exists only when "there is subordinate liability" and "the supervisor's action or inaction was affirmatively linked to the constitutional violation caused by the subordinate" (quoting Aponte Matos v. Toledo-Dávila, 135 F.3d 182, 192 (1st Cir. 1998)) (internal quotation marks omitted)); White v. Downs, No. 95-2177, 1997 WL 210858, at *4 (4th Cir. Apr. 30, 1997) (per curiam) ("Although there is no *respondeat superior* liability in *Bivens* actions, a supervisor c[an] be held liable for the acts of a subordinate . . . ." (citations omitted)). Whether the Court should even have decided the issue is questionable because both parties agreed on the availability of supervisory liability and the standard pursuant to which it should be judged, such that the question was not presented to the Court. *See Iqbal*, 129 S. Ct. at 1956-58 (Souter, J., dissenting) (asserting that the majority "*sua sponte* decide[d] the scope of supervisory liability" despite the parties' agreement on the issue). The absence of full briefing and

inquiry here because the Court's two-pronged approach to plausibility analysis systematically exploits pro se litigants' vulnerabilities to dismiss their seemingly weak suits.

## A. Ashcroft v. Iqbal

### 1. Background and Prior History

Following the September 11th terrorist attacks, federal authorities arrested and detained Javaid Iqbal, a Pakistani citizen.[101]  After pleading guilty to charges of fraud in connection with identification documents, Iqbal was released from detention and subsequently removed to Pakistan.[102]  In May 2004, he commenced a suit in the Eastern District of New York against numerous federal officials, including former Attorney General John Ashcroft and current FBI Director Robert Mueller.[103]

Iqbal's complaint concerned his seven-month confinement under highly restrictive conditions.[104]  Iqbal alleged that federal authorities designated him a person "of high interest on account of his race, religion, or national origin" in violation of the First and Fifth Amendments.[105]  Specifically, he alleged that the FBI, under Mueller's direction, arrested and detained "'thousands of Arab Muslim men . . . as part of its investigation of the events of September 11.'"[106]  He further alleged that, in discussions with Mueller, Ashcroft authorized a "policy of holding post–September 11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI."[107]  Last, Iqbal averred that Mueller and Ashcroft "each knew of, condoned, and willfully and maliciously agreed to subject" him and others to harsh condi-

---

argument on the *Bivens* issue may undercut the precedential effect of the Court's elimination of supervisory liability. *See* EUGENE GRESSMAN ET AL., SUPREME COURT PRACTICE 305 & n.94 (9th ed. 2007) (noting that "decisions explained in a written opinion but rendered without full briefing and argument" are not entitled to as much weight as decisions that are "fully articulated").

[101]  *See* Iqbal v. Hasty, 490 F.3d 143, 147-49 (2d Cir. 2007) (recounting Iqbal's arrest by the FBI and INS, as well as his subsequent detention in the Metropolitan Detention Center), *rev'd sub nom.* Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).

[102]  *See* Burbank, *supra* note 16, at 114 (detailing the facts preceding Iqbal's complaint, including a guilty plea leading to his removal to Pakistan).

[103]  *Iqbal*, 490 F.3d at 149; Elmaghraby v. Ashcroft, No. 04-01809, 2005 WL 2375202, at *1 (E.D.N.Y. Sept. 27, 2005).

[104]  *Iqbal*, 129 S. Ct. at 1943-44.

[105]  *Id.*

[106]  *Id.*

[107]  *Id.* (alteration in original) (quoting Iqbal's complaint).

tions "as a matter of policy, solely on account of [their] religion, race, and/or national origin and for no legitimate penological interest."[108]

Mueller and Ashcroft moved to dismiss the allegations against them for failure to state a claim.[109] Pre-*Twombly*, the district court denied their motion, invoking the *Conley* standard to assert that, accepting the allegations as true, it could not conclude that there was no set of facts that would entitle Iqbal to relief against Mueller and Ashcroft.[110] The defendants then pursued an interlocutory appeal in the Court of Appeals for the Second Circuit, which affirmed the district court's denial of the motion to dismiss in light of *Twombly*, decided just several months prior.[111]

The Second Circuit held that Iqbal's allegations against Ashcroft and Mueller satisfied the plausibility standard.[112] It interpreted *Twombly* as instituting "a flexible 'plausibility standard'" that only demands further factual support for claims where the context alone does not render inferences of wrongdoing plausible.[113] According to Judge Newman, no additional factual "amplification" was needed to render Iqbal's claims against Ashcroft and Mueller plausible.[114] The allegation that the defendants condoned and agreed to the discrimination was plausible "because of the likelihood that these senior officials would have concerned themselves with the formulation and implementation of policies dealing with the confinement of those arrested . . . and designated 'of high interest' in the aftermath of 9/11."[115]

### 2. The Supreme Court's Two-Pronged Approach

The Supreme Court reversed the Second Circuit's decision on the claims of discrimination against Ashcroft and Mueller in a five-to-four

---

[108] *Id.*

[109] Elmaghraby v. Ashcroft, No. 04-01809, 2005 WL 2375202, at *17 (E.D.N.Y. Sept. 27, 2005).

[110] *Id.* at *29.

[111] *See Iqbal*, 129 S. Ct. at 1942 (describing the procedural history in the lower courts).

[112] *See* Iqbal v. Hasty, 490 F.3d 143, 177 (2d Cir. 2007) ("Applying the normal pleading rules . . . , even as supplemented by the plausibility standard, we have no doubt that the Plaintiff's allegations . . . suffice to withstand a motion to dismiss."), *rev'd sub nom.* Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).

[113] *See id.* at 157-58 (emphasizing that a pleader need only "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*").

[114] *See id.* at 166 ("Plaintiff's allegations . . . are entirely plausible, without allegations of additional subsidiary facts.").

[115] *Id.* at 175-76.

decision.[116] Writing for the majority, Justice Kennedy held that Iqbal's complaint failed to adequately allege a plausible claim that the high-ranking officials acted for the purpose of discriminating on account of race, religion, or national origin.[117] The two-step process by which the majority arrived at that conclusion, however, vastly expanded *Twombly* beyond what its author, Justice Souter, intended.[118]

First, the Court instructed lower courts considering a Rule 12(b)(6) motion to ignore allegations that are, in fact, conclusions and therefore not entitled to a presumption of truth.[119] Despite attributing this maneuver to *Iqbal*'s plausibility predecessor, *Twombly*, Justice Kennedy extended its scope to include not only "*legal* conclusions" but also "threadbare" or "bald" *factual* allegations.[120] Thus, even factual averments or mixed statements of law and fact can be ignored in determining a complaint's plausibility if a judge deems them deficient of adequate specificity.[121] Additionally, the Court eva-

---

[116] *Iqbal*, 129 S. Ct. at 1954.

[117] *See id.* at 1952 (holding that the complaint did not contain facts plausibly showing the petitioners' purposeful adoption of a discriminatory policy).

[118] *See id.* at 1955 (Souter, J., dissenting) ("The majority then misapplies the pleading standard under *Bell Atlantic Corp. v. Twombly* to conclude that the complaint fails to state a claim." (citation omitted)); *see also* Burbank, *supra* note 16, at 115 (commenting that *Iqbal*'s "mischief" is likely a "major source of regret for the author of the *Twombly* decision").

[119] *See Iqbal*, 129 S. Ct. at 1949 (majority opinion) (asserting that a court need not accept as true "mere conclusory statements"). Notably, the Court did not outright "cast aside the assumption-of-truth rule, which holds that a claimant's factual allegations are entitled to be believed and accepted at the pleading stage." A. Benjamin Spencer, Iqbal *and the Slide Toward Restrictive Procedure*, 14 LEWIS & CLARK L. REV. 185, 192 (2010) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). However, the Court's treatment of the allegations in Iqbal's complaint does question the rule's vitality going forward. *Id.* Indeed, one commentator has characterized the plausibility inquiry as secondary to the first step at which certain allegations are ignored. *See* Adam N. Steinman, *The Pleading Problem*, 62 STAN. L. REV. 1293, 1314 (2010) (asserting that the "'plausibility' inquiry is not in fact the primary inquiry at the pleadings phase" and suggesting that it "becomes irrelevant if a plaintiff provides nonconclusory allegations for each element of a claim for relief").

[120] *Compare* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007) (concluding that the complaint's "stray" allegations of illegal "agreement" were "merely legal conclusions"), *with Iqbal*, 129 S. Ct. at 1951 (dismissing respondent's allegations regarding petitioners' knowledge as "bare" and "conclusory").

