RECEIVED

FEB 2 2 2016

DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| BARBARA ELLIS,<br><br>        PRO SE Appellant,<br><br>v<br><br>CHASE HOME FINANCE, LLC,<br>JP MORGAN CHASE BANK, N.A.,<br>DEUTCH BANK NATIONAL<br>TRUST COMPANY, as Trustee, and<br>UNKNOWN TRUST, the currently<br>unknown asset-backed security at issue.<br><br>        Defendants. | Appeal No. 15-1059<br><br>Trial Court No. 2:14-cv-11186<br>Honorable Laurie J. Michelson<br>Mag. Judge Michael J. Hluchaniuk |
| BARBARA ELLIS<br>Pro Se<br>8293 South Huron River Drive<br>South Rockwood, MI 48179<br>Telephone: (734)672-0574<br>4barbls@gmail.com | DYKEMA GOSSETT PLLC<br>Kyle R. Dufrane (P58809)<br>Thomas H. Trapnell (P74345)<br>Attorneys for Appellees<br>400 Renaissance Center<br>Detroit, MI 48243<br>(313)568-6529<br>kdufrane@dykema.com<br>ttrapnell@dykema.com |

TO THE HONORABLE UNITED STATES CHIEF APPELLATE JUDGE:

PETITION FOR PANEL REHEARING AND EN BANC

Comes Barbara Ellis, the Appellant, Pro Se and moves this Court for a panel rehearing.

In rendering this decision the Court has failed to acknowledge the following while the Appellee's

pattern of extrinsic fraud has, without doubt, thwarted this Court's ability to settle this matter:

Ellis will detail the extrinsic fraud, the omissions and the miscarriage of justice as briefly

as possible – exhibits are necessarily included in this petition. In short, will this Court please

1

overturn this ruling because:

Once again, JP Morgan Chase, the Appellee, heretofore called Chase for clarity of the actors in this scheme, has disparaged Ellis, her attorney and claimed total innocence in THIS Court, while negotiating yet another class action settlement for violating Ellis' rights in another court. Another scheme, similar to Salvatore Saccoccio v. JP Morgan Chase Bank, N.A . (Case 1:13-cv-21107-FAM, Southern District of Florida, 2013) well timed to thwart the rendering of justice in a multitude of pending cases, not just this one.

Outside of this court, Chase has moved for a class action settlement from Ellis' for illegally accessing her Experian consumer credit records in Eva Marison Duncan v. JP Morgan Chase Bank, NA (Case 5:14-cv-00912-FB-JWP, U.S. District Court for the Western Distric of Texas, San Antonio Division, *claim deadline March 23, 2016*). Although the preliminary settlement was reached on October 21, 2015, the original complaint was filed October 16, 2014.

Given that it's a settlement of 8.5 million dollars for approximately 2.2 million potential class members, Ellis observes that dilatory tactics were taken to limit Chase's practical liability to roughly six months. Ellis contacted Experian Credit to go farther back in her records. Experian's call center is in Costa Rica and no access to a supervisor was given after a 24 minute phone call with a representative named David, who first claimed that Experian was only legally required to maintain records two years back. David then stated that Experian would only supply credit reports beyond the "normal" consumer ie a "litigant" with a court order for the information. After Ellis observed that, having been in financial services, record keeping by law is a minimum of six years and prudent companies have policy of seven years. At which point, David said a supervisor would call me in 2 to 3 hours, then stated 48 to 72 hours, then restated 2 to 3 hours. As this court might guess, that call never came. Ellis took the 48 to 72 hours to

2

research the Fair Credit Reporting Act.

Duncan's initial complaint details that Chase illegally accessed her credit report 14 times in the two years after her home was sold in a trustee sale. In the state of Texas, a homeowner has the ability to sue for four years after the actual trustee sale. Given that the class affects 2.2 million consumers, one might only infer that Chase was systemically monitoring all foreclosed consumers illegally to get an idea of who maintained the financial ability to sue. And while Ellis technically meet the class requirement for the period of February 08, 2016 to February 8, 2014, Chase illegally ordered her credit report as Chase Mtg. three (3) times (Ex. A, Experian Credit Report, pp 4-5) in relation to events that occurred in her case.

1. On 02/20/2014 – Ellis had a 44 minute phone call with her attorney Adam Gantry, that was billed as 1.20 hours (Ex. A, Gantz Invoice #10017, p 1) as Gantz attempted a good faith effort to negotiate a loan modification with Chase without having to file suit. On 02/21/2014, Ellis' credit report clearly shows that Chase illegally accessed her credit report to gauge Ellis' ability to sue, settle and move.

2. On 09/02/2014 – Ellis received an email from Gantz Associates requesting a phone consultation (Ex. A, Gantz Email, p 1)– possibly in response to Ellis' August inquiry about his loss of two associates. During that 44 minute phone consultation on 09/05/2014 (Ex. A, Google Voice Record, 44 minutes, p 1) Gantz stated that Chase was only interested in offering "$5,000 cash for keys" and would not even entertain the loan modification referenced in The Parties' Joint Statement of the Case (Ex. B) ordered by Judge Michelson and referenced in detail. Again, Chase illegally accessed Ellis' credit report on 09/12/2014. What did Chase do then? Chase sent a letter offering mortgage

3

"assistance" in Michigan (Ex. A. Chase correspondence "We will be contacting you soon about mortgage assistance." -09/23/2014).   When in Michigan, a home that's gone to a sheriff's sale must be voided by a court order.  Chase, knew full well that Ellis' health was challenged, her business and career was at stake, made a false offer of assistance as an end run around her counsel.  Ellis read the letter over the phone to Gantz and thought no further of this Trojan horse.

3.   As Ellis had not responded to Chase's end run around her attorney, Chase once more illegally accessed Ellis' credit report (Ex. A, Credit Report, p 4).  As Gantz had given Ellis no real reason that her case might be dismissed. Gantz had supplied her with his reply to Chase's motion to dismiss but not the actual motion was moot.  Ellis, as clearly demonstrated in prior pleadings, found it extremely difficult to find an attorney to listen muc less take her case at the onset and found it downright impossible to replace Gantz. At this point, neither could Ellis consider representing herself Pro Se as her health had been an issue since January 2010 – given the huge necrotic wound she had no control over.

Ellis requests that her motions to sanction be reread in light of this new information, in that Ellis could not have known that Chase was illegally accessing her credit reports and at this point is unable to gauge the full extent of their manipulation of her, the foreclosure process and both courts.  Given the class representative's claims, one can logically deduce that Chase systematically and illegally monitored every homeowner they foreclosed on in order to manipulate outcomes.  As a resident of Texas, Duncan had four years to file suit for issues with her foreclosure.  Hence, Chase chose illegal means to ensure victories when their time, effort and money would arguably be better spent on correcting the issues.

4

Ellis was able to request another credit report within the class action time period when she still had car insurance because property and casualty insurance companies must keep these records on file for underwriting. Ellis contacted Experian again and talked to a Luis, who confirmed that they retained records 10 years, discussed that they were in Costa Rica and had no method to produce the data there. Unlike David, Luis followed the process to refer her to a supervisor. Three hours later, a supervisor named Kenneth called her back and gave Ellis a PO Box to write to inside the USA.

Ellis would point out at this point that she could not get 2013 data from her car insurance because Ellis' illness prevents her from driving and the neighbor she relies on cannot fit in her car. That is, tolling does not apply in this situation because Ellis would only have reviewed her credit report in anticipation of getting another job and that Chase, as one of the largest employers in the USA would have necessary intent to prevent just that, given that registered representatives finances and credit reports are reviewed yearly and in depth by their principal. Hence, this minimally leads to a separate action, in conjunction with letter of the law fraud on the court – in that Chase has repeatedly attacked Ellis' claims of extrinsic fraud as "fanciful" claims.

Additionally, this class action triggers review under the Fair Debt Collections Practices Act 339.15 in that Chase, as the servicer, has instituted schemes to collect a debt. And that Glazer v Chase Home Finance, LLC 704 F3d 453, 455 (6th Circ. 2013) has ruled that mortgage foreclosure is debt collection. Although this court has heretofore evaluated Ellis' claims under ineffective assistance in Doc 40, p 4, para 3:

> Now proceeding Pro Se, Ellis contends that her attorney engaged in misconduct.
> However, an adverse judgment in a civil case may not be attacked on the ground
> of ineffective assistance of counsel: a malpractice action against the attorney is
> the appropriate from of recourse. See United States v. $100, 375.00 in U.S.

5

Currency, 70 F.3d 438, 440-41 (6th Cir. 1995).

Ellis would remind this court that this case also states:

> In addition, "an ineffective assistance of counsel claim may not be raised on
> appeal for the first time when there is no proof of ineffective assistance of counsel
> in the record." United States v. Nagi, 947 F.2d 211, 214 (6th Cir.1991), cert.
> denied, 504 U.S. 958, 112 S.Ct. 2309, 119 L.Ed.2d 230 (1992) (citations omitted).

Opposing counsel DID that by entering into evidence an UNPUBLISHED case Thill v.

Ocwen Loan Servicing, LLC (E.D. Mich 2014) not only clearly demonstrating that Gantz

had been threatened with sanctions but that the Judge thought Gantz so incompetent that

he chose to ignore bankruptcy claims that were not barred by res judica.  Did Judge

Michelson suddenly believe that justice would be served going forward?  Thus, judicial

apathy raises the claim that Ellis was denied due process in the taking of her property in

that the matter was raised at the very beginning in District Court, yet nothing was done.

Such actions result in the general population sincerely believing that the judicial system is

rigged against anyone struggling with debt and/or illness:

> McDonald also claims that his rights under the Fifth Amendment to the
> Constitution were violated because he was denied due process or fundamental
> fairness in the taking of the money which he claims was his property.
> This issue also was not raised before the district court. Ordinarily, we "will not
> address issues on appeal that were not raised and ruled upon below," Meade v.
> Pension Appeals and Review Committee, 966 F.2d 190, 194 (6th Cir.1992), but
> we may address such an issue "in exceptional circumstances." Id. No exceptional
> circumstances have arisen here, because it is a case in which the claimant asserts
> that his attorney was negligent in his representation. The Due Process Clause of
> the Fifth Amendment applies to governmental actions, not the conduct of retained

6

counsel. There is nothing fundamentally unfair with the process accorded in the district court, inasmuch as it entered default judgment after McDonald's counsel failed to provide discovery.

Judicial apathy for preserving a fairness in any trial, even small civil actions result in the general population sincerely believing that the judicial system is indeed rigged against anyone struggling with debt and/or illness. Although it may be legal, throwing an ill person out of their home when they are least able to adapt tends to invoke righteous anger in the people who are watching. In particular when Ellis can not be lumped with the theoretical person who overbuilt, lived beyond their means and hoped to "get a free house" out of the bank. While this may have happened somewhere at some time on a very limited basis, the sad fact is that most people, including Ellis, now know several people who have lost homes and investment properties merely because they chose to apply for a mortgage with the "wrong bank."

That is, it's not 2009 anymore, it is now a major social issue that the courts at least attempt to render moral judgments, not just legal ones. The Occupy Wall Street movement was the canary in the mine shaft for the no longer "Too Big To Fail, Too Big To Jail" platforms this election primary candidates are running on. Furthermore, given the unexpected passing of U.S. Supreme Court Judge Antonin Scalia, all courts are and will be under extreme scrutiny. The clearest indicator of the pendulum having swung too far as Ellis referenced in her briefs is that many of the foreclosure appeals this court is reviewing are people who bought the foreclosed home at deep discount, and still went into foreclosure. This is a serious indicator that the banking industry is far from proving it's trustworthy and is part and parcel of the growing anger of a disappearing middle class in this country. As home ownership has always been the hallmark of a thriving middle class.

Finally, Ellis would remind this court that they in excluding all evidence of Ellis' de facto illness they have barred the judgment of a plain error of omission – that is that Ellis is struggling with a debilitating illness she has no control over.   While this appears to be the court policy, nothing exists in the FRAP, the Federal Rules of Evidence or the Michigan Rules of Evidence to support this procedure.  That is, in spite of a dictate to protect the rights of persons (emphasis on persons as Chase also failed to legally consider Ellis' 89 year old mother who needed 4 Liters of oxygen an hour to survive.

Although illness was not raised in District Court, failure to include evidence of disability into the mortgage process violates Ellis' Civil Rights under Section 504 of the Rehabilitation Act clearly states that "no qualified individual with a disability in the United States shall be excluded from, denied the benefits of, or be subjected to discrimination under" any program or activity that either receives Federal financial assistance or is conducted by any Executive agency or the United States Postal Service.  Additionally, illness of the skin is specifically mentioned in the definition of disability, it being the largest organ in the human body.  Ellis has attached the excluded submissions as Exibit D and advises this court that she could easily attach the pictures of her mother's bed sores but has not because they are horrible.  Ellis would argue that EVERY actor in her case contributed to discrimination against her and her mother's disabilities from day one.  That Ellis "lost" her home and primary means of support the day she was fully afflicted and caring for a physically challenged elderly mother.  Given that Chase has a federal charter, all attorneys must be qualified and judges have questionable, if no immunity, this court is forcing Ellis into litigation as not only discriminatory, but it also has high potential of denying her her Constitutional right to life and property ownership – in that once Ellis is homeless and jobless – she will be unable to fight off infections that already have nearly killed her once.  Institutionally

8

denying the rights of persons with disabilities requires a fight to and beyond death as there is a moral imperative.  By now, all parties realize that Ellis, is in no way a revolutionary, but having cared for several people whose only crime is not aging well,  and having the great responsibility of representing several large classes of Americans, alas, the issues with this judgment cannot and should not be ignored by a country with a rich history of laws for the common man.

Ellis reminds this court that under Morgan v. Scott (USD Delaware, March 19, 2015):

*The court must accept all factual allegations in a complaint as true and take them in the light most favorable to a Pro Se* plaintiff. *See Phillips v. County of Allegheny,* 515 F.3d 224, 229 (3d Cir. 2008); *Erickson v. Pardus,* 551 U.S. 89, 93 (2007). Prose pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520-521 (1972).

If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or the litigant's unfamiliarity with pleading requirements. *Boag v. MacDougall,* 454 U.S. 364 {1982).

As the pendulum swings and the full effect of the Twombly and Iqbal continue to be evaluated, Ellis would point out to this court that "Material Facts in the Debate Over Twombly and Iqbal" (Ex. C, Executive Summary, Para 3) clearly states that "This paper's basic message, then is that empirical evidence is unlikely to settle the debate over the case-quality effect of the new pleading regime ushered in by Twombly and Iqbal."  In short, the new pleading regime is not quantitatively "better" - the policy decision to focus such a huge discovery burden on the plaintiff will ultimately end with a major "social" decision.  Why?  Because this study completely avoided the Pro Se plaintiff.  Hence, if the new regime is not statistically proven in the "best" of cases, it is doomed to reversal given that 43 million small business owners who operate and live on roughly $45,000 a year of net income will determine it.

As a Pro Se and for expediency, this Appellant requests that this Court accept this brief for BOTH panel and En Banc rehearing? Why? Given the multitude of actions that Ellis has held out on in deference to this Courts authority, Ellis is now fighting a time bar on many of these actions. If this case weren't so extremely prejudicial, Ellis would be ABLE to move on, however, she can not and fears that it will be the next decade spent in both State and Federal Courts.

WHEREFORE, the Pro Se Appellant humbly requests this Court to rehearings and that they sua sponte render a decision that does not render the Appellant homeless, jobless and fighting for her life from infections due to her illness of the skin. This Appellant has attached proof of illness that was excluded by order of the Court Clerk Supervisor.

Respectfully submitted:

*Barbara Ellis*

Date: February 22, 2016        By: Barbara A. Ellis
                                   PRO SE Appellant
                                   8293 South Huron River Drive
                                   Rockwood, MI 48179

10

## CERTIFICATE OF SERVICE

I certify that on February 22, 2016, pursuant to 6 Cir. R. 25, I mailed a copy of the

foregoing to Defendant-Appellee via first class mail at the following address:

DYKEMA GOSSETT PLLC

Thomas H. Trapnell (P74345)
Attorney for Defendants-Appellees
400 Renaissance Center
Detroit, MI  48243

# EXHIBIT "A"

2/10/2016                                   Experian—Access your credit report

 Experian

BARBARA A ELLIS  |  Report number 1050x3982x80 |  February 10, 2016  |  Print  |  Close window

**Any pending disputes will be highlighted below.**

---

Personal Information

Name(s) associated with your credit

| Name | Name identification number |
|------|---------------------------|
| BARBARA A ELLIS | 1 |
| BARBARA ELLIS | 7241 |
| BARBARA A SCHEFFLER | 2 |
| ANN B ELLIS | 21350 |
| BARB ELLIS | 10130 |

Address(es) associated with your credit

| Address | Address identification number | Residence type | Geographical code |
|---------|------------------------------|----------------|-------------------|
| 8293 S HURON RIVER DR SOUTH ROCKWOOD MI 48179-9513 | 0448660201 | Single family | 0-83010030-115-2160 |
| 8293 S HURON DR SOUTH ROCKWOOD MI 48179 | 0614801424 | Single family | 0-00-0- |
| PO BOX 425 SOUTH ROCKWOOD MI 48179-0425 | 0102983128 | Post office box | 0-83010030-115-2160 |
| 8102 S HURON RIVER DR SOUTH ROCKWOOD MI 48179-9783 | 0102984106 | Single family | 0-83010030-115-2160 |
| 23355 WILLIAMSBURG CIR APTC WOODHAVEN MI 48183-3332 | 0103053601 | Apartment complex | 0-59300020-163-2160 |
| 23355 WILLIAMSBURG CIR WOODHAVEN MI 48183-3332 | 0103053468 | Multifamily | 0-59300020-163-2160 |

Other personal information associated with your credit

Year of birth

1966

Spouse or co-applicant

W

Telephone number(s)

| ~~859 876 6408~~ | Cellular |
| ~~734 379 9472~~ | Residential |
| ~~734 672 6574~~ | Cellular |

| Current or former employer(s) | Address |
|-------------------------------|---------|
| AUTO ALLIANCE INTERNATI | |
| MAZDA | |

---

Your personal statements

No general personal statements appear on your report.

Add statement(s)

1/7

US BK CT-EAST DIST MICH

211 W FORT ST
DETROIT, MI 48226
313 319 6188
**Address Identification number**
0448660201

| | | |
|---|---|---|
| **number** 1156293WS | $0 | 06/2011 |
| **On record until** Jun 2021 | **Liability amount** $0 | **Date resolved** 09/2011 |

**Chapter 7 bankruptcy discharged.**
**Responsibility**
Individual

---

**Account name**
CHASE MTG

PO BOX 24696
COLUMBUS, OH 43224
800 848 9136
**Address Identification number**
0448660201

**Account number**
T6606T322....

**Type**
Mortgage
**Terms**
30 Years

**On record until**
Aug 2017

**Recent balance**
$0 as of 08/01/2013

**Credit limit or original amount**
$240,000
**High balance**
$0
**Monthly payment**
$0
**Recent payment amount**
$0

**Date opened**
03/2004

**Date of status**
08/2013
**First reported**
03/2008
**Responsibility**
Individual

**Status**
Discharged through Bankruptcy Chapter 7.
**Comment**
Account information disputed by consumer (Meets requirement of the Fair Credit Reporting Act).
**Comment**
Foreclosure proceedings started.

**Account history**

| 2013 | | | | | | | 2012 | | | | | | | | | | | | | 2011 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul F | Jun ND | May 180 | Apr 180 | Mar 180 | Feb 180 | Jan 180 | Dec 180 | Nov 180 | Oct 180 | Sep 180 | Aug 180 | Jul 180 | Jun ND | May ND | Apr ND | Mar ND | Feb ND | Jan ND | | Dec ND | Nov ND | Oct ND | Sep ND | Aug ND | Jul ND | Jun ND |
| | | | | | 2010 | | | | | | | | | | | | 2009 | | | | | | | | | |
| May ND | Apr 150 | Mar 120 | Feb 90 | Jan 60 | Dec 60 | Nov 60 | Oct 60 | Sep 60 | Aug 30 | Jul OK | Jun 30 | May 30 | Apr OK | Mar OK | Feb OK | Jan ND | Dec ND | Nov ND | | Oct ND | Sep ND | Aug ND | Jul ND | Jun ND | May ND | Apr ND |
| | | 2008 | | | | | | | | | | | | | | | | | | | | | | | | |
| Mar ND | Feb ND | Jan OK | Dec ND | Nov OK | Oct OK | Sep ND | Aug ND | Jul ND | Jun ND | May ND | Apr OK | Mar OK | | | | | | | | | | | | | | |

Foreclosure as of Jul 2013
180 days past due as of Jul 2012 to May 2013
150 days past due as of Apr 2011
120 days past due as of Mar 2011
90 days past due as of Feb 2011
60 days past due as of Sep 2010 to Jan 2011
30 days past due as of Aug 2010, Jun 2010, May 2010
Debt included in Chapter 7 Bankruptcy on Aug 01, 2013

---

**Account name**
DTE ENERGY

1 ENERGY PLZ # WCB2106
DETROIT, MI 48226
877 200 0438
**Address Identification number**
0448660201

**Account number**
45328700....

**Type**
Utility
**Terms**
1 Months

**Recent balance**
$0 as of 01/15/2016

**Credit limit or original amount**
$1,014
**High balance**
$0
**Monthly payment**
$0
**Recent payment amount**
$0

**Date opened**
08/2004

**Date of status**
10/2011
**First reported**
09/2006
**Responsibility**
Individual

**Status**
Closed.

**Comment**
Account closed at consumer's request.

**Account history**

| 2016 | 2015 | | | | | | | | | | | 2014 | | | | | | | | | | | | | | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan CLS | Dec CLS | Nov CLS | Oct CLS | Sep CLS | Aug CLS | Jul CLS | Jun CLS | May CLS | Apr CLS | Mar CLS | Feb CLS | Dec ND | Nov CLS | Oct CLS | Sep CLS | Aug CLS | Jul CLS | Jun CLS | May CLS | Apr CLS | Mar CLS | Feb CLS | Jan CLS | Feb CLS | Jan CLS | Dec CLS |
| | | | | | | | | | | | 2012 | | | | | | | | | | | | | 2011 | | |
| Nov CLS | Oct CLS | Sep CLS | Aug CLS | Jul CLS | Jun CLS | May CLS | Apr CLS | Mar CLS | Feb CLS | Jan CLS | Dec CLS | Nov CLS | Oct CLS | Sep CLS | Aug CLS | Jul CLS | Jun CLS | May CLS | Apr CLS | Mar CLS | Feb CLS | Jan CLS | Dec CLS | Nov CLS | Oct CLS | |
| | | | | | | | | | 2010 | | | | | | | | | | | | | 2009 | | | | |
| Sep OK | Aug OK | Jul OK | Jun OK | May OK | Apr OK | Mar OK | Feb OK | Jan OK | Dec OK | Nov OK | Oct OK | Sep OK | Aug OK | Jul OK | Jun sd | May OK | Apr OK | Mar OK | Feb OK | Jan OK | Dec OK | Nov OK | Oct OK | Sep OK | Aug OK | |
| Jul OK | Jun OK | May OK | Apr OK | Mar OK | Feb OK | | | | | | | | | | | | | | | | | | | | | |

60 days past due as of Apr 2010

Experian – Access your credit report

## Balance history

The following data will appear in the following format:
Date: account balance / date payment received / scheduled payment amount / actual amount paid
Dec 2015: $0 / Sep 29, 2011 / No data / No data
Nov 2015: $0 / Sep 29, 2011 / No data / No data
Oct 2015: $0 / Sep 29, 2011 / No data / No data
Sep 2015: $0 / Sep 29, 2011 / No data / No data
Aug 2015: $0 / Sep 29, 2011 / No data / No data
Jul 2015: $0 / Sep 29, 2011 / No data / No data
Jun 2015: $0 / Sep 29, 2011 / No data / No data
May 2015: $0 / Sep 29, 2011 / No data / No data
Apr 2015: $0 / Sep 29, 2011 / No data / No data
Mar 2015: $0 / Sep 29, 2011 / No data / No data
Feb 2015: $0 / Sep 29, 2011 / No data / No data
Dec 2014: $0 / Sep 29, 2011 / No data / No data
Nov 2014: $0 / Sep 29, 2011 / No data / No data
Oct 2014: $0 / Sep 29, 2011 / No data / No data
Sep 2014: $0 / Sep 29, 2011 / No data / No data
Aug 2014: $0 / Sep 29, 2011 / No data / No data
Jul 2014: $0 / Sep 29, 2011 / No data / No data
Jun 2014: $0 / Sep 29, 2011 / No data / No data
May 2014: $0 / Sep 29, 2011 / No data / No data
Apr 2014: $0 / Sep 29, 2011 / No data / No data
Mar 2014: $0 / Sep 29, 2011 / No data / No data
Feb 2014: $0 / Sep 29, 2011 / No data / No data
The original amount of this account was $1,014

| Account name | Account number | Recent balance | Date opened | Status |
|---|---|---|---|---|
| DTE ENERGY | 45365700... | $150 as of 01/15/2016 | 06/2011 | Open. |

1 ENERGY PLZ # WCB2106
DETROIT, MI 48226
877 200 0438
**Address identification number**
04x985xxx91

**Type**
Utility
**Terms**
1 Months

**Credit limit or original amount**
$860
**High balance**
$0
**Monthly payment**
$0
**Recent payment amount**
$219

**Date of status**
09/2014
**First reported**
11/2011
**Responsibility**
Individual

### Account history

| | 2016 Jan | 2015 Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | 2014 Jan | Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan | 2013 Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | ND | OK | OK | OK | OK | 90 | OK | OK | OK | OK | OK | OK | OK | OK |

| Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan | 2012 Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan | 2011 Dec | Nov |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |

90 days past due as of Aug 2014

### Balance history

The following data will appear in the following format:
Date: account balance / date payment received / scheduled payment amount / actual amount paid
Dec 2015: $369 / Dec 09, 2015 / No data / $219
Nov 2015: $442 / Oct 09, 2015 / No data / No data
Oct 2015: $347 / Oct 09, 2015 / No data / $413
Sep 2015: $668 / Sep 11, 2015 / No data / $194
Aug 2015: $687 / Aug 07, 2015 / No data / $194
Jul 2015: $680 / Jul 06, 2015 / No data / $194
Jun 2015: $641 / Jun 08, 2015 / No data / $194
May 2015: $698 / May 04, 2015 / No data / $194
Apr 2015: $805 / Mar 19, 2015 / No data / $190
Mar 2015: $860 / Mar 05, 2015 / No data / $198
Feb 2015: $852 / Feb 16, 2015 / No data / $209
Dec 2014: $627 / Dec 04, 2014 / No data / $194
Nov 2014: $621 / Nov 12, 2014 / No data / $194
Oct 2014: $728 / Oct 08, 2014 / No data / $194
Sep 2014: $831 / Sep 02, 2014 / No data / $71
Aug 2014: $715 / May 29, 2014 / No data / No data
Jul 2014: $549 / May 29, 2014 / No data / No data
Jun 2014: $235 / Mar 17, 2014 / No data / No data
May 2014: $559 / Mar 17, 2014 / No data / No data
Apr 2014: $456 / Mar 17, 2014 / No data / No data
Mar 2014: $309 / Mar 17, 2014 / No data / $162
Feb 2014: $15 / Jan 03, 2014 / No data / $162

2/10/2016                                    Experian – Access your credit report

The original amount of this account was $860

---

## Accounts in good standing

No **Accounts in good standing** appear on your report.