[121] *See Has the Supreme Court Limited Americans' Access to Courts?: Hearing Before the S. Comm. on the Judiciary*, 111th Cong. 12 (2009) (statement of Stephen B. Burbank, Professor, University of Pennsylvania Law School), *available at* http://judiciary.senate.gov/hearings/hearing.cfm?id=4189 (under "Witness Testimony") (noting that the Court claimed the power to "carve a complaint" by ignoring some allegations of fact and mixed allegations of law and fact as conclusory); Bone, *supra* note 100, at 860-61 (con-

luated each allegation in the complaint individually to determine if they were specific enough to warrant a presumption of truth.[122] Again, this disregarded Justice Souter's consideration of the *Twombly* complaint as a whole before concluding that its "general allegations of agreement were intended to be [legal] conclusions based on parallel conduct alleged elsewhere."[123]

Once a court has "weeded out" the allegations that can be ignored for the purposes of deciding a motion to dismiss,[124] it is instructed to determine if the remaining factual allegations "plausibly suggest an entitlement to relief."[125] "[J]udicial experience and common sense" act as guides in considering whether, in light of competing inferences that can be drawn from the allegations, the plaintiff's theory of wrongdoing is plausible.[126] Although this step in the analysis largely parallels the approach in *Twombly*, there is a significant difference that bears highlighting: courts have extensive experience with generic antitrust suits, but not claims of the sort put forth by Javaid Iqbal.[127]

---

cluding that the *Iqbal* Court's approach to differentiating between conclusory and nonconclusory facts is based upon the level of generality at which they are stated).

[122] *See Iqbal*, 129 S. Ct. at 1951 (dismissing allegations as conclusory without discussion of other allegations to which they are related); *see also* Rakesh N. Kilaru, Comment, *The New Rule 12(b)(6): Twombly, Iqbal, and the Paradox of Pleading*, 62 STAN. L. REV. 905, 913 (2010) ("To Justice Kennedy, each allegation must stand or fall on its own . . . .").

[123] Bone, *supra* note 100, at 859; *see also Iqbal*, 129 S. Ct. at 1960 (Souter, J., dissenting) (suggesting that singling out certain allegations from a complaint as a whole is a "fallacy" inhering in the majority's approach).

[124] *Iqbal*, 129 S. Ct. at 1953 (majority opinion).

[125] *Id.* at 1951.

[126] *Id.* at 1950; *see also* Burbank, *supra* note 16, at 118 (characterizing the Court's analysis as a necessarily comparative one in which judges imagine, based on their predispositions, other possible explanations for the allegations included in a complaint). In evaluating motions to dismiss, courts are confined to reviewing facts in the complaint, documents referred to therein, and facts of which judicial notice is taken. *See* Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."). Thus, courts' consideration of competing inferences made from neither the plaintiff's pleadings nor the defendant's responses thereto—considered sua sponte, if you will—suggests that their analysis may extend beyond the proper scope of a Rule 12(b)(6) determination.

[127] *See Has the Supreme Court Limited Americans' Access to Courts?*, *supra* note 121, at 12 ("*Twombly* involved assessing competing inferences in a well-trodden path of antitrust law, [but] in *Iqbal* the Court was at sea, subjecting the competing inferences, most of which were left to the [J]ustices' imaginations, to an implicit comparative exercise."); *see also* Bone, *supra* note 100, at 877 (characterizing Iqbal's story as "unusual enough to suggest something fishy might be going on").

This results in greater reliance upon values than experience, despite the latter being perhaps more prudent. If a judge finds an opposing inference of lawful conduct by a defendant significantly more plausible, she should dismiss the claim.[128]

The Court proceeded to apply its novel two-pronged approach to Iqbal's allegations against Ashcroft and Mueller.[129] The Court excluded several critical averments included in the complaint, the most notable of which alleged that Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject [Iqbal] to harsh conditions of confinement as a matter of policy, solely on account of [his] religion, race, and/or national origin."[130] Thus, the Court considered only allegations asserting (1) that the pair agreed on the policy of restrictively detaining 9/11 suspects and (2) that the FBI implemented the policy under Mueller's direction. These, according to the Court, failed to "nudge" the claim of discriminatory purpose from "conceivable to plausible."[131] Competing inferences of lawful intent rendered the alternative pressed by Iqbal implausible; defendants, in other words, more likely sought to keep Iqbal in secure conditions because he was a suspected terrorist, not because of his Pakistani origin.[132]

## B. Iqbal's Impact on Pro Se Pleadings

The Supreme Court drastically altered federal pleading practice by supplanting *Conley*'s low-threshold, "no set of facts" standard with

---

[128] *See, e.g., Iqbal*, 129 S. Ct. at 1951-52 (concluding that, given more likely and obvious explanations for defendants' conduct, the allegations failed to raise a plausible inference of wrongdoing).

[129] Professor Spencer's analysis of the Court's treatment of Iqbal's supposedly "conclusory" allegations suggests that the plausibility inquiry does not even involve two distinct steps:

> At bottom . . . the Court's rejection of certain factual allegations as "too conclusory" is really a statement that (1) the allegations are factual claims that assert the unexpected, particularly about certain kinds of defendants . . . ; (2) as such, the allegations require additional supporting facts to be believed; and (3) such facts are lacking in the claimant's statement of his claim.

Spencer, *supra* note 119, at 196. However, the initial step in Professor Spencer's deconstruction of *Iqbal*'s approach involves a question of believability, or what many would term "plausibility."

[130] *Iqbal*, 129 S. Ct. at 1951 (internal quotation marks omitted).

[131] *Id.* at 1952 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

[132] *See id.* at 1951-52 (citing *Twombly*, 550 U.S. at 567) (emphasizing that a policy of targeting suspected terrorists and housing them in a restrictive environment is an "obvious alternative explanation," which only suggests disparate impact and not discriminatory purpose).

*Iqbal*'s new plausibility standard.[133]   The change demands that the Court's instruction to construe pro se complaints liberally similarly be reevaluated, if not concomitantly altered, because it is an elaboration of the now-retired standard.[134]   Thus, the following section considers whether in theory liberal construction survives *Iqbal*, and whether in practice it accommodates the resulting change in pleading doctrine to protect meritorious pro se complaints from premature dismissal.[135]

### 1. The Minimal Assurance Provided Pro Se Litigants by *Erickson v. Pardus*

On the heels of its decision in *Twombly*, the Supreme Court issued a per curiam opinion in *Erickson v. Pardus*, which involved a pro se complaint.[136]   Although the Court reemphasized the special solicitude granted pro se pleadings—thereby confirming liberal construction's survival post-plausibility—the case provides little comfort that pro se litigants have adequate access to courts under the new pleading regime.[137]

---

[133]  Herrmann, Beck & Burbank, *supra* note 4, at 148 (Burbank, Rebuttal) (arguing that, rather than clarifying pleading standards, the recent pleading decisions "changed them").

[134]  Unfortunately, commentators have given this relatively glaring development only casual, passing consideration. *See, e.g.*, Bacharach & Entzeroth, *supra* note 7, at 29-32 (noting that the new plausibility standard will change the extent to which courts liberally evaluate pro se complaints because it increases the subjectivity of the analysis).

[135]  Scholars have similarly singled out other types of cases for reevaluation in light of *Twombly* and *Iqbal*, concluding that the new plausibility standard is so poor a fit for such cases that an entirely different standard is necessary. *See, e.g.*, Joseph A. Seiner, *The Trouble with* Twombly*: A Proposed Pleading Standard for Employment Discrimination Cases*, 2009 U. ILL. L. REV. 1011, 1041-50 (proposing a new pleading standard to replace plausibility for evaluating employment discrimination complaints).

[136]  551 U.S. 89 (2007) (per curiam).  The acceptance of such an unremarkable case and the timing of its decision suggest that the Supreme Court sought to maintain, as one critic put it, "deniability": the capacity to check excessive usages of plausibility to give the appearance of maintaining a consistent pleading doctrine. *See* Editorial, *The Devil in the Details*, 91 JUDICATURE 52, 54 (2007) ("More probably, *Twombly* is an exercise in strategic ambiguity that empowers the lower federal courts to tighten pleading . . . while preserving deniability . . . [by] correct[ing] perceived excesses (as in *Erickson*)."); Amy Howe, *More on Yesterday's Decision in No. 06-7317*, Erickson v. Pardus, SCOTUSBLOG (June 5, 2007, 5:10 PM), http://www.scotusblog.com/2007/06/more-on-yesterdays-decision-in-no-06-7317-erickson-v-pardus (suggesting that the Court's decision was meant to "counteract the impression" that *Twombly* heightened pleading standards).