---

## Credit inquiries

We make your credit history available to your current and prospective creditors and employers as allowed by law. Personal data about you may be made available to companies whose products and services may interest you. As required by the Fair Credit Reporting Act, we display these requests for your credit history as a record of fact.

### Inquiries shared with others ?

No **Inquiries shared with others** appear on your report.

### Inquiries shared only with you ?

**Account name**
EXPERIAN

PO BOX 9600
ALLEN, TX 75013
800 311 4769

**Date of request(s)**

02/09/2016
02/09/2016
05/04/2011

---

**Account name**
LEXISNEXIS/STATE FARM

1000 ALDERMAN DR
ALPHARETTA, GA 30005
800 456 6004

**Date of request(s)**

11/30/2015
05/08/2015
**Comments**
On behalf of STATE FARM INSURANCE COM for Insurance
underwriting

**Account name**
LEXISNEXIS/STATE FARM

**Comments**
On behalf of STATE FARM INSURANCE COM for Insurance
underwriting

**Date of request(s)**

05/08/2015

**Account name**
BK OF AMER

PO BOX 17054
WILMINGTON, DE 19850
800 421 2110

**Date of request(s)**

03/04/2015

**Account name**
PROGRESSIVE INSURANCE

6300 WILSON MILLS RD
CLEVELAND, OH 44143
440 461 5000

**Date of request(s)**

03/04/2015

**Account name**
CHASE MTG

PO BOX 24696
COLUMBUS, OH 43224
800 848 9136

**Date of request(s)**

09/26/2014

2/10/2016

Experian – Access your credit report

**Account name**
CHASE MTG

**Date of request(s)**
09/12/2014

PO BOX 24696
COLUMBUS, OH 43224
800 848 9136

**Account name**
DTE ENERGY

**Date of request(s)**
09/02/2014

2000 3RD ST
DETROIT, MI 48226
313 235 4000

**Account name**
CHASE MTG

**Date of request(s)**
02/21/2014

PO BOX 24696
COLUMBUS, OH 43224
800 848 9136

---

Important messages

Experian collects and organizes information about you and your credit history from public records, your creditors and other reliable sources. By law, we cannot disclose certain medical information (relating to physical, mental, or behavioral health or condition). Although we do not generally collect such information, it could appear in the name of a data furnisher (i.e., "Cancer Center") that reports your payment history to us. If so, those names display on your report, but on reports to others they display only as "MEDICAL PAYMENT DATA." Consumer statements included on your report at your request that contain medical information are disclosed to others.

---

Know your rights

**Para informacion en espanol, visite www.consumerfinance.gov/learnmore o escribe a la Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, D.C. 20552.**

**A Summary of Your Rights under the Fair Credit Reporting Act**
The federal Fair Credit Reporting Act (FCRA) promotes the accuracy, fairness, and privacy of information in the files of consumer reporting agencies. There are many types of consumer reporting agencies, including credit bureaus and specialty agencies (such as agencies that sell information about check writing histories, medical records, and rental history records). Here is a summary of your major rights under the FCRA. **For more information, including information about additional rights, go to www.consumerfinance.gov/learnmore or write to: Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, D.C. 20552.**

**You must be told if information in your file has been used against you.** Anyone who uses a credit report or another type of consumer report to deny your application for credit, insurance, or employment or to take another adverse action against you must tell you, and must give you the name, address, and phone number of the agency that provided the information.
**You have the right to know what is in your file.** You may request and obtain all the information about you in the files of a consumer reporting agency (your "file disclosure"). You will be required to provide proper identification, which may include your Social Security number. In many cases, the disclosure " will be free. You are entitled to a free file disclosure if:
a person has taken adverse action against you because of information in your credit report;
you are the victim of identify theft and place a fraud alert in your file;
your file contains inaccurate information as a result of fraud;
you are on public assistance;
you are unemployed but expect to apply for employment within 60 days.

All consumers are entitled to one free disclosure every 12 months upon request from each nationwide credit bureau and from nationwide specialty consumer reporting agencies. See www.consumerfinance.gov/learnmore for additional information.
**You have the right to ask for a credit score.** Credit scores are numerical summaries of your credit-worthiness based on information from credit bureaus. You may request a credit score from consumer reporting agencies that create scores or distribute scores used in residential real property loans, but you will have to pay for it. In some mortgage transactions, you will receive credit score information for free from the mortgage lender.
**You have the right to dispute incomplete or inaccurate information.** If you identify information in your file that is incomplete or inaccurate, and report it to the consumer reporting agency, the agency must investigate unless your dispute is frivolous. See www.consumerfinance.gov/learnmore for an explanation of dispute procedures.
**Consumer reporting agencies must correct or delete inaccurate, incomplete, or unverifiable information.** Inaccurate, incomplete or unverifiable information must be removed or corrected, usually within 30 days. However, a consumer reporting agency may continue to report information it has verified as accurate.
**Consumer reporting agencies may not report outdated negative information.** In most cases, a consumer reporting agency may not report negative information that is more than seven years old, or bankruptcies that are more than 10 years old.
**Access to your file is limited.** A consumer reporting agency may provide information about you only to people with a valid need – usually to consider an application with a creditor, insurer, employer, landlord, or other business.
The FCRA specifies those with a valid need for access.
**You must give your consent for reports to be provided to employers.** A consumer reporting agency may not give out information about you to your

2/10/2016                                Experian – Access your credit report

employer, or a potential employer, without your written consent given to the employer. Written consent generally is not required in the trucking industry. For more information, go to www.consumerfinance.gov/learnmore.

**You may limit "prescreened" offers of credit and insurance you get based on information in your credit report.** Unsolicited "prescreened" offers for credit and insurance must include a toll-free phone number you can call if you choose to remove your name and address from the lists these offers are based on. You may opt-out with the nationwide credit bureaus at 1 888 5OPTOUT (1 888 567 8688).

**You may seek damages from violators.** If a consumer reporting agency, or, in some cases, a user of consumer reports or a furnisher of information to a consumer reporting agency violates the FCRA, you may be able to sue in state or federal court.

**Identity theft victims and active duty military personnel have additional rights.** For more information, visit www.consumerfinance.gov/learnmore. **States may enforce the FCRA, and many states have their own consumer reporting laws. In some cases, you may have more rights under state law. For more information, contact your state or local consumer protection agency or your state Attorney General. For more information about your federal rights, contact:**

| Type of Business: | Contact: |
|---|---|
| **1.a.** Banks, savings associations, and credit unions with total assets of over $10 billion and their affiliates. **b.** Such affiliates that are not banks, savings associations, or credit unions also should list in addition to the Bureau: | **a.** Bureau of Consumer Financial Protection 1700 G Street NW Washington, DC 20552 **b.** Federal Trade Commission: Consumer Response Center - FCRA Washington, DC 20580 (877) 382-4357 |
| **2.** To the extent not included in item 1 above: **a.** National banks, federal savings associations, and federal branches and federal agencies of foreign banks | **a.** Office of the Comptroller of the Currency Customer Assistance Group 1301 McKinney Street, Suite 3450 Houston, TX 77010-9050 |
| **b.** State member banks, branches and agencies of foreign banks (other than federal branches, federal agencies, and insured state branches of foreign banks), commercial lending companies owned or controlled by foreign banks, and organizations operating under section 25 or 25A of the Federal Reserve Act **c.** Nonmember insured banks, insured State Branches of Foreign Banks, and insured state savings associations | **b.** Federal Reserve Consumer Help Center PO Box 1200 Minneapolis, MN 55480 |
| **d.** Federal Credit Unions | **c.** FDIC Consumer Response Center 1100 Walnut Street, Box #11 Kansas City, MO 64106 **d.** National Credit Union Administration Office of Consumer Protection (OCP) Division of Consumer Compliance and Outreach (DCCO) 1775 Duke Street Alexandria, VA 22314 |
| **3.** Air Carriers | Asst. General Counsel for Aviation Enforcement & Proceedings Aviation Consumer Protection Division Department of Transportation 1200 New Jersey Avenue SE Washington, DC 20590 |
| **4.** Creditors Subject to Surface Transportation Board | Office of Proceedings, Surface Transportation Board Department of Transportation 395 E Street, SW Washington, DC 20423 |
| **5.** Creditors Subject to Packers and Stockyards Act | Nearest Packers and Stockyards Administration area supervisor |
| **6.** Small Business Investment Companies | Associate Deputy Administrator for Capital Access United States Small Business Administration 409 Third Street, SW, 8th Floor Washington, DC 20416 |
| **7.** Brokers and Dealers | Securities and Exchange Commission 100 F St NE Washington, DC 20549 |
| **8.** Federal Land Banks, Federal Land Bank Associations, Federal Intermediate Credit Banks, and Production Credit Associations | Farm Credit Administration 1501 Farm Credit Drive McLean, VA 22102-5090 |
| **9.** Retailers, Finance Companies, and All Other Creditors Not Listed Above | FTC Regional Office for region in which the creditor operates or Federal Trade Commission: Consumer Response Center - FCRA |

**Notification of Rights**
Notification of Rights for Alabama Consumers
Notification of Rights for Alaska Consumers
Notification of Rights for Arkansas Consumers
Notification of Rights for California Consumers
California Notice of Your Rights to Request and Obtain Your Credit Score
Notification of Rights for Colorado Consumers
Notification of Rights for Connecticut Consumers
Notification of Rights for Delaware Consumers
Notification of Rights for District of Columbia Consumers
Notification of Rights for Florida Consumers
Notification of Rights for Georgia Consumers
Notification of Rights for Indiana Consumers
Notification of Rights for Maryland Consumers
Notification of Rights for Massachusetts Consumers
Notification of Rights for Missouri Consumers
Notification of Rights for Montana Consumers
Notification of Rights for Nevada Consumers

2/10/2016                                    Experian – Access your credit report

Notification of Rights for New Hampshire Consumers
Notification of Rights for New Jersey Consumers
Notification of Rights for New Mexico Consumers
Notification of Rights for New York Consumers
Notification of Rights for North Carolina Consumers
Notification of Rights for North Dakota Consumers
Notification of Rights for Ohio Consumers
Notification of Rights for Oklahoma Consumers
Notification of Rights for Rhode Island Consumers
Notification of Rights for Tennessee Consumers
Notification of Rights for Texas Consumers
Notification of Rights for Vermont Consumers
Notification of Rights for Virginia Consumers
Notification of Rights for Washington Consumers
Notification of Rights for West Virginia Consumers
Notification of Rights for Wisconsin Consumers

© Experian 2016. All rights reserved.
Experian and the marks used herein are service marks or registered trademarks of Experian.
Other product and company names mentioned herein may be the trademarks of their respective owners.
View Experian's Privacy Policy

# GAN⚖Z ASSOCIATES

◆

## A Full Service Law Firm
27750 Middlebelt Road, Suite 100
Farmington Hills, MI 48334
Telephone: (248) 987-6505
Fax: (248) 886-9006

Invoice submitted to:
Barbara Ellis
8293 Huron River Dr
South Rockwood, MI 48179

May 15, 2014

Invoice #10017

Professional Services

|  | Hrs/Rate | Amount |
|---|---|---|
| 2/11/2014 Initial Consultation | 1.00 215.00/hr | 215.00 |
| 2/13/2014 Email correspondence with client | 0.20 215.00/hr | 43.00 |
| 2/14/2014 Email correspondence with client | 0.30 215.00/hr | 64.50 |
| 2/17/2014 Email correspondence with client | 0.20 215.00/hr | 43.00 |
| 2/20/2014 Phone call with client | 1.20 215.00/hr | 258.00 |
| 2/27/2014 Research Chain of Title, Signatures on Document's and Related Issues. | 1.50 215.00/hr | 322.50 |
| Email correspondence with client | 0.30 215.00/hr | 64.50 |
| 2/28/2014 Drafted Verified Complaint and Demand for Jury Trial | 5.90 215.00/hr | 1,268.50 |
| Drafted TRO and Motion for Preliminary Injunctive Relief | 1.25 215.00/hr | 268.75 |
| 3/3/2014 Travel to Monroe County Circuit Court to file complaint and seek TRO | 2.90 215.00/hr | 623.50 |

Barbara Ellis

Page    2

|  | | Hrs/Rate | Amount |
|---|---|---|---|
| 3/5/2014 | Various email correspondence with client | 0.40 215.00/hr | 86.00 |
| 3/17/2014 | Phone call with opposing counsel | 0.30 215.00/hr | 64.50 |
|  | Email correspondence with opposing counsel | 0.20 215.00/hr | 43.00 |
| 3/20/2014 | Email correspondence with opposing counsel | 0.20 215.00/hr | 43.00 |
| 3/21/2014 | Email correspondence with opposing counsel | 0.20 215.00/hr | 43.00 |
| 3/25/2014 | Review proposed order for extension | 0.20 215.00/hr | 43.00 |
|  | Email correspondence with opposing counsel | 0.20 215.00/hr | 43.00 |
| 3/27/2014 | Email correspondence with opposing counsel | 0.20 215.00/hr | 43.00 |
| 4/7/2014 | Email correspondence with client | 0.20 215.00/hr | 43.00 |
| 4/8/2014 | Email correspondence with client | 0.20 215.00/hr | 43.00 |
| 4/16/2014 | Reviewed Notice of Removal | 0.30 195.00/hr | 58.50 |
| 4/18/2014 | Drafted Motion to Remand | 2.80 195.00/hr | 546.00 |
|  | Email correspondence with opposing counsel | 0.20 215.00/hr | 43.00 |
| 5/6/2014 | Drafted Motion for an Extension Pending the Adjudication of the Motion to Remand | 1.30 195.00/hr | 253.50 |
| 5/7/2014 | Reviewed Defendant's Response to Plaintiff's Motion to Remand | 0.40 195.00/hr | 78.00 |
|  | Email correspondence with opposing counsel | 0.20 215.00/hr | 43.00 |
|  | Drafted stipulated order extending response to defendant's motion | 0.30 215.00/hr | 64.50 |

Barbara Ellis                                                                              Page    3

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 5/8/2014 | Email correspondence with opposing counsel | 0.30<br>215.00/hr | 64.50 |
|  | Email correspondence with client | 0.30<br>215.00/hr | 64.50 |
| 5/12/2014 | Drafted reply to Defendant's Response to Plaintiff's Motion to Remand | 1.60<br>195.00/hr | 312.00 |
| 5/13/2014 | Drafted Joint Status Report | 0.80<br>195.00/hr | 156.00 |
|  | Email correspondence with opposing counsel | 0.20<br>215.00/hr | 43.00 |
|  | For professional services rendered | 25.75 | $5,392.25 |

Additional Charges :

| 2/14/2014 | Filed verified complaint and request for jury trial | 235.00 |
|---|---|---|
|  | Mileage to and from Monroe County Circuit Court to file complaint and seek TRO | 47.30 |
| 3/13/2014 | Certified mail to Chase Home Finance | 18.55 |
|  | Certified mail to JPMorgan Chase | 19.65 |
|  | Certified mail to JPMorgan Chase | 26.15 |
|  | Certified mail to Unknown Trust C/O Deutsche Bank | 26.15 |
|  | Total additional charges | $372.80 |
|  | Total amount of this bill | $5,765.05 |

Accounts receivable transactions

| 2/11/2014 | Payment - Thank You | ($3,000.00) |
|---|---|---|
| 2/21/2014 | Payment - Thank You | ($500.00) |
| 3/7/2014 | Payment - Thank You | ($500.00) |
| 3/21/2014 | Payment - Thank You | ($500.00) |
| 4/4/2014 | Post-dated Check - Thank You | ($500.00) |
|  | Total payments and adjustments | ($5,000.00) |
|  | Balance due | $765.05 |





## Re: Status
1 message

B. ~~Nimmons~~ <~~barbie~~@gmail.com>                                                      Tue, Sep 2, 2014 at 3:00 PM
To: Josh Joseph <jjoseph@gantzassociates.com>

That will work. Thank you Josh.

Barb Ellis

On Tue, Sep 2, 2014 at 12:02 PM, Josh Joseph <jjoseph@gantzassociates.com> wrote:

Hello Barb:

I have you tentatively scheduled for Friday at 10:00 am for a phone conferenced with Adam. If you need to reschedule, please let me know.

Thanks,

Josh Joseph

Paralegal

GANTZ ASSOCIATES

27750 Middlebelt, Suite 100

Farmington Hills, MI 48334

Tel: (248) 987-6505

Fax: (248) 886-9006

**From:** B. ~~Nimmons~~ [mailto:~~barbie~~@gmail.com]
**Sent:** Tuesday, September 02, 2014 11:45 AM
**To:** Josh Joseph
**Subject:** Re: Status

Hello Josh,

Yes that would have been fine. Unfortunately, an unexpected an serious issue just came up 2 hours ago. Would it be possible to hold off until (anytime) Friday or next week?

Thanks-

Barb Ellis

On Fri, Aug 29, 2014 at 4:22 PM, Josh Joseph <jjoseph@gantzassociates.com> wrote:

Hello Barb:

Would you be available on Wednesday around 11:00 AM for a phone conference with Adam?

Thanks,

Josh Joseph

Paralegal

GANᵢZ ASSOCIATES

27750 Middlebelt, Suite 100

Farmington Hills, MI 48334

Tel: (248) 987-6505

Fax: (248) 886-9006

> **From:** 5-Nineteetwo-s4barbls@gmail.com
> **Date:** August 29, 2014 at 3:23:13 PM EDT
> **To:** "Adam J. Gantz" <agantz@gantzassociates.com>
> **Subject: Re: Status**
>
> Hello Adam,
>
> When I saw that you had a lot of changes in your office, I opted to just be patient and let you get back to me.
>
> And, yes, I would really like to know the status of this suit.  So  email a date and time works for you and I'll make myself available.
>
> Regards,
>
> Barb Ellis
>
>
> On Fri, Aug 29, 2014 at 12:41 PM, Adam J. Gantz <agantz@gantzassociates.com> wrote:
>
> Barb:
>
> Things have been quite hectic here lately, and we haven't had a chance to touch base. Are you available on Tuesday or Wednesday to talk about where we are going with your lawsuit?

Adam

Adam J. Gantz, Esq.

GANZ ASSOCIATES

27750 Middlebelt, Suite 100

Farmington Hills, MI 48334

Tel: (248) 987-6505

Fax: (248) 886-9006

B

[Voice](Voice)

Actions

601-610 of 641

Call
Text
Inbox
(132)

Starred
Voicemails
(49)
Texts
(4)
History
More

Google Contacts

Voice in Hangouts
Make calls from
Android
Your number:
(786) 505-5265
Credit:

Ron Lankford (734) 829-8807 mobile                 Inbox
9/7/14 9:34 AM 17 months ago

I guess you're cables to this is Ron. It's 930 Forever Sunday. I was gonna try
let you know the after 10:30. It'd be coming over, okay. Take it easy, bye.

00:19
Call
Text
more
▼
Transcript useful?

+17347823726 + Add - Flat Rock, MI
9/5/14 11:13 AM 17 months ago 10 minutes long

Call
Text
more
▼
Call quality?

+12489976505 (248) 987-6505 - mobile
9/5/14 10:04 AM 17 months ago 44 minutes long

Call
Text
more
▼
Call quality?

Chase
P.O. Box 469030
Glendale, CO 80246-9030

**CHASE** ○

September 23, 2014

0U5601 · 1 of 1 REPOST·IA·Z1·000000000000
Barbara A. Ellis
8293 S Huron River Drive
South Rockwood, MI 48179-9513



## We will be contacting you soon about mortgage assistance

Account:
Property Address:      8293 Huron River Drive
                       South Rockwood, MI 48179-0000

Dear Barbara A. Ellis:

We're writing because we will need to contact you about your request for mortgage assistance.

You previously asked that we not contact you. But in order to help with your request for mortgage assistance, or to find an alternative to foreclosure, we will disregard your previous request and begin contacting you again about your application. You may hear from us by mail, phone or email.

If you have questions, please contact us at one of the telephone numbers listed below.

Sincerely,

Chase
855-217-8966
800-582-0542 TTY
866-282-5682 Fax
www.chase.com

### AN IMPORTANT REMINDER FOR ALL OUR CUSTOMERS

As stated in the "Questions and Answers for Borrowers about the Homeowner Affordability and Stability Plan" distributed by the Obama Administration, "Borrowers should beware of any organization that attempts to charge a fee for housing counseling or modification of a delinquent loan, especially if they require a fee in advance." Do not sign over the deed to your property to any organization or individual unless you are working directly with your mortgage company to forgive your debt. Never make a mortgage payment to anyone other than your mortgage company without their approval. Loan modification scams should be reported to PreventLoanScams.org, or by calling 888-995-HOPE; 888-995-4673. We offer mortgage assistance free of charge (i.e., no fee required). Please call us immediately at 866-550-5705 to discuss your options. The longer you delay, the fewer options you may have.