[137]  Whether plausibility analysis applied at all to pro se pleadings was in question in the wake of *Erickson*. *See, e.g.*, Anthony Martinez, Case Note, *Plausibility Among the Circuits: An Empirical Survey of* Bell Atlantic Corp. v. Twombly, 61 ARK. L. REV. 763, 775 (2009) ("*Erickson* implies that the *Twombly* standard may not be applicable to a com-

William Erickson, a Colorado inmate, filed a pro se complaint against prison officials, alleging violations of his Eighth Amendment rights.[138] Specifically, Erickson, unaided by counsel, averred that

> prison officials had diagnosed him as requiring treatment for hepatitis C; that he had been placed in an appropriate treatment program; that shortly after the program commenced the prison[] doctor removed him from the program in violation of the applicable protocol; that prison officials refused to recommence his treatment despite his eligibility; and that, in the meantime, he was suffering irreversible damage to his liver and risking possible death.[139]

Nonetheless, the district court granted the defendants' Rule 12(b)(6) motion to dismiss because Erickson failed to allege adequately that the doctor's discontinuance of treatment caused the harm, rather than the hepatitis C.[140] The Court of Appeals for the Tenth Circuit agreed, further characterizing the allegations of independent harm as "conclusory" and therefore "insufficient to state a claim."[141] Each court paid lip service to the special solicitude afforded pro se pleadings,[142] but, alas, the leniency did not rescue Erickson's complaint in either venue.

The Supreme Court, however, did save the complaint, summarily reversing the lower court decisions because Erickson's allegations were not too conclusory to satisfy federal pleading requirements.[143] Despite having decided *Twombly* just two weeks earlier, though, the

---

plaint filed by a pro se plaintiff."). However, this seems to have been wishful thinking, because lower courts overwhelmingly cite the new standard when considering pro se complaints. *See, e.g.*, Severin v. Parish of Jefferson, 357 F. App'x 601, 603 (5th Cir. 2009) (per curiam) (applying the plausibility standard to a pro se complaint); Grabauskas v. CIA, 354 F. App'x 576, 576-77 (2d Cir. 2009) (dismissing a pro se complaint for failing to raise a plausible inference of wrongdoing).

[138]  *See* Complaint at 3, Erickson v. Pardus, 551 U.S. 89 (2007) (No. 05-0405) (per curiam), 2005 WL 5543460 (claiming that prison staff were deliberately indifferent to plaintiff's medical needs in violation of the Eighth Amendment).

[139]  Allan Ides, Bell Atlantic *and the Principle of Substantive Sufficiency Under Federal Rule of Civil Procedure 8(a)(2): Toward a Structured Approach to Federal Pleading Practice*, 243 F.R.D. 604, 636 (2007) (citing Complaint, *supra* note 138, at 3).

[140]  *See* Erickson v. Pardus, 198 Fed. App'x 694, 698 (10th Cir. 2006) (recounting the basis for the district court's dismissal of the pro se complaint), *vacated*, Erickson v. Pardus, 551 U.S. 89 (2007) (per curiam).

[141]  *See id.* (explaining that Erickson's complaint included only conclusory allegations regarding an independent cognizable harm from the doctors removing him from treatment).

[142]  *See, e.g., id.* at 696 (noting that a "pro se litigant's pleadings are to be construed liberally" but that a court "is not required to assume the role of advocate" (internal quotation marks omitted) (citations omitted)).

[143]  *See Erickson*, 551 U.S. at 93 (concluding that it was error for the Court of Appeals to dismiss the allegations of independent harm as conclusory).

Supreme Court made no mention of the plausibility standard.[144] In-stead, the Court emphasized that the allegations satisfied Rule 8(a)(2) by giving "the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests."[145] Notably, the Court did not rely upon Erickson's pro se status to deem his complaint adequate, noting only that the departure from established rules of pleading was more pro-nounced because of the leniency to which that status entitled him.[146]

Despite *Erickson's* reaffirmation that lower courts must liberally construe pro se complaints,[147] the decision fails to allay concerns over liberal construction's efficacy post-plausibility. This is because Erick-son's complaint, irrespective of the Court's failure to so state, satisfied *Twombly's* version of the plausibility standard.[148] Erickson raised a plausible inference of independent, cognizable harm by asserting that the prison doctor's deliberate cessation of treatment endangered his life.[149] The opinion, then, does not demonstrate that an otherwise too thinly pleaded complaint could be rendered substantively sufficient by liberally construing it since Erickson's pro se status did not influence the decision.[150] This shortcoming supports the notion that liberal construction only includes a set of devices to deal with challenges

[144] *See* Hatamyar, *supra* note 15, at 573 ("The [*Erickson*] Court did not even refer to the 'plausibility' standard . . . ."); Ides, *supra* note 139, at 639 (noting that the *Erickson* Court only cited *Twombly* twice for propositions unrelated to plausibility).

[145] *Erickson*, 551 U.S. at 93 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Although the Court correctly deemed the complaint sufficient to survive a Rule 12(b)(6) motion, it confused the notice-giving requirements of 12(e) with the requirements of substantive sufficiency in 12(b)(6). *See* Burbank, *supra* note 16, at 114 (implying that notice is irrelevant under Rule 12(b)(6) and is properly considered un-der Rule 12(e)); Ides, *supra* note 139, at 637-38 (suggesting that a problem inheres in the Court's emphasis on fair notice, rather than substantive sufficiency, which seems to undergird its decision).

[146] *See Erickson*, 551 U.S. at 94 (claiming that the departure from liberal pleading standards "is even more pronounced . . . because petitioner has been proceed-ing . . . without counsel," but asserting that the allegations were sufficient irrespective of plaintiff's pro se status).

[147] *See id.* (noting that "[a] document filed *pro se* is 'to be liberally construed'" (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976))).

[148] *See* Editorial, *supra* note 136, at 54 (asserting that the lower court rulings in *Erickson* were out of line with *Twombly*). One could also argue that, by holding the complaint sufficient to survive a motion to dismiss, the Court implicitly acknowledged that Erickson met the *Twombly* standard because the Court espoused the belief that *Twombly* had not changed pleading requirements.

[149] *See Erickson*, 551 U.S. at 94 (analyzing the complaint's assertion that the plain-tiff's removal from treatment "was endangering" his life).

[150] *See id.* (concluding that the allegations alone were sufficient to satisfy pleading requirements before mentioning liberal construction).

identified pre-plausibility and does not account for new issues arising after the modern standard's conception.

Moreover, the lower courts' excessive use of the "conclusory" label to disregard allegations in Erickson's pro se complaint foreshadowed liberal construction's inefficacy after *Iqbal*.[151] In *Iqbal*, the Supreme Court lent its imprimatur to such excesses by deeming certain allegations conclusory without offering a principled way by which to distinguish them from other acceptable allegations.[152] Lower courts, then, will predictably increase their disregard, unprincipled as it may be, for conclusory averments to dismiss pro se complaints at a disproportionately higher rate than those drafted by counsel.[153] Even if the Supreme Court is not comfortable with such usages, its limited discretionary docket prevents it from effectively curtailing them. More probably, though, the Court expects these excesses to occur, but shirks responsibility for them by deciding cases like *Erickson*. Indeed, that the Court of Appeals for the Tenth Circuit so used the "conclusory" label prior to *Iqbal*, and with regard to an obviously sufficient complaint, presaged the turn for the worse borne out by the statistical evidence presented below.

Therefore, even if the Court accepted *Erickson* as a means to check perceived excesses resulting from *Twombly*, its per curiam opinion fails to breathe enough life into liberal construction to check these excesses with respect to pro se complaints. What remains of liberal construction is that courts should disregard unclear drafting and supplement more accurate legal bases than those explicitly invoked in determining whether or not pro se complaints suggest plausible entitlements to relief.[154] Unfortunately, though, this leniency fails to ensure that meritorious pro se suits proceed to discovery.

---

[151] *See* Ides, *supra* note 139, at 638 (asserting that *Erickson* demonstrates lower courts' "overly fastidious and inappropriate insistence on the pleading of 'non-conclusory' facts").

[152] *See* Ashcroft v. Iqbal, 129 S. Ct. 1937, 1961 (2009) (Souter, J., dissenting) ("[T]he majority's holding that the statements it selects are conclusory cannot be squared with its treatment of certain other allegations in the complaint as nonconclusory.").

[153] *See infra* subsections II.B.2-3 (documenting and explaining the disproportionate increase in the dismissal rate of pro se complaints as compared to other complaints post-*Iqbal*).

[154] *See* McMahon, *supra* note 41, at 867-68 (hypothesizing that *Erickson* simply means that the plausibility standard should be less stringently applied to pro se complaints than complaints prepared by counsel).

### 2. *Iqbal*'s Exceptional Hostility Toward Pro Se Complaints

Recent evidence belies initial speculation that the new plausibility standard would not significantly increase the overall dismissal rate.[155] In fact, the most current evaluation of federal pleading practice demonstrates that the rate of dismissal increased by ten percent between *Conley* and *Iqbal*, rising from forty-six to fifty-six percent.[156] But, an increase in the rate of dismissal by itself would be less troublesome if relatively consistent between counseled and pro se litigants. However, initial evidence strongly suggests that the increase has not evenly affected both classes.