**If you are represented by an attorney, please refer this letter to your attorney and provide us with the attorney's name, address, and telephone number.**

To the extent your original obligation has been discharged, or is subject to an automatic stay of

bankruptcy under Title 11 of the United States Code, this notice is for compliance and/or informational purposes only and does not constitute a demand for payment or an attempt to impose personal liability for such obligation.

## IMPORTANT NOTICE TO SERVICEMEMBERS AND THEIR DEPENDENTS

If you are or recently were on active duty or active service, you may be eligible for benefits and protections under the federal Servicemembers Civil Relief Act (SCRA). This includes protection from foreclosure or eviction. You may also be eligible for benefits and protections under state law or Chase policy. SCRA and state Military benefits and protections also may be available if you are the dependent of an eligible Servicemember.

Eligible service may include:

> Active duty with the Army, Navy, Air Force, Marine Corps, or Coast Guard, or
> Active service as a commissioned officer of the National Oceanic and Atmospheric Administration, or
> Active service as a commissioned officer of the Public Health Service, or
> Service with the forces of a nation with which the United States is allied in a war or Military action, or
> Service with the National Guard of a state militia under a state call of duty, or
> Any period when you are absent from duty because of sickness, wounds, leave, or other lawful cause

For more information, please call Chase Military Services at 877-469-0110.

## FEDERAL ECOA NOTICE

The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract), because all or part of the applicant's income derives from any public assistance program, or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is the Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, DC 20006.

7.2013CR7099
UA064

# EXHIBIT "B"

**UNITED STATES DISTRICT COURT**
**IN THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

BARBARA A. ELLIS,                                  Case No. 2:14-cv-11186

      Plaintiff,                                Hon. Laurie J. Michelson

v.                                                 Magistrate Judge Michael
                                                        J. Hluchaniuk
CHASE HOME FINANCE, LLC,
JPMORGAN CHASE BANK, N.A.,
DEUTSCHE BANK NATIONAL
TRUST COMPANY, as Trustee, and
UNKNOWN TRUST, the currently
unknown asset-backed security at issue,

      Defendants.

---

Adam J. Gantz (P58558)                  Joseph H. Hickey (P41664)
Nickolas C. Buonodono (P70835)          Kyle R. Dufrane (P58809)
Attorneys for Plaintiffs                Thomas H. Trapnell (P74345)
Gantz Associates                        Attorneys for JPMorgan Chase Bank,
27750 Middlebelt Road, Ste. 100         N.A., and Deutsche Bank National Trust
Farmington Hills, MI  48334             Company, as Trustee
(248) 987-6506                          Dykema Gossett PLLC
agantz@gantzassociates.com              400 Renaissance Center
                                        Detroit, MI  48243
                                        (313) 568-6529
                                        kdufrane@dykema.com
                                        ttrapnell@dykema.com

---

**THE PARTIES' JOINT STATEMENT OF THE CASE**

1

Pursuant to the Court's Order to Provide Statement of the Case (Dkt. 12), Plaintiff Barbara A. Ellis ("Plaintiff") and Defendants JPMorgan Chase Bank, N.A. ("Chase"), successor by merger to Chase Home Finance LLC, and Deutsche Bank National Trust Company, solely and exclusively in its capacity as Trustee for Washington Mutual Mortgage Pass-Through Certificates, Series 2004-AR (the "Trustee"), named as "Deutsche Bank National Trust Company, as Trustee," (jointly "Defendants") submit the following Statement of the Case:

## I.    NATURE OF THE ACTION; THE PARTIES' CLAIMS AND DEFENSES

### Plaintiff's Statement

Plaintiff's claims concern a residential mortgage loan now serviced by Chase. Chase fraudulently billed Plaintiff in 2010 for force-placed hazard insurance after Chase stopped making payments on Plaintiff's more affordable hazard insurance policy. Plaintiff challenged the force-placed insurance in writing to Chase, which ignored Plaintiff's request. Chase also tricked Plaintiff into defaulting on her mortgage loan by misrepresenting to Plaintiff that she had to be in default in order to qualify for a loan modification. Plaintiff has asserted claims under the Real Estate Settlement

2

Procedures Act, the Truth in Lending Act, and the common law.  Plaintiff's

claims are pleaded with specificity and substantiated by written documents

attached to Plaintiff's pleading.

### Defendants' Statement

This case is pleaded as a foreclosure- and consumer lending-related

lawsuit, but it should be dismissed because the exhibits to Plaintiff's

Complaint make clear that in reality, there was no actual dispute between

Plaintiff and Chase until this lawsuit was filed.  Plaintiff went so far as to

inform Chase in writing that she preferred that her house be sold at a

*NOT SO! LOOK AT DOC*

Sheriff's Sale, even after obtaining approval from Chase for a short sale,

and that she intended to leave the subject real property in any event.

Plaintiff's claims for relief are time-barred, deficiently pleaded as a matter

of law, and/or refuted by documents attached to the Complaint itself.

## II.    PROCEDURAL HISTORY

2/28/14     Plaintiff's Complaint filed in Monroe County Circuit Court

3/20/14     Defendants remove lawsuit to this Court

4/16/14     Defendants' Motion to Dismiss filed

4/18/14     Plaintiff's Motion to Remand filed

5/2/14       Defendants' Response to Motion to Remand filed

## III.   SETTLEMENT DISCUSSIONS TO DATE

3

Counsel for the parties have begun exploring the settlement options. Plaintiff is interested in a loan modification as a means to settle this litigation. Defendants have asked whether Plaintiff would consider a cash-for-keys offer. These discussions are ongoing. Plaintiff believes a settlement conference would be beneficial.

*Respectfully submitted,*

**Gantz Associates**

*/s/ Adam J. Gantz* (w/consent)
Adam J. Gantz (P58558)
Nickolas C. Buonodono (P70835)
Attorneys for Plaintiffs
27750 Middlebelt Road, Ste. 100
Farmington Hills, MI 48334
(248) 987-6506
agantz@gantzassociates.com

**Dykema Gossett PLLC**

/s/ *Thomas H. Trapnell*
Joseph H. Hickey (P41664)
Kyle R. Dufrane (P58809)
Thomas H. Trapnell (P74345)
Attorneys for JPMorgan Chase Bank,
N.A., and Deutsche Bank National Trust Company, as Trustee
400 Renaissance Center
Detroit, MI 48243
(313) 568-6800
kdufrane@dykema.com
ttrapnell@dykema.com

# EXHIBIT "C"

**University of Pennsylvania Law School**
## Penn Law: Legal Scholarship Repository

Faculty Scholarship

3-18-2015

# Material Facts in the Debate Over *Twombly* and *Iqbal*

Jonah B. Gelbach
*University of Pennsylvania Law School*, jgelbach@law.upenn.edu

Follow this and additional works at: http://scholarship.law.upenn.edu/faculty_scholarship

Part of the Civil Procedure Commons, Courts Commons, Judges Commons, Law and Economics Commons, Litigation Commons, and the Public Economics Commons

### Recommended Citation

Gelbach, Jonah B., "Material Facts in the Debate Over *Twombly* and *Iqbal*" (2015). *Faculty Scholarship.* Paper 1539.
http://scholarship.law.upenn.edu/faculty_scholarship/1539

This Article is brought to you for free and open access by Penn Law: Legal Scholarship Repository. It has been accepted for inclusion in Faculty Scholarship by an authorized administrator of Penn Law: Legal Scholarship Repository. For more information, please contact PennlawIR@law.upenn.edu.

**Please cite to 68 Stan. L. Rev. ___ (forthcoming)**

# MATERIAL FACTS IN THE DEBATE OVER *TWOMBLY* AND *IQBAL*

*Jonah B. Gelbach*[*]
Associate Professor
University of Pennsylvania Law School
March 18, 2015

Forthcoming in 68 Stan. L. Rev. ___ (2016)

### ABSTRACT

This paper presents empirical evidence concerning the adjudication of defendant-filed summary judgment motions from nearly 2,000 randomly selected employment discrimination and contracts cases to try to assess whether *Twombly* and *Iqbal*'s performance in filtering cases according to merit. I first explain how such data might be helpful in such an assessment, taking into account the possibility that parties' behavior might have changed following *Twombly* and *Iqbal*.

I find that even using this large collection of data——the most comprehensive data assembled to date to address this question—we cannot tell whether "*TwIqbal*" supporters or critics are more correct about the efficacy of the new plausibility pleading regime in the pre-discovery filtering of cases according to merit. This null result points to the very real possibility that plausibility pleading's case-quality effects—a quintessential empirical question—simply can't be answered using data.

This paper's basic message, then, is that empirical evidence is unlikely to settle the debate over the case-quality effects of the new pleading regime ushered in by *Twombly* and *Iqbal*.

[*] This paper uses data collected for a Public Policy Report ("Report") written for and released by the Searle Civil Justice Institute ("SCJI") and the Law and Economics Center ("LEC") at George Mason University. *See* Searle Civil Justice Institute, Measuring the effects of a heightened pleading standard under *Twombly* and *Iqbal*, October 2013, http://masonlec.org/site/rte_uploads/files/Twombly-Iqbal%20Report%20by%20SCJI%20(George%20Mason%20Law%20%26%20Economics%20Center)%20October%202013.pdf . I draw heavily in some places—and possibly verbatim in a few—from the analysis and text of the Report. While the Report is copyrighted to the George Mason University LEC, I have permission to duplicate parts of the Report at will (emailed permission on file with author). I am grateful to the SCJI at the George Mason University LEC for its generous financial support of this project as well as for providing coders. I am also grateful for the many helpful comments I received from the judges, practitioners, and academics on the SCJI Board of Overseers, participants in the SCJI research workshop at George Mason University School of Law, and two anonymous referees provided by the LEC. I also thank Rita Choi for help managing early data collection and James Cooper for his management expertise and intellectual support for my work on this project, as well as current and former GMU School of Law students Dale Baker, Josh Branson, Corey Carpenter, Wei Fan, Patrick Vincent, and Chris Woolley, and current and former University of Pennsylvania Law School students Meredith Gage, Gary Ho, Jonathan Kaplan, James Klima, and Jonelle Saunders for all their hard work coding cases. In addition, this project could not have been completed without the data (and helpful discussions concerning it) provided by Thomson Reuters, nor the generous financial support in acquiring those data that was provided by the Oscar M. Ruebhausen Fund at the Yale Law School. I am also very grateful to Yale Law School Professor William N. Eskridge and Dean Robert C. Post for their enthusiastic support in acquiring these data. Finally, I had many valuable conversations with legal scholars too numerous to name; at the risk of offending those left out, I offer special thanks to Steve Burbank, Henry Butler, Joe Cecil, David Engstrom, William Hubbard, Daniel Klerman, Jon Klick, Bruce Kobayashi, Alan Morrison, and Joshua Wright.

**Please cite to 68 Stan. L. Rev. ___ (forthcoming)**

## Contents

INTRODUCTION ................................................................................................................ 1

I. TWOMBLY, IQBAL, AND WHAT WE CAN LEARN FROM SUMMARY JUDGMENT RESULTS
   4

    A. Twombly, Iqbal and Discovery .......................................................................... 4

    B. Defining "Merit Post-Discovery" ...................................................................... 8

    C. Understanding the Summary Judgment Link When Only Judges' Behavior
       Changes Following Twombly and Iqbal ............................................................ 9

    D. Party Selection Effects of Twombly and Iqbal ............................................... 14

II. DATA .................................................................................................................... 17

III. EMPLOYMENT DISCRIMINATION CASES .................................................................. 21

    A. Basic Characteristics of the Employment Discrimination Sample ............... 21

    B. Summary Judgment Adjudication Results for Employment Discrimination
       Cases .............................................................................................................. 22

    1. The percentage of cases in which plaintiffs win as to all challenged claims or
       issues ............................................................................................................. 24

    2. The percentage of cases in which plaintiffs win on at least one challenged
       claim .............................................................................................................. 25

    3. Measuring the Quality-Filtering Effect Using Changes in the Number of
       Employment Discrimination Cases Facing Summary Judgment Motions ........... 26

IV. CONTRACT CASES ................................................................................................. 29

    A. Basic Characteristics of the Contracts Sample ............................................. 29

    B. Summary Judgment Adjudication Results for Contracts Cases .................... 31

    1. The percentage of cases in which plaintiffs win as to all aspects raised by
       defense summary judgment motions .............................................................. 31

    2. The percentage of cases in which plaintiffs win on at least one claim
       challenged via defense summary judgment motion ......................................... 32

    3. Challenges in Measuring the Quality-Filtering Effect Using Changes in the
       Number of Contracts Cases Facing Summary Judgment Motions ..................... 34

V. FURTHER ISSUES ................................................................................................... 36

    A. Why it Would be Problematic to Focus Only on Cases in Which a Rule
       12(b)(6) Motion was Filed ............................................................................. 36

    B. Threats to the Validity of the Empirical Approach ....................................... 38

    1. The Recession ................................................................................................ 38

    2. LEDBETTER V. GOODYEAR, INC. AND THE LILLY LEDBETTER FAIR PAY ACT . 38

    3. Scott v. Harris ................................................................................................ 39

**Please cite to 68 Stan. L. Rev. ___ (forthcoming)**

|  | 4. | Amendments to Rule 56 | 40 |
|  | 5. | Other Factors that Might Lead to Invalid Estimates | 40 |
| CONCLUSION | | | 42 |

**Please cite to 68 Stan. L. Rev. ___ (forthcoming)**

INTRODUCTION

Much controversy has surrounded the Supreme Court's opinions in *Bell Atlantic v. Twombly*[1] and *Ashcroft v. Iqbal*.[2]  Critics of the plausibility standard introduced in these cases argue that it will reduce access to the federal courts in meritorious suits.[3]  In some disputes, the critics argue, the defendant controls the information that would be necessary to plead in sufficient factual detail to meet the plausibility standard.  Under *Conley v. Gibson*'s now-retired "no set of facts" pleading standard,[4] plaintiffs could allege wrongdoing generally and then count on discovery to unearth the facts necessary to establish the elements of such causes of action.  By requiring plaintiffs to allege such facts *before* Rule 12(b)(6) adjudication, critics argue, *Twombly*'s plausibility standard sets up a Catch-22: pleading sufficiently to reach discovery requires access to information that is available only through discovery.[5]

On the other side of the "*TwIqbal*" debate, supporters of the plausibility standard argue that too many plaintiffs intentionally bring low-merit lawsuits for settlement value only.  Defendants must agree to pay off plaintiffs in such cases, according to this view, because the burden of discovery is greater for defendants than plaintiffs.  Plaintiffs in such suits have little disincentive to proceed through discovery, leaving defendants to choose between either settling before discovery or bearing the high discovery costs that will enable them to get to summary judgment, where the defendants will very likely win.  Supporters of the switch to *Twombly*'s plausibility standard believe it will help eliminate low-merit cases, whose plaintiffs they believe will be unable to plead with sufficient factual detail, before discovery costs mount.

Both the critics and the supporters hold theoretically coherent views: logically, both views could be correct.  Further, it is possible that there are sizable numbers of both meritorious cases likely to face a Catch-22 problem under the plausibility standard, and strike suits likely to be filtered out by the plausibility standard.  Therefore, which effect predominates ultimately is an empirical question.

While there has been no shortage of empirical work on *TwIqbal*, it has overwhelmingly focused on the question of whether judges have indeed applied a  higher standard when adjudicating Rule 12(b)(6) motions.[6]  But almost no work besides the present paper has even

---

[1] Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).

[2] Ashcroft v. Iqbal, 556 U.S. 662 (2009).

[3] For purposes of this paper, a case has merit if, following discovery, there would be sufficient facts that either (i) are in dispute or (ii) point in the plaintiff's favor if not in dispute, such that the defendant would not be entitled to judgment as a matter of law.  That is, a case has merit if, following discovery, its factual posture would either present an issue of triable fact or entitle the plaintiff to judgment as a matter of law  A final way to say it is that a case has merit if, following discovery, the plaintiff could demonstrate that she would be able to meet her burden of production at trial. Given this definition of merit, it is possible for even meritorious suits to fail the plausibility pleading standard. Judges deciding Rule 12(b)(6) motions might believe that the complaint's allegations are implausible, so that they grant the motions, even though it happens to be true that discovery, were it to occur, would turn up evidence sufficient to meet the plaintiff's burden of production.

[4] *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

[5] For an interesting discussion of the challenges in designing a pleading standard that accounts both for such Catch 22-style asymmetries and for the possibility that pretrial litigation costs are asymmetric in the opposite direction, *see* Paul Stancil, *Balancing the Pleading Equation*, 61 Baylor L. Rev. 90 (2009).

[6] *See, e.g.*, JOE S. CECIL ET AL., FED. JUDICIAL CTR., MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM AFTER *IQBAL*: REPORT TO THE JUDICIAL CONFERENCE ADVISORY COMM. ON CIVIL RULES (2011), *available at*

tried to measure the extent to which *TwIqbal* have affected any measure of the level of merit among cases that get past the Rule 12(b)(6) stage.[7]

In this paper, I take up that task by using outcomes of defense summary judgment motions to attempt to measure *TwIqbal*'s effects on case quality. In its shortest form, the idea is this. Define a case as having no merit post-discovery if a reasonable fact-finder could not find for the plaintiff on the basis of the post-discovery record (I elaborate on this definition in Part I.B). Defendants in such cases can be expected to file and win summary judgment motions. Assuming that the plausibility pleading standard is effective at snagging low-merit cases at the Rule 12(b)(6) stage, such no-merit cases will be eliminated from the set of cases that make it to

---

http://www.fjc.gov/public/pdf.nsf/lookup/motioniqbal.pdf/$file/motioniqbal.pdf); Joe S. Cecil Et Al., Fed. Judicial Ctr., UPDATE ON RESOLUTION OF RULE 12(B)(6) MOTIONS GRANTED WITH LEAVE TO AMEND: REPORT TO THE JUDICIAL CONFERENCE ADVISORY COMM. ON CIVIL RULES (2011), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/motioniqbal2.pdf/$file/motioniqbal2.pdf; Kendall W. Hannon, Note, *Much Ado About Twombly? A Study on the Impact of* Bell Atlantic Corp. v. Twombly *on 12(b)(6) Motions*, 83 Notre Dame L. Rev. 1811 (2008); Joseph A. Seiner, *The Trouble with* Twombly*: A Proposed Pleading Standard for Employment Discrimination Cases*, 2009 U. Ill. L. Rev. 1011 (2009); Joseph A. Seiner, *Pleading Disability*, 51 B.C. L. Rev. 95 (2010); William H.J. Hubbard, *Testing for Change in Procedural Standards, with Application to* Bell Atlantic v. Twombly, 42 J. LEGAL STUD. 35 (2013); Patricia W. Hatamyar, *The Tao of Pleading: Do* Twombly *and* Iqbal *Matter Empirically?*, 59 Am. U. L. Rev. 553 (2010); Patricia Hatamyar Moore, *An Updated Quantitative Study of* Iqbal*'s Impact on 12(b)(6) Motions*, 45 U. Rich. L. Rev. (2012); Raymond H. Brescia, *The* Iqbal *Effect: The Impact of New Pleading Standards in Employment and Housing Discrimination Litigation*, 100 Ky. L.J. 235 (2012); Victor D. Quintanilla, *Beyond Common Sense: A Social Psychological Study of* Iqbal*'s Effect on Claims of Race Discrimination*, 17 Mich. J. Of Race & L. 1 (2011); Scott Dodson, *A New Look: Dismissal Rates of Federal Civil Claims*, 96 Judicature 127 (2012); Alexander A. Reinert, *Measuring the Impact of Plausibility Pleading*, manuscript (2015) (on file with author); Joe S. Cecil, *Of Waves and Water: A Response to Comments on the FJC Study Motions to Dismiss for Failure to State a Claim after Iqbal (2012)*, available at http://ssrn.com/abstract=2026103; Lonny Hoffman, *Twombly And Iqbal's Measure: An Assessment of the Federal Judicial Center's Study of Motions to Dismiss*, 6 FED. COURTS L. REV. 1 (2011); Lonny Hoffman, *Rulemaking in the Age of Twombly and Iqbal*, 46 U.C. DAVIS L. REV. 1483 (2013), available at http://ssrn.com/abstract=2123325. *See also* Theodore Eisenberg & Kevin M. Clermont, *Plaintiphobia in the Supreme Court*, 100 Cornell L. Rev. 193 (2014) (reporting trends in "the difference between the pretrial-adjudication judgment rates for the defendant and for the plaintiff" and associating these trends with the summary judgment "trilogy" cases as well as *Twombly* and *Iqbal*); Roger Michalski and Abby K. Wood, *Twombly and Iqbal at the State Level* (December 3, 2014), USC Law Legal Studies Paper No. 14-30 (using data from states to conduct before-after comparisons of the sort other authors have done at the federal level); and Samuel Issacharoff and Geoffrey Miller, An Information-Forcing Approach to the Motion to Dismiss, 5 J. Leg. Analysis 437, 439, 452 (2013) (proposing "a use of fee and cost shifting in the initial process of factual claiming and denials that would create incentives for the parties to acquire or reveal information germane to the motion to dismiss by forcing them to absorb the costs of either producing the information or denying its existence" and engaging in "a mild empirical inquiry" to determine how much such a policy might matter).

[7] Alexander Reinert has written two papers that in whole or in part are directed toward this question. Reinert, *Measuring the Impact of Plausibility Pleading*, note 6, *supra*, focuses primarily on the same question that most of the *Twombly/Iqbal* empirical literature has considered—how the outcomes of Rule 12(b)(6) motions themselves have changed. However, the paper also includes a brief section, titled "Plausibility pleading as filter?", based on Reinert's coding of post-Rule 12(b)(6) outcomes in the cases he studies. I discuss this paper further in Part V.A, *infra*. In the other paper, Alexander Reinert, *The Costs of Heightened Pleading*, 86 Indiana L.J. 119 (2011), Reinert attempts to measure the effects that a heightened pleading standard would have had on the ultimate dispensation of pre-*Twombly* cases that had Rule 12(b)(6) motions granted and then reversed on appeal. By design, this paper uses only pre-*Twombly* cases, so it cannot provide information about cases that are actually litigated after the switch to *Twombly/Iqbal*'s plausibility pleading standard. Moreover, by coding cases that settle as meritorious, Reinert begs the very question raised by supporters of the plausibility pleading standard: whether settlements occur because of the threat of costly discovery rather than the presence of a genuine basis for suit.

summary judgment in the post-*Iqbal* period. Thus (i) there should be fewer cases in the summary judgment population post-*Iqbal*, and (ii) those cases will be more likely to survive summary judgment. Consequently, the plaintiff's win rate against defense summary judgment motions should be greater following *Iqbal* than before *Twombly*. On the other hand, if *Tw/Iqbal*'s critics are correct, then the plaintiff's win rate will have either dropped (indicating that *Tw/Iqbal* filters out higher-quality, rather than lower-quality cases) or stayed the same (indicating that *Tw/Iqbal* filters equal proportions of high- and low-quality cases).

In fact, things are more complicated, because there are good reasons to believe that parties' case and Rule 12(b)(6) motion filing behavior, as well as settlement, will change following a perceived change in the pleading standard.[8] Accordingly, in Part I.D, I also discuss the role of such party selection effects for present empirical purposes. A critical question that arises in this discussion is whether there are any disputes that "select into summary judgment," in the sense that they would develop into lawsuits that make it to under *Tw/Iqbal*, but not under the pre-*Twombly* pleading standard. To use my empirical approach to measure the quality-filtering effect of *Tw/Iqbal* requires the assumption that there are no such cases—the "no selection into summary judgment" assumption. This assumption is strong, in that it amounts to a restriction on the scope of party selection effects. Without the assumption, though, differences in the plaintiff's win rate at summary judgment involve not only the quality-filtering effect discussed above, but also a component related to the quality of cases that are selected into summary judgment as a result of *Tw/Iqbal*. To my knowledge, no discussion of *Tw/Iqbal*'s effects on the mix of case quality relates to this latter selection effect set of cases. Thus the no selection into summary judgment assumption is necessary to assess commentators' claims about *Tw/Iqbal*'s effects on the mix of cases that make it past the Rule 12(b)(6) stage.[9] I note that the no selection into summary judgment assumption is partially testable, because if it is correct, then if *Tw/Iqbal* has any quality-filtering effect, there must have been a drop in the number of cases that face summary judgment motions.