The rate at which pro se complaints are dismissed after *Iqbal* has increased by an even greater extent than the overall rate of dismissal.[157] The percentage of motions to dismiss for failure to state a claim "granted in all cases brought by pro se plaintiffs grew from *Conley*

---

[155] *See, e.g.*, Kendall W. Hannon, Comment, *Much Ado About* Twombly? *A Study on the Impact of* Bell Atlantic Corp. v. Twombly *on 12(b)(6) Motions*, 83 NOTRE DAME L. REV. 1811, 1815 (2008) (concluding from an initial study of *Twombly* that the new plausibility standard had "*almost* no substantive impact," except in civil rights cases (emphasis in original)). Importantly, these speculations largely related only to *Twombly* and did not predict *Iqbal*'s strengthening of the plausibility standard. Nevertheless, even after *Iqbal*, some commentators refuse to acknowledge that the recent Supreme Court rulings ushered in a new era of pleading and insist that the decisions have not significantly altered how courts evaluate motions to dismiss for failure to state a claim. *See, e.g., Has the Supreme Court Limited Americans' Access to Courts?: Hearing Before the S. Comm. on the Judiciary*, 111th Cong. 21-23 (2009) (statement of Gregory G. Garre, Partner, Latham & Watkins LLP), *available at* http://judiciary.senate.gov/hearings/hearing.cfm?id=4189 (under "Witness Testimony") (concluding that *Twombly* and *Iqbal* have not led to "wholesale dismissal of claims"). Still, others occupy a more middle ground, declining to paint the new decisions as contrary to traditional pleading practice and attempting instead to reconcile the two. *See, e.g.*, Edward A. Hartnett, *Taming* Twombly, *Even After* Iqbal, 158 U. PA. L. REV. 473, 474 (2010) ("Rather than decrying *Twombly* as a radical departure and seeking to overturn it, this Article instead emphasizes *Twombly*'s connection to prior law and suggests ways in which it can be tamed.").

[156] *See* Hatamyar, *supra* note 15, at 600 (asserting that *Iqbal* increased the rate of dismissal sufficiently to "reject the null hypothesis" that the ruling had no effect on 12(b)(6) motions).

[157] Readers should note that the study observed this difference despite excluding from its sample prisoner complaints reviewed under the PLRA and complaints submitted with an application to proceed in forma pauperis. *See id.* at 585. Although such an exclusion, the author notes, is necessary to make the study sound because slight inconsistencies may inhere in pleading standards for these claims and because the risk of bias is particularly acute, in practice these complaints are overwhelmingly filed by pro se litigants and are subject to an analysis similar to *Iqbal*'s. *See* Rosenbloom, *supra* note 5, at 322, 324-25 (noting that almost all pro se litigants proceed in forma pauperis and that a significant number are inmates). Accordingly, the actual discrepancy may be even more pronounced than that which the study observed.

(67%) . . . to *Iqbal* (85%)."[158]   Thus, pro se complaints have experienced nearly a twenty percent hike in the rate at which they are dismissed, which is double that experienced by all suits generally.   In addition to the increased rate of dismissal, a disparate impact exists between regimes.   Whereas courts dismissed approximately thirty percent more pro se complaints than represented complaints under *Conley*, after *Iqbal*, the difference grew to approximately thirty-eight percent.[159]   The two-pronged plausibility standard, then, is empirically less friendly to pro se complaints than it is to those drafted by counsel.

Also troubling is the effect that grants of dismissal have on pro se complaints.   Two statistics are particularly worrisome: "[t]he relative risk of a 12(b)(6) motion to dismiss a pro se plaintiff's complaint being granted *without leave to amend*, rather than denied, is over five times greater . . . than for a represented plaintiff,"[160] and "[t]he odds that a *pro se* plaintiff's complaint would be *entirely dismissed* upon the grant of a 12(b)(6) motion were 3.48 times greater than a represented plaintiff's."[161]   Together with the grossly disproportionate dismissal rate of pro se suits exacerbated by *Iqbal*, these numbers illustrate that plausibility will prevent pro se litigants from accessing discovery more often than represented litigants.   The greater-than-average number of claims asserted and defendants named by pro se litigants[162] highlights the significance of this concentrated impact.

Thus, *Iqbal* appears to have emasculated liberal construction as the tool by which courts protect pro se litigants.   Regardless of whether it was effective enough under the "no set of facts" standard, liberal construction now surely demands reinvigoration if pro se litigants with meritorious claims are to have a fair chance at accessing discovery.[163]

---

[158]   Hatamyar, *supra* note 15, at 615.

[159]   *Id.* at 633 tbl.G.

[160]   *Id.* at 621 (emphasis added).

[161]   *Id.* at 623-24.

[162]   *See* Rosenbloom, *supra* note 5, at 322-23 tbl.II (presenting data showing the greater incidence of multiple defendants in pro se cases).

[163]   *See* Hatamyar, *supra* note 15, at 615 (detailing the increased rate at which pro se complaints are dismissed to conclude that "the boilerplate language that pro se plaintiffs' complaints should be treated with leniency is not taken very seriously" (footnotes omitted)).   For a similar suggestion that the new pleading practice established by *Iqbal* is out of step with normative policies underlying civil rights legislation and should therefore be reconsidered, see Howard M. Wasserman, Iqbal, *Procedural Mismatches, and Civil Rights Litigation*, 14 LEWIS & CLARK L. REV. 157 (2010).   Although there is no abundance of legislation protecting pro se litigants of the sort that exists with respect to civil rights, our historical regard for the right to prosecute a case without counsel suggests that there is what Professor Wasserman terms a "procedural mismatch" between plausibility

Doing so, however, requires understanding the reasons for plausibility's disproportionate hostility.

### 3. Explanations for the Disproportionate Increase in Pro Se Dismissals

The now-retired "no set of facts" standard contained only one step, which did not by its own terms disproportionately attack pro se pleadings. Only by manipulation did some courts circumvent its low threshold to dismiss what were arguably too many pro se complaints. By contrast, however, the modern plausibility analysis has two steps, both of which require of courts what, under *Conley*, was done covertly and without Supreme Court endorsement: disregarding conclusory factual allegations and subjecting plaintiffs' theories of liability to possible competing inferences. Each of these steps, though, is uniquely poised to disproportionately impact pro se pleadings.

#### a. *Necessarily Conclusory Allegations*

Pro se litigants' circumstances—both economic and noneconomic—render them substantially more likely to articulate claims using what many courts will deem conclusory allegations.[164] Consequently, pro se complaints will be stripped of meaningful allegations without regard for their relationship to surrounding averments. Indeed, the likelihood that this will occur is heightened by judicial disfavor of pro se claims, which largely goes unchecked due to the "conclusory" label's malleability[165] and the relative difficulty in successfully appealing these determinations.

First, plaintiffs who are forced to proceed pro se by insolvency will lack the financial wherewithal to conduct the sort of prefiling discovery necessary to draft sufficiently specific allegations.[166] Purely legal con-

---

pleading and the policies articulated by liberal construction. It is this mismatch that this Comment seeks to resolve by reforming the treatment of pro se pleadings.

[164] *See supra* subsection I.B.3 (surveying the general challenges faced by pro se litigants in crafting acceptable complaints, including those that may lead to less specific allegations).

[165] *See* Kilaru, *supra* note 122, at 919-20 (asserting that the majority and dissenting opinions in *Iqbal* highlight just how "manipulable" the distinction between conclusory and nonconclusory allegations can be).

[166] *See* Lonny S. Hoffman, *Burn Up the Chaff With Unquenchable Fire: What Two Doctrinal Intersections Can Teach Us About Judicial Power Over Pleadings*, 88 B.U. L. REV. 1217, 1257 (2008) ("Whether prudent or not, gathering additional factual information to include in the complaint is not costless."); *see also* Bone, *supra* note 100, at 860-61

clusions of the sort considered in *Twombly* should not be affected, but factual averments and mixed statements of law and fact upon which they rely, like those disregarded in *Iqbal*, will certainly be impacted. Nowhere will this reality manifest itself more obviously than in pleading mental state, an element without which certain claims, particularly ones concerning civil rights, cannot proceed.[167] These, however, are precisely the claims that a vast majority of pro se litigants pursue.[168] Without some form of documentation of defendants' motive in discrimination suits, for example, pro se plaintiffs will be relegated to pleading purpose quite generally.[169] Such generality very well may prove fatal to the allegations and, consequently, the complaint as a whole. In fact, it proved fatal with respect to Javaid Iqbal's complaint,[170] but a poor pro se litigant presumably would have even less of an opportunity to discover relevant facts before filing than did Iqbal's lawyer.