The empirical work in this paper is based on a random sample of cases in which defendants filed Rule 56 summary judgment motions, which I created using a data base of docket reports to which I have unique access (I discuss the source of these data in more detail in Part II). I determined which cases had at least one motion for summary judgment filed among all civil cases filed in the federal district courts in the periods of October 1, 2005-June 30, 2006 (the pre-*Twombly* period) and October 1, 2009-June 30, 2010 (the post-*Iqbal* period).[10] Restricting attention to cases with a PACER code indicating the nature of the suit was employment

---

[8] *See* Jonah B. Gelbach, *Note, Locking the Doors to Discovery? Assessing the Effects of Twombly and Iqbal on Access to Discovery*, 121 Yale L.J. 2270 (2012); Jonah B. Gelbach, *Can the Dark Arts of the Dismal Science Shed Light on the Empirical Reality of Civil Procedure?* 2 Stan. J. Complex Litig. 223 (2014); Hubbard, *Testing for Change*, note 6, *supra*. For discussions of changes in party behavior induced by changing pleading standards under the Private Securities Litigation Reform Act, *see* Stephen J. Choi, *Do the Merits Matter Less After the Private Securities Litigation Reform Act?* 23 J. L. Econ. & Organization 598 (2007); Stephen J. Choi, Karen K. Nelson, and A. C. Pritchard, *The Screening Effect of the Private Securities Litigation Reform Act*, 6 J. Empirical Legal Stud. 35 (2009).

[9] On the unavoidable role of making behavioral assumptions in empirical research about human behavior, including the effects of changes in legal rules, *see* Gelbach, *Dark Arts*, note 8, *supra*.

[10] These are the filing periods used in the reports by FJC researchers; *see* Cecil, et al.,

discrimination or contracts, I then sampled cases randomly from these two periods. Current and/or recently graduated law students then coded the sampled cases.

I focused on employment discrimination and contract cases for a simple reason. Employment discrimination cases may turn on the reasons for an employer's adverse action, and these reasons may be difficult for an employee to ascertain without discovery. Thus, employment discrimination cases are relatively likely to involve the Catch 22 information asymmetry problem embodied by what I call the Aggressive Critics' view (*see* Part I.C). By contrast, it seems reasonable to think that plaintiffs should be able to plead the reasons for a contract claim without the benefit of discovery. Thus the Aggressive Critics' view of *TwIqbal* seems unlikely to hold in the contract litigation setting.

My results for employment discrimination cases are statistically insignificant and generate wide confidence intervals. This fact suggests that data for employment discrimination cases do not allow us to distinguish between the three very different views about *TwIqbal*. For contract cases, there is relatively weak evidence in favor of an increase in the quality of cases that make it to summary judgment due to *TwIqbal*. However, for this category of cases there is reason to doubt the assumption that there is no selection into summary judgment. In context, that would mean that the *TwIqbal*-induced change in the plaintiff's win rate that I use here measures a combination of both (i) the case-quality effects of interest and (ii) case quality among cases that select into summary judgment as a result of *TwIqbal*. This makes it questionable whether the results for contract cases address the central debate over *TwIqbal*'s effects on case quality.

These results underscore a disappointing but unavoidable fact: there are some empirical questions that can't be clearly answered using feasible data. This paper's basic message, then, is that data are unlikely to settle the debate over the case-quality effects of the new pleading regime ushered in by *Twombly* and *Iqbal*.[11]

## I. *TWOMBLY, IQBAL*, AND WHAT WE CAN LEARN FROM SUMMARY JUDGMENT RESULTS

### A. Twombly, Iqbal *and Discovery*

Before *Twombly, Conley v. Gibson* set the standard for federal courts adjudicating Rule 12(b)(6) motions to dismiss: "a complaint should not be dismissed for failure to state a claim

---

[11] The direction of *Twombly* and *Iqbal*'s quality-filtering effects is hardly alone on the list of important empirical questions that feasible data and methods are unlikely to resolve. *See, e.g.,* the debate over the existence of a deterrent effect of the death penalty, as investigated by John J. Donohue and Justin Wolfers, *Uses and Abuses of Empirical Evidence in the Death Penalty Debate*, 58 STAN. L. REV. 791 (2006) ("Our estimates suggest not just 'reasonable doubt' about whether there is any deterrent effect of the death penalty, but profound uncertainty. We are confident that the effects are not large, but we remain unsure even of whether they are positive or negative. The difficulty is not just one of statistical significance: whether one measures positive or negative effects of the death penalty is extremely sensitive to very small changes in econometric specifications. Moreover, we are pessimistic that existing data can resolve this uncertainty.")

unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[12]  This standard is both objective and low. In the half-century between *Conley* and *Twombly*, a number of lower courts imposed effective pleading standards more demanding than *Conley*'s no-set-of-facts standard.[13]  In response, the Supreme Court more than once reversed Courts of Appeals, affirming the *Conley* standard in no uncertain terms. One such reversal occurred in 1993, in a constitutional civil rights case,[14] while another occurred as recently as 2002, in a Title VII employment discrimination case.[15]

In 2007's now-famous *Twombly* case, which was a putative class action involving allegations of conspiracy founded only on allegations of parallel conduct, the Court switched directions. Although some of the argument in *Twombly* could be read as applying specifically to antitrust's substantive prohibition on drawing inferences of conspiracy from evidence indicating only the presence of parallel conduct, the Court was categorical in rejecting *Conley*'s no-set-of-facts standard, holding that it had "earned its retirement."[16]  Two years later the *Iqbal* Court eliminated any residual doubt concerning the reach of *Twombly's* new standard, straightforwardly holding that *Twombly's* plausibility standard governed pleading in "all civil actions."[17]  *Twombly* and *Iqbal* have been cited an enormous number of times: as of February 20, 2015, Westlaw reported that *Twombly* had been cited in federal cases over 110,000 times; for *Iqbal*, the corresponding figure is over 87,000 times.

*Twombly* and *Iqbal* have also touched off a firestorm of debate among judges, practitioners, and academics.[18]  Critics believe that these cases have destabilized the pleading

---

[12] Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

[13] For discussions of such cases, see Richard L. Marcus, *The Revival of Fact Pleading Under the Federal Rules of Civil Procedure*, 86 COLUM. L. REV. 433 (1986); Richard L. Marcus, *The Puzzling Persistence of Pleading Practice*, 76 TEX. L. REV. 1749 (1998); and Christopher M. Fairman, *The Myth of Notice Pleading*, 45 ARIZ. L. REV. 987 (2003).

[14] *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) ("it is impossible to square the 'heightened pleading standard' applied by the Fifth Circuit in this case with the liberal system of 'notice pleading' set up by the Federal Rules" and elaborated the Court in *Conley v. Gibson*).

[15] Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) ("Imposing the Second Circuit's heightened standard conflicts with Rule 8(a)'s express language," citing *Conley v. Gibson*, and stating that "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.").

[16] *Id.* at 563.

[17] Ashcroft v. Iqbal, 556 U.S. 662, 684 (2009).

[18] *See, e.g.*, Colleen McMahon, *The Law of Unintended Consequences: Shockwaves in the Lower Courts After* Bell Atlantic Corp. v. Twombly, 41 SUFFOLK U. L. REV. 851, 852-53 (2008) ("no one quite understands what the case holds. ... We district court judges suddenly and unexpectedly find ourselves puzzled over something we thought we knew how to do with our eyes closed: dispose of a motion to dismiss a case for failure to state a claim."); *Barriers to Justice and Accountability: How the Supreme Court's Recent Rulings Will Affect Corporate Behavior: Hearing Before the S. Comm. on the Judiciary*, 112th Cong. 2 (2011) (statement of Andrew Pincus, Partner, Mayer Brown LLP), *available at* http://judiciary.senate.gov/pdf/11-6-29%20Pincus%20Testimony.pdf ("Two years ago, many asserted that the Court's ruling in *Ashcroft v. Iqbal* . . . would dramatically restrict plaintiffs' access to court and that Congressional action was needed to overturn that decision. That speculation has been proven wrong . . . ." (citing JOE S. CECIL ET AL., FED. JUDICIAL CTR., MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM AFTER *IQBAL*: REPORT TO THE JUDICIAL CONFERENCE ADVISORY COMM. ON CIVIL RULES (2011), *available* at http://www.fjc.gov/public/pdf.nsf/lookup/motioniqbal.pdf/$file/motioniqbal.pdf); Arthur R. Miller, *From* Conley *to* Twombly *to* Iqbal: *A Double Play on the Federal Rules of Civil Procedure*, 60 DUKE L.J.1, 10 (2010).

system, and thus federal litigation generally.[19]   Especially relevant to this paper, critics have argued that the plausibility pleading standard will reduce access to plaintiffs with meritorious claims, especially in disputes whose alleged wrong-doers control access to the information necessary to meet the heightened pleading standard.[20] By contrast, supporters of *Twombly* and *Iqbal* point to their hoped-for role in reducing the burdens presented by meritless lawsuits.[21]

The Court's opinions in the two cases themselves raise policy concerns related to the discovery burdens that defendants face.  In *Twombly*, Justice Souter suggested that caution related to pre-discovery dismissal must be counterbalanced against the expense of discovery in antitrust cases.  He cited a law review student note that focuses on the special discovery burdens antitrust defendants face;[22] the Manual for Complex Litigation;[23] and a Judicial Conference Committee document emphasizing discovery's high share of litigation costs in cases when it is used.[24]   Moreover, Justice Souter declared defeat in the use of case management, to which

---

[19] *See, e.g.*, Robert G. Bone, *Plausibility Pleading Revisited and Revised: A Comment on* Ashcroft v. Iqbal, 85 NOTRE DAME L. REV. 849, 852 (2010) ("*Iqbal* applies a thick screening model that aims to screen weak as well as meritless suits, whereas *Twombly* applies a thin screening model that aims to screen only truly meritless suits. The thick screening model is highly problematic on policy grounds . . . ."); , Kevin M. Clermont & Stephen C. Yeazell, *Inventing Tests, Destabilizing Systems*, 95 IOWA L. REV. 821, 840 n.70 (2010) (writing that a defense attorney "commits legal malpractice if he or she fails to move to dismiss with liberal citations to *Twombly* and *Iqbal*" and quoting "experienced litigator" Tom Goldstein as "predict[ing] that *Iqbal* will be 'the basis for an attempt to dismiss more than 50 percent of all the complaints filed in federal court'" (citation omitted )); Michael C. Dorf, Iqbal *and Bad Apples*, 14 LEWIS & CLARK L. REV. 217, 218 (2010) ("[u]nless overturned by Congress or the Rules Advisory Committee process, the *Twombly/Iqbal* pleading rule will play a potentially decisive role in every federal civil case."); Mark Herrmann, James M. Beck & Stephen B. Burbank, Debate, *Plausible Denial: Should Congress Overrule* Twombly *and* Iqbal?, 158 U. PA. L. REV. PENNUMBRA 141, 145 (2009), *available at* http://www.pennlawreview.com/online/158-U-Pa-L-Rev-PENNumbra-141.pdf.

[20] *See, e.g.*, Joshua Civin & Debo P. Adegbile, *Restoring Access to Justice: The Impact of* Iqbal *and* Twombly *on Federal Civil Rights Litigation*, AM. CONST. SOC'Y FOR L. & POL'Y 2 (2010), *available at* http://www.acslaw.org/sites/default/files/Civin_Adegbile_Iqbal_Twombly.pdf (expressing fear that *Twombly* and *Iqbal* might "create an undesirable safe harbor that effectively places some defendants beyond the reach of civil rights laws"); Alexander A. Reinert, *The Costs of Heightened Pleading*, 86 IND. L.J. 119, 159 (2011) ("[C]ases in which state of mind plays a large role or in which there are large information asymmetries, such as civil rights, constitutional, and employment discrimination cases, are most likely to be vulnerable to accusations of thin pleading."); Arthur R. Miller, *Are the Federal Courthouse Doors Closing? What's Happened to the Federal Rules of Civil Procedure?*, 43 TEX. TECH L. REV. 587, 596 (2011) ("In many modern litigation contexts the critical information is in the possession of the defendant and unavailable to the plaintiff. ... Discovery was designed to let each side have access to that type of information so that the litigation playing field would be level to promote more informed settlements and trials.").

[21] *See, e.g.*, Mark Herrmann, James M. Beck & Stephen B. Burbank, *supra* note 40, at 145 (opening statement of Herrmann and Beck); Richard A. Epstein, *Of Pleading and Discovery: Reflections on* Twombly *and* Iqbal *with Special Reference to Antitrust*, 2011 U. ILL. L. REV. 187, 196 ("[A] bad set of legal rules also leads to bad settlements. As a general matter, these settlements reflect the probable outcomes of cases that go to final judgment. Any errors in the overall procedural rules, therefore, are likely to be embedded in the settlements.").

[22] William H. Wagener, Modeling the Effect of One-Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation, 78 N.Y.U. L. REV. 1887, 1898-1899 (2003).

[23] Manual for Complex Litigation (Fourth) § 30 (2004) ("Antitrust litigation can, however, involve voluminous documentary and testimonial evidence, extensive discovery," and other related features).

[24] This document is cited in *Twombly* as "Memorandum from Paul V. Niemeyer, Chair, Advisory Committee on Civil Rules, to Hon. Anthony J. Scirica, Chair, Committee on Rules of Practice and Procedure (May 11, 1999), 192 F.R.D. 354, 357 (2000) (reporting that discovery accounts for as much as 90 percent of litigation costs when discovery is actively employed)." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007).

Please cite to 68 Stan. L. Rev. ___ (forthcoming)

Justice Stevens pointed in his *Twombly* dissent, "given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side."[25]

Justice Souter's concern regarding the role of discovery expense is well summarized by the following passage:

> the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching [summary judgment]. Probably, then, it is only by taking care to require allegations that reach the level *suggesting* conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence to support [an antitrust claim under Section 1 of the Sherman Act].[26]

*Ashcroft v. Iqbal* involved a defendant facing a different kind of discovery burden. The plaintiff alleged that after the attacks of September 11, 2001, he was arrested and held in administrative detention, where he had suffered "brutal mistreatment and discrimination,"[27] including having been "deliberately and cruelly subjected to numerous instances of excessive force and verbal abuse, unlawful strip and body cavity-searches, the denial of medical treatment, the denial of adequate nutrition, extended detention in solitary confinement, the denial of adequate exercise, and deliberate interference with ... rights to counsel and to exercise of ... sincere religious beliefs."[28] In addition to low-ranking defendants such as correctional officers, Iqbal sued then-Attorney General John Ashcroft and then-FBI Director Robert Mueller, alleging that he was treated unlawfully "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest."[29]

Echoing Justice Souter's skepticism of managerial judging as a solution to discovery costs, Justice Kennedy wrote that the "rejection of the careful-case-management approach is especially important in suits where Government-official defendants are entitled to ... [be free of]

---

[25] *Twombly*, 550 U.S. at 559. For this proposition, Justice Souter cites a law review article by Judge Frank Easterbrook, whose argument may be worth quoting at length:

> The timing is all wrong. The plaintiff files a sketchy complaint (the Rules of Civil Procedure discourage fulsome documents), and discovery is launched. A judicial officer does not know the details of the case the parties will present and in theory *cannot* know the details. Discovery is used to find the details. The judicial officer always knows less than the parties, and the parties themselves may not know very well where they are going or what they expect to find. A magistrate supervising discovery does not—cannot—know the expected productivity of a given request, because the nature of the requester's claim and the contents of the files (or head) of the adverse party are unknown. Judicial officers cannot measure the costs and benefits to the requester and so cannot isolate impositional requests. Requesters have no reason to disclose their own estimates because they gain from imposing costs on rivals (and may lose from an improvement in accuracy). The portions of the Rules of Civil Procedure calling on judges to trim back excessive demands, therefore, have been, and are doomed to be, hollow.

Frank H. Easterbrook, *Discovery As Abuse*, 69 B.U. L. REV. 635, 638 (1989).

[26] *Twombly*, 550 U.S. 544, 559 (emphasis added) (quotation and punctuation marks omitted).

[27] Second Amended Complaint at 1, Elmaghraby v. Ashcroft, No. 1:2004cv01809 (E.D.N.Y. May 03, 2004), ECF No. 273.

[28] *Id.* at 2.

[29] Ashcroft v. Iqbal, 556 U.S. 662, 668-669 (2009).

the concerns of litigation, including avoidance of disruptive discovery."[30] Justice Kennedy also linked the Court's earlier holding in *Twombly* explicitly to discovery, writing that although the Federal Rules of Civil Procedure's pleading standard in Rule 8 "marks a notable and generous departure from the hyper-technical … regime of a prior era, … it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions," rather than hard factual information provided in the lawsuit's complaint.[31]

In sum, the majority opinions in both *Twombly* and *Iqbal* focus on the discovery burdens defendants can be expected to face in a system that allows merits determination only after discovery. Each opinion suggests a belief that district courts will be able to usefully forecast, on the basis of the plaintiffs' complaints, the set of cases in which discovery will yield evidence of liability, signaling the useful link between summary judgment results and the case-quality views held by supporters and opponents of *Twombly* and *Iqbal*.

### B. Defining "Merit Post-Discovery"

Under Rule 56, summary judgment should be granted only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[32] Thus, summary judgment against a plaintiff's claim is appropriate only when the plaintiff has been able to come up with no evidence that would allow a reasonable jury to find for her.[33] One might say that where pleading standards involve judgments about the possibility (*Conley*) or plausibility (*TwIqbal*) that sufficient facts will materialize to entitle the plaintiff to relief, the summary judgment standard involves the *actuality* of entitlement to relief given those facts that have been discovered.

I will refer to a claim as "having no merit post-discovery"—or just "no merit", for short— if summary judgment for the defendant is appropriate. Conversely, I will say that a claim "has merit post-discovery"—or just "has merit"—if, after discovery, the plaintiff would be able to survive a summary judgment motion. I emphasize that these definitions are not intended to, and do not, implicate a claim's *pre*-discovery merit. Importantly, there is no reason why a case that turns out to be meritless post-discovery might not have merit *pre*-discovery. To take an extreme example, suppose Paula has actually been injured due to someone's negligence. After a reasonable investigation, she sues DeAndre, who appears to be responsible, only to find out through discovery that Dave was actually responsible.[34] By my definition, Paula's claim against DeAndre has no merit post-discovery, even though many if not all would agree that it was meritorious pre-discovery.

---

[30] *Id.* at 685 (quotation marks omitted).

[31] *Id.* at 678-679.

[32] Fed. R. Civ. P. 56.

[33] Note that "no evidence that would allow a reasonable jury to find for her" is not the same thing as no evidence at all. It is not sufficient for a plaintiff to come up with a mere "scintilla" of evidence, because courts impose a burden of production on parties that requires some minimal level of evidence that is more than simply a shred. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

[34] *See, e.g., Zielinski v. Philadelphia Piers, Inc.*, 139 F. Supp. 408 (E.D. Pa. 1956).

Of course, such a case isn't the sort that *Twombly* and *Iqbal* purport to target; by their own terms *Twombly* and *Iqbal* would not lead to Rule 12(b)(6) dismissal of Paula's case, since her complaint meets the plausibility standard. Nevertheless, my definition of merit post-discovery is a good one for understanding *Twombly* and *Iqbal*'s effects on case quality. Even though it is true that *Twombly* and *Iqbal* are directed at early termination of cases based on a judge's *pre*-discovery assessment, the object of that assessment is whether, *after* discovery, there is likely to be any evidence of entitlement to relief. This object is precisely what my definition of post-discovery merit concerns.

### C. *Understanding the Summary Judgment Link When Only Judges' Behavior Changes Following Twombly and Iqbal*

In this section I shall assume, for exposition's sake only, that party behavior is unaffected by *TwIqbal*. This assumption allows us to begin to understand how summary judgment adjudication could be useful for measuring *TwIqbal*'s effects on post-discovery case quality. I then take up the issue of changes in party behavior in section D.

In a suit with no merit post-discovery, there will by definition be no genuine dispute concerning any material fact after discovery, and the defendant will be entitled to judgment as a matter of law. Therefore, defendants should always win their summary judgment motions in meritless suits. In his opinion for the *Twombly* Court, Justice Souter wrote that the plausibility standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [entitlement to relief]."[35] Thus, one useful way to understand the plausibility standard is that it (a) asks trial judges to forecast what will result from discovery, and (b) expects them to be able to forecast that result with some level of success. Translated into my terms, then, one may read Justice Souter's opinion to mean that the plausibility standard "calls for enough fact to raise a reasonable expectation that the case will have merit post-discovery." This reading allows us usefully to connect the plausibility pleading standard to summary judgment adjudication.

Accordingly, I will use the term "Supporters' view" to refer to a situation in which judges are good at forming expectations concerning the fruits of discovery. Consider a judge adjudicating a Rule 12(b)(6) motion to dismiss. If the Supporters' view is right, then the judge will be at least partly able to forecast whether the case will have no merit post-discovery. Thus, under the *TwIqbal* pleading standard judges will be more likely to dismiss cases that would turn out to have no merit post-discovery.

The supporters' view is not the only possible one. As discussed above, *TwIqbal* critics worry that judges erroneously will dismiss some high-merit cases under the plausibility pleading standard because these plaintiffs will be unable to allege sufficient information at the pleading

---

[35] Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007) (the actual quotation being "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement," in reference to *Twombly*'s § 1 antitrust context).

**Please cite to 68 Stan. L. Rev. ___ (forthcoming)**

stage. That is, these critics fear that some cases that would actually turn out to have merit post-discovery will be dismissed at the Rule 12(b)(6) stage because judges wrongly forecast that they will have no merit post-discovery. I shall distinguish two types of critics' view. Under the Aggressive Critics' view, judges will do such an inaccurate job of forecasting discovery results that they will be systematically more likely to dismiss high-merit cases than to dismiss low-merit cases. Under the Moderate Critics' view, judges will be neither particularly good nor particularly bad at forecasting discovery results. Accordingly, the Moderate Critics' view holds that Rule 12(b)(6) dismissals will be essentially random with respect to post-discovery case quality: the probability of dismissing high- and zero-merit cases will track their relative incidence in the population of cases facing Rule 12(b)(6) motions.[36]

Table 1 summarizes the analysis so far. The first row of the table illustrates the *Tw/Iqbal* Supporters' view that cases that would turn out to have no merit post-discovery will be eliminated by switching to the plausibility pleading standard. As a result, (i) there will be fewer cases facing summary judgment motions, and (ii) among those cases that do face such motions, an *increased* share will have merit post-discovery. Consequently, under the Supporters' view, the plaintiff's win rate against defense summary judgment motions should be greater among cases filed under the *Tw/Iqbal* pleading standard.

---

[36] Notice that I have assumed that the applicable pleading standard has no bearing on whether a given plaintiff would win at summary judgment, once a case actually gets there. This assumption can be justified from two more primitive assumptions. The first primitive assumption is that the pleading standard does not affect the record that will exist once the parties get through discovery and to summary judgment, if indeed a case survives to discovery. The second primitive assumption is that, for a given record, judges will adjudicate summary judgment motions the same way post-*Iqbal* as pre-*Twombly*. If both these assumptions hold, then a given case that makes it to summary judgment under both pleading standards will have the same record, which will be adjudicated the same way, under both pleading standards.

One might challenge the first assumption on the ground that *Twombly* and *Iqbal* give plaintiffs an incentive to conduct a more comprehensive investigation before filing suit, in order to draft a complaint that is more likely to be found plausible in the event that a Rule 12(b)(6) motion is filed. Would more intensive pre-filing investigations lead to a more plaintiff-friendly record post-*Iqbal* than pre-*Twombly*? Not necessarily, because it is possible—indeed, arguably likely—that evidence relevant to the summary judgment record that a plaintiff could uncover in a *pre-filing investigation* under the post-*Iqbal* pleading standard would also turn up *during discovery* under the pre-*Twombly* pleading standard.