Second, even pro se litigants with adequate funds to conduct informal discovery before filing suit will have allegations ignored as conclusory. Without legal training, pro se litigants are much more likely to rely upon pleading templates for guidance.[171] A review of Form 11,

(showing that conclusory allegations are those that are stated at "too high a level of generality" and therefore need further factual support).

[167] *See* Kilaru, *supra* note 122, at 927-28 (asserting that information about a defendant's mental state is difficult to discover, but, without adequately pleading mental state, motive-based tort claims are likely to fail); *see also* Carl Tobias, *Rule 11 and Civil Rights Litigation*, 37 BUFF. L. REV. 485, 498 (1989) ("[I]n numerous civil rights suits, considerable information important to the factual preparation of complaints that appear specific will be in the records or minds of government or corporate defendants and cannot be secured before these pleadings must be filed, becoming available only during discovery.").

[168] *See* Hatamyar, *supra* note 15, at 613 (discussing data showing that about half of the civil rights cases studied in the article were initiated pro se); Rosenbloom, *supra* note 5, at 320 (noting that in a study of pro se litigants, the most common complaints were civil rights actions).

[169] The Federal Rules of Civil Procedure endorse general allegations regarding elements of this nature. *See* FED. R. CIV. P. 9(b) (permitting "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally"). However, the majority in *Iqbal* asserted that this rule "merely excuses a party from . . . an elevated pleading standard" of the sort imposed upon claims of fraud by Rule 9(b). Ashcroft v. Iqbal, 129 S. Ct. 1937, 1954 (2009). Therefore, even allegations of discriminatory intent, and other states of mind, are subject to the limitation on conclusory statements.

[170] *See Iqbal*, 129 S. Ct. at 1954 (concluding that Iqbal's "complaint fail[ed] to plead sufficient facts").

[171] That proponents of strengthening pro se assistance advocate for increased access to such materials demonstrates pro se litigants' substantial reliance on them. *See, e.g.*, VanWormer, *supra* note 20, at 1014-15 (considering as necessary to assist pro se litigants a "centralized clearinghouse" through which pro se litigants can access "printable forms necessary to initiate a case and make motions, as well as instructional

appended to the Federal Rules,[172] though, demonstrates that following these exemplars may prove detrimental to pro se litigants. The Form 11 model encourages plaintiffs to plead negligent operation of a motor vehicle without asserting what aspect of the defendant's driving was negligent, such as, for example, swerving or speeding.[173] However, "it is difficult to see the difference between this negligence allegation and the key allegations [disregarded] in *Iqbal*."[174] The likelihood that these allegations are ignored is not only attributable to their obvious level of generality, but also to their resemblance to legal conclusions, which courts have long excluded from consideration.[175] Thus, the Federal Rules entice pro se litigants to plead using shorthand factual allegations,[176] while courts, with Supreme Court approval, are apt to punish them for doing so.[177] In this way, pro se litigants are unusually disadvantaged by the first prong of the plausibility analysis.

By excluding critical allegations from consideration, courts are able to more easily deem a complaint's theory implausible.[178] Thus, judicial power to disregard "direct allegations of liability-creating conduct" can be wielded to dismiss disfavored claims by disfavored par-

---

materials related to the filing of such forms"). The importance of the forms appended to the Federal Rules cannot be overstated, as their primary architect, Charles Clark, considered them "the most important part of the rules" concerning pleading. *See* Charles E. Clark, *Pleading Under the Federal Rules*, 12 WYO. L.J. 177, 181 (1958) ("We require a general statement. How much? Well, the answer is made in what I think is probably the most important part of the rules so far as this particular topic is concerned, namely, the Forms.").

[172] FED. R. CIV. P. Form 11 (setting forth the minimal allegations necessary to plead basic negligence, including date, place, and that the defendant "negligently drove a motor vehicle" resulting in injury to plaintiff).

[173] *See* Bone, *supra* note 100, at 861 (acknowledging that Form 11 makes no mention of what defendant's car did to hit plaintiff or why it is alleged to have constituted negligence).

[174] *Id.* For one court's acknowledgement that *Iqbal* calls into question the continuing viability of the Federal Rule Forms, see *Doe ex rel. Gonzalez v. Butte Valley Unified School District*, No. 09-0245, 2009 WL 2424608, at *6-7 (E.D. Cal. Aug. 6, 2009).

[175] *See* Ides, *supra* note 139, at 612 (asserting that the allegation of negligence in Form 9 is both a conclusion of law and an "assertion of fact . . . that . . . defendant drove in a manner below the standard of due care"); *see also* Bone, *supra* note 100, at 866 ("Today, it is settled law that a judge deciding a 12(b)(6) motion need not accept legal conclusions . . . as true." (citation omitted)).

[176] *See* FED. R. CIV. P. 84 ("The forms in the Appendix suffice under these rules and illustrate the simplicity and brevity that these rules contemplate.").

[177] The inconsistency perhaps stems from the Supreme Court's circumvention of the appropriate rulemaking process by which to affect formal changes to pleading doctrine.

[178] *See* Bone, *supra* note 100, at 861-62 (claiming that the *Iqbal* majority made it easier to conclude that the complaint failed the second prong by aggressively using the first prong).

ties.[179] The legal community's negative perception of pro se litigants makes them likely targets of such unequal use of this discretionary authority.[180] Bias against pro se litigants, though, even more deeply infects *Iqbal's* second prong.

b. *Biased Plausibility*

While earlier developments in summary judgment practice provide general insight into how pleading standards have changed,[181] one particular parallel has unfortunately emerged for pro se litigants. It is the potential for judicial "cognitive illiberalism"[182]: "an inability to recognize how cultural background influences one's own (as opposed to others') decisionmaking."[183] Indeed, the likelihood that such cognitive biases infect determinations is greatest at the pleading stage, during which neither party introduces evidence for consideration by the judge.[184]

Professors Kahan, Hoffman, and Braman studied *Scott v. Harris,* in which the Supreme Court relied on a video of a high-speed chase to reconsider a trial court's factual findings and ultimately reverse its denial of summary judgment.[185] The Court held that no reasonable juror could find that the respondent, the fleeing driver, did not pose a deadly risk to the public, thus warranting the force used by police to end the chase.[186] A study of the public's own reactions to the video, howev-

[179] Burbank, *supra* note 16, at 117 (asserting that by giving judges the power to disregard factual allegations, *Iqbal* strengthened plausibility as "an invitation to the lower federal courts to screen out complaints in disfavored classes of cases").

[180] *See supra* subsection I.B.3 (discussing bias against pro se litigants).

[181] For a detailed discussion of the lessons about pleading that can be learned from summary judgment, see generally Hoffman, *supra* note 166, at 1240-43. For a more extreme take on the links between the two procedural devices, see Thomas, *supra* note 92, at 28-34.

[182] *See* Dan M. Kahan, David A. Hoffman & Donald Braman, *Whose Eyes Are You Going to Believe? Scott v. Harris and the Perils of Cognitive Illiberalism,* 122 HARV. L. REV. 837, 842-43 (2009) (coining the term and explaining its effect on the Court's decision to grant summary judgment).

[183] Christopher Slobogin, *The Perils of the Fight Against Cognitive Illiberalism,* 122 HARV. L. REV. F. 1, 2 (2009), http://www.harvardlawreview.org/media/pdf/slobogin.pdf.

[184] *See Has the Supreme Court Limited Americans' Access to Courts?, supra* note 121, at 12-13 (explaining that the prejudicial effect of "cognitive illiberalism" is more "worrisome" at the motion to dismiss stage because of the lack of an evidentiary record).

[185] *See* 550 U.S. 372, 386 (2007) (finding a police officer entitled to summary judgment).

[186] *See id.* ("The car chase that respondent initiated in this case posed a substantial and immediate risk of serious physical injury to others; no reasonable jury could conclude otherwise.").

er, indicated the contrary. Members of certain subcommunities sharing common experiences and values—eerily reminiscent of the experience and common sense referred to in *Iqbal*—perceived less danger in the plaintiff's flight and attributed more responsibility to police.[187]

According to the authors, this division demonstrated that the Court operated in a state of cognitive illiberalism; it displayed "overconfidence in the unassailable correctness of [its] factual perceptions . . . and unwarranted contempt for [contrary] perceptions."[188] The potential for the same "type of decisionmaking hubris"[189] to afflict courts' determinations on the plausibility of plaintiffs' claims is significant. The analysis requires courts to imagine other possible explanations for allegations put forth in complaints,[190] which courts may favor if they more closely align with the judges' predispositions or experiences. Indeed, the Supreme Court endorsed a process similar to this bias by emphasizing "judicial experience and common sense" as the lens through which to evaluate plausibility.[191]

The subjectivity that inheres in the comparative endeavor portends special trouble for pro se litigants and the liberal construction afforded their complaints.[192] As a group, pro se litigants have "identity-defining characteristics" that differ from lower court judges.[193] Unlike members of the federal bench and their clerks, for example, a majority of pro se litigants are black, Asian, or Hispanic.[194] Kahan and

---

[187] *See* Kahan, Hoffman & Braman, *supra* note 182, at 841 (noting that segments of the public that value egalitarianism and social solidarity more than hierarchy and individualism tended to disagree with the Court's conclusion in *Scott v. Harris*).