Since the summary judgment standard was unaffected by *Twombly/Iqbal*, the second assumption is really quite undemanding. Still, one might imagine arguments to the contrary. For example, numerous scholars argue that *Twombly* and *Iqbal* are part of a broad campaign of retrenchment against plaintiffs. *See, e.g.,* Miller, note 6, *supra*; Stephen B. Burbank and Sean Farhang, *Litigation Reform: An Institutional Approach* (2014), 162 U. Pa. L. Rev. 1543 (2014); Eisenberg and Clermont, note 6, *supra*; and Elizabeth M. Schneider, *The Changing Shape of Federal Civil Pretrial Practice: The Disparate Impact on Civil Rights and Employment Discrimination Cases*, 158 U. Pa. L. Rev. 517 (2010). If judges respond to such a campaign by "tightening up" on plaintiffs across the board, then the second primitive assumption would fail to hold. It is worth noting that if such "zeitgeist" effects do occur, then it is highly unlikely that there will exist *any* empirical strategy that allows us to learn about the quality-filtering effects of *Twombly/Iqbal*. Some behavioral assumptions are inevitably necessary to allow one to estimate the effects of legal rules; *see* Gelbach, *Dark Arts*, note 6, *supra*.

**Please cite to 68 Stan. L. Rev. ___ (forthcoming)**

TABLE 1
PREDICTIONS FLOWING FROM SUPPORTERS' AND CRITICS' VIEWS
WHEN THERE IS NO SELECTION INTO SUMMARY JUDGMENT

| | Impact on: | | |
|---|---|---|---|
| | (1) | (2) | (3) |
| *View* | *Number of Cases Facing Summary Judgment Motions* | *Share of Cases that Have Merit Post-Discovery, Among those Facing Defense Summary Judgment Motions* | *Plaintiff's Win Rate against Summary Judgment Motions* |
| Supporters | Drop | Increases | Increases |
| Aggressive Critics | Drop | Drops | Drops |
| Moderate Critics | Drop | Stays unchanged | Stays unchanged |

The table's second row indicates the Aggressive Critics' view—that cases that would turn out to have merit post-discovery will be eliminated by switching to the plausibility pleading standard. As a result, (i) there will be fewer cases facing summary judgment motions, and (ii) among those cases that do face such motions, a *reduced* share will have merit post-discovery. Consequently, under the Aggressive Critics' view, the plaintiff's win rate against defense summary judgment motions should be greater among cases filed under the *TwIqbal* pleading standard. The third row indicates the Moderate Critics' view that cases will be randomly filtered out as a result of *Twombly* and *Iqbal*, leading to no change in the quality of cases that actually face defense summary judgment motions. As a result, (i) there will be fewer cases facing summary judgment motions, and (ii) among those cases that do face such motions, there will be *no change* in the share that would have merit post-discovery. Consequently, under the Moderate Critics' view, the plaintiff's win rate against defense summary judgment motions should be unaffected by switching to the *TwIqbal* pleading standard.

Table 1 allows us to connect an observable fact and a key question of interest in understanding *TwIqbal*'s effects. The observable fact is the direction in which the plaintiff's win rate against defense summary judgment motions changes. The question of interest is whether *TwIqbal* has led district court judges to systematically filter out cases that would have no merit post-discovery, as the Supporters' view predicts, or whether one of the Critics' views holds instead.

In fact, under our maintained assumption of no change in party behavior, empirical evidence would allow us to learn even more. As we have discussed, *TwIqbal*'s more demanding pleading standard would cause judges to filter out some cases at the Rule 12(b)(6) stage. But *TwIqbal* certainly should not cause judges to deny any Rule 12(b)(6) motions they would otherwise grant. Accordingly, while *TwIqbal* should cause some cases to be filtered out of the set of cases that would face summary judgment motions if allowed to get to discovery, no cases should be caused to select into summary judgment, absent party selection effects: there should not be any cases that would face summary judgment under the *TwIqbal* pleading standard but not under the pre-*Twombly* standard. This means that any difference in the pre-*Twombly*/post-*Iqbal* plaintiff's win rate against defense summary judgment motions would have to be driven by case quality differences between filtered-out cases, on the one hand, and those that face summary judgment motions under both pleading standards.

Consider a simple concrete example. Suppose that 90 cases would face summary judgment motions if they were litigated at a time when the pre-*Twombly* pleading standard applied. Now suppose that only 60 of these cases would face summary judgment motions if they were litigated at a time when the *TwIqbal* standard applied. This means that there are 30 cases that would be filtered out of facing summary judgment motions due to *TwIqbal*. Now suppose that the plaintiff's win rate against defense summary judgment motions in these case would be 40 percent if they were litigated at a time when the pre-*Twombly* pleading standard applied, and 35 percent if they were litigated under *TwIqbal*. The impact of *TwIqbal* on the overall plaintiff's win rate at summary judgment would thus be five percentage points (40 percent minus 35 percent). However, by construction, there are 60 cases whose summary judgment outcome is unaffected by *TwIqbal*. Thus, the impact of five percentage points is driven by the 30 cases that are filtered out of summary judgment due to *TwIqbal*. These 30 cases constitute one-third of the original 90 cases. Intuition suggests that if filtering out one-third of cases cause a five-point increase in the plaintiff's win rate, then the plaintiff's win rate among the filtered-out cases must be less than the plaintiff's win rate among other cases by 15 percentage points (3 times 5 percentage points).

Thus, we should surmise that the plaintiff's win rate among the 30 filtered-out cases is 15 percentage points less than plaintiff's win rate in the cases whose summary judgment status are unaffected by *TwIqbal* (in this example the Supporters' view is correct). The same reasoning suggests that if the filtered-out cases constituted one-fourth of the total, then we should multiply the observed difference in the plaintiff's win rate by four; were they half of the total number of cases, then we should multiply by two; and so on. This intuition is exactly right. It can be proved mathematically that when there is no selection into summary judgment, the difference between the plaintiff's win rate among filtered-out cases and those that would have summary judgment motions under both pleading standards equals the ratio of (i) the change in the plaintiff's win rate against defense summary judgment motions, to (ii) the share of cases that are filtered out from facing summary judgment as a result of *TwIqbal*.[37]

---

[37] Let $W_{both}$ be the plaintiff's win rate among cases that would face summary judgment motions under both pleading standards, and let $W_{fo}$ be the corresponding plaintiff's win rate among cases that would be filtered out of facing summary judgment motions due to *Twombly* and *Iqbal*. Define the quality-filtering effect $Q \equiv W_{both} - W_{fo}$; this is the effect we wish to identify. I shall now prove that $Q$ may be determined from observable data under the assumption of no selection into summary judgment.

**Please cite to 68 Stan. L. Rev. ___ (forthcoming)**

---

Let $W_{pre-T}$ and $W_{post-I}$ be the observed plaintiff's win rate against defense summary judgment motions under the pre-*Twombly* and post-*Iqbal* pleading standards, respectively. Let $W_{both}$ be the plaintiff's win rate against defense summary judgment motions among cases that would face summary judgment motions under both pleading standards, and let $W_{si}$ be the corresponding plaintiff's win rate among any cases that select into summary judgment (note that $\lambda = 0$ under the assumption of no party selection effects, which I have maintained in the discussion in this section, but it is useful to allow it to be non-zero for expositional purposes in this footnote). Lastly, denote by $\pi$ the share of pre-*Twombly* cases with summary judgment motions that would be filtered out by *Tw/Iqbal*, and denote by $\lambda$ the share of post-*Iqbal* cases with summary judgment motions that select into summary judgment (see parenthetical comment just above). Then we may write the observed plaintiff's win rate as:

$$
\begin{aligned}
W_{pre-T} &= (1-\pi)W_{both} + \pi W_{fo} \\
W_{post-I} &= (1-\lambda)W_{both} + \lambda W_{si}
\end{aligned}
\tag{1}
$$

It follows that the change in the observed plaintiff's win rate is

$$
\begin{aligned}
W_{post-I} - W_{pre-T} &= (\pi-\lambda)W_{both} + \lambda W_{si} - \pi W_{fo} \\
&= (\pi-\lambda)[W_{both} - W_{fo}] + \lambda\{W_{si} - W_{fo}\},
\end{aligned}
\tag{2}
$$

where the second line follows by adding and subtracting $\lambda W_{fo}$ to the right hand side of the first line. If we then adopt the assumption of no selection into summary judgment, so that $\lambda$ is zero, the term in curly braces disappears, and we obtain

$$
W_{post-I} - W_{pre-T} = \pi[W_{both} - W_{fo}].
\tag{3}
$$

Now observe that if we divide both sides of equation (3) by $\pi$ and rearrange slightly, we get

$$
Q = W_{both} - W_{fo} = \frac{W_{post-I} - W_{pre-T}}{\pi}.
\tag{4}
$$

In other words, the quality-filtering effect, $W_{both} - W_{fo}$, equals the ratio of the observed change in the plaintiff's win rate against defense summary judgment motions divided by the filtered-out share $\pi$. To make this equation useful requires us to have a way to determine $\pi$ using observable data.

Let $N_{pre-T}$ and $N_{post-I}$ be the number of cases that would face summary judgment motions under the pre-*Twombly* and post-*Iqbal* pleading standards, respectively. Let $N_{both}$, $N_{fo}$, and $N_{si}$ respectively be the number of cases that would face summary judgment motions under both pleading standards, the number that would be filtered out due to *Twombly/Iqbal*, and the number that would select into summary judgment due to *Twombly/Iqbal*. Then it is always true that

$$
\begin{aligned}
N_{post-I} &= N_{both} + N_{si} \\
N_{pre-T} &= N_{both} + N_{fo}
\end{aligned}
\tag{5}
$$

Subtracting each side of the bottom equation in (5) from the corresponding side of the top equation then yields

$$
N_{post-I} - N_{pre-T} = N_{si} - N_{fo},
\tag{6}
$$

so that the observed change in the number of cases facing summary judgment motions equals the difference in the number of cases that select into summary judgment and the number that are filtered out. Under the assumption of no selection into summary judgment, we have $N_{si} = 0$; adopting this assumption and dividing both sides of (6) by $N_{pre-T}$ then yields

$$
\frac{N_{post-I} - N_{pre-T}}{N_{pre-T}} = -\frac{N_{fo}}{N_{pre-T}},
\tag{7}
$$

and since the ratio on the right hand side of (7) is the filtered-out share, we have

$$
\pi = -\frac{N_{post-I} - N_{pre-T}}{N_{pre-T}}.
\tag{8}
$$

13

To recap the discussion in this section, I have adopted two assumptions and derived three key analytical results:

> Assumption 1: There is no change in party behavior following as a result of *TwIqbal*.
>
> Assumption 2: How cases are adjudicated at summary judgment is not affected by the pleading standard that governs through the Rule 12(b)(6) stage (*see* note 36, *supra*, for discussion of this assumption).
>
> Result 1: The number of cases that face summary judgment motions will be lower under *TwIqbal* than under the pre-*Twombly* pleading standard.
>
> Result 2: If the Supporters are correct, the plaintiff's win rate against defense summary judgment motions will be greater under *TwIqbal* than under the pre-*Twombly* pleading standard; if the Aggressive Critics are correct, this rate will be lower under *TwIqbal*; and if the Moderate Critics are correct, the plaintiff's win rate will be unaffected by the switch to *TwIqbal*.
>
> Result 3: The difference between the plaintiff's win rate among cases that are filtered out of facing summary judgment motions and those that would face these motions regardless of the pleading standard equals (i) the observed difference in the plaintiff's win rate across pleading standards, divided by (ii) the percentage drop in the number of cases facing summary judgment motions.

I now turn to the important question of how party selection effects affect the analysis in this section.

### D. Party Selection Effects of Twombly and Iqbal

In the discussion *supra*, I assumed that *Twombly* and *Iqbal*'s filtering effect operates only via changes in judicial behavior among cases that face a Rule 12(b)(6) motion. But *Twombly* and *Iqbal* can be expected to have broader effects, via changes in party behavior.[38] To illustrate party selection effects, consider a hypothetical dispute in which Smith believes that Jones, Inc. has discriminated against her. Assume for the moment that under the pre-*Twombly* pleading standard, Jones will forego filing a Rule 12(b)(6) motion, and the case would go through

---

In other words, $\pi$ may be calculated from observable data: it equals minus-1 times the change in the number of cases that face summary judgment motions, expressed as a ratio of the number of cases that would face summary judgment motions under the pre-*Twombly* pleading standard. Combining equations (4) and (8) thus yields

$$Q = W_{both} - W_{fo} = \frac{W_{post-I} - W_{pre-T}}{-\left(\frac{N_{post-I} - N_{pre-T}}{N_{pre-T}}\right)}. \tag{9}$$

All terms on the right hand side of equation (9) are observable quantities. This proves that under the assumption of no selection into summary judgment, the quality-filtering effect of *Twombly/Iqbal*, $W_{both} - W_{fo}$, may be found using observable data.

[38] *See, e.g.*, works cited in note 8, *supra*.

discovery and then face a summary judgment motion. However, under the post-*Iqbal* pleading standard, (i) Jones might become sufficiently optimistic about prevailing on Rule 12(b)(6) that Jones would file such a motion if Smith filed a complaint, and (ii) knowing this, and being pessimistic about her chances of surviving a Rule 12(b)(6) motion, under *TwIqbal* Smith might choose not to file suit in the first place.[39] In this example, a dispute that would make it to summary judgment under the pre-*Twombly* pleading standard would not get there post-*Iqbal*.

Consider a variation on the previous example's theme. The pre-*Twombly* situation is the same as in the previous example. But under the post-*Iqbal* standard, Smith is more optimistic about her Rule 12(b)(6) chances, and so she files suit even after *TwIqbal*. If Jones files a Rule 12(b)(6) motion and prevails on it, then once again we have a dispute that would make it to summary judgment under the pre-*Twombly* pleading standard but that would not get there post-*Iqbal*.[40] For a second variation on the original example, suppose both parties expect that under the post-*Iqbal* standard the judge would be very likely to grant a Rule 12(b)(6) motion. Then under that pleading standard, the parties might be able to find a mutually agreeable settlement amount before the Rule 12(b)(6) stage.[41] In this example, too, then, we have a dispute that would make it to summary judgment under the pre-*Twombly* pleading standard but that would not get there post-*Iqbal*.

The three foregoing examples involve three different types of party selection, but in each case, *TwIqbal*'s selection effects cause a reduction in the number of cases that make it to summary judgment. Thus, these types of party selection operate in tandem with the judicial behavior effects, discussed in Section C, *supra*, to filter cases out of the set that face summary judgment motions.

Accordingly, the analysis above applies to these types of party selection as well as to judicial behavior effects. However, it is important to observe that when there are party selection effects, *TwIqbal*'s quality-filtering effect must be interpreted more carefully. This effect no longer can be viewed as telling us only about whether judges are good at forecasting post-discovery case merit. With party selection effects of the types discussed above, *Twombly* and *Iqbal*'s quality filtering effects operate through both judicial filtering and party filtering. Because there is no way to determine which filtered-out cases are filtered out due to changes in judicial behavior at Rule 12(b)(6) and which are filtered out due to party selection, all we can hope to measure is the overall, net change due to both effects together. Table 1 remains germane, but the channels through which *TwIqbal* operates are broader: they encompass changes in both judicial and party behavior.[42]

---

[39] This is an example of what Jonah Gelbach has referred to as plaintiff selection; *see* Gelbach, *Locking the Doors to Discovery?*, *supra* note 59.

[40] A dispute in which the plaintiff files suit under either pleading standard, with the defendant allowing the case to go to discovery under the pre-*Twombly* standard but filing a Rule 12(b)(6) motion under the post-*Iqbal* standard is an example of what Gelbach has referred to as defendant selection; *see id.*

[41] This is an example of what Jonah Gelbach has referred to as settlement selection; *see id.* For a recent empirical study concerning settlement rates before *Twombly* and after *Iqbal*, *see* Victor Abel Pereyra and Benjamin Sunshine, *Access-to-Justice v. Efficiency: An Empirical Study of Settlement Rates after Twombly & Iqbal*, University of Illinois L. Rev. (Forthcoming), available at http://ssrn.com/abstract=2259766.

[42] Insofar as *TwIqbal* shifted the pre-Rule 12(b)(6) balance of power in favor of defendants, cases that are filtered out of summary judgment due to party selection can be expected to have done so on terms that are both beneficial to

Please cite to 68 Stan. L. Rev. ___ (forthcoming)

There remains one type of party selection effect to discuss. Consider again our hypothetical dispute between Smith and Jones. But now assume that under the notice pleading standard, Smith and Jones would settle the dispute before Smith files suit, in part because Jones would not expect to be able to win a pre-discovery dismissal of a lawsuit, should Smith file suit. If the same dispute occurred when the post-*Iqbal* pleading standard applied, though, Jones might believe it could win a Rule 12(b)(6) motion, making the company unwilling to settle for an amount Smith would accept. Now suppose that Jones, having been overly optimistic, were to lose its post-*Iqbal* Rule 12(b)(6) motion. If the parties did not then settle, then under the post-*Iqbal* pleading standard *Smith v. Jones, Inc.* would get to discovery, and possibly also to summary judgment.[43]

This example shows that changes in the pleading standard can eliminate settlements, causing cases to select into summary judgment. An immediate consequence of this fact is that it is possible for the number of cases that face summary judgment motions to rise as a result of *Twombly* and *Iqbal*. Whether that happens will depend on the relative magnitudes of filtering-out by judges and parties, on the one hand, and selection into summary judgment due to busted settlements, on the other.

One thing that can be said is that if a change from the pre-*Twombly* pleading standard to the post-*Iqbal* pleading standard does cause an increase in the number of cases facing summary judgment motions, then there must have been selection into summary judgment.[44] Beyond that, the analysis of what can be learned when there is selection into summary judgment is relatively complicated. Differences in the plaintiff's win rate at summary judgment across cases filed under different pleading standard regimes then involve both (1) the quality-filtering effect discussed above and (ii) the difference in case quality between cases that are filtered out and cases that select into summary judgment.[45]

---

defendants and detrimental to plaintiffs. That places party-filtered cases and judge-filtered cases on a similar footing—both involve *Twombly* and *Iqbal* working to cause cases to end before summary judgment, in ways that benefit defendants at plaintiffs' expense.

[43] It is possible that the parties would settle following the denial of Jones's Rule 12(b)(6) motion; after all, under the notice pleading standard, they would settle before Smith even filed suit. But it is also possible that the parties would not settle. One inducement to settle before either party files suit is that it allows the parties to avoid all costs not yet sunk into the filing and defending of the suit. Once the plaintiff files suit, she has sunk some costs, reducing the scope for a settlement to leave both parties better off. Similarly, by litigating its Rule 12(b)(6) motion, Jones might have made some investigations that also reduce its cost of post-Rule 12(b)(6) litigation; sinking such costs further reduces the scope for mutually beneficial settlement. Thus, some cases that would (i) settle without the filing of a complaint under the notice pleading standard but (ii) face a Rule 12(b)(6) motion under the plausibility pleading standard might not settle following denial of a Rule 12(b)(6) motion.

[44] Note that the converse is not true: even if the change in the pleading standard causes a *decrease* in the number of cases facing summary judgment motions, it is still possible that there is some selection into summary judgment; there might just be more filtering out than selection into summary judgment.

[45] This fact may be seen using the second line of equation (2) of note 37, *supra*, which shows that the difference in the post-*Iqbal* and pre-*Twombly* plaintiff's win rates may be written as

$$W_{post-I} - W_{pre-T} \;=\; (\pi - \lambda)[W_{both} - W_{fo}] + \lambda\{W_{si} - W_{fo}\}.$$

The parameter $\lambda$ is the share, among cases that faces summary judgment motions under *TwIqbal*, of cases that would not have had summary judgment motions filed under the pre-*Twombly* pleading standard; in other words, $\lambda$ is

## II. DATA

The data I use here originally became available as a result of a grant funded by the Oscar M. Ruebhausen Fund at the Yale Law School.[46] That grant funded a contract between Yale and Thomson Reuters, owner of Westlaw, to provide direct access to the universe of federal district court docket reports for civil cases filed beginning on January 1, 2005. These are the docket sheet data one can search on Westlaw via its "DCT" database. Pursuant to the contract, Thomson Reuters delivered docket report data in raw form. Various data base and scripting tools were used to select cases with at least one docket entry whose text indicates that the docketed event is a motion for summary judgment under Rule 56. These cases were uploaded into a database connected to a web-based coding tool. A number of current JD students and recently graduated students working with the project then read and coded judicial opinions and orders related to cases' summary judgment motions (as well as, where needed, the underlying motions or other case documents).

Cases involving employment discrimination are those with PACER nature-of-suit code 442, while those involving contracts are those with PACER nature-of-suit code between 110-190. Employment discrimination cases were chosen both because there are a large number of them and because many critics of *Twombly* and *Iqbal* have focused on employment discrimination suits as among those most prone to the information asymmetry that might create a need-discovery-to-get-to-discovery Catch-22.[47] Contracts cases, on the other hand, were chosen

---

the share of *TwIqbal*-standard cases that were selected into summary judgment. When $\lambda$ is zero—when there is no selection into summary judgment—this equation is necessarily proportional to the quality-filtering effect $[W_{both} - W_{fo}]$ discussed above. But when there is selection into summary judgment, $\lambda$ is not zero, and the term $\{W_{si} - W_{fo}\}$ comes into play as well. This term is the difference in the plaintiff's win rate—the case-quality difference—between cases that select into summary judgment and those that are filtered out.

An example will help illustrate how important selection into summary judgment can be in determining what conclusions may be drawn from the observed difference in the plaintiff's win rate. Suppose that the number of cases with summary judgment motions filed under the two pleading standards would be exactly the same. This equality necessarily means that the number of filtered-out cases and the number of cases that are selected into summary judgment are the same; since there are the same total number of cases with summary judgment motions filed under the two pleading standards, this result in turn means that $\pi$ and $\lambda$ must be equal. Consequently, what I have called the quality-filtering effect, $[W_{both} - W_{fo}]$, drops out of the equation above. What is left is the term $\lambda\{W_{si} - W_{fo}\}$. Since $\lambda$ is a proportion, it is necessarily positive. Thus, when there is no change in the number of cases with summary judgment motions filed, so that $\pi = \lambda$, the observed difference in the plaintiff's win rate has the same sign as $\{W_{si} - W_{fo}\}$. In other words, the information in the observable data tells us whether cases that are selected into summary judgment or cases that are filtered out of summary judgment have greater quality, as measured by the plaintiff's win rate against defense summary judgment motions. In this example we would be unable to learn anything at all about quality among cases that would face summary judgment motions under both pleading standards. That would prevent us from determining whether either the filtering-out or selecting-in channels of *TwIqbal* improve quality. When $\pi = \lambda$—when there is no difference in the number of summary judgment motions faced by cases under the two pleading standards—the data simply can't tell us anything about such questions.

[46] This grant was submitted jointly by me and Yale Law School Professor William N. Eskridge.

[47] All cases were dropped for which coding indicated the presence of any claims, among those challenged by a defense summary judgment motion, that were potentially related to the Americans with Disability Act (ADA). The reason this exclusion of cases is warranted is that the ADA Amendments Act of 2008 expanded the set of people protected by the ADA. *See, e.g.*, Seiner, *Pleading Disability*, *supra* note 55, at 108 (quoting the ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(1), 122 Stat. 3553, 3554 (2008)). This change could be expected to induce more ADA-related cases and claims all else equal, so that defense summary judgment adjudication might differ across pre-*Twombly* and post-*Iqbal* cases involving the ADA for reasons unrelated to the conceptual issues

because plaintiffs in these cases would seem to be less likely to require information that can only be acquired in discovery to satisfy *Twombly* and *Iqbal's* plausibility standard.