[188] *Id.* at 843.

[189] *Id.* at 842.

[190] *See, e.g.,* Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 711 (7th Cir. 2008) ("The plausibility of an explanation depends on the plausibility of the alternative explanations.").

[191] *See* Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) (noting that a court must draw on its "judicial experience and common sense" when determining the plausibility of a claim); Burbank, *supra* note 16, at 118 ("The *Iqbal* Court's reliance on 'judicial experience and common sense' is, in certain types of cases, an invitation to 'cognitive illiberalism' . . . .").

[192] *See* Bacharach & Entzeroth, *supra* note 7, at 30-31 (noting that the rule set forth in *Haines* runs into trouble because "plausibility is inherently subjective and judges likely gauge 'plausibility' differently based on their ideologies, attitudes, and experiences").

[193] *See* Kahan, Hoffman & Braman, *supra* note 182, at 879 (asserting that individuals whose opinions differed from the Court's shared "a core of identity-defining characteristics").

[194] *See* OFFICE OF DEPUTY CHIEF ADMIN. JUDGE FOR JUSTICE INITIATIVES, SELF-REPRESENTED LITIGANTS: CHARACTERISTICS, NEEDS, SERVICES 3 (2005), *available at* http://www.nycourts.gov/reports/AJJI_SelfRep06.pdf (reporting that over eighty percent of pro se litigants surveyed were not Caucasian).

his coauthors observed that racial differences can result in not only opposing perceptions of a set of facts, but, more importantly, conflicting conclusions based thereon.[195] The difference manifests in the parties these populations tend to support, with minorities favoring plaintiffs more often than Causasians.[196] Furthermore, poorer pro se litigants tend to harbor a greater level of suspicion toward authority figures.[197] That most pro se litigants sue governmental officials[198] renders this difference critical to plausibility decisions because courts—significant wielders of authority themselves—may unintentionally favor alternative, lawful explanations for alleged official misconduct.[199] In fact, pro se litigants' distrust of the court system over which judges exercise control exacerbates the disconnect.[200] These, as well as other, influential differences between pro se litigants and the courts evaluating their complaints[201] raise the specter of unintentional privileging of competing inferences.[202]

Accordingly, without a version of liberal construction that adequately accounts for the change in pleading standards that *Iqbal* finalized, courts risk alienating a group of citizens by summarily dismissing their claims as undeserving of discovery. The result is particularly ironic because pro se litigants are the only group of litigants selected for special accommodations at the pleading stage of litigation.

---

[195] Kahan, Hoffman & Braman, *supra* note 182, at 867.

[196] *See id.* (finding that African Americans were significantly more likely to find for plaintiffs than Caucasians).

[197] *See id.* at 879-80 (noting that differences, including degrees of wealth, affected whether individuals "view[ed] those in authority with trust or suspicion").

[198] *See* Rosenbloom, *supra* note 5, at 323 ("Almost four out of every five pro se cases were filed against at least one government defendant.").

[199] *See, e.g.*, Russell K. Robinson, *Perceptual Segregation*, 108 COLUM. L. REV. 1093, 1154 (2008) ("[T]he courts tend to reflect the insider view that discrimination is rare and that most claims are meritless, rather than the opposing view that discrimination is pervasive.") For an assertion that the majority in *Iqbal* displayed these institutional biasing effects, see Spencer, *supra* note 119, at 197-99.

[200] *See supra* subsection I.B.2 (listing the reasons that litigants choose to proceed pro se, which include distrust for lawyers and the legal system in general).

[201] For an acknowledgement that judges as a group may differ in their explanations of facts from other groups as a result of "legal and judicial professionalization," see Kahan, Hoffman & Braman, *supra* note 182, at 883.

[202] This discussion should be read neither to insinuate bad faith on the part of federal judges construing pro se complaints nor to deny the myriad differences between federal pro se litigants. Instead, it is intended merely to call attention to the potential for the plausibility inquiry to disadvantage certain pro se complaints that an identifiable group of self-represented litigants tend to pursue and that implicate the courts' inherent trust in official behavior.

## III. REFASHIONING LIBERAL CONSTRUCTION IN A POST-PLAUSIBILITY ERA

Liberal construction's commendable components—the most notable of which is the judicial practice of inferring the correct cause of action from complaints invoking an incorrect one[203]—should be retained because plausibility has not rendered them unfit to accommodate pro se litigants. However, as a rule meant to support meritorious pro se litigation, liberal construction should be strengthened to account for the difficulties the new plausibility standard presents.[204] First, courts should demand less specificity of factual allegations drafted by pro se litigants in order to comport with the policy underlying liberal construction. Second, favored competing inferences must be transparent in order to prevent pro se litigants from repeating the errors that initially caused dismissal when amending their complaints.[205]

### A. *Restraining Judicial Authority to Carve Complaints*

Although *Erickson* presaged *Iqbal*'s negative impact on pro se complaints,[206] the Supreme Court's decision also suggested a way to mitigate the troublesome effect: restrain courts' discretion to disregard allegations they deem conclusory.[207] Building upon this foundation, liberal construction should require courts to consider all pro se

---

[203] *See, e.g.,* Hansen v. May, 502 F.2d 728, 729-30 (9th Cir. 1974) (holding that the lower court should have treated a pro se plaintiff's claim as one made pursuant to § 1983, despite having been styled as one for habeas corpus).

[204] Notably, these challenges emerged prior to *Twombly* as a result of lower courts' informal elevation of pleading requirements. Thus, even if Congress overturns *Twombly* and *Iqbal* by statute, *see, e.g.,* Notice Pleading Restoration Act of 2009, S. 1504, 111th Cong. (2009), these adaptations would still help to ensure that pro se litigants receive the accommodations necessary to protect their access to courts.

[205] These recommendations are an attempt to adapt to the new plausibility standard, rather than to repudiate it as an incorrect construction of federal pleading requirements. They would most appropriately be implemented by judicial decree, just as was liberal construction itself. Indeed, a modified rule of liberal construction is ill-suited to both the rulemaking and legislative processes. The Federal Rules are transsubstantive, rendering a party-specific rule anathema. And, while the federal government has codified special pleading requirements in the past, in this context, an analogous statute would unnecessarily constrain the judicial flexibility needed to accommodate pro se litigants.

[206] *See supra* subsection II.B.1 (explaining why *Erickson* provides little assurance that liberal construction as presently practiced will meet the challenges facing pro se litigants post-*Iqbal*).

[207] *See* Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (admonishing the lower court for dismissing allegations as conclusory when they were adequate to "put the[] matters in issue").

allegations in evaluating a Rule 12(b)(6) motion unless they are pure legal conclusions. That way, courts will not unintentionally punish pro se litigants for crafting allegations as specifically as their circumstances and legal acumen permit.

Strengthening liberal construction with such a supplement is not without support in the Federal Rules of Civil Procedure. For example, Rule 1 instructs courts to construe and administer the Rules to ensure "just" determinations.[208] Similarly, Rule 8(e) demands that "[p]leadings . . . be construed so as to do justice."[209] With a principled distinction between conclusory and acceptable factual allegations evading even the strongest legal minds,[210] pro se litigants most certainly cannot be expected to grasp the difference. A lack of experience with courts exasperates this inability, as increased interaction with the courts would provide them, as it does practicing lawyers, an intuitive sense of how judges decide Rule 12(b)(6) motions.[211] Accordingly, to administer pleading requirements to ensure fair results, pro se litigants should be better insulated from the admonition against conclusory factual allegations that they are unable to identify ex ante.[212]

To implement this rule, however, a principled distinction must still be established between purely legal conclusions and general or shorthand factual allegations, and it must be one that pro se litigants can fairly be expected to comprehend.[213] For purposes of liberally

---

[208] *See* FED. R. CIV. P. 1 (requiring that the Rules "be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding").

[209] FED. R. CIV. P. 8(e).

[210] *See* Walter Wheeler Cook, *Statements of Fact in Pleading Under the Codes*, 21 CO-LUM. L. REV. 416, 417 (1921) (rejecting the assumption "that there is some clear, easily drawn and scientific distinction" between facts and conclusions aside from the level of specificity at which they are stated). Indeed, the endeavor proved so difficult that the drafters of the Federal Rules abandoned it altogether. *See* Burbank, *supra* note 16, at 115 ("Yet, an important reason why the drafters of the 1938 Federal Rules rejected fact pleading is that one person's 'factual allegation' is another's 'conclusion.'" (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 574-75 (2007) (Stevens, J., dissenting))).