This study includes cases that were initially filed in either of two time periods: (i) October 1, 2005 – June 30, 2006 (the "Pre-*Twombly* observation period"), and (ii) October 1, 2009 – June 30, 2010 (the "Post-*Iqbal* observation period"). These time periods were chosen because they are the ones used by the FJC to evaluate changes in Rule 12(b)(6) filing rates in its initial study of the effects of *Twombly* and *Iqbal* on Rule 12(b)(6) practice.[48] These time periods are appropriate, since the Pre-*Twombly* observation period ends well in advance of *Twombly* (the Supreme Court released its opinion on May 21, 2007), and since the Post-*Iqbal* observation period begins several months after *Iqbal* (the Supreme Court released its opinion on May 18, 2009).[49] The FJC characterizes the Pre-*Twombly* observation period as one "of stable motion practice," and its report suggests that the Post-*Iqbal* observation period is appropriate because it occurs after "each of the circuits had had a chance to publish at least one appellate court opinion interpreting *Ashcroft v. Iqbal* and offering guidance to the district courts."[50] Like the Cecil reports, I use only cases in which plaintiffs were counseled.[51]

There is one case-coverage difference between the Cecil reports and the present study. The Cecil reports contain data from only 23 district courts, which, according to the FJC, accounts for roughly half the cases filed in the U.S. district courts in 2009.[52] By comparison, my sample

---

discussed in Part I. There are reserved PACER codes for ADA cases (code 445 is for ADA-employment claims, and 446 is for other ADA claims). However, some cases with ADA claims are coded under PACER's nature-of-suit code 442, the omnibus employment discrimination code. These cases can be identified using the brief textual description of challenged claims that coders were asked to create. Claims were coded as ADA-related when this description contained any of the following strings: "isabil", "isable", or "ADA". It is possible that not all ADA-related cases were flagged this way by coders, but as many have been excluded as could have been.

[48] *See* Cecil Et Al., Motions To Dismiss, *supra* note 6.

[49] It is possible that with many delays or repeated pleading amendments, a case in my pre-*Twombly* sample could have been at risk of facing a Rule 12(b)(6) motion *after Twombly* was decided. To assess this possibility, the earliest date on which each case had a *summary judgment* motion filed was coded. Among employment discrimination and contracts cases used in the final analysis pre-*Twombly* sample, 87% and 84%, respectively, had a summary judgment motion filed before *Twombly*, so none of these cases could have faced a Rule 12(b)(6) motion after *Twombly* (since Rule 12(b)(6) motions must be filed earlier than summary judgment motions); note also that any Rule 12(b)(6) motion converted to a summary judgment motion must be decided under Rule 56. Results calculated without the remaining 13% and 16% of cases were very similar to those reported below. Finally, since discovery takes time, it is perhaps reasonable to assume that a case would not face a summary judgment motion fewer than 90 days following the filing of a Rule 12(b)(6) motion. Among cases in the final analysis pre-*Twombly* sample, 96% of employment discrimination and 94% of contracts cases had their first summary judgment motion filed within 90 days following May 21, 2007. Thus there seems little basis for concern about whether the cases in my pre-*Twombly* sample were actually affected by *Twombly*.

[50] *See* Cecil Et Al., Motions To Dismiss, *supra* note 6.

[51] Shortly after handing down *Twombly*, the Supreme Court in Erickson v. Pardus, 551 U.S. 89, 94 (2007) (*per curiam*) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976), which itself cites directly to *Conley*'s no-set-of-facts language), reaffirmed that in "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." For this reason, some empirical studies concerning *Twombly* and *Iqbal* exclude *pro se* cases, *see*, *e.g.*, CECIL ET AL., MOTIONS TO DISMISS, *supra* note 6, at 6 n.10, though the Cecil et al approach has been somewhat controversial; *see* Moore, *supra* note 6. There were many fewer *pro se* than counseled cases in my sample, and excluding them does not have important effects on its results.

[52] *Id.* at 5.

**Please cite to 68 Stan. L. Rev. ___ (forthcoming)**

is drawn from cases in 75 of the 78 districts that had adopted the electronic case filing ("ECF") system before October 1, 2005.[53],[54]

The sample was constructed by first searching the docket reports in all employment discrimination or contracts cases for text suggesting that a docket entry involved the filing of a motion for summary judgment.[55] Next, docket-sheet entries were collected from each selected case, and the cases were sorted on a number generated using a computerized pseudo-random number generator. Cases were then served in this random order to coders who logged on to a secure web-based coding system. The coder who was assigned to a case then read through its docket sheet, looking for entries that appear to be motions for summary judgment and orders resolving them. Finally, the coders downloaded the relevant documents—motions and resolving orders—from a legal research site, read the documents, and entered details concerning the motions and their resolutions.

The latest date on which a case could have been filed and included in my analysis was June 30, 2010. At the time the coders began work, the data base had up-to-date information on cases through June 30, 2012. Therefore, docket-report information was available for up to 731 days (2012 having been a leap year). For cases filed on dates earlier than June 30, 2010, there were more days of information, but such information was disregarded in order to allow the same

---

[53] The date on which a district court adopted ECF was determined by visiting the "INDIVIDUAL COURT SITES" webpage at the PACER website (http://www.pacer.gov/psco/cgi-bin/links.pl) and clicking on the information icon (which looks like this: ⓘ) next to each district court's name. The resulting webpage lists the date on which the court began using the ECF system in the field "ECF Go Live Date." The courts that had not yet gone live as of October 1, 2005, were the District of Nevada, District of Montana, District of North Dakota, District of Hawaii, District of Alaska, Eastern District of Oklahoma, Western District of Texas, Southern District of California, District of Vermont, Southern District of Florida, District of New Mexico, District of Virgin Islands, Central District of California, Western District of Wisconsin, District of Northern Mariana Islands, and Western District of Tennessee. I use only the 78 districts that had fully implemented the CM/ECF system in order to avoid any problems that might arise if the ECF system were adopted between my pre-*Twombly* and post-*Iqbal* periods; such problems could occur to the extent that coders are able to obtain case documents more for cases filed after adoption than before, in late-adopting districts.

For a study of summary judgment activity in fiscal year 2006 by Federal Judicial Center researchers that uses the same universe of courts, *see* Memorandum from Joe Cecil and George Cort to Hon. Michael Baylson, (April 12, 2007) (Revised June 15, 2007) (https://bulk.resource.org/courts.gov/fjc/sujufv06.pdf). I will not discuss the voluminous literature on summary judgment practice more broadly; for contributions concerning summary judgment practice, *see, e.g.*, Jonah B. Gelbach, *Rethinking Summary Judgment Empirics: The Life of the Parties*, 162 U. Pa. L. Rev. 1663 (2014); Memorandum from Joe Cecil and George Cort to Hon. Michael Baylson, (April 12, 2007) (Revised June 15, 2007) (https://bulk.resource.org/courts.gov/fjc/sujufv06.pdf); Joe S. Cecil, Rebecca N. Eyre, Dean Miletich, and David Rindskopf, *A Quarter-Century of Summary Judgment Practice in Six Federal District Courts*, 4 J. Empirical Legal Stud. 861 (2007); Stephen B. Burbank, *Vanishing Trials and Summary Judgment in Federal Civil Cases: Drifting Toward Bethlehem or Gomorrah?* 1 J. Empirical Legal Stud. 591 (2004); Theodore Eisenberg and Charlotte Lanvers, *Summary Judgment Rates Over Time, Across Case Categories, and Across Districts: An Empirical Study of Three Large Federal Districts* (May 28, 2008), Cornell Law School Research Paper No. 08-022 (http://ssrn.com/abstract=1138373).

[54] My sample contains no cases from the District Courts for the Northern District of Illinois, the Northern Mariana Islands, or Southern District of West Virginia. It became evident after coding had been completed that docket entries involving summary judgment motions follow a different textual structure in these districts from the structure typically used elsewhere. Consequently, the text search used to find summary judgment motion entries did not detect cases in these districts.

[55] Roughly speaking, docket entries were searched to determine whether they begin with the phrase "MOTION FOR SUMMARY JUDGMENT" or certain variations thereon.

period of observation for all cases considered. Consequently, the sample includes only cases with summary judgment motions adjudicated within 731 days of case filing.[56]

One further issue to discuss involves the number of claims challenged in a motion. Plaintiffs can state multiple claims in a lawsuit, and defendants can challenge either none, all, or some subset of claims in both Rule 12(b)(6) motions to dismiss and Rule 56 motions for summary judgment. Further, parties can move for,[57] or be granted,[58] summary judgment as to only certain aspects of a claim. This discussion raises the question of how to measure the plaintiff win rate in defense summary judgment motions. Should it be the fraction of cases in which the plaintiff defeats a defense summary judgment motion on all challenged claims? Or should it be the fraction of cases in which the plaintiff defeats a defense summary judgment motion on at least one challenged claim?[59]

A plaintiff, the saying goes, is the master of her complaint, so the number of claims lodged in an action is subject to party choice. Along the same lines, defendants are masters of their summary judgment motion: they choose for themselves which claims to attack. Thus, there is no convincing reason to prefer using the plaintiff-wins-on-all-claims or the plaintiff-wins-on-any-claim measure of the plaintiff's win rate. Accordingly, in the empirical work below I report the change in the plaintiff win rate for each of them.

---

[56] Without the 731-day limit, non-comparability problems could occur. To illustrate, consider two cases—one filed on June 30, 2006, and one filed on June 30, 2010. The docket reports text is up to date through June 30, 2012, for both cases. Therefore, there are 2,192 days of docket information for the earlier case (four years having 365 days, plus two leap years having 366 days), by comparison to the 731 days of docket information for the later-filed case. Suppose that in general there are two types of cases, simple and complex, and suppose that simple cases always have motions for summary judgment filed and adjudicated within 731 days of case filing, while complex cases have these motions filed and adjudicated between 731 and 2,192 days of case filing. Then an unrestricted search of earlier cases' docket reports would yield a data set that included both simple and complex cases, whereas such a search of later cases' docket reports would yield a data set including only simple cases. If claims challenged by defense summary judgment motions have different average merit levels in simple and complex cases, then ignoring the different lengths of data availability would bias the results. To avoid this potential problem and maintain comparability of the pre-*Twombly* and post-*Iqbal* data sets, only cases whose summary judgment motions are adjudicated within 731 days of case filing are considered.

[57] FED. R. CIV. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense — or *the part of each claim or defense* — on which summary judgment is sought") (emphasis added).

[58] FED. R. CIV. P. 56(g) ("If the court does not grant all the relief requested by the motion, it may enter an order stating *any material fact* — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case") (emphasis added).

[59] A third alternative would be to use the fraction of all challenged claims in which the plaintiff defeats a defense summary judgment motion. Experience showed that it can sometimes be difficult to determine exactly how many claims are challenged via a defense summary judgment motion. An important reason for this difficulty is that defense summary judgment motions sometimes state that they challenge "all claims", or some other phrasing with similar meaning, when some claims have already been withdrawn by the plaintiff or otherwise dismissed. To determine exactly how many claims are challenged for each case thus could require reading multiple case documents (e.g., complaints). There was not enough time to ask coders to engage in such extraordinarily detailed work. Also, the judicial orders or opinions resolving motions for summary judgment could not always be retrieved, but the disposition of the summary judgment motion in question could sometimes still be coded because it was docketed. In sum, a percentage-of-all-claims-challenged measure might well be beset by unavoidable measurement error. Moreover, sometimes particular issues, rather than claims as such, are challenged (*see, e.g.,* Fed. R. of Civ. P. 56(g)), and it is not always clear how to map general fact issues into claims. For these reasons, I restrict my attention to the two measures discussed in the text—whether the plaintiff prevails at summary judgment as to either all claims or at least one claim that the defendant challenges.

### III. EMPLOYMENT DISCRIMINATION CASES

*A.    Basic Characteristics of the Employment Discrimination Sample*

Coders processed a total of 2,511 employment discrimination cases. Of these, 185 were dropped because they were from a district that had not adopted the ECF system as of October 1, 2005. An additional 335 were dropped because at least one *pro se* plaintiff was involved in at least one motion for summary judgment. A further 138 were dropped because they appeared to involve ADA-related claims.[60] That leaves a sample of 1,853 employment discrimination cases with summary judgment motions in which all plaintiffs were counseled and no claims appeared to be ADA-related. In 32 of these, there was no defendant's summary judgment motion filed,[61] so that there are 1,821 non-ADA employment discrimination cases in which there were no *pro se* plaintiffs and at least one defense summary judgment motion was filed.[62]

The first column of Table 2 reports the number of such cases in my sample by year of filing (Panel *A*) and according to whether the filing year was in the pre-*Twombly* or post-*Iqbal* period (Panel *B*). All told, my sample contained 1,189 employment discrimination cases coded in the pre-*Twombly* period that had defense summary judgment motions and no *pro se* plaintiffs; there were 632 such cases in the post-*Iqbal* period. The second column of Table 2 reports the number of these cases that had at least one summary judgment motion adjudicated within 731 days of case filing. As with the total number of coded cases, and for the same reasons,[63] a disproportionate number of these cases were filed in 2005. Within each year category, motions were adjudicated before the 731-day cutoff in just below 60 percent of cases. All told, the pre-*Twombly* period has 700 employment discrimination cases with no *pro se* plaintiff and an adjudicated defense summary judgment motion, while the post-*Iqbal* period has 368 such cases. These are the cases whose outcomes I analyze below.

---

[60] As discussed, *supra* note 76, the ADA Amendments Act of 2008 expanded the set of people covered by the ADA. Dropping ADA-related cases avoids the risk of misattributing effects of this change in ADA law to changes in pleading standards. See *supra* note 47 for a discussion of the method for identifying cases with ADA-related claims.

[61] Summary judgment motions filed by defendants in their capacity as crossclaimants or counterclaimants were not treated as defense summary judgment motions.

[62] Only 74 of these 1,821 cases also had a plaintiff's summary judgment motion filed

[63] *See supra* note **Error! Bookmark not defined.**.

Please cite to 68 Stan. L. Rev. ___ (forthcoming)

TABLE 2
NUMBER OF EMPLOYMENT DISCRIMINATION CASES WITH SUMMARY JUDGMENT MOTIONS
OBSERVED FILED, AND WITH ADJUDICATIONS WITHIN 731 DAYS

| Year Filed | Defense Summary Judgment Motion | | Sampling Weight |
| | Filed in Observed Period | Adjudicated Within 731 Days | |
|---|---|---|---|
| *A. By year case filed* | | | |
| 2005 (Oct 1— Dec 31) | 769 | 457 | 0.266 |
| 2006 (Jan 1 — Jun 30) | 420 | 243 | 1 |
| | | | |
| 2009 (Oct 1— Dec 31) | 206 | 119 | 1 |
| 2010 (Jan 1 — Jun 30) | 426 | 249 | 1 |
| | | | |
| *B. By pre-*Twombly*/post-*Iqbal | | | |
| Total, pre-*Twombly* | 1,189 | 700 | |
| Total, post-*Iqbal* | 632 | 368 | |

I note that it is not an accident that there are a disproportionate number of cases included in the 2005 filing period. This happened because the JD student coders were ready to work before all years of data were loaded into the data base. Rather than have the coders sit idle, I decided to have them code cases that were filed in 2005 while data base code necessary to load the other years' cases was completed. To avoid any non-representativeness in the results, I use weights that adjust for the difference in sample sizes. These weights appear in the final column of Table 2; each case from 2005 effectively gets just under 27 percent as much weight as cases filed in other years.[64]

### B.  *Summary Judgment Adjudication Results for Employment Discrimination Cases*

This section reports the core results for employment discrimination cases. I present both an unadjusted and an adjusted estimate of the change in the plaintiff win rate following *Twombly* and *Iqbal*. The unadjusted estimates are based on the simple plaintiff win rate among observations in my analysis sample. The adjusted estimates are based on binary logit models.[65] In these models, the outcome variable is a dummy variable equal to one for a case whose plaintiff wins on a defense summary judgment motion (however a win is measured), and equal to zero otherwise. The variable of primary interest is a dummy variable indicating whether the case

---

[64] I constructed the weight for cases filed in 2005 so that it equals $\frac{N_{2006}}{2 \times N_{2005}} = \frac{243}{2 \times 457} = 0.266$, where $N_{2006}$ and $N_{2005}$ are the numbers of cases in the second column of Table 2 for 2006 and 2005, respectively; the resulting value ensures that cases filed in 2005 receive one-third of the weight accorded to cases in my pre-*Twombly* period, reflecting the relative number of days from 2005 in that period. Note that this is the opposite of the approach one would take in a stratified sampling design, wherein the weight a stratum receives is an increasing function of the fraction of sampling fractions were used, since sample means within these strata have lower variance. In the usual case, one is trying to obtain lower-variance estimates in a sample for which the population mean is assumed not to vary across strata. Here, though, my concern is with the representativeness of the sample, and I am unwilling to assume that the 2005 and 2006 population means of outcome variables necessarily are the same.

[65] A binary logit model is a commonly used model for measuring the relationship between a binary outcome variable of interest—such as whether a motion was denied or not—and a set of predictor variables, such as the post-*Iqbal* dummy and the district court dummies.

was filed in my post-*Iqbal* period. The adjusted estimate of the change in plaintiff win rate following *Twombly* and *Iqbal* equals the average value, over all cases in the analysis sample, of the estimated marginal effect of switching a case from the pre-*Twombly* to the post-*Iqbal* sample.[66] The other predictor variables—whose inclusion in the model is the source of the adjustment—are the following:

- A dummy variable indicating whether the judge was appointed by a Republican president.[67]

- A dummy variable indicating whether any defendant in the case is a business organization.[68]

- The employment-to-population ratio for the year when the case was filed, in the state where the judicial district is located.

- The employment-to-population ratio for each of the two years preceding the year in which the case was filed, in the state where the judicial district is located.

- The population for the year when the case was filed, for the state where the judicial district is located.

The appointing-President variable is meant to capture the effects of any ideological variation in judging, to the extent that such a variable does so.[69] I include the business organization variable to capture any effects of differences in party type. I include the employment-to-population variables in order to control for business cycle variation that could have important effects on litigation behavior, independent of *Twombly* and *Iqbal* (*see* Part V.I.B.1, *infra*, for more on this issue). Finally, the population variable is included to control for the possibility that cases in districts in bigger states might be systematically different from those in smaller districts.

---

[66] Estimating a logit model yields estimated coefficients relating to each of the included predictor variables (the post-*Iqbal* dummy variable, plus the district court dummies). These coefficient estimates can then be used to estimate the probability that the plaintiff in each case would win against a defense summary judgment motion in each of the pre-*Twombly* and post-*Iqbal* periods. The difference in these estimated probabilities for a given case is the estimated value of the marginal effect of switching pleading standards. The average marginal effect is then the average of this estimate over all cases included in the analysis. That average value is what appears in the tables below.

[67] My data on the judge assigned to the case are current as of the time that Thomson Reuters pulled the case's docket information from PACER. Since cases might have been reassigned, from one judge to another, between the time that summary judgment motions were adjudicated and the time when the docket information is retrieved, it is possible that the judge data are not entirely accurate.

[68] I coded cases as having a defendant business organization if a defendant party's name ended with the string "INC" or "CORP" or included any of the following strings: "INC.", "INCORPORATED", "CORP.", "L.L.P.", "LLP", "LIMITED LIABILITY PARTNERSHIP"; "L.L.C."; "LLC"; or "LIMITED LIABILITY COMPANY".

[69] *See also* Jonah B. Gelbach, *Rethinking Summary Judgment Empirics*, note 53, *supra*, for more discussion of why judicial ideology needn't lead to predictable differences across cases in litigation behavior or outcomes.

**Please cite to 68 Stan. L. Rev. ___ (forthcoming)**

1. The percentage of cases in which plaintiffs win as to all challenged claims or issues

The first column of Table 3 reports percentages of employment discrimination cases, among those with motions adjudicated within 731 days of case filing, in which the plaintiff won on all challenged claims. For the pre-*Twombly* sample, 18.3 percent of motions were denied as to all claims raised in the motions. For the post-*Iqbal* period, this figure was slightly lower, at 17.1 percent. The table's second column reports estimated standard errors for these percentages, which are 1.8 and 2.0 percentage points, respectively.

The first column of the table's final row reports information for the difference in the all-claims-denied percentage. This difference is -1.2 percentage points, nominally suggesting that case quality fell. However, the second column shows that the difference in win rates has an estimated standard error of 2.7 percentage points—great enough so that the difference is far from being statistically significantly different from zero.[70] Another way to put this is via a 90% confidence interval for the change in the plaintiff's win rate against all challenged claims. This confidence interval, reported in the bottom row of TABLE 3, includes all values between a drop of 5.5 percentage points and an increase of 3.2 points, which makes it clear that the results are not precise enough to allow us to conclude that *TwIqbal* caused either a drop or an increase in this measure of the plaintiff's win rate.

TABLE 3
PERCENTAGE OF CASES IN WHICH PLAINTIFFS WON ON ALL CHALLENGED CLAIMS
IN EMPLOYMENT DISCRIMINATION CASES
(AMONG THOSE WITH MOTIONS RESOLVED IN 731 OR FEWER DAYS)

|  | Unadjusted | | Adjusted[a] | |
|  | Percentage | Estimated Standard Error | Percentage | Estimated Standard Error |
|---|---|---|---|---|
| Pre-*Twombly* | 18.3 | 1.8 | | |
| Post-*Iqbal* | 17.1 | 2.0 | | |
| Difference | -1.2 | 2.7 | 4.4 | 6.1 |
| 90% CI | [-5.5,3.2] | | [-14.4,5.7] | |

[a] A number of cases were dropped by the logit estimate's statistical routine because of either missing data on the party of the President who appointed the judge or because these district courts have no variation in the plaintiff win rate, preventing the inclusion of these observations in logit estimation. The adjusted estimates in this table are thus based on 968 observations, by comparison to 1,068 observations in the unadjusted estimation. Unadjusted estimates calculated using only the 968 observations included in the logit estimation yielded a difference in the plaintiff win rate of -0.8 percentage points, with an estimated standard error of 2.8.

[70] The *p-value* based on a standard *t*-test is 0.659, whereas conventional levels of significance in the social sciences would require a value less than 0.10. Note that the reported *p-value* is for a test of the null hypothesis of zero difference in the plaintiff win rate, against the two-sided alternative of a change not equal to zero. The two-sided alternative is appropriate here since the Supporters' view predicts a positive difference, while the Aggressive Critics' view predicts a negative difference.

The third and fourth columns show that adjusting for party of the appointing president, business status of defendants, state population, and trends in the state employment-to-population ratio leads to a substantially larger estimate of the change in the plaintiff win rate—a drop of 4.4 percentage points. However, the adjusted difference is still quite far from being statistically significant: its estimated standard error is 6.1 percentage points, yielding a *p*-value well above conventional significance levels.[71] The greater estimated standard error leads to an even wider 90% confidence interval, which includes all values between a drop of 14.4 percentage points and an increase of 5.7 points. Thus the adjusted results also are not precise enough to allow us to conclude with typical levels of confidence that *Tw/Iqbal* caused either a drop or an increase in this measure of the plaintiff's win rate.

### 2. The percentage of cases in which plaintiffs win on at least one challenged claim

The first column of Table 4 reports the percentages of claims on which plaintiffs won on at least one challenged claim in employment discrimination cases. For the pre-*Twombly* sample, plaintiffs won on at least one claim in 37.0 percent of cases. For the post-*Iqbal* period, this percentage was slightly greater, at 38.0 percent. The table's second column reports estimated standard errors for these percentages, which are 2.2 and 2.5 percentage points, respectively. The unadjusted difference of 1.0 percentage points has an estimated standard error of 3.4 percentage points and is thus far from statistically significant. The table's final row also reports information for the adjusted difference in the plaintiff's win percentage. The difference of 2.7 percentage points is likewise statistically insignificant, given its estimated standard error of 7.8 percentage points. Once again, another way of framing the statistical insignificance of the estimates is that 90% confidence intervals are wide enough to include zero for both the unadjusted and adjusted results.

---

[71] The *p*-value, testing a null of zero effect against the two-sided alternative of nonzero effect, is 0.474.

TABLE 4
PERCENTAGE OF CASES IN WHICH PLAINTIFFS WON ON AT LEAST ONE CHALLENGED CLAIM
IN EMPLOYMENT DISCRIMINATION CASES
(AMONG THOSE WITH MOTIONS RESOLVED IN 731 OR FEWER DAYS)

| | Unadjusted | | Adjusted[a] | |
|---|---|---|---|---|
| | Percentage | Estimated Standard Error | Percentage | Estimated Standard Error |
| Pre-*Twombly* | 37.0 | 2.2 | | |
| Post-*Iqbal* | 38.0 | 2.5 | | |
| Difference 90% CI | 1.0 [-4.5,6.6] | 3.4 | 2.7 [-10.2,15.6] | 7.8 |

[a] A number of cases were dropped by the logit estimate's statistical routine because of either missing data on the party of the President who appointed the judge or because these district courts have no variation in the plaintiff win rate, preventing the inclusion of these observations in logit estimation. The adjusted estimates in this table are thus based on 968 observations, by comparison to 1,068 observations in the unadjusted estimation. Unadjusted estimates calculated using only the 968 observations included in the logit estimation yielded a difference in the plaintiff win rate of 0.8 percentage points, with an estimated standard error of 3.5.