[211] *See* Leandra Lederman & Warren B. Hrung, *Do Attorneys Do Their Clients Justice? An Empirical Study of Lawyers' Effects on Tax Court Litigation Outcomes*, 41 WAKE FOREST L. REV. 1235, 1252-53 (2006) ("[A]s experts and repeat players in the court system, litigating attorneys should have . . . better access to information about what the . . . judge likely will do.").

[212] For the origins of this functional argument, see Email from Stephen B. Burbank, Professor, University of Pennsylvania Law School, to author (Nov. 11, 2009, 14:52 EST) (on file with author).

[213] Although any attempt to distinguish between legal conclusions and factual allegations superficially harkens back to code pleading, which has long been rejected, the gloss that follows does not resuscitate the hypertechnical distinctions of yore. Rather, it seeks to establish a uniquely low specificity threshold beyond which allegations

construing pro se complaints, then, legal conclusions that courts need not presume true should be only those in which pro se plaintiffs assert that defendants' conduct either (1) amounts to a violation of the law or (2) satisfies an element of the alleged offense in obviously "canonical form."[214]  All other allegations, including the mixed statements of law and fact that comprise the majority of complaints, should be presumed true.  For example, a pro se prisoner's averment that a particular punishment constituted retaliation for free speech, and therefore violated the First Amendment, would not pass muster.  By contrast, if that same plaintiff alleged that a prison guard subjected her to harsh conditions of confinement *because* of complaints she made about the guard's behavior, the statement would be presumptively entitled to consideration in determining the complaint's plausibility.  Simply put, courts should accept general statements regarding objectively verifiable facts, but reject legal determinations supposed to be made from those statements:  the motive for certain conduct can be confirmed or disproved by evidence, while that conduct's constitutionality is a determination made only in light of such evidence.[215]

Severely curtailing courts' ability to carve conclusory factual allegations from pro se complaints errs on the side of considering allegations and thereby heightens the chance that claims are deemed plaus-

---

are entitled to the presumption of truth for one particular subgroup of litigants whom courts have singled out for special treatment due to policy considerations.  In that regard, it benefits from the work of a leading scholar during the code-pleading era and one of its strongest critics, Walter Wheeler Cook, who believed that factual specificity differentiates conclusions from allegations and that the required amount of specificity should comport with "notions of fairness and convenience."  Cook, *supra* note 210, at 422-23.

[214]  *See* Bone, *supra* note 100, at 867 n.94 (suggesting that one extreme way to narrow the class of excludable conclusions is to limit it to "allegations that simply insert 'plaintiff' and 'defendant' into a legal proposition otherwise stated in some recognizably canonical form").

[215]  *See id.* at 873-74 (discussing objectively verifiable facts in the context of plausibility analysis).  Drawing the line at objective verifiability comports with the previous acknowledgment that Form 11 should be sufficient to entitle pro se plaintiffs to discovery.  It requires a plaintiff claiming basic negligence to state only, "On [X] date, at [X] place, the defendant negligently drove a motor vehicle against the plaintiff." FED. R. CIV. P. Form 11.  Its use of the term "negligently," however, is not a legal conclusion that can be disregarded, but rather just a description of the defendant's driving, like "sporadic" or "substandard," which can be objectively verified through discovery.  *See supra* subsection II.B.3.a (discussing Form 11 as endorsing shorthand factual allegations).  Accordingly, similar descriptive terms that resemble legal conclusions should not be disregarded when liberally construing pro se complaints.  *Cf.* Bone, *supra* note 100, at 873-74 (explaining that some conclusory statements do provide the court with a sufficient basis to evaluate a claim's success under the plausibility standard).

ible.[216]  However, this recommendation should not be interpreted to strip courts of their ability to dismiss overly fanciful or clearly outrageous claims and claims for which there is absolutely no valid basis in the law because the plausibility prong remains intact.  Therefore, such claims—the majority of which are admittedly pursued pro se[217]—will not survive motions to dismiss despite the change outlined above.  Although similarly emasculating *Iqbal*'s first prong may be prudent for entire classes of claims involving hard-to-verify facts, the transsubstantive application of the Federal Rules would not permit such a development.  However, because pro se litigants have already been selected for special treatment, transsubstantivity should not block their entitlement to a less stringent version of *Iqbal*'s first prong.

B.  *Making Inferences Transparent to Assist with Complaint Amendments*

Courts are presently amenable to granting pro se litigants leave to amend their complaints.[218]  Although exceedingly liberal access to amendments should be retained for pro se plaintiffs, such access is of little use when unaccompanied by transparent explanations as to why particular complaints are insufficient.[219]  Failures to set forth such explanations are likely to increase post-*Iqbal* because of the subjectivity that inheres in plausibility analysis and courts' inability to recognize that perceptions of factual circumstances differ among groups.[220]  Accordingly, the inferences that courts believe render theories of wrongdoing implausible should be made clear so pro se litigants can

[216]  *See, e.g.*, Ashcroft v. Iqbal, 129 S. Ct. 1937, 1959-60 (2009) (Souter, J., dissenting) (agreeing with the majority that, without the factual allegations disregarded as conclusory, the complaint failed to state a plausible claim to relief); Bone, *supra* note 100, at 861-62 (noting that *Iqbal*'s first prong "did all the work" by making it easy to conclude that the complaint did not raise a plausible inference of wrongdoing).

[217]  *See* Byron C. Keeling, *Toward a Balanced Approach to "Frivolous" Litigation: A Critical Review of Federal Rule 11 and State Sanctions Provisions*, 21 PEPP. L. REV. 1067, 1142 (1994) ("[P]ro se litigants file a large proportion of the nut claims.").

[218]  *See, e.g.*, Shomo v. City of New York, 579 F.3d 176, 183 (2d Cir. 2009) ("[A] *pro se* complaint . . . should not [be] dismiss[ed] *without granting leave to amend at least once* . . . ." (internal quotation marks omitted) (emphasis added)).

[219]  *See* Richard Zorza, *The Disconnect Between the Requirements of Judicial Neutrality and Those of the Appearance of Neutrality When Parties Appear* Pro Se: *Causes, Solutions, Recommendations, and Implications*, 17 GEO. J. LEGAL ETHICS 423, 436-40 (2004) (discussing transparency as essential to providing pro se litigants meaningful judicial accommodations and noting that explanation is a "particularly important" component of that transparency).

[220]  For a fuller discussion of this type of unintentional decisionmaking confidence or "hubris," see *supra* subsection II.B.3.b.

better supplement their complaints to undercut the viability of those inferences and thereby increase the plausibility of their own.[221]

A heightened sense of "judicial humility"[222] in drawing competing inferences is perhaps the first step toward increasing the aforementioned transparency. Courts should second-guess their disregard for inferences upon which pro se plaintiffs rely to ensure that their disbelief is not motivated by a difference in values or predispositions, but rather by a more neutral conviction that the inferences would not persuade individuals sharing even the litigants' "identity-defining" traits.[223] That way, courts will be both less likely to alienate pro se litigants by discounting inferences that these litigants, as a recognizable group, deem credible, and better able to identify favored competing inferences when granting leave to amend. As a result, pro se litigants will understand the allegations requiring additional factual enhancement to make the necessary, but unmade, inferences plausible and limit courts' skepticism. Indeed, including suggestions in the opinion as to the types of support needed to sustain missing elements would be advisable, as pro se litigants may otherwise neglect to include all the facts within their possession on the assumption that complaints should be as "short and plain" as possible.[224]

In fact, despite having unabashedly privileged its own perception of the facts alleged in *Iqbal*, one redeeming quality of the majority's opinion in that case is its presentation of the competing inference that, for five Justices, made Iqbal's claim implausible. In particular, the majority expressly stated its belief that, in light of the recent Sep-

---

[221] A related approach would permit plaintiffs to conduct limited discovery to quell courts' skepticism as to plausibility. *See, e.g.*, Suzette M. Malveaux, *Front Loading and Heavy Lifting: How Pre-Dismissal Discovery Can Address the Detrimental Effect of* Iqbal *on Civil Rights Cases*, 14 LEWIS & CLARK L. REV. 65, 140 (2010) ("Where the complaint's implausibility is due to an informational inequity, an opportunity to re-plead does little good without some narrow discovery to ameliorate the problem."). Additional transparency would work well in conjunction with predismissal discovery because it would direct the discovery and thereby limit its cost.

[222] *See* Kahan, Hoffman & Braman, *supra* note 182, at 897-99 (defining "judicial humility" as a way by which judges can prevent privileging value-laden perceptions over competing perceptions likely made by groups with different "identity-defining characteristics").