### 3. Measuring the Quality-Filtering Effect Using Changes in the Number of Employment Discrimination Cases Facing Summary Judgment Motions

As I discussed in Part I.C (and I.D, as extended to party selection effects with no selection into summary judgment), the percentage change in the number of cases facing summary judgment motions plays an important role in understanding the quality-filtering effect of *TwIqbal*. To measure this change for employment discrimination cases filed in each judicial district in each study period, I counted the number of cases that appeared to have a summary judgment motion filed, via the search defined in/around TAN 55, *supra*. This is an imperfect method, because some of the summary judgment motions filed will have been filed by plaintiffs rather than defendants. However, as discussed *supra*, the overwhelming majority of summary judgment motions filed in employment discrimination cases are filed by defendants, so this method is reasonable for employment discrimination cases.[72] Among all cases filed in districts included in the analysis above during the pre-*Twombly* study period, I found 2,695 whose docket sheet indicated that a summary judgment motion was filed. The corresponding figure for cases filed in the post-*Iqbal* study period was 2,422. Thus, the number of summary judgment motions

---

[72] Recall that cases in the pre-*Twombly* period have been ongoing four years more than cases in the post-*Iqbal* period. While it is possible that the drop in the number of employment discrimination cases facing summary judgment motions is due partly to different case durations, that seems unlikely. If there was substantial censoring in the filing of summary judgment motions in the post-*Iqbal* period by comparison to the pre-*Twombly* period, I would expect that the share of cases with motions adjudicated before the 731-day cutoff to be substantially greater in the post-*Iqbal* period than in the pre-*Twombly* period. But as I wrote in section A of the present Part: "Within each year category, just below 60 percent of cases with motions filed had them adjudicated before the 731-day cutoff." I conclude that it is reasonable to compare the number of cases with summary judgment motions filed in the pre-2012 period, even though this allows four more years of observation time for cases filed in the pre-*Twombly* period.

filed in employment discrimination cases fell by 477 during the period. This is a drop of roughly 18 percent, using the pre-*Twombly* study period as the denominator ($477 \div 2,695 = 0.177$).[73] If we adopt the assumption that there was no selection into summary judgment, then as discussed in Part I.C, *supra,* the quality-filtering effect equals the ratio of the change in the plaintiff's win rate to the 18 percentage point drop in the number of cases with summary judgment motions. This is equivalent to multiplying the change in the plaintiff's win rate by the inverse of the percentage drop in the number of cases with summary judgment motions, which is between 5 and 6;[74] for concreteness, I shall use a multiplication factor of 5.

Finally, recall that under the assumption of no selection into summary judgment, the quality-filtering effect should be interpreted as the difference between the plaintiff's win rate among cases that would face summary judgment motions under both pleading standards and the plaintiff's win rate among cases that are filtered out; when the quality-filtering effect is positive, then, *TwIqbal* operate to filter out lower-quality cases, and vice-versa.

Table 5 reports ranges of estimates of the quality-filtering effect that are consistent with various approaches to estimating the effect of *Twombly* and *Iqbal* on the plaintiff's win rate at summary judgment for employment discrimination cases. The table reports ranges for both approaches to defining the plaintiff's win rate discussed in TABLE 3 (which defined a plaintiff win as requiring the plaintiff to win on all challenged claims) and TABLE 4 (which defined a plaintiff win as requiring the plaintiff to win only on at least one challenged claim), in each case presenting ranges based both on unadjusted and adjusted-for-covariates estimation approaches. For each of the four approaches, I report both a lower bound and an upper bound on the quality-filtering effect. Each estimation method's lower bound equals the multiplication factor of 5 just derived, times the lower bound of the 90% confidence interval for each method. The upper bound is calculated the same way except using the upper bound of the 90% confidence interval.

---

[73] One might worry that the recession affected litigation behavior, especially in employment discrimination cases; *see* John J. Donohue III & Peter Siegelman, *Law and Macroeconomics: Employment Discrimination Litigation over the Business Cycle*, 66 S. CAL. L. REV. 709 (1993). To account for this possibility, I first calculated the number of cases with a summary judgment motion filed in the judicial districts of each state of the union, for each year of the study. I then used ordinary least squares to estimate a model relating the natural logarithm of the district-level number of cases to a dummy variable for the post-*Iqbal* period and the natural logarithm of the state's population, as well as another model that also includes the log of the employment-to-population ratio in the year the case was filed, as well as two annual lags of this (logged) variable. The results of the first specification imply a value of the percentage drop in the number of cases with summary judgment motions filed of roughly 15 percent, which is highly statistically significantly different from zero. The second specification's results imply a larger percentage drop—roughly 30 percent. However, the coefficients on the employment-to-population variables are both individually and jointly insignificant in the second model, suggesting the economy is not significantly associated with changes in summary judgment incidence, and the coefficient on the post-*Iqbal* dummy variable is statistically insignificantly different from zero. Presumably the loss of precision in the post-*Iqbal* dummy's coefficient, coupled with an increase in this estimated coefficient's magnitude, is due to the addition of the employment-to-population variables, which vary a lot across the pre-*Twombly*/post-*Iqbal* period and thus chew up a substantial amount of the information in the post-*Iqbal* dummy. Thus the simpler approaches to estimating the percentage drop appear more credible than the second multivariate model. I therefore use the simple percentage drop of 18 points, discussed in the main text above.

[74] The inverse of 0.18 is 5.6.

Leaving the numerical particulars aside, the central message of Table 5 is that, even under the assumption of no selection into summary judgment, the data reported above are consistent with a wide range of values of the quality-filtering effect. Consider the approach with the *narrowest* of the four bounding values, which occurs when a plaintiff must win on all challenged claims for the case to be considered high-merit, using the unadjusted method of estimating the change in the plaintiff's win rate. The data are consistent with the possibility that the high-merit share among filtered-out cases is 28 percentage points *lower* than the high-merit share among cases that would face summary judgment motions under both pleading standards. If this figure is accurate, and if there is no selection into summary judgment, plaintiffs would have won at summary judgment on all claims in roughly 45 percent of cases that were filtered out of summary judgment due to *Twombly/Iqbal*—by comparison to 17.1 percent in those cases whose summary judgment status is unaffected by *Twombly/Iqbal*.[75]

Table 5
RANGE OF QUALITY-FILTERING EFFECT ESTIMATES FOR
EMPLOYMENT DISCRIMINATION CASES,
ASSUMING NO SELECTION INTO SUMMARY JUDGMENT

| | Impact of *Twombly/Iqbal* on Plaintiff's Win Rate Estimation Method | | | |
| | Unadjusted | | Adjusted[a] | |
| | Lower Bound[a] | Upper Bound[a] | Lower Bound[a] | Upper Bound[a] |
| --- | --- | --- | --- | --- |
| *Measure of plaintiff's win rate* | | | | |
| Plaintiff wins on all challenged claims | -28 | 16 | -72 | 29 |
| Plaintiff wins on at least one challenged claim | -23 | 33 | -51 | 78 |

[a] Bounds calculated by multiplying 90% confidence interval bounds in TABLE 3 and TABLE 4 by multiplication factor of 4.

Table 5 shows that the corresponding upper bound when a plaintiff must win on all challenged claims for the case to be considered high-merit, again using the unadjusted estimation method, is a quality-filtering effect of 16 percentage points. If this figure is accurate, and if there is no selection into summary judgment, plaintiffs would have won at summary judgment on all claims in only 1 percent of cases that were filtered out of summary judgment due to

[75] Given a particular estimate of $Q$, the quality-filtering effect, we can back out the values of $W_{both}$ and $W_{fo}$ under the no selection into summary judgment assumption. Under that assumption, $W_{both} = W_{post}$, so $W_{fo} = W_{post} - Q$. When a plaintiff must win on all challenged claims for the case to be considered high-merit and we use the unadjusted method of estimating the change in the plaintiff's win rate, we obtain an estimate of $W_{post} = 17.1$ percent. If $Q = -22$, then $W_{fo} = 17.1 - (-22) = 39.1$. This calculation implies that plaintiffs would have won at summary judgment on all claims in 39.1 percent of cases that were filtered out of summary judgment due to *Twombly/Iqbal*—by comparison to 17.1 percent in those cases whose summary judgment status is unaffected by *Twombly/Iqbal*.

*Twombly/Iqbal*—again by comparison to 17.1 percent in those cases whose summary judgment status is unaffected by *Twombly/Iqbal*.[76]

Thus, even if we use the narrowest confidence interval in Table 5, we find that the data are consistent with a range of plaintiff's win rates of between 1 percent and 45 percent for the cases that *TwIqbal* filter out of summary judgment adjudication. Given the observed plaintiff's win rate of 17.1 percent for cases not filtered out, this range is potentially consistent with any of the case-quality views held by *TwIqbal*'s supporters or its critics, whether aggressive or moderate. And that means that, even under the assumption that there is no selection into summary judgment, the data on employment discrimination cases simply can't settle the dispute over *TwIqbal*'s quality-filtering effect: my empirical evidence is consistent with the position of partisans on all sides of the *Twombly/Iqbal*-quality debate.

## IV. CONTRACT CASES

### A. Basic Characteristics of the Contracts Sample

Coders processed a total of 2,478 contracts cases. Of these, 236 were dropped because they originated in districts that had not adopted the ECF system before October 1, 2005.[77] An additional 53 were dropped because at least one *pro se* plaintiff was involved in at least one motion for summary judgment,[78] and 8 more were dropped because coders indicated that at least one claim involved the ADA.[79] That leaves 2,181 contracts cases with summary judgment motions in which all plaintiffs were counseled. In 750 of these, there was no defendant's summary judgment motion filed,[80] so that there are 1,431 contracts cases in which there were no *pro se* plaintiffs involved in any motion for summary judgment and at least one defense summary judgment motion was filed.[81] Table 6 reports the breakdown of these 1,431 cases across sub-types of contract suits; 48.2 percent (689) involved insurance, 7.1 percent (103 cases) involved other enumerated types of cases, and the remaining 44.7 percent (639 cases) involved the "Other Contract" PACER category.

---

[76] If $Q = 12.8$, then $W_{f_0} = 17.1 - 12.8 = 4.3$.

[77] *See supra* note 82.

[78] *See supra* note 80 concerning the rationale for excluding cases with *pro se* plaintiffs.

[79] *See supra* notes 47 and 60.

[80] As above, summary judgment motions filed by defendants in their capacity as either crossclaimants or counterclaimants were not treated as defense summary judgment motions.

[81] Of the 2,181 contracts cases with summary judgment motions in which all plaintiffs were counseled, 85 had summary judgment motions filed only by a party classified as neither a plaintiff nor a defendant, and another 665 had summary judgment motions filed by plaintiffs but not defendants. Together, these two sets of cases make up the 750 contracts cases with summary judgment motions in which all plaintiffs were counseled, but in which no defense summary judgment motion was filed. The share of all contracts cases with summary judgment motions in which all plaintiffs were counseled and in which a plaintiff filed a summary judgment motion thus was 36 percent ($100\% \times 750 \div (2,181-85)$), which is much greater than the rate for filing by plaintiffs in employment discrimination cases; *see supra* note 78.

TABLE 6
SERVED CONTRACTS CASES, BY INDIVIDUAL NATURE OF SUIT CODE

| PACER Code | Nature of Suit | Number of Cases Served |
|:---:|---|:---:|
| 110 | Insurance | 689 |
| 120 | Marine | 27 |
| 130 | Miller Act | 4 |
| 140 | Negotiable Instrument | 12 |
| 150 | Recovery of Overpayment & Enforcement of Judgment | 10 |
| 151 | Medicare Act | 15 |
| 152 | Recovery of Defaulted Student Loans (Excl. Veterans) | 1 |
| 160 | Stockholders' Suits | 5 |
| 190 | Other Contract | 639 |
| 195 | Contract Product Liability | 22 |
| 196 | Franchise | 7 |
| | *All Contracts cases* | *1,431* |

The first column of Table 7 reports the distribution of contracts cases with a defense summary judgment motion and no *pro se* plaintiff by year (Panel A) and by pre-*Twombly*/post-*Iqbal* period (Panel B).[82] There are somewhat more coded cases in the pre-*Twombly* period (758 cases) than in the post-*Iqbal* period (673 cases). This discrepancy arose because the coders worked on one year of cases at a time, and all coders had to stop working before they managed to code as many 2010 cases as 2006 cases.[83]

[82] Unlike the employment discrimination sample, the contracts sample does not have a disproportionate number of cases included in the 2005 filing period, because all relevant years of contracts cases had been loaded into the data base when the coders began coding these cases.

[83] There were no qualitative changes in the results when the samples were weighted so that the 2005 and 2009, and 2006 and 2010, samples had the same effective number of cases.

**Please cite to 68 Stan. L. Rev. ___ (forthcoming)**

TABLE 7
NUMBER OF CONTRACTS CASES WITH SUMMARY JUDGMENT MOTIONS OBSERVED FILED,
AND WITH ADJUDICATIONS WITHIN 731 DAYS

| | Defense Summary Judgment Motion | |
|---|---|---|
| **Year Filed** | **Filed in Observed Period** | **Adjudicated Within 731 Days** |
| *A. By year case filed* | | |
| 2005 (Oct 1— Dec 31) | 238 | 124 |
| 2006 (Jan 1 — Jun 30) | 520 | 276 |
| | | |
| 2009 (Oct 1— Dec 31) | 254 | 144 |
| 2010 (Jan 1 — Jun 30) | 419 | 237 |
| | | |
| *B. By pre-*Twombly*/post-*Iqbal | | |
| Total, pre-*Twombly* | 758 | 400 |
| Total, post-*Iqbal* | 673 | 381 |

The second column of Table 7 reports the number of the contracts cases with any defense summary judgment motion filed that had at least one such motion adjudicated within 731 days of case filing. The discrepancy in the number of cases across the pre-*Twombly*/post-*Iqbal* periods is largely eliminated because the share of cases that were adjudicated within 731 days is greater in the post-*Iqbal* period (57 percent) than in the pre-*Twombly* period (53 percent). Overall, the pre-*Twombly* period has 400 contracts cases with an adjudicated defense summary judgment motion, while the post-*Iqbal* period has 381 cases.

### B. Summary Judgment Adjudication Results for Contracts Cases

#### 1. The percentage of cases in which plaintiffs win as to all aspects raised by defense summary judgment motions

The first column of Table 8 reports the percentages of contracts cases in which plaintiffs won on all claims challenged via a defense summary judgment motion. For the pre-*Twombly* sample, plaintiffs won on all challenged claims in 36.3 percent of cases. For the post-*Iqbal* period, this figure was slightly greater, at 37.3 percent. The table's second column reports estimated standard errors for these percentages, which are 2.4 and 2.5 percentage points.

**Please cite to 68 Stan. L. Rev. ___ (forthcoming)**

TABLE 8
PERCENTAGE OF CASES IN WHICH PLAINTIFFS WIN ON ALL CHALLENGED CLAIMS
IN CONTRACTS CASES (AMONG THOSE WITH MOTIONS RESOLVED IN 731 OR FEWER DAYS)

|  | Unadjusted | | Adjusted[a] | |
|---|---|---|---|---|
|  | Percentage | Estimated Standard Error | Percentage | Estimated Standard Error |
| Pre-*Twombly* | 36.3 | 2.4 |  |  |
| Post-*Iqbal* | 37.3 | 2.5 |  |  |
| *Difference* | *1.0* | *3.5* | *6.2* | *7.0* |
| *90% CI* | *[-4.7,6.7]* | | *[-5.4,17.7]* | |

[a] A number of cases were dropped by the logit estimate's statistical routine because of either missing data on the party of the President who appointed the judge or because these district courts have no variation in the plaintiff win rate, preventing the inclusion of these observations in logit estimation. The adjusted estimates in this table are thus based on 707 observations, by comparison to 781 observations in the unadjusted estimation. Unadjusted estimates calculated using only the 746 observations included in the logit estimation yielded a difference in the plaintiff win rate of 0.1 percentage points, with an estimated standard error of 3.6.

The table's next row reports information for the difference in the percentage of cases in which plaintiffs won on all challenged claims. The unadjusted increase of 1.0 percentage points is in line with the supporters' view of *Twombly* and *Iqbal*, but this increase is very small. Moreover, its estimated standard error, 3.5 percentage points, is large enough that 90% confidence intervals include both positive and negative numbers. Once again, this difference is not statistically different from zero using either a two-sided or one-sided test of significance.[84] The adjusted difference, which is based on the same logit model described in Part III, *supra*, is much larger, at 6.2 percentage points. However, this estimate is quite imprecise, with an estimated standard error of 7.0 percentage points, so that it, too, is statistically insignificant.[85]

### 2.  The percentage of cases in which plaintiffs win on at least one claim challenged via defense summary judgment motion

The first column of Table 9 reports the percentages of contracts cases in which the plaintiff won at summary judgment on at least one claim challenged by a defense summary judgment motion. For the pre-*Twombly* sample, the plaintiff won on at least one challenged

---

[84] A one-sided alternative hypothesis is arguably appropriate for contracts case, since the aggressive critics' concern that only defendants will have the information necessary to plead seems considerably less likely to hold in contract actions.

[85] This conclusion holds regardless of whether one uses a two- or one-sided alternative hypothesis.

claim in 52.0 percent of cases. For the post-*Iqbal* period, this percentage was 56.4 percent. The table's second column reports estimated standard errors for these percentages, which are 2.5 in both periods. The table's final row reports information for the difference in the denial percentage.

The difference of 4.4 percentage points indicates some support for the supporters' view of *Twombly* and *Iqbal*, since it suggests that average merit increased. However, the difference has an estimated standard error of 3.6 percentage points, indicating that this difference, like those above, is not statistically significantly different from zero.[86]

TABLE 9
PERCENTAGE OF CASES IN WHICH PLAINTIFF WON ON AT LEAST ONE CLAIM
IN CONTRACTS CASES (AMONG THOSE WITH MOTIONS RESOLVED IN 731 OR FEWER DAYS)

|  | Unadjusted | | Adjusted[a] | |
|---|---|---|---|---|
|  | Percentage | Estimated Standard Error | Percentage | Estimated Standard Error |
| Pre-*Twombly* | 52.0 | 2.5 |  |  |
| Post-*Iqbal* | 56.4 | 2.5 |  |  |
| Difference | 4.4 | 3.6 | 13.6 | 7.0 |
| 90% CI | [-1.4,10.3] |  | [2.1,25.2] |  |

[a] A number of cases were dropped by the logit estimate's statistical routine because of either missing data on the party of the President who appointed the judge or because these district courts have no variation in the plaintiff win rate, preventing the inclusion of these observations in logit estimation. The adjusted estimates in this table are thus based on 707 observations, by comparison to 781 observations in the unadjusted estimation. Unadjusted estimates calculated using only the 707 observations included in the logit estimation yielded a difference in the plaintiff win rate of 3.5 percentage points, with an estimated standard error of 3.8.

Finally, though, consider the third and fourth columns of Table 9. The adjusted difference, in the third column, indicates that when I adjust for measures related to the judge, for the business organization status of defendants, and for state population and business cycle variables, *Twombly* and *Iqbal* are associated with a 13.6 percentage-point increase in the plaintiff win rate. This estimated difference in the plaintiff win rate is statistically significantly different from zero, using either a two-sided ($p$-value=0.052) or one-sided ($p$-value=0.026) alternative hypothesis.[87] Moreover, the point estimate is quite sizable: 13.6 percentage points amounts to nearly a 25 percent increase over the pre-*Twombly* plaintiff win rate of 52.0 percent (*see* the first row of the first column in the table). Thus, using the conventional approach to significance testing, the results for contracts cases do provide some evidence that the quality of cases adjudicated at summary judgment was greater following *TwIqbal* than before.

---

[86] Even the one-sided $p$-value for this estimate exceeds 0.10.

[87] *See supra* note 84 for an explanation of why a one-sided test is arguably appropriate for contract cases.

33

Please cite to 68 Stan. L. Rev. ___ (forthcoming)

### 3.  Challenges in Measuring the Quality-Filtering Effect Using Changes in the Number of Contracts Cases Facing Summary Judgment Motions

As I discussed in Part I.C conceptually, and in Part III.B.0 as applied to employment discrimination cases, the change in the number of cases facing a defendant's summary judgment motions plays an important role in understanding the quality-filtering effect of *TwIqbal*. Among contracts cases with at least one summary judgment motion apparently filed, there is no defendant-filed motion in more than a third.[88] Moreover, an initial review of my coded data suggests that this fraction might have been greater in my post-*Iqbal* period than in the pre-*Twombly* period. Thus, it seems considerably more problematic to use pre-*Twombly* and post-*Iqbal* counts of the number of cases with summary judgment motions filed, as I did for employment discrimination cases in Part III.B.0, to measure the change in the number of cases with defendant-filed summary judgment motions.

For the sake of discussion, I shall ignore that concern here and assume that the number of cases with a defendant-filed summary judgment motion is proportional to the number of cases with any summary judgment motion filed. Under this assumption, the percentage drop in the number of cases with any summary judgment motion filed (regardless of which party filed it) will equal the percentage drop in the number of cases with a defendant-filed summary judgment motion (our drop of interest).

Using the search defined in/around TAN 55, *supra*, to count the number of contracts cases (filed in the districts included in this study) that appeared to have a summary judgment motion, I found that there were 3,127 such cases in the pre-*Twombly* period and 3,005 in the post-*Iqbal* period. These figures imply a 3.9 percentage point drop, whose inverse—which is the multiplication factor discussed in Part III.B.3, *supra*—is roughly 25.[89] Thus under the assumption that there was no selection into summary judgment, the difference in the plaintiff's win rate among filtered-out cases and those that would face defense summary judgment motions under both pleading standards would equal 25 times whatever "Difference" measure that we choose from TABLE 8 or TABLE 9.

Consider the first column of TABLE 8,[90] whose estimated difference of 1.0 percentage points has an associated 90% confidence interval that includes all difference values between a drop of 4.7 percentage points and an increase of 6.7 percentage points. Multiplying each of these figures by 25 would suggest a confidence interval that includes all values between a drop of more than 100 points and an increase of more than 100 points.[91] But the maximum logically possible difference in the plaintiff's win rate between any two sets of cases is 100 points in either direction. This means that even when we impose the assumption of no selection into summary

---

[88] *See* note 81 at page 29, *supra*. By comparison, there are precious few employment discrimination cases in which only plaintiffs file summary judgment motions.

[89] That is, $\frac{3005-3127}{3127} = 0.039$, and $\frac{1}{0.039} = 25.6$.

[90] In this table, a plaintiff is considered to have won against a defense summary judgment motion only if she wins on all challenged claims; the first column uses the unadjusted approach to measuring the change in the plaintiff's win rate resulting from *TwIqbal*.

[91] That is, 25 times 4.7 is more than 100, as is 25 times 6.7.

judgment, the results involved in the first column of TABLE 8 are entirely uninformative about *TwIqbal*'s quality-filtering effect for contracts cases.

The same argument applies to the second column of TABLE 8 as well, and a variation on it applies to the first column of TABLE 9. Thus, if we were to adopt any of these measures of the observed change in the plaintiff's win rate against defense summary judgment motions, then even under the assumption of no selection into summary judgment we should conclude that the data for contracts cases are consistent with such a wide range of results that they are uninformative about *TwIqbal*'s quality-filtering effects.