[223] *See id.* at 898-99 (urging a process whereby judges reconsider their conclusions that no reasonable juror could find wrongdoing to make sure that they do not denigrate the views of particular communities that perceive facts differently).

[224] For a compelling discussion of why "cause of action" information should not generate concerns over judicial partiality, see Jona Goldschmidt, *Judicial Assistance to Self-Represented Litigants: Lessons from the Canadian Experience*, 17 MICH. ST. J. INT'L L. 601, 622-23 (2009).

tember 11th attacks, the high-ranking officials likely placed Iqbal in restrictive confinement because of his suspected terrorist connections and not on account of his nationality or race.[225] At least, then, if Iqbal had not retained counsel, his opportunity to amend the complaint would remain meaningful. Iqbal could have, for instance, alleged deficient intelligence connecting him to terrorism in order to rebut the Court's conviction that defendants acted lawfully and render the proposed inference of wrongdoing plausible. To go one step further, discussing the type of factual support tending to adequately "show" motive in the relevant context would at least place him on a more level playing field with litigants whose lawyers understand the type of support required to succeed.[226]

Although post-analysis treatment of pro se complaints cannot properly be labeled a method of liberal construction, it is nevertheless a critical extension of the leeway given pro se litigants at the pleading stage of litigation. The present liberal amendment practice with respect to pro se litigants cannot compensate adequately for the pleading developments *Iqbal* enshrined unless significant transparency is infused into the highly subjective second prong of the analysis. Discerning competing inferences that must be rebutted is a daunting task for lawyers well-versed in drafting complaints, let alone pro se litigants. Thus, like limiting the grant of authority to disregard conclusory allegations, requiring greater explanation as to the deficiencies courts perceive in pro se complaints will promote the goal of liberal construction.[227]

### C. *Addressing Concerns Related to Neutrality, Caseload, and Abuse*

Pro se advocacy necessarily arouses concerns over judicial neutrality, docket burden, and litigation abuse. Accordingly, it is important to address these concerns because the techniques set forth above will, as intended, lead to pro se litigants accessing discovery in greater numbers. These issues, though, fail to counsel convincingly against a more robust version of liberal construction, particularly in

---

[225] *See* Ashcroft v. Iqbal, 129 S. Ct. 1937, 1951-52 (2009) (noting that all the alleged nonconclusory facts can be read to suggest is that defendants placed plaintiff in restrictive confinement because he was a suspected terrorist, which does not plausibly suggest invidious discrimination).

[226] For a similar suggestion that instructions to pro se litigants be included in orders granting leave to amend so that they can correct defects in their complaints, see Zeigler & Hermann, *supra* note 64, at 211.

[227] *See supra* Section III.A (articulating a functional argument for constraining judicial capacity to disregard "conclusory" allegations based upon Rules 1 and 8(e)).

Case: 15-1059     Document: 34     Filed: 08/04/2015     Page: 102

light of the alternative mechanisms available by which to check excessive pro se litigation.

Some commentators—most notably Judge Bacharach and Professor Entzeroth—argue against robust liberal construction because, in their opinion, it destroys judicial neutrality.[228] However, their criticism does not target adaptations like the first supplement to liberal construction proposed above. Constraining courts' authority to disregard factual allegations does not require judges to treat pro se complaints in a manner that conflicts with their authors' intentions. In fact, it accomplishes quite the opposite. Requiring courts to accept more allegations as presented by pro se litigants will better align their treatment of pro se complaints with litigants' expectations, precisely the goal of Bacharach and Entzeroth's critique.[229] Moreover, while concerns about judicial partiality are perhaps more relevant to the second supplement proposed herein, they are still insufficient to counsel against its implementation. Increasing transparency with respect to pro se complaints aids self-represented litigants by making meaningful amendments more accessible. However, it requires judges neither to substantially alter the process by which they evaluate the sufficiency of pro se complaints nor to advocate on behalf of pro se litigants by affirmatively correcting substantive inadequacies.

While these proposals separately fail to blur the line between neutrality and advocacy, together they do warrant skepticism regarding the increased workload that will result from their implementation. Nonetheless, several observations allay these concerns. First, early statistics indicate that *Twombly* and *Iqbal* may actually decrease the number of pro se suits that are filed in the first place.[230] Thus, to the extent that this trend continues, it may negate at least some of the extra workload shouldered by courts overseeing more pro se discovery. Indeed, one of the benefits of working within the plausibility regime (rather than exempting pro se litigants from it completely) is the standard's ability to discourage less meritorious filings. In addition, limiting the effort required of judges liberally construing pro se complaints could counterbalance the resulting increase in discovery-

---

[228] *See* Bacharach & Entzeroth, *supra* note 7, at 42 ("The effort to equalize adversarial ability is a futile endeavor, but the hopelessness of the task is not the greatest danger. Instead, the greater danger is the loosening of the well-designed constraints on the role of the judiciary in the adversarial process.").

[229] *See id.* at 43 ("The key to construction of pro se pleadings involves an understanding of what the litigant has said.").

[230] *See* Hatamyar, *supra* note 15, at 613 ("Interestingly, the percentage of *pro se* plaintiffs . . . declined from *Conley* (30%) to *Twombly* (27%) to *Iqbal* (24%).").

related burdens. The reductions in time and energy spent parsing conclusory from nonconclusory allegations and reconsidering amended complaints should permit courts to dedicate more attention to pro se cases after deciding motions to dismiss.

A related issue to which many attribute the recent shift in pleading standards involves discovery costs incurred by defendants and the potential for abusive litigation. This concern is particularly acute in the context of pro se litigation, which admittedly involves more unmeritorious claims. However, the costs likely to result from more pro se discovery will not be grave because pro se claims are on the whole much simpler than actions pursued with counsel.[231] Their simplicity renders pro se claims particularly amenable to supervised discovery, which should quickly reveal to defendants whether or not a summary judgment motion would succeed. In addition, the leeway afforded pro se litigants does not exempt them from Rule 11 sanctions for failing to affirm (1) that "reasonable prefiling inquiry has shown that a filing's claims and assertions are 'well grounded in fact and [are] warranted by existing law or a good faith argument for [a change] of existing law'" and (2) that "the filing 'is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.'"[232] These sanctions should continue to deter some of the excesses that have come to characterize pro se cases.

Leaving the gate to discovery slightly more ajar for pro se litigants will not grind the gears of our federal judicial system to a halt. Accordingly, a stronger version of liberal construction is warranted in light of the countervailing fairness concerns that underlie the system's historic support for self-representation.

## CONCLUSION

Liberal construction developed in response to challenges facing pro se litigants that courts identified as having the potential to unfairly deny them access to discovery. As the term itself suggests, those challenges consisted of the potential for (1) incomprehensible or "inart-

---

[231] *See supra* note 57 (examining the complexity of pro se suits and the burden they impose on courts).

[232] Nichols, *supra* note 49, at 355 (quoting FED. R. CIV. P. 11). The 1983 revisions to Rule 11 eliminated unrepresented litigants' previous exemption from the Rule's reach. *Id.* at 355-56. Now, "the rule unequivocally reaches the conduct of *pro se* litigants . . . [and] no federal court may claim that it is powerless to administer [R]ule 11 sanctions against unrepresented parties whose filings it finds to be frivolous-in-fact, frivolous-in-law, or improperly motivated." *Id.* at 357; *see also* FED. R. CIV. P. 11.

ful" drafting and (2) incorrect or incomplete invocation of the legal bases for claims. That these difficulties do not include the potential for the standard for evaluating complaints to punish pro se litigants reflects the background notice-pleading regime under which the Supreme Court first granted the leniency. The *Conley* "no set of facts" standard raised a deceptively low bar to pleading a cause of action adequately, thereby posing little threat of inherent unfairness to pro se litigants.

Only through informal channels did lower courts heighten pleading requirements to make suits pursued by particular claimants, including pro se litigants, more vulnerable to dismissal for failure to state a claim. The unexpressed nature of this development perhaps excuses, or at least explains, the system's previous failure to reevaluate liberal construction as an adequate accommodation to pro se litigants. However, *Iqbal* removed the disguise, ushering in a new era of heightened pleading requirements. Plausibility analysis adds yet another unique challenge to the set of concerns initially identified as requiring liberal construction of pro se pleadings since each of its prongs unfairly punishes unrepresented litigants. As a result, courts would be remiss not to allow greater leniency for self-represented litigants at the pleading stage of litigation.

This Comment endeavors to provide insight into exactly how the plausibility standard disproportionately undercuts the efforts of pro se litigants to access discovery in order to highlight why two particular supplements to liberal construction are advisable. Without meaningful adaptations of the sort here proposed, our legal system risks not only defying the longstanding statutory protections afforded to the right of self-representation, but also infringing upon pro se litigants' constitutional right to a meaningful opportunity to be heard.