Now consider the remaining results, in the second column of TABLE 9. It is impossible for *TwIqbal* to have increased the plaintiff's win rate against defense summary judgment motions by the reported 13.6 percentage points if both (i) there was no selection into summary judgment and (ii) only 3.9 percent of cases were filtered out of facing defense summary judgment motions: 13.6 points times the multiplication factor of 25 exceeds 100 points, which is the maximum logically possible quality-filtering effect. In fact, it can be shown that a filtered-out share of 3.9 percent would be consistent with the absence of selection into summary judgment only if the actual effect of *TwIqbal* on the plaintiff's win rate against defense summary judgment motions is roughly 2 percentage points—the very bottom of the 90% confidence interval reported in the second column of TABLE 9.[92,93]

Thus, unless the adjusted estimates in the second column of TABLE 9 are greatly overstated, there must have been some selection into summary judgment. If that is so, then the quality-filtering effect cannot be isolated using the data discussed here.[94] As a result, even if

---

[92] Under the assumption of no selection into summary judgment, the plaintiff's win rate against defense summary judgment motions before *Twombly* can be written as a weighted average of the win rate among filtered out cases and the win rate among cases that would face summary judgment motions under both pleading standards. With 4 percent of cases having been filtered out by *TwIqbal*, as discussed above, we have $W_{p\text{-}e\text{-}T} = 0.039 \times W_{fo} + 0.961 \times W_{both}$. In the most extreme situation, plaintiffs would win in none of the filtered out cases, so that $W_{fo}^{min} = 0$. That would imply $W_{both}^{max} = \frac{W_{pre\text{-}T}}{0.961}$. From the first row and column of TABLE 9, we know that plaintiffs win 52.0 percent of the time pre-*Twombly*, so $W_{pre\text{-}T} = 0.52$. Thus, $W_{both}$ is no greater than 0.52 divided by 0.961, or 54 percentage points. Thus the maximum quality-filtering effect is $W_{both}^{max} - W_{pre\text{-}T}^{min} = 54 - 0 = 54$ percentage points. Dividing this by the multiplication factor of 25 yields a result of roughly 2 percentage points for the maximum possible change in the observed plaintiff's win rate that is consistent with both (i) no selection into summary judgment and (ii) a filtered out share of 3.9 percent. This same argument applies even if the filtered out share of cases is, say, 8 percent; in that case, the maximum possible change in the observed plaintiff's win rate that is consistent with both no selection into summary judgment is below 5 percentage points—still far below the point estimate in the second column of TABLE 9.

[93] Perhaps one should not make too much of the statistical significance of the result in the second column of TABLE 9 in the first place. There are four different models estimated for contract cases (two in each of TABLE 8 and TABLE 9). It is well known in statistics that when a researcher conducts what are known as multiple inferences—here, the construction of four confidence intervals—the standard confidence interval bounds are too narrow. The norm in much social science scholarship, and also in empirical legal studies, is simply to ignore this fact. I shall largely follow that norm here, as it is complicated to explain how to construct confidence intervals that properly account for multiple inferences. However, it takes little gumption to conjecture that the one 90% confidence interval in these tables that doesn't include zero—the one statistically significant result—would not likely be statistically significant once multiple inferences are taken into account.

[94] The example considered in note 45, *supra*, shows that when there is no change in the number of cases with summary judgment motions filed, the observed difference in the plaintiff's win rate equals $\lambda\{W_{sl} - W_{fo}\}$. However,

there really was a quality improvement, it likely is due at least in part, and maybe totally, to the replacement of relatively low-quality filtered-out cases by cases that have selected into summary judgment due to *TwIqbal*. It is difficult to assess the welfare implications of such a result. First, while the filtered-out cases would be lower quality than those selected into summary judgment, there is no way to know whether filtered-out cases were lower quality than those that face summary judgment motions under both pleading standards. Second, the result would imply that a relatively substantial number of high-quality cases that would settle pre-discovery but for *TwIqbal* instead are going through discovery, and then summary judgment adjudication. At the very least, such a result seems inconsistent with *TwIqbal*'s meta-policy rationale related to reducing litigation costs.

In sum, the results for contract cases do not paint any clearer a picture than those for employment discrimination cases. On the one hand, there is some evidence that *TwIqbal* caused an increase in the quality of contract cases that make it to summary judgment. On the other hand, this evidence is relatively weak in context.[95] Further, it appears likely that there was selection into summary judgment in contract cases, which would defeat our ability to draw meaningful inferences limited to *TwIqbal*'s quality-filtering effect.

## V. FURTHER ISSUES

In this Part I discuss some methodological issues. First, I discuss why it would be problematic to focus only on cases in which a Rule 12(b)(6) motion would be filed, as one other recent paper does in its assessment of *TwIqbal*'s performance as a filter. Second, I discuss a number of factors that might render my estimates above unreliable measures of *TwIqbal*'s overall causal effect on the change in the plaintiff's win rate against defense summary judgment motions: the recession; the Supreme Court's resolution of the *Ledbetter* case and its subsequent override by Congress; *Scott v. Harris*; amendments to Rule 56 that took effect in 2007, 2009, and 2010; changes in primary behavior; and the possibility of other confounding factors.

### A. *Why it Would be Problematic to Focus Only on Cases in Which a Rule 12(b)(6) Motion was Filed*

As I mentioned in the introduction, there is one other paper that attempts to draw inferences concerning *TwIqbal*'s effects on case quality. Professor Alexander Reinert read and coded information related to the resolution of Rule 12(b)(6) motions in more than four thousand cases.[96] Most of this paper is directed at comparing the rate of Rule 12(b)(6) dismissals before *Twombly* and after *Iqbal*.[97] But Reinert also includes a section titled, "Plausibility pleading as a filter?". There he reports the "ultimate outcome" of cases after adjudication of an initial Rule

---

there is no way to separately identify the part of this difference that is due to $\lambda$, which measures the extent of selection into summary judgment, and the part that is due to $\{W_{si} - W_{fo}\}$, which is the difference in case quality between cases that select into and that are filtered out of summary judgment.

[95] *See* note 93, *supra*.

[96] Alexander A. Reinert, *Measuring the Impact of Plausibility Pleading*, draft manuscript on file with author (2015).

[97] *See* Gelbach, *Locking the Doors*, note 6, *supra*, and Gelbach, *Dark Arts*, note 6, *supra*, for critical discussions of such an approach to measuring the impact of changes in pleading standards.

12(b)(6) motion.[98] One of the categories of ultimate outcomes he considers is "Dismissed ([Summary judgment])".[99]

Reinert's analysis in this section differs from mine in three key ways. First, he does not do anything to account for the fact that cases in the pre-*Twombly* period are more likely to have had time to reach a definitive result than cases filed in the post-*Iqbal* period, simply due to the fact that the pre-*Twombly* cases were filed earlier.[100] For this reason, his summary judgment dismissal comparisons might be skewed due to the longer follow-up period available for cases filed in his pre-*Twombly* period.[101] Second, Reinert does not report the share of cases that are challenged via summary judgment, which is enough to render his results and mine non-comparable.

Third, and possibly most important, Reinert's study design focuses only on cases in which a Rule 12(b)(6) motion is filed. It might seem that this approach usefully focuses attention where it is warranted. But that view is mistaken. Consider a defendant selection case, which the defendant would answer under *Conley* but challenge with a Rule 12(b)(6) motion post-*Twombly/Iqbal*.[102] If I considered only cases with a Rule 12(b)(6) motion filed and denied, then the post-*Twombly/Iqbal* sample would include those cases in which the defendant loses the Rule 12(b)(6) motion and then files for summary judgment. But the pre-*Twombly* sample would exclude such cases. Defendant selection cases thus would be represented in the post-*Iqbal* sample, but not the pre-*Twombly* sample. If case quality is correlated in important ways with changes in parties' litigation choices, as it might be, then this sample-definition rule would induce non-comparability across the two periods.

There are other selection-related types of cases that also make Reinert's approach to comparing ultimate outcomes problematic. For example, consider a case in which the parties agree that the defendant would be unlikely to win a Rule 12(b)(6) motion pre-*Twombly*, but they disagree enough on the merits such that the defendant would answer, allowing the case to go to discovery, after which the defendant would move for summary judgment. Under the *Tw/Iqbal* pleading standard, though, the parties in this case would settle even before the answer/Rule 12(b)(6) stage, because both of them expect that if they didn't settle, the defendant would (i) file a Rule 12(b)(6) motion and (ii) have a substantial probability of winning on it. Such a case would yield the opposite result to the one in the defendant selection case just discussed: it would be represented in the pre-*Twombly* sample, but not the post-*Iqbal* sample.

These examples show that it is problematic to measure *Tw/Iqbal*'s case-quality effects using only cases in which Rule 12(b)(6) motions are filed. Such an approach unavoidably introduces the possibility of non-comparable samples in the pre-*Twombly* and post-*Iqbal* periods.

---

[98] It is potentially meaningful to follow up even those cases in which the initial Rule 12(b)(6) motion is granted, because in some cases plaintiffs receive leave to amend their complaints even after a Rule 12(b)(6) dismissal.

[99] Reinert, *Measuring the Impact*, note 96, *supra*, at 37.

[100] As discussed in/around note 56, *supra*, my main focus is on only those summary judgment motions that are adjudicated within 731 days in order to avoid differential follow-up periods.

[101] Indeed, the share of cases in Reinert's "Unresolved" category for cases filed in his post-*Iqbal* period dwarfs the corresponding share in his pre-*Twombly* period. *Id.*

[102] *See* Gelbach, *Locking the Doors*, note 6, *supra*, and Gelbach, *Dark Arts*, note 6, *supra*.

*B.  Threats to the Validity of the Empirical Approach*

### 1.  The Recession

Earlier empirical work has suggested that the characteristics of employment discrimination cases differ over the business cycle.[103] It seems reasonable to think that contract disputes, or simply undisputed breaches, might also be more likely during economic downturns, with some parties being less able to perform than they had anticipated at the time they formed contracts. As it happens, the worst recession in six decades gripped the United States in the period between my pre-*Twombly* and post-*Iqbal* study periods. Thus, it is reasonable to worry that changes in the economy might have had important effects on the incidence of disputes, the filing of civil suits, or the nature of litigation.[104]

It is for this reason that I include both the contemporaneous variable and one- and two-year lags to account for the fact that lawsuits needn't be filed immediately. It is certainly possible that my approach fails to capture important aspects of the business cycle, but the employment-to-population ratio seems as good a measure as any. Unlike the unemployment rate, the employment-to-population ratio does not move in the direction of "good economic news" when more workers become so discouraged that they drop out of the labor force.[105] Further, by including both the contemporaneous employment-to-population ratio and two annual lags, I am able to account for not just the current level, but also ongoing trends, in labor market conditions in the state where a district court is located.

### 2.  *LEDBETTER V. GOODYEAR, INC.* AND THE LILLY LEDBETTER FAIR PAY ACT

The functioning of the Title VII statute of limitations was in a state of some flux between the two study periods I consider here. In 2007, the Supreme Court held that the Title VII statute of limitations does not re-set following an initial act of employment discrimination; *see Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007). Congress overrode this holding in 2009, retaining the six-month statute of limitations but allowing it to re-set with each new paycheck embodying a discriminatory act.[106]

It is possible that these changes caused differences in the number and composition of employment discrimination cases filed in the pre-*Twombly* and post-*Iqbal* periods of study, but I am unaware of other empirical *TwIqbal* studies that have considered this possibility. Of course, the general failure of the literature to consider this issue might simply have been an oversight. Unfortunately, aside from business cycle controls, I do not have a good strategy for overcoming any bias that might be caused by this change. I do take some solace from the fact that the circuit

---

[103] See Donohue and Siegelman, note 73, *supra*.

[104] *See, e.g.,* David Freeman Engstrom, THE *TWIQBAL* PUZZLE AND EMPIRICAL STUDY OF CIVIL PROCEDURE, 65 Stan. L. Rev. 1203, 1240 (2013) (suggesting a need to take the business cycle seriously in discussing a very early version of the results presented in the present study).

[105] The unemployment rate is vulnerable to such changes because its denominator includes only those looking for work. Thus when workers become discouraged, all else equal the unemployment rate rises; the denominator of the employment-to-population ratio is unaffected by such changes as long as unemployed people do not move out of state.

[106] *See* Lilly Ledbetter Fair Pay Act of 2009, Pub. L. 111-2.

split that the Supreme Court noted in *Ledbetter* involved only two circuits (the D.C. Circuit and the Second Circuit), based on two 2005 cases, so it is possible that there was relatively little on-the-ground awareness of this issue before *Ledbetter*. Moreover, the quick override of the Supreme Court's decision in *Ledbetter*—President Obama signed the legislation in a high-profile ceremony less than two weeks after taking office[107]—meant that the law on this issue was nationally uniform well before my post-*Iqbal* study period.

### 3. Scott v. Harris

In *Scott v. Harris*,[108] the Supreme Court reversed the lower courts' denial of summary judgment for a police officer who had rammed his car into the subject of a high-speed car chase. In holding that the officer's use of force was reasonable, the Court relied on a videotape of the car chase. The Court held that the videotape so thoroughly discredited the plaintiff's account of events that only an unreasonable jury would find for him. Even though courts handling a summary judgment motion usually construe all facts in the light most favorable to the nonmovant, the Supreme Court held that courts confronting the particular facts of *Scott v. Harris* "should not adopt [the discredited] version of the facts for purposes of ruling on a motion for summary judgment."[109]

*Scott v. Harris* was handed down three weeks before *Twombly*, so most of the summary judgment motions considered in my pre-*Twombly* period were filed before *Scott*. While pending motions could have been affected by *Scott*, it is clear that more cases in the post-*Iqbal* period would be affected. Thus, if *Scott* created substantial change in district courts' summary judgment practice, it would also render my two periods non-comparable for purposes of summary judgment adjudication.

But this seems unlikely, because the factual predicate for *Scott*'s applicability is unusual. Few cases can be expected to involve a documentary record that directly and, according to the Supreme Court, inarguably controverts testimonial evidence that would be the only evidence a nonmovant could provide. Justice Scalia's opinion for the Court's 8-1 majority says as much, characterizing the videotape's role in *Scott* as "an added wrinkle."[110] Concurring, Justice Breyer refers to the Court's determination concerning the underlying Fourth Amendment issue at stake in the case as "highly fact-dependent."[111] While it is possible that *Scott* might signal the Supreme Court's approval of lower courts' use of added discretion at summary judgment, it seems at least as likely that the case's impact on the great mass of summary judgment motions is quite limited, especially in the two substantive areas I consider here; also, *cf. Tolan v. Cotton*.[112]

---

[107] *See* Sheryl Gay Stolberg, *Obama Signs Equal-Pay Legislation*, New York Times, January 29, 2009.

[108] Scott v. Harris, 550 U.S. 372 (2007).

[109] *Id.* at 380.

[110] *Id.* at 378.

[111] *Id.* at 387. It is worth noting that Justice Stevens issued a spirited dissent; *see id.* at 389.

[112] *Tolan v. Cotton*, 572 U.S. ___ (2014) (per curiam) (vacating the Fifth Circuit's grant of a defendant's summary judgment motion for having "failed to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.' *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 255 (1986)").

### 4. Amendments to Rule 56

Following 1986's famed "trilogy" of summary judgment cases,[113] Rule 56 was amended in 1987 and then left untouched by the Advisory Committee for twenty years. There were then three amendments in as many years, with changes taking effect on December 1 of each of 2007, 2009, and 2010. The 2007 amendment was part of the overall re-styling project, which was intended to clarify the Rules without changing the meaning of any rule.[114] The 2009 amendment "consolidated and substantially revised" the timing provisions for Rule 56, allowing parties to file summary judgment motions earlier than before.[115] The 2010 Amendment revised various aspects of "the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts."[116] It also restored the word "shall", which had been replaced by "should" as part of the 2007 restyling project, and replaced "no genuine issue" with "no genuine dispute".[117] However, the Advisory Committee Note for the 2010 Amendment states that "[t]he standard for granting summary judgment remains unchanged" and that the "amendments will not affect continuing development of the decisional law construing and applying these phrases."[118] By the Advisory Committee's own lights, then, nothing important about the incidence and ultimate results of summary judgment adjudication should have changed due to the amendments interposed between my pre-*Twombly* and post-*Iqbal* periods.

### 5. Changes in Primary Behavior

Some fear that due to the Catch 22 problem, *TwIqbal* will "create an undesirable safe harbor that effectively places some defendants beyond the reach of civil rights laws,"[119] with a possible result being more unlawful discrimination in the first place. Alternatively, it is possible to construct examples in which employers are dissuaded from implementing employment policies that would be lawful, if adjudicated on the merits, because the employers fear plaintiffs will file suit alleging unlawful disparate impact. If employers expect the shift to *TwIqbal* to make it easier to get such lawsuits dismissed earlier and at lower cost, then employers might institute

---

[113] See *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita Electric Industrial Co., Ltd. et al. v. Zenith Radio Corp. et al.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

[114] *See, e.g.*, Edward H. Cooper, *Restyling the Civil Rules: Clarity without Change*, 79 Notre Dame L. Rev. 1761 (2004) (characterizing "the goal of the Style Project" as being "to translate present text into clear language that does not change the meaning").

[115] Advisory Committee Note on Rules — 2009 Amendment.

[116] Advisory Committee Note on Rules — 2010 Amendment.

[117] Prior to December 1, 2010, Fed. R. of Civ. P. 56(c) stated that "[t]he judgment sought *should* be rendered if ... there is no genuine *issue* as to any material fact and that the movant is entitled to judgment as a matter of law" (emphasis added). After 2010, the relevant language, found in Fed. R. of Civ. P. 56(a), is "[t]he court *shall* grant summary judgment if the movant shows that there is no genuine *dispute* as to any material fact and the movant is entitled to judgment as a matter of law" (emphasis added). According to the 2010 Advisory Committee Note, *Id.* "[t]he word 'shall' in Rule 56 acquired significance over many decades of use. Rule 56 was amended in 2007 to replace 'shall' with "should" as part of the Style Project, acting under a convention that prohibited any use of 'shall.' Comments on proposals to amend Rule 56, as published in 2008, have shown that neither of the choices available under the Style Project conventions — 'must' or 'should' — is suitable in light of the case law on whether a district court has discretion to deny summary judgment when there appears to be no genuine dispute as to any material fact."

[118] *Id.*

[119] Civin & Adegbile, note 20, *supra*, at 2.

the policies in the first place.[120] These are examples of *TwIqbal*-induced changes in primary behavior that could lead to changes in the number and quality of lawsuits filed. Such changes could render my estimation approach invalid. Thus my approach relies on the assumption that any such primary behavior changes must have been small enough so as not to have importantly changed the distribution of cases over the period I study.

## 6. Other Factors that Might Lead to Invalid Estimates

The recession, the *Ledbetter* case and its override, *Scott v. Harris*, and amendments to Rule 56, are all identifiable reasons why one might worry about comparing plaintiff win rates in cases filed in the pre-*Twombly* and post-*Iqbal* periods. Even if one accepts my arguments for concluding that the present study is not importantly affected by these issues, it is possible that some other, heretofore undiscussed, factors that are unrelated to changes in the pleading standard might have affected plaintiff win rates in these two study periods. Such concerns are an unavoidable part of attempting to draw causal inferences from real-world data when the variables of interest are not under researchers' control.[121]

One approach that is often advocated, and nearly as often used, is to draw an analogy to medical trials, with the units of empirical interest thought of as being an experimental "treatment group." Causal inferences are then based on finding a comparison group that is supposed to be entirely similar to the treatment group aside from exposure to some treatment of interest.[122] In the present situation, the "treatment" is the post-*Twombly*/*Iqbal* pleading standard. So the treatment group is the set of all cases exposed to this treatment—including both my employment discrimination and contracts cases.

Since *Twombly* and *Iqbal* apply trans-substantively due to the trans-substantivity of the Federal Rules of Civil Procedure,[123] precious few comparison groups are conceivable. One

---

[120] This example is drawn from Gelbach, *Selection in Motion: A Formal Model of Rule 12(b)(6) and the* Twombly-Iqbal *Shift in Pleading Policy*, at 43 (August 29, 2014) (available at http://ssrn.com/abstract=2138428).

[121] One consequence is that there has been a movement among legal scholars in favor of "randomizing law." *See* Michael Abramowicz, Ian Ayres & Yair Listokin, *Randomizing Law*, 159 U. PENN. L. REV. 929 (2011) (arguing that, where it is feasible to do so, legal rules should be randomized in order to facilitate measurement of policies' effects); for a paper focusing on the patent law context, *see* Lisa Larrimore Ouellette, *Patent Experimentalism* (January 9, 2014), 101 Va. L. Rev. ___ (forthcoming), available at http://ssrn.com/abstract=2294774. As Abramowicz, Ayres and Listokin acknowledge, though, randomization is not always feasible, and it does have drawbacks. Consequently, recommendations for randomizing wherever possible are actually controversial among empirically oriented economists, with some highly influential scholars emphasizing the problems with an exclusive focus on randomization as the basis for credible empirical work. *See, e.g.,* James J. Heckman and Jeffrey A. Smith, *Assessing the Case for Social Experiments*, 9 J. ECON. PERSP. 85 (1995)) and Angus Deaton, *Instruments, Randomization, and Learning about Development*, 48 J. Econ. Lit. 424. (2010). For more on issues related to randomization in the empirical law and economics context in particular, *see* Jonah B. Gelbach and Jonathan Klick, *Empirical Law and Economics*, (October 8, 2014). Oxford Handbook of Law and Economics, edited by Francesco Parisi (forthcoming) (available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2507324) .

[122] Researchers often refer to the comparison group as a "control group." This practice is unfortunate, because the whole problem in a non-experimental study is that assignment to the treatment is *not* controlled by the researcher. Thus it is an abuse of analogy to use the term "control group".

[123] *Iqbal*, 556 U.S. 662, 684 (2009) (Citing Rule 1 for the proposition that "[o]ur decision in *Twombly* expounded the pleading standard for all civil actions[, including ] antitrust and discrimination suits alike.") (quotation marks removed).

example involves securities litigation. The Private Securities Litigation Reform Act of 1995 ("PSLRA")[124] prescribes a pleading standard that applies only to certain securities cases, requiring that a complaint's allegations must raise *more* than a plausible inference as to relevant elements.[125] Since *Twombly* and *Iqbal* purport to interpret only Rule 8 of the Federal Rules of Civil Procedure, these cases should not have affected the pleading standard that applies to the relevant cases covered by the PSLRA. Thus, one possibility would be to use these securities cases as a comparison group.

But I do not think that would be a good idea. There are surely many, many differences between the mine run employment discrimination (or contract) case, on the one hand, and even the typical securities fraud case, on the other. Many employment discrimination cases are relatively simple affairs, involving a single plaintiff, and such cases need not involve much procedural wrangling other than the adjudication of straightforward Rule 12(b)(6) and Rule 56 motions. By comparison, securities fraud litigation typically involves an effort to certify a class action under Rule 23, and many of these cases become very complicated and drawn-out. Thus, the effects of changes in procedural law might be quite difficult to identify. In sum, there is little reason to believe that securities fraud cases constitute a comparison group that is entirely similar to the treatment group aside from exposure to some treatment of interest, as required to learn anything from such an approach.

CONCLUSION

This paper investigates the effects of *Bell Atlantic v. Twombly* and *Ashcroft v. Iqbal* on the quality of cases that face defendant-filed summary judgment motions. My methodological discussion shows that, under the assumption that the *TwIqbal* pleading standard does not cause any selection into summary judgment, the views of *TwIqbal* Supporters and Critics line up cleanly with the direction of change in the plaintiff's win rate against defense summary judgment motions. I also show how, again under the assumption of no selection into summary judgment, one can use observable data to compare the quality of cases that are filtered out of summary judgment as a result of *TwIqbal* with the quality of cases that would face summary judgment motions under both pleading standards. My results suggest that even with the relatively strong assumption related to selection into summary judgment, and even with usable data on nearly 2,000 cases, it is not possible to clearly determine the quality-filtering effects of *TwIqbal*. The data are consistent with the positions of all three views described above—Supporters, Aggressive Critics, and Moderate Critics. This finding suggests the disappointing, but nevertheless real, prospect that it might not be possible to settle the controversy over *TwIqbal*'s quality-filtering effects using empirical evidence.

---

[124] Pub. L. 104-67, 109 Stat. 737.

[125] *See* 15 U.S.C. § 78u-4(b)(1) (requiring the complaint to plead with particularity when the plaintiff alleges that the defendant untruthfully stated a material fact or omitted a material fact necessary to make a statement non-misleading) and 15 U.S.C. § 78u-4(b)(2) (stating that when recovery of money damages requires proof of the defendant's state of mind, "the complaint shall … state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"). *See also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) (interpreting "strong inference" in § 78u-4(b)(2) to mean that "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent").